**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EMPLOYBRIDGE, LLC, a California
Limited Liability Company, and
EMPLOYMENT SOLUTIONS
MANAGEMENT, INC., a Georgia
Corporation,

        Plaintiffs,

    v.                                 Case No. 1:16-cv-00833 WJ/KK

RIVEN ROCK STAFFING, LLC, a Nevada
Limited Liability Company, LARRY SHAUN
SHEPHERD, an individual, CATHERINE
OLINGER, an individual, TERRY MILLER,
an individual, TIMOTHY JAQUEZ, an
individual, and Does 1 through 25, inclusive,

        Defendants.

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON CITY OF
ALBUQUERQUE CONTRACT & SUPPORTING MEMORANDUM**</u>

      Come now Defendants Riven Rock Staffing, LLC, Terry Miller and Timothy Jaquez

(hereinafter collectively "Defendants" or individually as "RR," "Miller" and "Jacquez"), with the

following Motion for Summary Judgment.[1] Plaintiffs seek to hold Defendants, and RR in

particular, liable for over $1,000,000.00 in purported damages attributable to Plaintiffs' failure to

obtain a contract award arising from a 2016 Request for Bid ("RFB") that the City of

Albuquerque ("City") issued to, and solicited from, the general public to provide temporary

staffing services to the City.  After receiving ten (10) bids from staffing companies in the greater

Albuquerque staffing community, the City awarded the primary contract to RR, the secondary

contract to Excel Staffing and the tertiary contract to ATA Management Services. *See Contract*

*Award, Exhibit 1.*

---

[1] Pursuant to D.N.M. LR.-Civ.10.5, counsel has conferred and agreed to an exhibit page extension of up to 150 pages for both sides and Plaintiffs understand that 10.5 only requires motion practice in the absence of agreement. Should the Court require so, however, Plaintiffs will prepare and file a joint Motion/Order.

Plaintiffs contend RR, through Olinger and/or Shepherd,[2] unlawfully competed and/or solicited the City and *caused* Plaintiffs to lose the *primary* staffing award, even though the City did not even award Plaintiffs either the secondary or tertiary contract. To wit, Plaintiffs did not qualify for an award because they chose to submit an incomplete bid and the City never considered them. Plaintiffs' causation argument fails on the facts and the law, and contravenes the basic principle that a party cannot cause its own losses and then sue for them.

There exist additional reasons why all claims involving the City contract should be dismissed, including the fact that there was no underlying unlawful conduct. In sum, any and all legal claims in the First Amended Complaint ("FAC") [doc. 23, filed 08.17.16] related to the City of Albuquerque RFB should be dismissed.

## I.   UNDISPUTED MATERIAL FACTS ("UMF")

1.   Both RR and Plaintiffs operate in the staffing industry and supply customers with temporary staffing workers. *See FAC* ¶¶ 6; 15-16; *Answer* [doc. 37, filed 09.09.16] at ¶¶ 3, 11.

2.   RR commenced its staffing operations in 2016.  Ash Abtahi and Donyelle Rose, former employees of Plaintiffs and/or one of its affiliates, serve as the managing members.  Individually named Defendants Miller, Jacquez, Olinger and Shepherd all work for RR. *Offer letters, attached hereto as Exhibit 2.* Shepherd serves as Vice-President. *Deposition of Shaun Shepherd, attached hereto as Exhibit 3, p.173, ll. 20-22.*

3.   Plaintiffs employed Miller and Jacquez until April 2016 and June 2016, respectively. *Deposition of Terry Miller, attached hereto as Exhibit 4, p. 23, ll. 3-7; Deposition of Timothy Jacquez, attached hereto as Exhibit 5, p. 26, ll. 8-14.* Plaintiffs contend Miller and Jacquez are

---

[2] Plaintiffs made an arbitration demand on Olinger and Shepherd and the parties are currently in arbitration. Plaintiffs still seek to hold RR liable for their actions in the federal proceeding.

bound by certain non-solicitation and non-disclosure provisions contained in Employment Agreements. *See FAC* [doc. 23-3, pp.1-3 & doc. 23-4, pp.1-3].

4.      Putting aside their validity, Miller's and Jacquez' non-solicitation provisions prohibit the canvassing, solicitation, acceptance or servicing of Plaintiffs' customers over whom either had responsibility or direct contact to patronize business for one year. *Id.* Miller and Jacquez never had responsibility over, or contact with, the City. *Fran Scott Depo., Vol, II, p.78:8-11 attached hereto as Exhibit 6.*

5.      Olinger and Shepherd worked for Select Staffing, an affiliate of Plaintiffs, and later Plaintiff EmployBridge, until they resigned in February 2016. *Deposition of Catherine Olinger attached hereto as Exhibit 7, p. 20, ll. 17-18; Shepherd Depo, Ex. 3, p. 17, ll. 15-18.*  Plaintiffs contend Olinger and Shepherd are bound by certain post-employment covenants contained in their hiring packages. *See FAC, ¶¶ 35-39.*

6.      Olinger's non-solicitation provision provides that for a one (1) year period following separation she cannot influence, or attempt to influence, any customer with whom she dealt or did business to stop or reduce doing business for Select Staffing.  *Doc. 23-1, p.10,¶(c).*  Olinger worked with the City on behalf of Plaintiffs. *Olinger Depo., Ex. 7, pp. 374, ll. 20- 375, ll. 12.*

7.      Shepherd's non-solicitation provision provides that for a 1 year period following separation he will not solicit any Select Staffing customers with whom he had contact for the purpose of offering services that compete with those offered by Select. *See FAC, ¶ 35.* Shepherd worked with the City. *Shepherd Depo, Ex. 3, p. 178, ll. 22-25; pp. 184, ll. 3- 185, ll. 16.*

8.      Shepherd's non-competition provision provides that for a one (1) year period following separation he will not compete by performing the same or substantially the same job duties for a

competitor as he performed for Select Staffing within a fifteen (15) mile radius of the branch office. *See FAC, ¶ 35; Shepherd Depo, Ex. 3, p. 227, ll. 10-12; p. 237, ll. 4-15.*

9.      When Shepherd onboarded at Select Staffing for a Sales Manager position, he was asked to fill out a hiring packet, including affixing an electronic signature to the aforementioned non-solicitation/non-competition provisions. *Shepherd Depo, Ex. 3, p.217, ll.8-22; Deposition of Terrie Doty, attached hereto as Exhibit 8, p. 18, ll. 19- p. 19, ll. 13.*

10.     Shepherd, however, expressed to Terrie Doty, his supervisor, two (2) particular issues with the hiring packet: the commission structure and the non-competition provision. *Id. at p.223, ll.4-6.* Doty advised Shepherd they would discuss them. *Id. at ll. 7-16.*

11.     Doty served as Shepherd's immediate supervisor. She managed the branch office, had the authority to hire, fire, direct and assign work, and directed Shepherd's hire in particular.   *Doty Depo., Ex.8, p.7:8-23; p.67:5-17.*

12.     Doty advised Shepherd not to worry about the non-competition provision and that it was not enforceable. *Shepherd Depo, Ex. 3, p.229:8-21.* Shepherd did not agree to the non-competition provision based on Doty's representation. *Id; see also p.233:9-17.*

13.     Doty cannot specifically recall whether Shepherd raised the non-competition issue, but confirms that if Shepherd had, she would have told him they are not enforceable in New Mexico so do not worry about it. *See Declaration of Terrie Doty, attached hereto as Ex. 9, ¶6.*

14.     For a number of years, Plaintiffs provided temporary staffing services to the City of Albuquerque. *See Deposition of J. Maydew attached hereto as Exhibit 10, p.62:16-25.*

15.     On or about August 2, 2016, the City Purchasing Division formally issued RFB B2017000009 for "Temporary Personnel Services."   *Maydew Depo, p.78:25-p.79:12; Ex.107 to Maydew Depo.; Shepherd Depo, Ex.3, p.194:14-24; 195:13-19.*   It provided that "[t]he purpose

of this Request for Bid (RFB) is to solicit bids for Temporary Personnel Services to be used by various departments and divisions within the City." *Ex. 107, ¶1.*  The award called for a two (2) year contract, with three additional one (1) year extensions available. *Id. p.1.*

16.     Pursuant to the Procurement Code, NMSA 1978, § 13-1-28 through 13-1-199 (2016), local public entities such as the City are legally required to solicit for goods and services, invite those who meet certain qualifications to submit bids, quotes, proposals and the like in response to the public entities' solicitation efforts, and to set forth the specifications related to the contract. *See e.g.* §§ 13-1-30 & 13-1-103.

17.     The Code further required the City to ensure that each entity qualified as a "responsible bidder" under § 13-1-82.

18.     Under the Code a "responsive bid" is one that "conforms in all material respects to the requirements set forth in the invitation for bids. Material respects of a bid include but are not limited to price, quality, quantity or delivery requirements." § 13-1-84.

19.     The qualifications for the RFB included: (a) maintaining general liability and worker's compensation insurance; (b) an appropriate bond; and (c) complying with all applicable laws. *E.g. Ex. 107, Maydew Depo., Ex. 10, pp. 2-3, 6.*  The bidder also had to be adequately equipped, supplied and staffed to promptly and efficiently deliver and dispense all services. *Ex. 107, p.1.*

20.     The RFB provided that the City would consider the following:

      a.     Cost:  Contracts shall be awarded under this RFB, by group, on an "All-or-None" basis.
      b.     Letters of Recommendation.
      c.     Bidder must have been in business in the Albuquerque Metropolitan area in the temporary worker services field, for the past three (3) years.     *Ex. 107. p.6.*

21.     The RFB proposed supplying the City with temporary workers covering five (5) separate job groups, comprising a total of eighty-four (84) separate job classifications. With regard to

pricing/costs, the RFB provided minimum rates, and each bidder was responsible for submitting proposed bill rates for all 84 job classifications, and proposed pay rates if the rates assigned by the City were deemed to be too low.  *Id. pp.8, 12-16.*

22.     The City set forth a "temporary personnel services" checklist identifying the documents each bidder was required to submit to be considered: (a) pay equity form; (b) temporary personnel services worksheet; (c) three (3) letters of recommendation; and (d) statement of history working in the Albuquerque Metropolitan Area.  *Id. p.18.*

23.     In response to questions and concerns that arose over the RFB, the City issued an Addendum to the official "Specifications for RFB 20170000009" in order to "change the deadline for receipt of bids" from September 5, 2016 at 5:00 p.m. to September 6, 2016 at 5:00 p.m. and "to respond to potential respondents' questions and to add to and clarify the requirements and terms as listed below." *Maydew Depo, Ex. 10, p.84:22-p.85:18; Ex. 108 to Maydew Depo.*

24.     The City presented the following Question and Answer No. 9 in the Addendum: "Do companies interested in responding to this RFB have to bid on classifications?"  "No, however, **it is the City's desire to award <u>all</u> groups to an <u>individual</u> bidder.**" (emphasis added). *Ex. 108.*

25.     The City presented the following Question and Answer No. 14 in the Addendum: "Can you bid on selected groups? Example groups 1 and 2, excluding 3-5?"  "Yes, however, **it is the City's desire to award <u>all</u> groups to an <u>individual</u> bidder or the offeror meeting the most groups at the lowest, responsible and responsive offer.**" (emphasis added). *Ex. 108, p.3.*

26.     The City presented the following Question and Answer No. 15 in the Addendum: "Will award be based on a single group or all groups?" "**It is the City's desire to award <u>all</u> groups to an <u>individual</u> bidder.**" (emphasis added). *Id.*

6

27.     The City issued the following Question and Answer No. 16 in the Addendum: "Can you bid on select positions within a group?" "**Yes, however, it is the City's desire to award <u>all</u> groups and <u>all</u> positions within those groups to an <u>individual</u> bidder.**" (emphasis added).  *Id.*

28.     Julie Maydew serves as Plaintiffs' Regional Vice-President. *Maydew Depo, Ex. 10, p.5:1-8*. She, along with others, including Daniel Crotwell, participated directly in the bid that Plaintiffs ultimately submitted in response to the City's solicitation efforts to obtain temporary staffing services.  *Maydew Depo Ex. 10, p.71: 10-13; p. 76:15-20: p. 77: 4-14*.

29.     Maydew admits the bid team had internal company discussions and made the determination to submit a bid on behalf of Plaintiffs for less than all 84 job classifications. *Maydew Depo., Ex. 10, p. 78: 5-19*.

30.     Maydew admits her team discussed the risks in submitting a bid that did not include all 84 job classifications for all 5 groups. To quote the deposition exchange:

> Q:     Speaking of Risk, did you talk about the risks with your local team,
>        Mr. Seymour or others if you submitted a bid and you didn't include
>        all job classifications?
> A:     Yes.
> Q:     Were there concerns if you didn't bid for all job classifications that you
>        wouldn't get the primary—"you" being EmployBridge, wouldn't get
>        the primary award?
> A:     Yes.                                                    *Id. p.86:20-p.87:4.*

31.     Plaintiffs: (a) read and reviewed the City's explanatory Q&A presentation in the RFB Addendum prior to submitting their bid proposal; (b) discussed the concerns over submitting a bid covering less than all 84 classifications and all 5 groups; and (c) fully understood it was the City's desire to ultimately award the RFB to one individual bidder who bid on everything. *Maydew Depo, Ex. 10, p.85:22-p.86:19; p.90:3-21; Deposition of D. Crotwell, Exhibit 11, p.32:22-p.35:23.*

32.    Plaintiffs admit they made a calculated decision entirely on their own to submit a bid for

less than all 84 job classifications for all 5 groups, admitting further that Defendants had no

impact or influence on that decision. To quote the deposition exchange:

>    Q:    But ultimately is it fair to say that EmployBridge made its own
>           calculated decision not to submit a bid that included all job
>           classifications?
>    A:    Yes.
>    Q.    Okay. And is it fair to say that no one at Riven Rock, and of the
>           individual defendants, had any kind of impact or influence on that
>           decision?
>    A:    The EmployBridge decision, yes, that's true.  (emphasis added). *p.87:17-25*; *see*

*also p.95:22-p.96:2*.

33.    Ultimately, Plaintiffs submitted a bid for only 80 of 84 job classifications, only 11 out of

13 job classifications listed in Group 4 and only 16 of 18 job classifications listed in Group 5.

*Maydew Depo, Ex. 10, p. 92:16-93:13; Ex. 10, Maydew Depo Ex. 107, pp.15-16*.

34.    After leaving Select Staffing in February 2016, but before the City even issued the RFB

on August 2, 2016, the following communications took place between Olinger and Shepherd and

City Personnel with whom Olinger and Shepherd had worked during their time at Select

Staffing:

>    A.    In Late May 2016, Shepherd called Viola Cunningham at the City to say hi & to
>           provide new contact information; he inquired whether the City needed
>           assistance with skilled laborer staffing services because those positions were
>           not being serviced by any staffing company; Cunningham advised to register
>           with the City but Shepherd indicated RR was not going to go after any bid;
>           Shepherd gave Cunningham his email.
>
>    B.    After the telephone call, Cunningham emailed Shepherd, included Rebecca Tynan
>           on the email herself, thanked Shepherd for providing his contact information, and
>           advised Shepherd to be sure to sign up for the City's e-procurement system.
>           Shepherd, among other things, cc'd Olinger and Amber Fluitt, another RR
>           employee, thanked Cunningham, indicated Fluitt would sign up for the City's
>           system, wrote looking forward to working with you and closed by writing "Have
>           a super great day!"

C.     Tynan then chimed in and exchanged pleasantries with Olinger, who responded as follows: "Here I am! It's great to hear from you. I hope all is well in our neck of the woods."

D.     On July 15, 206 Shepherd wrote to say hello to Tynan & Cunningham and inquired whether the City had any information on when the RFB might come out; Tynan indicated she did not know but was eagerly awaiting the green light and would be in touch once it was posted online so that Shepherd would be aware that the City was soliciting bids. Each then thanked one another.

E.     A City employee ran into Olinger's husband and wanted to converse with Olinger; Olinger's husband gave the employee Olinger's cell and she called to catch up and to raise an issue about Select Staffing; Olinger said she could not help her on that front, as she longer worked there. *Olinger Depo, Ex. 64; Depo p. 162:13-p.163:1;  Olinger Depo, p.169:9-23 Shepherd Depo, p.177:12-p.179:15; p.183:13-22; p.186:16-24; p.190:22-p.192:25.*

35.    With the exception of the noted instances, Olinger never communicated with the City prior to the August 2, 2016 issuance of the RFB. *Olinger Depo, Ex. 7, p.172: 1-24.*

36.    Shepherd likewise never communicated with the City after the July 15, 2016 email inquiry. *Shepherd Depo Ex. 3, p.195:6-12.*

37.    On August 2, 2016 Tynan emailed Shepherd and Olinger and again advised to sign up for the City's vendor registration if interested in obtaining more details on the City's RFB, though Fluitt had already done so. RR later received an email notification of the City's RFB through an e-procurement system. *Shepherd Depo Ex. 3, p.195:13-19; Ex. 12, City of Albuquerque Emails.*

38.     Shepherd, Rose and Abtahi, individually and collectively, engaged in several discussions to ascertain whether to accept the City's invitation to submit a bid.  This included discussions about factoring, lines of credit, obtaining the necessary insurance, and the feasibility of servicing the contract. *Shepherd Depo, Ex. 3, p.198:7-200:2; Donyelle Rose Depo, Ex.13, p.194:16-p.195:23.*

39.    RR staff, including Olinger and Shepherd, discussed whether to submit a bid and the team agreed to give it their best shot. *Olinger Depo, Ex. 7, p.174:1-23.*  The motive was

legitimate: RR would likely go out of business. *Olinger Depo, Ex. 7, pp. 213, ll. 25- p. 214, ll. 3; Shepherd Depo, Ex. 3, p. 216, ll. 17-24; Rose Depo, Ex. 13, pp.193, ll. 22- p. 194, ll.5.*

40.     Abtahi and Rose made the final decision to submit a bid on behalf of RR because it was their money at stake. *Donyelle Rose Depo, Ex. 13, p.198:11-p.199:1.*

41.     Shepherd placed Amber Fluitt in charge of the City bid, and advised her to work with Rose and Will Hall, another employee of RR. Shepherd generally advised if RR could not take the hard costs, add 4% for corporate allocation, 3% for health care and still obtain one dollar per hour in gross margin, RR could not survive servicing the contract. *Shepherd Depo, Ex. 3, p.203:24-p.204:9; D. Rose Depo, Ex. 13, p.202:20-p.203:3.*

42.     Shepherd's "one dollar per hour in gross margin" advice was not confidential, proprietary or trade secret information, but rather a common margin target that exists in the staffing community. *Id. at p.204:10-p.205:1; Rose Depo, Ex. 13, p.202:20-p.203:9.*

43.     Shepherd had no other involvement in the actual bid RR prepared and submitted to the City, other than working on infrastructure in the event RR received one of the three (3) awards. *Id. p.210:18-25; p.214:8-20; D. Rose Depo, Ex. 13, p.201:2-8.*

44.     Olinger had no involvement in the actual bid RR prepared and submitted to the City other than infrastructure work. However, she did obtain a customer letter of recommendation for general use that was included in the bid packet submitted to the City. *Olinger Depo, Ex. 7, p.214: 8-17; p.217:1-3, 20-25*; *p.218:25-p.219:5; p.223:21-p.224:1; Rose Depo, Ex. 13, p.201:2-8.*

45.     Instead, Fluitt, with the assistance of Rose and Hall, created, prepared and submitted RR's actual bid. *Shepherd Depo, Ex. 3, p.214:3-6; Rose Depo, Ex.13, p.200:17-22; Deposition of A. Fluitt attached hereto as Ex. 14, p.127:24-p.128:13; Ex. 12.*

46.     Rose worked with Hall to ascertain the hard/soft costs for the proposed pay & bill rates, assessed and evaluated the numbers (e.g. W.C., FICA/FUTA) associated with each of the 84 job classifications listed in the City's RFB, and then provided the information to Fluitt via telephone to input into the final bid. *Rose Depo, Ex. 13, p.195:23-p.196:15; p.200:17-22; p.201:19-p.202:19; Depo of A. Fluitt, Ex. 14, p.136:7-p.137-p.138:15; p.138:16-20*.

47.     Rose also worked on obtaining factoring if RR were awarded the contract. *Rose Depo, Ex. 13, p.196:24-p.197:21.* Hall worked primarily on ascertaining the worker's compensation codes associated with each of the five (5) job groups in the RFB. *Fluitt Depo, Ex. 14, p.142:4-10*.

48.      RR's proposed bill rates to the City were based on workers' comp codes, taxes and gross margins anticipated for each of the 84 job classifications. *Fluitt Depo, Ex. 14, p.142:4-143:19*.

49.     Fluitt asked staff to obtain letters of recommendation, per the City's instructions to submit them as part of the bid packet. *Fluitt Depo, Ex. 14, p.145:17-p.146:2.* Olinger, Miller and Jacquez and others obtained letters of recommendation, but Fluitt made the decision of which letters to submit to the City, and she actually submitted four (4). *Fluit Depo, Ex. 14, p.146:3-20; Ex. 12*.

50.      Per the City's instructions, RR also provided a statement of the history of its personnel working in the Albuquerque Metropolitan area, purely factual, public information. *Ex. 12*.

51.     RR timely submitted its completed bid on September 6. 2016. *Ex. 12*.

52.     On October 3, 2016 Rebbekka Tynan prepared an official Interoffice Memorandum recommending that the primary, secondary and tertiary awards go to RR, Excel Staffing and ATA Management, respectively. *Ex. 10; Crotwell Depo, p.40:24-p.41:6*. The Memorandum further explained the City's decision-making process:

"It was bid to awarded primary, secondary and tertiary contracts on an "All-or-None" basis. If no bids had been received offering prices for all positions offered, bids with the most amounts of items offered would have been considered…Six bidders offered pricing for all items requested. Based on the lowest pricing, the Purchasing Division recommends awarding as follows…"            *(Ex. 109, Maydew Depo., Ex. 10.)*

The recommendation was approved by the City's Chief Procurement Officer.

53.    Of the six (6) bidders who submitted bids for all 84 job classifications (Accro, ATA, Excel, Express, RR and Sabio), RR had the "lowest pricing" with an average hourly rate of $19.30. Excel had the second lowest average pricing of $19.39/hour and ATA had the third lowest average pricing of $20.10/hour. *See Ex. 10, ex. 109 to Maydew Depo*.

54.    Plaintiffs' bid did not qualify as a "responsive bid" and was not considered because the City received six (6) bids that offered prices for **all** positions set forth in the RFB. *Ex. 10*. Even the three (3) other companies (Accro, Express and Sabio) who failed to receive one of the three (3) awards, but who submitted complete bids, would have been considered over and above Plaintiffs ("If no bids had been received offering prices for all positions offered…."). *Id.*

55.    ItsQuest, Inc., another competitor, submitted a bid for 83 job classifications. Among those four remaining (4) companies who failed to bid on all positions, ItsQuest, Inc. actually submitted a bid "with the most amounts of items offered" (83), over and above Plaintiffs' bid (80). *Ex. 10, Maydew Depo. Ex. 109*.

56.    Plaintiffs do not know where they placed in the bid process. *Crotwell Depo, Ex. 11, p.16:8-10*; *Maydew Depo, Ex. 10, p.92:2-4*.

57.    Plaintiffs have no evidence they would have received even the secondary or tertiary awards, do not know why Excel or ATA won them, and do not know why they lost them. *Crotwell Depo, Ex. 11, p.39:16-25; p.42:10-14; p.14:22-p.15:9*.

58.     After receiving notification of the awards, Crotwell contacted Tyner to ascertain why Plaintiffs did not receive the award. She advised it was because Plaintiffs failed to submit a complete bid covering all 84 job classifications. *Crotwell Depo, Ex. 11, p.13:16-p.14:18.*

59.     Maydew and Crotwell admit they have no knowledge Defendants had any input or influence whatsoever on the City's decision to award the primary contract to Riven Rock. *Maydew Depo, Ex. 10 p.91: 2-6; Crotwell Depo, Ex. 11, p.40:8-14.*

60.     Nor could they have. The City was required to follow the decision-making processes set forth in the Procurement Code. *See e.g.* § 13-1-105 ("bids shall be evaluated based on the requirements set forth in the invitation for bids…"); § 13-1-108 (contract solicited by competitive sealed bids shall be awarded to **lowest responsible bidder.**) (emphasis added).

61.     Maydew and Crotwell have no knowledge Riven Rock or anyone else used any of Plaintiffs' purported confidential information in RR's bid. *Maydew Depo, Ex. 10, p.89:10-14; Crotwell Depo, Ex. 11, p.42:15-19.*   Shepherd adamantly denies ever using or disclosing any confidential/trade secret information for use in RR's bid. *Shepherd 30(b)(6) Depo attached hereto as Exhibit 15, p.91:22-p.92:9.*

62.     Regardless, the proposed pay rates and bill rates that a party submits become a matter of public record. Plaintiffs' bill rates for the years it serviced the City contract prior to the 2016 RFB were public records. *Maydew Depo, ex. 10, p.88:7-11.* NMSA 1978, § 14-2-1 et seq. (2016)("every person has a right to inspect public records of this state," with limited exceptions); § 13-1-107 (Code authorizes competitive bids to be unsealed and open to public inspection).

## II.     APPLICABLE LAW

In this lawsuit, Plaintiffs seek to hold RR, Miller and Jacquez liable under contract and tort law for their failure to receive one of the City's three awards arising from the City's RFB.

The elements of a breach of contract claim in New Mexico are: (1) existence of a binding and enforceable contract; (2) material breach of the contract; (3) causation; and (4) damages. See *Famiglietta v. Ivie-Miller Enters.*, 1998-NMCA-155; NM UJI 13-801, 13-802, 13-822, 13-843.

Tortious interference with prospective contractual relations requires the following: (1) knowledge of the prospective contractual relations between the plaintiff(s) and another; (2) performance of the contract was refused; (3) the defendant(s) played an active and substantial part in causing the plaintiff(s) to lose the benefits of the prospective contractual relations; (4) damages flowed from the breached contract, and (5) the defendant(s) induced the breach "without justification or privilege to do so." *Ettenson v. Burke*, 2001-NMCA-003, P14.  Because the tort claim for the City involves a prospective contractual relation, i.e. an open contract up for bid, Defendants must have acted: (a) solely or primarily with an improper motive; or (b) through improper means. *Kelly v. St. Vincent Hosp.*, 1984-NMCA-130, P25.

Civil conspiracy requires (1) existence of a conspiracy between two or more individuals; (2) specific wrongful acts carried out by the defendants pursuant to the conspiracy; (3) causation; and (4) damages arising from the wrongful acts. *Ettenson*, 2001-NMCA-003, P12 (citing *Silva v. Town of Springer*, 1996-NMCA-022, P25).

## III.   ARGUMENT

### A.   *Plaintiffs cannot establish causation.*

All of the claims in the FAC asserted against Defendants involving the City's RFB require Plaintiffs to prove causation, namely that the purportedly unlawful acts of the Defendants caused Plaintiffs not to receive the primary, secondary or tertiary awards from the City. *See Section II, supra.* The fundamental problem is that the uncontroverted evidence establishes that Plaintiffs caused their own losses and that even if RR had not submitted a bid, Plaintiffs have no

evidence they would have received even the tertiary award, let alone the primary or secondary awards.

This Court initially need look no further than the City's official Memorandum, signed by its Chief Procurement Officer. It carefully explains that the RFB was bid to award on an "All-or-None" basis; that "if no bids had been received offering pricing for all positions offered, bids with the most amounts of items offered would have been considered;" that six (6) bidders offered pricing for all items requested; and that "based on lowest pricing, the Purchasing Divisions recommends awarding" RR the primary award, Excel Staffing, Co. the secondary award and ATA Management Services the tertiary award. *UMF 52.*

The unequivocal evidence establishes that six (6) different companies submitted bids offering pricing "for all positions offered," Plaintiffs did not, the City only would have considered Plaintiffs "if no bids had been received offering pricing for all positions offered," and the RFB only provided for three (3) awards to be split among the six (6) bidders who bid for all 84 positions. *UMF 29, 33, 52.* Even if RR had not submitted a bid, there were five (5) other companies the City would have considered over Plaintiffs, thereby ensuring Plaintiffs never would have received any of the three (3) awards based on its failure to bid on all positions. Plaintiffs do not have legal license to demand that this Court (or a jury) dispose of the City's entire decision-making process and recalibrate the bid process to inure to their personal benefit.

Furthermore, the three (3) awards were based on lowest pricing among those six (6) companies who bid on all 84 job classifications, in full accordance with the Procurement Code. Section 13-1-108 (contract solicited by competitive sealed bids shall go to lowest responsible bidder). *UMF 52.* The uncontested fact remains that Plaintiffs did not submit a bid containing the

first, second or third (or even fourth, fifth or sixth) lowest pricing among the six (6) bidders who actually followed the City's instructions to bid for all 84 positions.  *UMF 29, 33*, 52, 53.

Even if the City had considered those 4 bidders who bid on less than all 84 classifications, the City indicated it would have considered "bids with the most amount of items offered."  *UMF 52*. ItsQuest, Inc. bid on 83/84 classifications, 3 more than EmployBridge's bid of 80/84. *UMF 52*. Plaintiffs cannot even establish they would have been next in succession. To the extent Plaintiffs even placed, it was 8th. They do not now get to leapfrog over everyone else and obtain an award.

The record further demonstrates RR had no input or involvement in Plaintiffs' decision to submit a bid for less than all positions in all 5 groups and all 84 job classifications. Plaintiffs knew the City intended to award the contract on an all-or-none basis, that the City specifically advised all bidders in the Q&A addendum that the award would go to one individual bidder who bid on all groups and all classifications, and that Plaintiffs' made a calculated decision not to bid on all groups and all classifications. *UMF 23-33*. Plaintiffs lost not because of anything the City, RR or the other bidders did, but solely because of their own fatal decision-making. *UMF 52*.

Not surprisingly, Plaintiffs have no evidence RR caused them to lose any of the three (3) awards, or that had RR not submitted a bid, Plaintiffs would have received one. *UMF 56, 57*. What Plaintiffs have known since October 2016 is that they did not win because their bid was incomplete, consistent with the explanation set forth in detail by the City that it only considered those who submitted full and complete bids for the three (3) awards. *UMF 52, 58*.

Essentially Plaintiffs ask this Court (or a jury) to award them a prize that the City did not. However, just as with employment matters, it is not the Court's role "to act as a 'super personnel department' that second guesses employers' business judgments" *Simmons v. Sykes Enters.*, 647

F.3d 943, 948 (10th Cir. 2011). The Code required the City "to provide fair and equitable treatment of all persons involved in public procurement, to maximize the purchasing value of public funds and to provide safeguards for maintaining a procurement system of quality and integrity." § 13-1-29.   The City followed the law and determined, among other things, that the public benefitted best from others. While Plaintiffs do not like the outcome, they only have themselves to blame. But neither the Court nor a jury can first undo the bid process, and then redo it to benefit Plaintiffs.

In sum, there is no evidence RR caused Plaintiffs to lose the City contract and/or that Plaintiffs would have received any award absent the submission of RR's bid. Each and every claim related to the City's RFB should be dismissed in their entirety on this basis alone.

> B.     *Miller, Jacquez, Shepherd and Olinger did not violate their non-solicitation provisions.*

While Defendants believe each of the legal claims relating to the City RFB fail at the inception for lack of causation, the evidence establishes the individual Defendants did not violate their non-solicitation provisions either directly, or in a manner sufficient to justify holding RR vicariously liable.

First, Miller and Jacquez never had responsibility over, or direct contact with, the City. *UMF 4*. Accordingly, they did not breach, and could not have breached, their non-solicitation provisions. Any effort to attribute their actions to RR must similarly fail. Second, Shepherd's non-solicitation provision provides that he cannot "solicit any customers over Select Staffing with whom he had contact," but the City is the party who actively and intentionally engaged in solicitation efforts by submitting the RFB and inviting the general public to submit bids. The RFB itself provides that its purpose was to "**solicit** bids for the Temporary Personnel Services..." and that "[t]he City makes no representations hereunder about the amount of work that may be

given….as a result of this **solicitation**."  (emphasis added). *UMF 15.* The City's Memorandum confirms that "A Request for Bid to establish contracts for Temporary Personnel services was competitively **solicited** and closed on Tuesday, September 6, 2016." *UMF 52.*

The Code recognizes this fact by defining an "invitation for bid," for example, as "all documents, including those attached or incorporated by reference, utilized for **soliciting** sealed bids." Section § 13-1-64. The City set forth the specifications for each bid and mandated the requirements for each responsive bidder to submit. In doing so, the City engaged in the solicitation efforts and each staffing company responded to the City's solicitation. Accordingly, no one could be said to have solicited the City unlawfully or improperly.

This is entirely consistent with the plain meaning of "solicit," which Webster's New Collegiate Dictionary 1106 (7th ed. 1976) defines as: "to make petition, entreat; to approach with a request or plea; to try to obtain by urgent requests or pleas." As further elucidated by other courts, "[t]hus, the common usage of the term "solicit" implies active conduct on the part of the solicitor directed at a specific target audience." *Farm Bureau Mut. Ins. Co. v. Osby*, 2005 Iowa App. LEXIS 1342 **9-10 (Iowa Ct. App. November 9, 2005)(affirming no active solicitation occurred; *see also Inland American Winston Hotels, Inc. v. Crockett*, 712 S.E.2d 366, 370 (2011) (defining solicit and induce in employment context to require active persuasion, request, or petition).

Nothing Shepherd did qualifies as active solicitation. The City determined for itself when and why to submit the RFB, what specifications to include and what criteria to consider in awarding the bid. *UMF 15, 19, 20.* Shepherd did not solicit, nor could he have because the Code establishes the procurement process. Shepherd's limited communications with City personnel in the Summer of 2016 *pre-dated* the actual publication of the RFB on August 2, 2016 and were

18

limited to general talk and innocuous inquiries. *UMF 34*. Shepherd could hardly have actively directed efforts to solicit the City's RFB when there was no RFB to solicit. There is also no evidence Shepherd even communicated with the City after the RFB was issued, a prerequisite for solicitation. *UMF 36*. Finally, there is no evidence Shepherd's communications with City personnel in May and July 2016 actually *caused* Plaintiffs' losses, nor could there be. The City awarded the three contracts based on lowest pricing among those 6 bidders who bid on all 84 jobs and the evidence is uncontested that Plaintiffs did not bid on all 84 jobs. *UMF 52*.

There is likewise no evidence Olinger influenced, or attempted to influence, the City, as prohibited by her non-solicitation provision, such that the conduct could be attributed to RR et al. Her initial May 2016 communication with City personnel consisted of telling Tynan "Here I am! It's great to hear from you. I hope all is well in our neck of the woods."  Her other communication with a City worker had nothing to do with the RFB. *UMF 34, 35*. Olinger did obtain a general letter of recommendation that was attached to RR's final bid, but Fluitt is the one who made the decision to include it, not Olinger. *UMF 44, 49*. Furthermore, the City's RFB mandated the submission of three (3) letters of recommendation and advised that the failure to submit all necessary materials would disqualify the bidder. *UMF 22*. That RR chose to follow the City's directives does not manifest influence or attempt to influence on Olinger's part, but rather compliance with the RFB. Even assuming there are disputed issues on Olinger's solicitation that could attach to RR, for the reasons previously stated there is no evidence that any of her words or actions caused, or could have caused, Plaintiffs' losses.

       C.    *Defendants did not breach any non-disclosure provisions.*

Defendants similarly did not breach any non-disclosure provisions with regard to the City of Albuquerque such that RR et al could be held liable. Initially, Miller and Jacquez never even

worked with the City and had no confidential information. There is no record evidence Olinger ever retained, used or disclosed any alleged confidential/trade secret City information. Plaintiffs contend Shepherd possessed such information because during his employment, he forwarded volumes of work materials from his business email address to his personal yahoo email account and he only turned those materials over on September 7, 2016, after RR submitted its bid. Plaintiffs' efforts to generate a legal violation and hold RR liable for the same are unavailing.

While it is altogether unclear what alleged confidential information Shepherd obtained from Plaintiffs prior to his February 5, 2016 resignation that would be relevant to the RFB that the City issued on August 2, 2016, some six (6) months later, Shepherd testified unequivocally that neither he nor anyone else at RR ever used any confidential City information in preparing or submitting RR's bid. *UMF 61*. There is no evidence to the contrary. *Abreu v. N.M. Children, Youth & Families Dep't* (CYFD), 797 F. Supp. 2d 1199 (D.N.M. 2011)(party cannot avoid summary judgment with conclusory opinions, allegations, speculations or suspicions, but must set forth specific facts contesting an issue).

Furthermore, possession, to the extent it even existed, is not tantamount to unlawful use and disclosure and Plaintiffs have no evidence of unlawful use or disclosure. *See* 18 U.S.C. § 1839(5); NMSA 1978, § 57-3A-2 (2016). Even Maydew and Crotwell admit they have no evidence of anyone at RR using any confidential information to generate the pricing proposals set forth in RR's bid. *UMF 59, 61*. Instead, Rose and Hall came up with the actual "hard numbers" for the 84 job classifications on which the City instructed bidders to bid and they used the non-confidential, industry standard of "one dollar per hour gross margin." *UMF 41, 42*.

Plaintiffs' claim to confidential/trade secret City information is questionable at best. The pricing/job information for the City contract that Plaintiffs were servicing prior to losing the RFB

were available to the public under the New Mexico Inspection of Public Records Act, NMSA 1978, 14-2-1 *et seq.* (2016). Finally, there is no evidence that any alleged unlawful use or disclosure by Shepherd caused Plaintiffs to lose the City contract.

> D.   *Shepherd did not have an enforceable non-competition provision and, in the alternative, he did not violate it.*

Plaintiffs allege Shepherd violated his non-competition provision by competing for the City contract which, in turn, caused Plaintiffs to lose the City contract and RR et al. should be held liable for his actions.  Plaintiffs' argument is not persuasive.

First, during Shepherd's hire, Shepherd expressed to Terrie Doty, his supervisor and the person in charge of his hire, concerns about the non-compete.  Doty specifically advised Shepherd not to worry about it and that it was unenforceable.  While Doty cannot recall the specifics, she agrees that if asked she would have said as much. *UMF 9-13*. Doty was clearly acting as the supervisory and principal hiring agent for Plaintiffs and admits she had the authority to hire, fire and discipline and, in fact, performed Shepherd's hire. *Diversified Dev. & Inv., Inc. v. Heil,* 1995-NMSC-005, P27. (agency relationship must first be established to demonstrate statements, representations or admissions can be binding on principal.). She was acting as agent for Plaintiffs, and her statements are binding on it.

It was entirely reasonable for Shepherd to rely on her waiver statement during the hiring process in response to a direct question under the doctrine of apparent authority. *Id.* Her response was unequivocal: she specifically represented that the non-competition provision was not enforceable and not to worry. *cf. Id.* P33 (discussing situation of competing, reasonable interpretations).  While determining apparent authority can require resolution by the trier of fact in some cases, this is not such a case. Doty's authority included, among other things, hiring Shepherd and asking and answering his hiring questions. He provided her with knowledge of his

specific competition concerns, and she told him not to worry about it. Her knowledge of Shepherd's concern was directly imputed to Plaintiffs and, as agent for Plaintiffs, she acted with apparent authority. *Jackson Nat'l Life Ins. Co. v. Receconi,* 1992-NMSC-019, P28 (agent knowledge imputed to principal).

Alternatively, Plaintiffs waived the non-competition provision under the doctrine of waiver by estoppel:

> "To prove waiver by estoppel the party need only show that he was misled to his prejudice by the conduct of the other party into the honest and reasonable belief that such waiver was intended. The estoppel is justified because the estopped party reasonably could expect that his actions would induce the reliance of the other party. However, unlike the case of a voluntary waiver, either express or implied in fact, the waiver of the contractual obligation or condition and the effect of the conduct upon the opposite party may have been unintentional."

*J.R. Hale Contractor Co. v. United N.M. Bank*, 1990-NMSC-089, P12. The evidence is uncontested Shepherd had a reasonable belief the non-competition provision had been waived. Doty told him so. *UMF 12-13*. Plaintiffs cannot now arrive years later and seek enforcement when Shepherd agreed to work for Plaintiffs based on her representation.

Even assuming disputed facts remain on apparent authority or waiver by estoppel, Shepherd's non-competition provides he cannot compete "by performing the same or substantially the same job duties for a competitor as a he performed for Select Staffing," not that he cannot compete altogether for business or engage in other forms of competition. *UMF 8*. The evidence does not demonstrate that Shepherd is, or has been, performing the same or similar (whatever that means) duties at RR or, more importantly, that he did so in relation to the City's RFB, which would be the operative issue here. Finally, even assuming disputed issues remain on that point, Plaintiffs' contract claims still fail because they did not cause Plaintiffs to lose the City contract.

      E.     *Defendants did not play an "active and substantial part" in causing Plaintiffs'*
              *failure to secure the City contract.*

As set forth in Section IIIA, *supra*, not only does the evidence fail to establish causation, it altogether fails to demonstrate that Olinger, Shepherd, Miller and/or Jacquez "played an active and substantial part" in causing Plaintiffs' failure to secure the City contract. *Ettenson,* 2001-NMCA-003, P14.  Miller and Jacquez played no part in the actual bid RR submitted to the City, other than obtaining general letters of recommendation. *UMF 49*. While Olinger and Shepherd worked on office infrastructure in the event RR obtained the contract, neither worked on the actual bid (importantly, the "hard numbers") RR submitted; Fluitt, Hall and Rose did. *UMF 43, 46, 47*. This is insufficient to establish the requisite level of involvement to sustain the tort. Shepherd and Olinger's limited, pre-RFB communications with City personnel are likewise insufficient to tip the participation scales such that any of the Defendants could be liable in tort. *UMF 34*.

      F.     *Defendants did not act primarily with an improper motive or through improper*
              *means.*

There should be no serious dispute that even though Plaintiffs had been servicing the City contract, when the City issued the August 2016 RFB the contract became one for prospective contractual relations. New Mexico Courts have long recognized the following principle:

> American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts. Where the defendant is accused of interfering with the plaintiff's opportunity to enter into contracts with third persons, a strong showing must be made that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite.

*Anderson v. Dairyland Ins. Co.*, 97 N.M. 155, 158, 637 P.2d 837, 840 (1981) (quoting James A. Henderson, Jr. & Richard N. Pearson, The Torts Process 1166 (2d ed. 1981)); *see also Fikes v. Furst*, 2003-NMSC-033, P22.

Defendants did not act either with the primary or sole motive of personal vengeance or spite against Plaintiffs in responding to the RFB. Instead, they were motivated by the need to stay in business, an entirely legitimate motive. *UMF 38-40*; *Fikes*, 2003-NMSC-033, P23 ("A motive to protect one's own interest does not need to be the exclusive motive for the conduct to be privileged); *Williams v. Ashcraft,* 1963-NMSC-080, P5 ("'One acting to protect his [or her] property rights is privileged to interfere even if he does so with malice.'…)(quoted authorities omitted). New Mexico Courts have repeatedly granted summary judgment in similar situations. *See LensCrafters, Inc. v. Kehoe,* 2012-NMSC-020, P43 (affirming dismissal of interference with prospective relations claims on failure to proffer evidence showing primarily improper motive); *Silverman v. Progressive Broad., Inc.*, 1998-NMCA-107, P30 (party acted in part with a legitimate motive and not solely to harm the other and summary judgment warranted); *Clough v. Adventist Health Sys.*, 1989-NMSC-056, P15 (legitimate motives existed and summary judgment proper on interference claim); *Kelly v. St. Vincent Hosp.*, 1984-NMCA-130 (even if hospital had motive to harm plaintiffs, it also had legitimate motives and summary judgment proper).

Plaintiffs equally cannot show Defendants interfered through improper means. Restatement of Torts 2d, supra, Comment c. to § 767 and Comment e. to § 768 describe wrongful means in terms of predatory means, though the conduct at issue does not itself have to rise to the level of an independent, underlying tort. *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, P21. Predatory behavior is "wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Id.* (citations omitted).

Yet, "it is no tort to beat a business rival to prospective customers." Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element," a defendant may

seek to increase his business without incurring liability. *M & M Rental Tools, Inc. v. Milchem, Inc.*, 1980-NMCA-072, ¶¶ 28-29 (citations omitted). Though not exhaustive, "[c]ommonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1367 (1978)).

Here, RR et al. competed fairly in an effort to obtain the City contract. The Defendants did not engage in predatory behavior, violate any statutes, violate any industry customs or norms or violate any restrictions, as set forth in Sections IIIB-IIIE.

G.      *No civil conspiracy exists.*

For the reasons set forth above, the civil conspiracy claim must likewise be dismissed. There is no evidence of an actual conspiracy. There is similarly no independent, unlawful act on the part of any individual Defendant on which the conspiracy could lie, as set forth and argued above. *Ettenson*, 2001-NMCA-003, P12 ("A civil conspiracy must actually involve an independent, unlawful act that causes harm--something that would give rise to a civil action on its own."). Finally, there is no evidence any alleged conspiracy *caused* Plaintiffs' failure to secure the City RFB. In the absence of disputed issues of fact, the civil conspiracy claim similarly fails.

## IV.      CONCLUSION

For the reasons stated herein, any and all claims in the FAC arising from, or relating to, the 2016 City contract and for which Plaintiffs seek to hold Miller, Jacquez and RR liable should be dismissed. Defendants should be permitted to apply for attorney's fees relating to this Motion because Plaintiffs have known since late last year why they lost the City contract and that RR et al did not cause it. *See 2*8 U.S.C. §1927. In the face of that knowledge, they still proceeded with

pursuing a claim that had no merit. Finally, the Court should award any additional relief deemed

just and proper.

Respectfully submitted,

**MOODY & WARNER, P.C.**

By: */s/ RDS on 2017.04.24*
   Christopher M. Moody
   Repps D. Stanford
4169 Montgomery Blvd. NE
Albuquerque, NM  87109
(505) 944-0033
moody@nmlaborlaw.com
stanford@nmlaborlaw.com
*Attorneys for Defendants*

I HEREBY CERTIFY that the foregoing document was filed through the CM/ECF system which caused all counsel of record to be served by electronic means on this 24th day of April, 2017.

Thomas Stahl
Scott Gordon
Rodey, Dickson, Sloan, Akin & Robb, P.A.

Daniel P. Hart
Michael Cross
Seyfarth Shaw, LLP

*Attorney for Plaintiffs*

MOODY & WARNER, P.C.

By: */s/ Repps D. Stanford 2017.04.24*
   Repps D. Stanford