Page 14

1  than your attorneys at Moody & Warner about this
2  case?
3      A.   No.
4      Q.   Did you speak with -- other than the
5  meetings that we've already talked about --
6  Ms. Olinger about your deposition here today?
7      A.   In general conversation I would say, of
8  course.
9      Q.   And what did you discuss?
10     A.   Today's the day.  It's getting close.
11 We're almost there.
12     Q.   Anything else?
13     A.   Lots of votes of confidence.  No shame.  We
14 have nothing to hide.  We have nothing to worry
15 about.  Speak the truth, and state your case.  I
16 mean, that's been our theory and our theme through
17 the whole process.
18     Q.   Anything else you discussed with
19 Ms. Olinger?
20     A.   No.
21     Q.   What about Mr. Miller, did you discuss your
22 deposition with him, other than the meetings with
23 counsel that we already discussed?
24     A.   Same content.  I've discussed with my
25 entire team each one of our depositions, including

Page 15

1  mine.  And because there is not any substantive stuff
2  that we need to collaborate on, it's been more of a
3  vote of confidence, saying we've got nothing to worry
4  about.  State your statements.  Tell the story.  Tell
5  the truth, and have faith in our country and our
6  system, and that's it.
7      Q.   Did you talk to Mr. Jacquez about your
8  deposition?
9      A.   Same thing.
10     Q.   Same thing as Mr. Miller and Ms. Olinger?
11     A.   There's been no deviations or any more
12 involvement from one person to the next.  It is
13 equally spread across the Board.  The message and the
14 theme is the same.
15     Q.   What about Ms. Rose, have you spoken to her
16 about your deposition?
17     A.   Yes.
18     Q.   And what did you discuss with her?
19     A.   The same thing.
20     Q.   And Mr. Abtahi, have you spoken to him
21 about your deposition?
22     A.   Yes.
23     Q.   What did you discuss with him?
24     A.   The exact same thing.
25     Q.   Do you know someone named Steve Sorenson?

Page 16

1      A.   Yes.
2      Q.   Have you spoken to him about your
3  deposition here today?
4      A.   Absolutely not.
5      Q.   Are you paying Moody & Warner's fee in
6  connection with this matter?
7      A.   No.
8      Q.   Who is?
9      A.   Ash and Donyelle.
10     Q.   Are you aware whether they are personally
11 paying it or through RivenRock Staffing?
12     A.   I would imagine it's through RivenRock
13 Staffing.
14     Q.   Why do you imagine that?
15     A.   The daily grind of everything that goes on,
16 and when this came out, and this lawsuit was
17 frivolously filed against us, there was a brief
18 conversation that Ash and Donyelle said, Nobody
19 worry.  Settle the team down.  We'll take care of
20 this and we'll support you guys through this whole
21 entire thing.  So from that I've taken as fact that
22 Ash and Donyelle would be taking care of the attorney
23 fees.
24     Q.   Did you have any other discussions, other
25 than that, about who would pay Moody & Warner's fees

Page 17

1  in this case?
2      A.   No.
3      Q.   So in the other depositions I've done this,
4  and I'll do the same to make sure we're on the same
5  page.  I'm going to use the phrase "EmployBridge" to
6  refer to the EmployBridge family of companies,
7  including all of its subsidiaries and affiliates; is
8  that fair?
9      A.   No.
10     Q.   Why not?
11     A.   Because I never worked for EmployBridge.
12     Q.   When did you leave -- did you work for
13 Select Staffing?
14     A.   I did.
15     Q.   When did you leave Select Staffing?
16     A.   February 5th.
17     Q.   Of what year?
18     A.   2016.
19     Q.   Is that before or after the merger with
20 EmployBridge?
21     A.   The merger was still in progress when I
22 left.  There was no definitive completion of the
23 merger.
24     Q.   In February 5th of 2016?
25     A.   Yes, ma'am.

EXHIBIT 3                U.S. LEGAL SUPPORT                 14 to 17
                           (916) 248-5608

## Page 170

1  he went on a fairly long tangent about Steve Sorenson
2  and Melissa Porter, and how bad he was treated, and
3  how much he was screwed, and that that was such a bad
4  time of his life and such a bad deal, that where he
5  was at in his career, he just wanted to put it behind
6  him and never look back.  And he was done with
7  wasting any more oxygen on them.  And the
8  conversation, basically, ended as -- you know, I'll
9  tell you what, I do have a lot to say, and I'd love
10 to say it, but I'm not going to change my life or my
11 schedule for -- to make this a priority.  So, by all
12 means, add me to the list.  Have your attorneys
13 contact me, and if I answer, I answer.  If I don't,
14 I'm busy.  If they happen to catch me, great.  If
15 not, that's about as much as I want to be involved.
16     Q.  Have you had any communications with
17 Ms. Coyman since that call?
18     A.  Yeah, we had quite a few conversations
19 after that call.
20     Q.  How many?
21     A.  Somewhere between two and four, probably.
22     Q.  Between what time period and what time
23 period?
24     A.  Shortly after that -- it was probably, I'll
25 say a couple of weeks later he called me again to

## Page 171

1  find out where Leyzcha was at, said that he had --
2  said that he had -- I don't remember if it was that
3  call -- I think a couple of weeks later, he called me
4  and I know it was specifically about trying to track
5  down Leyzcha.  I didn't have much information for
6  him.  It was a pretty short call.  And then about, I
7  don't know -- it's two, three, four weeks later,
8  somewhere in there, he called looking for a job.
9  They fired him.
10     Q.  Chartwell did?
11     A.  Yes.  They fired him, and he called looking
12 for a job, to see if we had anything going.  I told
13 him, No, we didn't have anything going, and --
14 think at that point -- I don't know if it was the
15 third call or the fourth call -- I think that one was
16 a pretty brief call -- pretty short.  Asked how
17 things were going.  Said, Good.  Still trying to get
18 it up and going.
19         And I think that was pretty much the gist
20 of it, because the last time that we talked I think
21 was the fourth time.  It could have been probably
22 another couple -- two or three weeks later.  He
23 called me and told me that Dave Bell was very
24 interested in joining the class action lawsuit, but
25 he was scared to death.  He had something about his

## Page 172

1  commissions are down so much, it's such a joke, that
2  they had to get rid of one of their cars.  He's the
3  only bread maker, and that he was just scared to
4  reach out, and was working on some kind of a deal,
5  possibly putting his own staffing company together
6  with him and Dave Bell.
7     Q.  Is that the last time you've spoken to or
8  had contact with Dave Coyman?
9     A.  Yes.  I heard something from somebody that
10 I confronted him on that call.  I think I heard
11 something about -- he said something to somebody -- I
12 don't know if it was Theresa, April -- somewhere,
13 someone heard something that Dave Coyman had said "F
14 Shaun."  And "he can go F himself."
15         And so when he called me that fourth time,
16 I was listening to his story, and he had just gotten
17 fired.  And I thought that it was kind of odd that he
18 was considering being more interested in the class
19 action lawsuit, as well as Dave Bell.  But Dave Bell
20 was just scared to death to make any kind of
21 movements or contacts.  And I addressed him and I
22 said, Hey, Dave, before we hang up -- I don't like
23 just sweeping things under the rug, so I'm just going
24 to hit it right on the head.  I hope it doesn't
25 offend you, but I heard a rumor that something was

## Page 173

1  said, and you said F Shaun.  What's that all about?
2  And he said, I'm not sure where you heard that.
3  That's not true at all.  Why would I have any reason
4  to say that.
5         I said, I don't know.  That's why I wanted
6  to address you frankly about it.  And he said, No,
7  dude, if I said that, I would tell you.
8         I said, All right.  I just wanted to make
9  sure that there wasn't any kind of hostile --
10 something hadn't happened that I wasn't aware of,
11 because I just don't understand why that would even
12 be some form of a rumor.
13         He said, No, dude, we're fine.  I would
14 never say that.
15     Q.  Was the last time you had any contact with
16 him?
17     A.  Yes.
18     Q.  Do you know what he's doing now?
19     A.  I have no idea.
20     ==Q.  You're currently employed as the==
21 ==vice-president at RivenRock, correct?==
22     ==A.  Correct.==
23     Q.  What do you do on a day-to-day basis?
24     A.  Well, since the lawsuit, I have worked on
25 trying to read and understand what is happening to

Larry Shaun Shepard
February 17, 2017

Page 174

1  us, produce all of the discovery. Obviously, trying
2  to prepare our corporation to take a different route
3  than what we originally planned on, trying to work on
4  all of our infrastructure of our company.
5       Q.  What does that mean?
6       A.  Well, in the early days, May and June we
7  had a pretty rinky-dink network. I mean, we couldn't
8  even -- if there were more than two computers on it,
9  we couldn't even send an e-mail or type an e-mail.
10 It would take ten minutes for your words to --
11      Q.  Early start-up stuff?
12      A.  Yeah.
13      Q.  Let's say since November, what have your
14 responsibilities been on a day-to-day basis?
15      A.  Since November?
16      Q.  Since November, yeah?
17      A.  Managing my team, the culture of our
18 company, making sure that we're compliant, making
19 sure we have the resources and supplies necessary to
20 live our culture. I have meetings with the team on a
21 regular basis to make sure that we're living our
22 culture, and that we're polling our associates and
23 polling our clients to understand the level of
24 service that we're giving them.
25      I mean, November, all of the way up to

Page 175

1  leading up to the depositions here, there's just been
2  a lot of answering interrogatories and making sure
3  that everything is gone through with a fine-toothed
4  comb. I chase a lot of money. I'm involved in that
5  portion of the business.
6       Q.  Do you have day-to-day contact with
7  clients?
8       A.  Not so much, no.
9       Q.  Do you work on your class action lawsuit as
10 part of your work at RivenRock?
11      A.  Not really.
12      Q.  What do you mean by "not really"?
13      A.  Well, in the early days when I left Select
14 Staffing, I think I was in my attorney's office the
15 following week. So, from probably the second or
16 third week of February 2016, I've been inundated with
17 hundreds and hundreds and hundreds of phone calls,
18 sharing very similar stories to mine. And so there
19 was some time spent during those early days on the
20 class action lawsuit.
21      Q.  The early days of RivenRock, you mean?
22      A.  Yeah, I mean, literally, from the time that
23 I resigned, I was trying to find an attorney
24 immediately.
25      Q.  Do you work on the class action lawsuit

Page 176

1  from your office in the RivenRock office in
2  Albuquerque?
3       A.  No.
4       Q.  You never do?
5       A.  No, I've taken phone calls. I mean, any
6  time phone calls come in, of course I'm going to try
7  to answer them and respond to them, but as far as
8  working on that case while at RivenRock, not true at
9  all.
10      Q.  You don't do any -- other than taking phone
11 calls from folks, you don't do any work on the class
12 action lawsuit during business hours at your office?
13      A.  Since the lawsuit was filed, there has not
14 been one ounce of work, to my knowledge, or to the
15 best of my recollection, on the class action.
16      Q.  No phone calls since -- and you mean since
17 this lawsuit was filed?
18      A.  I'm sure there have been quite a few people
19 who have reached out to me, and I've said, Hey, look,
20 we have been served litigation from EmployBridge, and
21 so for the time being the class action is on hold.
22 Do you want me to get back in touch with you once we
23 are through this process?
24      And their response has been, Yes,
25 absolutely -- whatever their response is. It is, for

Page 177

1  the most part, consistently yes, across the board.
2  And there has not been any work done on it since -- I
3  actually want to say July -- probably July 20th, is
4  the last time it has even been looked at.
5       Q.  Of 2016?
6       A.  Of 2016.
7       Q.  Now, RivenRock, one of its clients is the
8  City of Albuquerque?
9       A.  Uh-huh.
10      Q.  Answer audibly.
11      A.  Yes.
12      Q.  Did you have any contact with anyone at the
13 City of Albuquerque after leaving Select, and before
14 the City put out a request for bid?
15      A.  Yes, I did.
16      Q.  Tell me about that?
17      A.  I made a phone call to Viola Cunningham, I
18 believe in May -- late May, to just say, Hey, we're
19 really sorry. I know we left at a really bad time.
20      Q.  Who's the "we" you're talking about?
21      A.  Me, Katherine. I just called her to just
22 apologize for the way that we left. It was not our
23 character to leave at that time. It was devastating
24 for us, as it probably was for you, and I know that
25 was a really, really crappy time, after all of those

U.S. LEGAL SUPPORT
800-993-4464

EXHIBIT 3   45 (Pages 174 to 177)

Larry Shaun Shepard
February 17, 2017

Page 178

1  positions were terminated by EmployBridge -- left
2  them in a really bad spot.  And I just wanted to
3  reach out to you and apologize and say, Hi.
4           And she responded with, Oh, my gosh, where
5  have you been?  What are you doing.  It's so good to
6  hear from you.
7           And I said, Well, it's great to hear your
8  voice, too.
9           She said, How are you doing?  What are you
10 doing?
11          I said, I'm with a new company.
12          And she said, Have you gotten registered
13 yet?
14          And I said, No, we're not going to compete
15 for the City bid.
16          And she said -- and when I mentioned the 65
17 positions that they terminated -- the class codes
18 that they terminated, she said we have contracted
19 those all through 1099.  Do you guys do any kind of
20 skilled labor?
21          I said, Well, we're a really small company.
22 We're not geared for big volumes.  We're not set for
23 big volumes, and plus, I have a non-solicitation
24 agreement with Select Staffing, and I would never
25 step on their toes.

Page 179

1           She said, Oh, I totally get it.  I've been
2  there before.  I know, I've been working with
3  staffing companies for 20 years.
4           And I said, So there is no -- so, I said,
5  No, we -- just that kind of conversation just went on
6  for a few minutes.  And she said, Well, you guys can
7  still, at least, get registered.  You don't have to
8  bid on all of it.  You can bid on just a portion of
9  it, whatever you want to do.
10          I said, Great.  She said, What's your
11 contact number, or how do I get ahold of you guys?
12 What's your e-mail address?
13          I gave her my e-mail address, and she said,
14 Great, I'll send you an e-mail so that you have
15 Rebbekka's contact information, and I'm sure she'll
16 respond to you.  It's great to hear from you.
17          Great.  And that was pretty much it.
18     Q.   What did you understand her to mean when
19 she said to you, You can bid on some of it; you don't
20 have to bid on all of it?
21     A.   I would imagine that there's -- on the
22 skilled side of it, that is not done through
23 staffing.  There was an opportunity there, if we
24 could do skilled, like, electricians and plumbers,
25 and heat and AC people -- there was a whole separate

Page 180

1  segment from the temporary staffing code in which
2  they would have a solicitation, I would assume.
3      Q.  Did she -- actually, let me ask you about
4  this.  You said all of those positions -- you talked
5  to her about all of the positions were being
6  terminated by EmployBridge?
7      A.  Yes.
8      Q.  What do you mean by that?  What are you
9  referring to?
10     A.  Oh, well, let's see, sometime in November
11 or December, EmployBridge, there was -- I'm not sure
12 what started it, but EmployBridge had a new safety
13 officer come in to town.  And I don't know what was
14 exactly -- remember, I just got back from Dallas five
15 or six months, didn't even know any of these people.
16 I think there was some sort of help desk ticket for a
17 request of something along the lines of maybe APD
18 academy trainers.  And when the help desk ticket got
19 put into risk, risk just had a holy fit and said,
20 You're out of your mind.  We don't do these
21 positions.
22          And so then the next -- that started a
23 great, big -- kind of whirlwind of upper management
24 and executives and vice-presidents, and I think Sean
25 Poole got involved.  And they started saying, Hey,

Page 181

1  wait.  What is this city contract now?  What's this
2  all about?
3           And so they started going through the --
4  through all of the job descriptions, and they saw we
5  had people in shark tanks.  We have horse handlers.
6  We had these APD trainers.  There was just -- snake
7  handlers, all of these -- dog handlers.  There was
8  just a whole lot of positions that they were like,
9  holy crap, no.  We don't do this.
10          And there was quite a few clients, as well,
11 aside from the City, that they just kind of started
12 going through the whole -- kind of our whole
13 associate pool and what people do.  And they
14 determined there was, like, 65 positions -- job
15 descriptions that were going to be terminated -- or
16 65 positions total.  It was five or six different
17 categories that they were terminating.
18     Q.   Out of how many positions that were filled
19 for the City by Select?
20     A.   Well, if you look at it as like job
21 descriptions, there are typically anywhere from 70 to
22 maybe 85 or 90 different job titles, and each one of
23 them has a different job description, pay rate, et
24 cetera.
25          And as they filtered through all of those

U.S. LEGAL SUPPORT
800-993-4464

46 (Pages 178 to 181)

EXHIBIT 2

## Page 182

1  job descriptions, and what people were actually
2  doing, there is no way they could carry this over
3  into 2016 because their insurance company would not
4  insure those positions.  And so they terminated them,
5  I believe -- I believe they terminated them, probably
6  before going -- the last week of 2015, maybe the
7  first week of January.
8      Q.  So it was five or six job descriptions out
9  of the 80 or so different categories?
10     A.  Yes.  Let's say 80 -- there are 80 job
11  descriptions, 80 titles.  There was, I believe, five,
12  six or seven job titles that their insurance carrier
13  would not carry going into 2016.
14     Q.  When you were at Select, did you have any
15  conversations with anyone at the City of Albuquerque
16  about their reaction to those five or six titles
17  being terminated?
18     A.  I think there was a lot of conversations,
19  Julie and Paul, myself, Leyzcha.
20     Q.  With the City of Albuquerque?  I'm sure
21  there were a lot of conversations internal to Select.
22  I'm asking, did you have any conversations about that
23  with anyone at the City?
24     A.  Yes.  I'm telling you about them.  So with
25  Julie, with Paul, and with Leyzcha, we had numerous

## Page 183

1  discussions with the City about how disappointed and
2  how frustrating this is, and how painful it is going
3  to be for them.  And those conversations -- there
4  were numerous of those conversations, all of the way
5  up to the week that I left.
6      Q.  Who at the City was on those conversations?
7      A.  Susan Fisher, Viola Cunningham, Mona or
8  Ramona Martinez, I believe.  There might have been a
9  Mitsie, Billy, or Mitsie and -- of course, all of the
10  corporate risk department from EmployBridge and
11  Select Staffing were involved in all of those
12  conversations for the most part.
13     Q.  After that May phone call that you had with
14  Viola Cunningham, when was the next time you had
15  contact with anyone at the City of Albuquerque?
16     A.  She had fired off an e-mail to me that day,
17  I think just within a couple of hours of me talking
18  to her.  And then there was, I believe I copied
19  Catherine Olinger on a return e-mail to her, saying,
20  Thanks, it was great talking to you.  I believe that
21  there was a little bit of innuendo as to possibly
22  looking at those skilled positions.
23         And, again, the only reason why we would
24  look at those is because that wouldn't interfere with
25  any of our covenants or agreements.  It's a subsector

## Page 184

1  in a business line that almost no staffing company
2  would touch, unless it's a construction company.
3      Q.  When you say it wouldn't interfere with
4  your covenants and agreements, what are you referring
5  to?
6      A.  Well, that's not competing with a piece of
7  business that Select Staffing had.
8      Q.  What specific covenants are you referring
9  to?
10     A.  The covenants that you keep referring to in
11  the agreement that says I am not to solicit or
12  compete in this market.
13     Q.  Why were you worried about that -- those
14  covenants?
15     A.  Because I feel like I have an understanding
16  of how EmployBridge is going to misconstrue and file
17  or seek litigation.  So there was a sense of -- I
18  think I can best say it this way:  When I left Select
19  Staffing, I'm aware of the application that you guys
20  have signatures on, and I would never do anything to
21  go against anything that could be implied that I'm
22  supposed to behave by.
23         So the feeling of leaving is, Okay, if I am
24  going to do anything here locally, I'm going to make
25  sure that, regardless of whether I think my agreement

## Page 185

1  is enforceable or not, I will not walk the line.  I
2  will not approach a gray shaded area that can be
3  construed in a fashion that benefits them, to make me
4  or anyone else that is with me, look bad.
5         So it's an extremely important culture that
6  I have to live with every day that, taking the high
7  road -- I didn't need any of their business.  I
8  didn't need to take anything from them.  I didn't
9  want to take anything from them.  And I never had any
10  intentions of taking anything from them or competing
11  with them.
12        So that always has been an undertone to any
13  thought or process moving forward.
14        Just being cognitive and aware of what
15  their capabilities are, there was no need or no
16  desire whatsoever to poke the bear.
17     Q.  After that May 2016 e-mail exchange with
18  Ms. Cunningham, when is the next time that you or
19  anyone else at RivenRock had contact with anyone at
20  the City?
21     A.  I think within a little few minutes,
22  Rebbekka Tynan had send back an e-mail saying, Hey,
23  there you are -- that's where you are, Catherine, or
24  something like that, and sent a whole -- a whole,
25  like, be sure to go here and get registered and all

## Page 186

1  that.
2      And truth be told, we had already done
3  that. We didn't need those instructions. That whole
4  process was completed long before that.
5      Q. When was that process completed?
6      A. I believe it was completed on 3/16.
7      Q. 3/16 of 2016?
8      A. Three -- somewhere around -- March or
9  April, when we brought Amber Fluitt on.
10     Q. When you say that process was completed,
11 you mean registration in the E Procurement system of
12 the City of Albuquerque?
13     A. No, Sycom.net. Amber registered nationally
14 for all RFPs throughout the nation that Sycom
15 administers. And that was that.
16     Q. What was the next communication that you or
17 anyone else at RivenRock had with anyone at the City
18 of Albuquerque, after the May e-mail exchanges.
19     A. I believe on 7/15 I sent another e-mail to
20 Rebbekka or Viola, or maybe the combination of the
21 two. I just said, Hey, just checking in. Any idea
22 when that RFP is going to come out?
23     And she had wrote back and said, Have no
24 idea, something -- that she's working on it, but
25 there was -- I mean for all we knew, and based off

## Page 187

1  just kind of a general understanding, they had been
2  saying that the RFP was coming out with the City
3  since -- let's see, I believe in November or December
4  of 2011, we -- Select Staffing won, like, the whole
5  contract. And Adecco refused to roll over any of
6  their associates, and got a whole bunch of attorneys
7  involved, and locked down the awarding of that whole
8  process. So the City just kept filing extensions.
9  And I think they were 90-day extensions, or six-month
10 extensions. And that had gone on since, I believe,
11 2011, somewhere in there.
12     Q. Was that mid July communication that you
13 had with the City, was that phone? E-mail? How was
14 that done?
15     A. No, it was, I believe -- I believe it
16 was -- I thought it was June or July because the
17 intent of me calling to find out, was whether or not
18 we were going to bring Will Cordero, who is someone
19 who was interviewing with us on board, because he is
20 in the skilled -- and that's also Lupe Marquez.
21     And I was down to the final decisions on
22 deciding what we were going to do with the team, and
23 how we were going to move forward. I knew Tim and
24 Terry needed something soon, and they needed some
25 kind of direction on what we were going to do. And

## Page 188

1  then, I believe -- I want to say that there was
2  something -- there was a reason why I had the idea to
3  find out. And I wonder --
4      Q. To find out what?
5      A. To find out when the RFP was going to come
6  out.
7      Q. When you reached out on July 15th of 2016,
8  how did you know that a request for proposal was
9  forthcoming?
10     A. I didn't.
11     Q. Well, you said you reached out to say,
12 When's it coming?
13     A. I think, if you look back at all of my
14 e-mails, there was probably an e-mail to the City
15 going back three and a half years, or maybe longer --
16 every four or five or six months, because my
17 superiors were constantly asking, When is the City
18 rebid coming up? It was from Julie, to Paul, to my
19 direct reports prior to that, Sean Befke, Melissa
20 Porter. They were always interested in when that new
21 RFP was coming out, because there hadn't been price
22 changes in a long time. We gave them one in 2013, I
23 believe, and everybody was always -- that's a big
24 piece of business. And so I was always being asked,
25 When is that RFP coming up? When is that RFP coming

## Page 189

1  up?
2      Q. When you were at Select?
3      A. Yes.
4      Q. Why did you reach out in July of 2016 to
5  the City to ask when the request for proposal was
6  coming out, if you didn't know that a request for
7  proposal was forthcoming?
8      A. It was a very common question when it came
9  to the City. There was no -- and I think in one of
10 the e-mails, either Viola or Rebbekka says something
11 along the lines, like, Oh, God, who knows.
12     Q. Was that in response to your July
13 communication, or before that?
14     A. I don't remember.
15     Q. But at some point before the request for
16 proposal came out, you had some communications with
17 the City where they indicated that an RFP would be
18 forthcoming?
19     A. The RFP that would have been the topic of
20 discussion, was Viola and I -- it was very clear that
21 not -- we did not want the City bid. We didn't have
22 the infrastructure, the payroll, the funding. We
23 didn't even have computers. I mean, we were
24 literally on a shoestring budget.
25     Q. Then why were you asking about when the

Larry Shaun Shepard
February 17, 2017

Page 190

1  City's bid was forthcoming?
2      A.  Because if I could have a little piece of
3  that skilled business, which would justify bringing
4  Lupe and Will on, that was the type of company that
5  we were establishing to be able to go and offer other
6  companies.  There was absolutely -- there was no way
7  in hell I even wanted that City bid.  That is a
8  disaster waiting to happen.  So --
9      Q.  Do you still think that way, given that you
10  have the contract currently?
11      A.  I think we have a really good team that is
12  going to make the best of it.  What the future holds
13  is all depending on injury frequency, and severity,
14  those types of things.  You know, litigation is
15  killing us.
16      Q.  Are you still concerned that the City's
17  contract is a disaster waiting to happen?
18      A.  No.  I think we've done a pretty good job
19  of having some really good discussions with them on
20  cleaning it up and getting it right.  And I think
21  that things are manageable at this point.
22      Q.  When did you have any -- when, after
23  leaving Select, did you have the first communications
24  with anyone at the City about the potential for a
25  request for a bid being put out?

Page 191

1      A.  I already told you.  There was an e-mail on
2  7/15 that I sent asking about the RFP, which Viola
3  referred to as the skilled contractor, 1099 labor,
4  that they have that nobody does.
5      Q.  What do you mean nobody does it?
6      A.  In other words, they hire companies, and
7  they hire contractors to climb on roofs and do
8  heating and air-conditioning and plumbing and
9  electrical work.  I don't know of anybody that does
10  that kind of work in the staffing industry.
11          So that's the stuff that comes with some
12  good margins.  And if there are decent pay rates, you
13  can hire good, qualified people.  I wasn't talking to
14  Viola, or referencing -- I was very crystal clear to
15  Viola that we didn't want the City bid, and we
16  weren't going for the City bid, for multiple reasons,
17  in addition to the agreement that I had with Select
18  Staffing.  And I would never -- if you want to know
19  the real term, I would never crap in their backyard.
20  That's the term that was used.
21      Q.  If you weren't interested in going after
22  the City's bid, why were you asking about when the
23  bid was coming out?
24          MR. STANFORD:  Objection.  Form.
25      A.  I wasn't asking about "the City bid" that

Page 192

1  you're referencing to.  I'm asking about, because she
2  gave me a lead and asked if we did those types of
3  skilled positions that no one else will do.
4      Q.  Was that going to be put out to bid?
5      A.  I have no idea.  All she told me was, Well,
6  I have no idea when it's coming, but you want to get
7  registered.  And I said, We already are registered.
8  And she said, Oh, good.
9      Q.  Did the skilled positions ever come out for
10  bid, to your knowledge?
11      A.  I have no idea.
12      Q.  So, when you were asking about a request
13  for bid, you were asking about a request for bid for
14  the skilled positions?
15      A.  I was asking about that labor category that
16  she referenced that there was about 70 or 80 people
17  that she can only get the work done in the labor
18  force or the workforce that is on 1099 or contracted
19  through vendors.  So she was telling me about those
20  potentials, Well, can you do that?
21          And I said, It's something that we could
22  look at.
23      Q.  Was that in the July e-mail?
24      A.  No, that was on the phone, when I called
25  her.

Page 193

1      Q.  Right.  I'm asking about the July e-mail.
2  What did the July e-mail say?
3      A.  I was referencing back to, When is the RFP
4  coming out?
5      Q.  Was it your understanding that there was
6  going to be an RFP for those skilled positions?
7      A.  Yes.
8      Q.  That's what I'm asking.
9      A.  When?  There was no specific time frame.
10      Q.  But you understood there was going to be an
11  RFP for the skilled positions at some time?
12      A.  At some point.
13      Q.  Sure.
14      A.  She says to me, Get registered.  We talk
15  about this little piece of skilled business.  She
16  wants to make sure we're registered.  Who knows when
17  it's going to come out.  We weren't -- anyway.
18      Q.  After this July communication you had, did
19  you get a response to your question of when those --
20  when the request for bid was coming out?
21      A.  Yes, and you have that response.
22      Q.  It was in an e-mail?
23      A.  Yes.
24      Q.  From Ms. Cunningham?
25      A.  No, from Rebbekka Tynan, I believe.

U.S. LEGAL SUPPORT
800-993-4464

EXHIBIT 2
49 (Pages 190 to 193)

## Page 194

1  Q. And that's an e-mail you produced in this
2  case?
3  A. Absolutely.
4  Q. What did Rebbekka say in response, in that
5  e-mail?
6  A. I don't even recall. Something like, Have
7  no clue. Working on it.
8  Q. Have you provided any services to the City
9  of Albuquerque in those skilled positions that you
10  were initially interested in?
11  A. No.
12  Q. Why not?
13  A. Because it didn't come out.
14  Q. After that July e-mail correspondence about
15  your question and their response on those skilled
16  positions, when was the next time you or anyone else
17  at RivenRock had communications with the City of
18  Albuquerque?
19  A. Well, we got an e-mail from Sycom.net that
20  said request for proposal.
21  Q. When did you get that e-mail?
22  A. Oh, the lawsuit, I believe, was served on
23  July 28th. And if I remember, 8/2, four or five
24  days later, that's when the announcement came out.
25  Q. Between the mid-July e-mail exchange we've

## Page 195

1  discussed, and the time in which the City's request
2  for bid was put out, did you or anyone else at
3  RivenRock have communications with anyone at the City
4  of Albuquerque?
5  A. Ask the question one more time.
6  Q. Sure. Between the time period of the
7  mid-July e-mail exchange about skilled positions and
8  the time that the request for bid came out in early
9  August of 2016, from the City, did you or anybody
10  else at RivenRock have any contact with the City of
11  Albuquerque?
12  A. No.
13  Q. And how did you learn the City had put out
14  a request for bid?
15  A. Sycom.net e-mailed the announcement on 8/2.
16  Q. And what was -- what did the announcement
17  say?
18  A. A temporary staffing request for proposal
19  page.
20  Q. And what did you do after receiving that
21  e-mail?
22  A. Actually, there was -- there was a whole
23  bunch of people that I think came running down the
24  hallway that said, Did you see that? Did you see
25  that? And we had been discussing over the last week

## Page 196

1  that we were going to have to probably terminate
2  everyone but Catherine due to the lawsuit. And that
3  e-mail came out, and I think it -- it almost seemed
4  like a whole bunch of -- I think everyone grabbed on
5  to hope -- is there a chance? But knowing the
6  statements, and knowing the meetings that we've had,
7  and where we were at with the company, I think it was
8  just like a glimmer of hope. Is there any way? Can
9  we do this?
10  Q. Were you surprised to see the City put out
11  a request for bid?
12  A. I was shocked.
13  Q. Why?
14  A. Because there hasn't been a request for bid
15  since 2011. And it was just shocking. It was
16  like -- it was crazy.
17  Q. Between -- since 2011, to the time that
18  City's request for bid came out, who was servicing
19  the City's temporary staffing needs?
20  A. Adecco, ATA, and Select Staffing.
21  Q. Were any of those companies the primary on
22  the contract?
23  A. Adecco.
24  Q. Adecco was the primary?
25  A. Yes.

## Page 197

1  Q. Select wasn't a co-primary?
2  A. No. Select was a secondary and a
3  tertiary -- third place.
4  Q. And what about ATA, what position did they
5  have there?
6  A. They were primary and secondary, depending,
7  because it was broken up in a bunch of different
8  classes. Certain job titles when you are the
9  first -- it was the same RFP since 2007, because the
10  2010 rebid never went through because of the
11  litigation with Adecco.
12  Q. What was the annual revenue that Select
13  took in from the City of Albuquerque when you were
14  there?
15  A. Probably the first year that I was there
16  was probably two and a half million dollars a year.
17  Q. What about the last full year that you were
18  there?
19  A. Probably six and a half million.
20  Q. Do you know if ATA's revenue was more or
21  less than Select's?
22  A. I have no clue.
23  Q. What about Adecco?
24  A. I have no clue. I did see in an audit
25  in -- from the City in 2015, I think, it was

## Page 198

1  completed in, like, August somewhere in there, that
2  over the course of one -- one year, there was
3  $18.9 million in total staffing spent between all of
4  the staffing companies from, like, a July to a
5  June -- I think it was July of 2014 to June of 2015,
6  somewhere in there.
7      Q.  After the request for bid was put out by
8  the City, did the RivenRock team have any discussions
9  about whether you would submit a response to the bid?
10      A.  I told everybody when they came, excited,
11  that maybe this was a glimmer of hope, to not get
12  your hopes up.  But I would get on the phone and I
13  would have some discussions and seek advice, et
14  cetera.  And to just hold it together and give me
15  some time to make some phone calls.
16      Q.  And did you make those phone calls?
17      A.  I did.
18      Q.  Who did you call?
19      A.  First I called Ash and Donyelle, and I
20  said, Pretty crazy how things work, but we just got
21  the notification for the City bid.  It's not -- I
22  don't know if it's all lumped together with the
23  skilled, et cetera, but it is for, it looks like, all
24  temporary staffing.
25          They asked how much would that be?  I said

## Page 199

1  all I can do is go off of -- because I don't know
2  what portion Adecco had.  I can only assume, based
3  off of that audit, there was 18.9 million in spend
4  and then -- and I said, Is this even something that
5  we should even consider?  Should we look at it?  I
6  mean, we've got major challenges with infrastructure.
7  We don't have the money.  There was times and days
8  and weeks that I wasn't even getting paid, because
9  there wasn't money.
10          So we started the dialogue over the next
11  couple of days of, Okay, well, how big is this?  What
12  does it mean?  We have no idea.  We had what's
13  called -- what is it called, assigned risk, workmen's
14  comp.  So we had no -- we had an incredibly high
15  workmen's comp rates.
16          So Ash and Donyelle started asking, Do you
17  think it's possible?  And we started talking through,
18  okay, if this happens we have to do this, this, this
19  this, this, this, and just started circling and
20  mapping out kind of what would -- what could we do.
21      Q.  Who else, other than you and Ms. Rose and
22  Mr. Abtahi, were part of those conversations?
23      A.  Just Ash, Donyelle and I.
24      Q.  So it was the three of you that were
25  deciding whether it was conceivable for the company

## Page 200

1  to submit a response to the bid?
2      A.  Yes.
3      Q.  And what type of analysis did you do, as
4  part of that work, to figure out to whether it would
5  be possible for RivenRock to respond to the bid?
6      A.  I think my number one complaint was, I
7  said, Ash, I can't even send a document to you or
8  type on my e-mail without it taking ten minutes to
9  populate the sentence that I just typed in.  There is
10  no way we're going to be able to handle that kind of
11  volume with this type of network and systems.
12          And, of course, he said, Well, that we can
13  fix.  And then we just started talking about -- the
14  biggest concern was workmen's comp, insurance, the
15  bonds, and the payroll.
16          And I was focused in on the infrastructure,
17  desks, personnel, hiring people, pay cards,
18  automatic -- you know, auto deposit, all of those
19  types of things.
20          My concern was before ever even looking at
21  possibly the reality of it, was:  Is our company even
22  set up to be able to handle something like this?
23  And, of course, first and foremost, above all of the
24  technical stuff and setting up was:  Where in the
25  hell are we going to get the money?  And that was the

## Page 201

1  topic of our discussions.
2      Q.  So the three of you sort of put your heads
3  together to figure out whether it was possible for
4  you to submit a response?
5      A.  Uh-huh.
6      Q.  You have to answer audibly?
7      A.  Yes.
8      Q.  Did you ultimately -- were you able to
9  obtain the money that you needed to be confident that
10  you could go forward, or at least resolve that issue
11  on how you were going to obtain the money?
12      A.  I can't say that I was confident.
13      Q.  What did you discuss about ways that you
14  could get the money?
15      A.  Well, Ash and Donyelle said they would seek
16  factoring and some lines of credit or, you know,
17  funds, but assured me that wasn't something I needed
18  to be concerned about.  They'll either make it
19  happen, or they won't.
20          And they asked a lot of questions, if --
21  things like, okay, let's hypothetically say we go for
22  the bid.  And let's hypothetically say we don't get
23  the insurance, and we can't meet the bonds, and we
24  can't get the factoring set up to take something on
25  like this.  What is the worst case scenario?

Larry Shaun Shepard
February 17, 2017

Page 202

1    My response was, You just bow out of it.
2    And so it was a discussion that became, Well, the
3    only way that you're going to get it, is if you go
4    for it, and the worst case scenario is that we end up
5    backing out of it.
6        And so Ash and Donyelle said they would do
7    whatever it takes to get us the things that we needed
8    to make it happen, and that included all of the
9    infrastructure and the additional head count and
10   payroll. And that they would find a way to get the
11   factoring and the resources that we needed to take on
12   something like that.
13       Q. Who, ultimately, made the decision between
14   the three of you that it was, at least conceivable
15   that you could attempt -- make a valiant effort at
16   getting ramped so you could submit a request for bid?
17       A. I don't know that there was -- that hung on
18   one particular person.
19       Q. It was a consensus?
20       A. It was a consensus. It was a Hail Mary.
21   It came with some very strict rules and processes to
22   all of it. And I think it just kind of came to a
23   consensus that, yeah, this is we're -- we're going to
24   go for it.
25       Q. At some point did you talk to the rest of

Page 203

1    the team about the City's request for bid?
2        A. Yes.
3        Q. Tell me about that?
4        A. After Ash and Donyelle had committed to
5    finding the people, and bringing the people in
6    necessary to be able to do something like this, I
7    went to the team. I gathered everybody up. I
8    believe Ash and Donyelle were on the call -- as a
9    conference call, and we were all in one room.
10       And I said -- I told everybody what the
11   marching orders were, and that if we go for this,
12   there had to be an understanding that there was not
13   going to be -- in order to be what I considered to be
14   in -- even in the bread box of getting close, we
15   would have to review and have an understanding that
16   there may not be a commission schedule on this type
17   of revenue coming out of the gate, probably for the
18   first year, because we're in assigned risk. And we
19   have no idea what the actual hard costs of ramping
20   this up would be. It was going to take a lot of long
21   hours, and I wanted the team to chat amongst
22   themselves to make sure that they were on board with
23   taking something like this on.
24       Q. And what did -- that's what you said at the
25   meeting?

Page 204

1        A. Yes. And then I said, Amber, this is your
2    account. This is your deal. I gave the marching
3    orders to Donyelle and Will Hall and Amber. If we're
4    going to do something like this, you have to take the
5    hard costs, you have to add 4 percent for corporate
6    allocation, 3 percent for ACA and add 1 dollar per
7    hour in gross margin. And if that does it, that does
8    it. If it doesn't, there is no way we can survive or
9    do this. It's not worth it, and we're out.
10       Q. You gave them the overall strategy of how
11   to compute the numbers for the bid; is that what
12   you're saying?
13       A. No.
14       Q. What are --
15       A. I have no idea what the numbers are. I
16   just said that -- which is a very common theme across
17   staffing, a buck an hour in gross margin. Whatever
18   that comes out to be is whatever it comes out to be.
19   I have no idea what our workmen's comp rates are,
20   what our SUI, FUI, FICA, Medicaid, Medicare -- you
21   know, there are times they change during the year.
22   There are times they go up, down, all of those types
23   of things. And the team needed to get with Will and
24   with corporate, and determine what all of those
25   workmen's comp codes are, the costs, and submit the

Page 205

1    bid.
2        Q. And was this all in that first conversation
3    you had with the team?
4        A. Yes.
5        Q. What did anyone else, other than you, say
6    during this initial meeting with the team?
7        A. I think there was a frenzy of, Okay, I'll
8    do this. I'll get with Catherine. I'll get with
9    this person. I'll get with that person. I'll get
10   with this person. Chad, Will, Amber, Donyelle knew
11   what their tasks were.
12       Q. Who said, I'll get with Catherine?
13       A. Probably Donyelle.
14       Q. And what did you understand her to mean by
15   that?
16       A. We had some real system challenges. We had
17   connectivity challenges. We had internet that would
18   go down. And in order for Catherine to be able to do
19   her part, she was going to have to be able to make
20   sure they had a secure, stable network, computers. I
21   think we had, at the time, I don't know, five or six
22   people there, and two or three computers. And there
23   had to be lots of training. Catherine, at that
24   point, was the only person who knew the system, which
25   meant that anybody else that was in the company,

Page 210

1   put that in there, because they don't want to have
2   another Select incident, where they cut the
3   employees?
4       A.  You guys -- I don't think you understand
5   how staffing works.  I don't get into the trenches,
6   and I haven't been in the trenches of contractual
7   stuff and clients and relations with clients in four
8   years.  I've been a regional manager at 30,000 feet,
9   managing multiple people.  I'm not in the trenches of
10  the daily grind.
11      Q.  But you knew Select had cut those
12  employees, you testified about that earlier, right?
13      A.  Yes.
14      Q.  So that never -- when you saw you have to
15  bid on all employees, you never remembered back, Oh,
16  yeah, we cut employees when I was at Select.  It
17  never crossed your mind?
18      A.  This is about how much time I spent on the
19  document.  I looked at the document, and I said, Hmm,
20  and I turned it over to my team and said, if we're
21  going to go for this, you take all of our hard costs,
22  plus 4 percent corporate allocation, 3 percent ACA
23  and add $1 per line item, per hour.  And if that gets
24  it, that gets it.  If it doesn't, it doesn't and I'm
25  out.  And I didn't have anything else to do with it.

Page 211

1       Q.  One of the things you said that also was
2   your responsibility was making sure pay rates were in
3   line with your company's culture?
4       A.  Yes.
5       Q.  How did you do that with respect to the
6   response to the City of Albuquerque bid?
7       A.  I wasn't.  The City doesn't -- the City
8   tells you what the pay rates are.
9       Q.  But did you need to evaluate them to
10  determine whether that was -- that either conflicted
11  or was consistent with your culture?
12      A.  It wouldn't have mattered because I didn't
13  get to tell anybody what those pay rates are.
14      Q.  So even if it didn't align with the
15  culture, that is just, you have to take it?
16      A.  Yeah, it's a City bid.  They wag the tail.
17      Q.  What was your involvement in preparing the
18  response to the bid?
19      A.  I just got done telling you.  That was the
20  extent of my involvement.
21      Q.  And after those initial conversations, did
22  anyone come and ask questions about -- to you, to
23  prepare the bid.
24      A.  I think that I got asked when I started
25  with Select Staffing.  I think that I got asked --

Page 212

1       Q.  Who asked you that?
2       A.  I think Amber.  As far as my team goes, no.
3   As far as Ash and Donyelle, on the back side of the
4   business, I think I collaborated in orchestrating
5   making sure that Ash was committed to getting us a
6   scanner, and fixing our network, and getting a backup
7   network in case it went down.  Our printers were from
8   the '80s, I think.  They were really pathetic and
9   bad.
10      Q.  Who was responsible for preparing the
11  request -- the response for the request for bid?
12      A.  Again, Amber, Donyelle, Will Hall, probably
13  Chad.  I think there was probably -- I know there was
14  an initiative to try to get reference letters from
15  clients that our team had worked with before.
16      Q.  Who was involved with that?
17      A.  I couldn't even tell you.  I don't know.
18      Q.  Was one person spearheading that project,
19  or did each person sort of go out and see who they
20  could get letters from?
21      A.  No, I remember Amber saying, Hey, do you
22  have anybody you can get a letter from -- any client
23  you can get a letter from?  And I said, I'll see.  I
24  don't know.
25      Q.  Did you get a letter?

Page 213

1       A.  Yeah, I think I got one from -- I think I
2   got one from Warren Kelm.
3       Q.  Who is he?
4       A.  He was the head of the APD department
5   probably up until, like, 2013, 2014.  Somebody that
6   we had worked with and kind of became friends with.
7       Q.  And was that letter, to your knowledge,
8   included in the response to the City's request for
9   bid?
10      A.  No.
11      Q.  Why not?
12      A.  Wasn't necessary.
13      Q.  Did anyone else obtain letters that were
14  then included in the City's response for bid, to your
15  knowledge?
16      A.  I think I saw, obviously -- I saw the
17  documents, so I think that everybody on the team got
18  some kind of letter.
19      Q.  Mr. Miller got one?
20      A.  I think so.
21      Q.  And what about Ms. Olinger, did she get
22  one?
23      A.  I believe so.
24      Q.  And Mr. Jacquez, did he get one?
25      A.  I think so.

Larry Shaun Shepard
February 17, 2017

**Page 214**

1 Q. And Ms. Fluitt, did she get one?
2 A. I don't know.
3 Q. What was Ms. Olinger's role, if any, in
4 preparing the response to the bid?
5 A. Again, Amber, Will Hall, Donyelle, and Chad
6 Hager are the only ones that prepared the bid.
7 Catherine did not have anything to do with the bid.
8 The only thing Catherine and I worked on from that
9 point on is answering our responses to this
10 litigation, trying to keep our team engaged from the
11 fear of a lawsuit and EmployBridge, trying to scratch
12 out a living without stepping on any toes, or any
13 part of EmployBridge.
14     And we worked on the infrastructure of
15 trying to establish how in the world, if we are going
16 to be forced to have to take on this big piece of
17 business, at a time that we were not prepared for it,
18 or even thought that we were going to do it, we had
19 some internal operations and trainings to do.  And
20 that's all that we focused on.
21     MS. LIBEU:  Do you want to take a break?
22     (Recess was taken from 3:32 to 3:53 p.m.)
23 Q. (By Ms. Libeu) If you didn't want RivenRock
24 to solicit or interfere with EmployBridge's clients,
25 why did RivenRock submit a response to the City of

**Page 215**

1 Albuquerque bid?
2 A. Well, considering the litigation and that
3 our company was going in a completely different
4 direction, carving out a new sector in the industry,
5 I had no non-compete, or any agreement with them, and
6 considering my team, and what we were faced with, it
7 was a decision that the company made to sustain
8 itself.
9 Q. Are you aware of a preliminary injunction
10 being issued in this case?
11 A. I am.
12 Q. And when was that entered approximately?
13 A. Possibly August.
14 Q. Of 2016?
15 A. I believe so, somewhere in there.
16 Q. And when was the response to the City of
17 Albuquerque bid submitted by RivenRock?
18 A. I don't know.
19 Q. Was it after the preliminary injunction or
20 before?
21 A. Yes.
22 Q. I'll ask it again.  Was the -- RivenRock's
23 response to the City of Albuquerque's request for bid
24 submitted after the preliminary injunction was issued
25 in this case?

**Page 216**

1 A. I believe so.
2 Q. Were you at all concerned with submitting a
3 response to the City of Albuquerque's request for
4 bid, given the preliminary injunction issued by the
5 court?
6 A. Say one more time.
7 Q. Did the fact that the court had issued an
8 injunction concern you when submitting a response --
9 when RivenRock submitted a response to the City's
10 request for bid?
11 A. No.
12 Q. Why not?
13 A. Because I didn't have anything to do with
14 it, and the named defendants didn't have anything to
15 do with it, and it is RivenRock's privilege to seek
16 business in whatever fashion they see fit.
17 Q. You had conversations with Ms. Rose and
18 Mr. Abtahi about whether RivenRock should submit or
19 could submit a response to the City's request for
20 bid, correct?
21 A. Not our ability to submit, our ability to
22 be able to operate if it was won.
23 Q. If you won the bid?
24 A. Yes.
25 Q. And you had a meeting with the entire

**Page 217**

1 RivenRock team, including Ms. Olinger and Mr. Abtahi
2 and Ms. Rose, to discuss whether the company could or
3 should submit a response to the City of Albuquerque
4 bid, right?
5 A. I did.
6 Q. I'm going to introduce another exhibit for
7 you.
8     (Exhibit 88 marked.)
9 Q. (By Ms. Libeu) Do you have Exhibit 88 in
10 front of you?
11 A. I do.
12 Q. Have you seen it before?
13 A. I have.
14 Q. What is it?
15 A. It looks like an application for
16 employment.
17 Q. And are there other documents with it, as
18 well?
19 A. Yes.
20 Q. Would it be fair to call it a new-hire
21 packet?
22 A. Yes.
23 Q. So you're fine if I refer to Exhibit 88 as
24 a new-hire packet?
25 A. That would be fine.

### Page 222

1  hand. There was questions that I had about the
2  application, so there was no signatures or dates on
3  any part of this application.
4       I took it back to her that -- I believe it
5  was the Friday before August 1st. I took it back
6  to her that afternoon, probably 1:00-ish. When I
7  came in the door -- when I walked in the door they
8  said Terrie Doty was not there. There was a Meghan
9  Yamagata that was sitting at the front desk. I had
10 it in a manila folder.
11      I said, Terrie is in a rush to get this.
12 Can you see to it that she gets this right away.
13      Now that I think about it, I think that
14 might have actually been on a Thursday. And the
15 reason being is, I don't remember hearing from her
16 that day. And I was leaving the next morning to
17 Oklahoma for my daughter. And she called me the next
18 morning and said they won't accept your application,
19 because you filled it out by hand. And so this has
20 to be filled out digitally.
21      I said, Terrie, I am literally driving
22 through Amarillo right now, and I don't even have a
23 computer.
24      And she said, Okay, I've got to get this in
25 by 2:00. Do you mind if I have it all typed in.

### Page 223

1  I'll take it off the paper application, and I'll get
2  it submitted, that way we can get your log-ins, and
3  we can have you start Monday morning.
4       I said I have some questions about the
5  commissions and -- the commissions, the collections
6  and also the non-compete.
7       And she said we can go over those on
8  Monday. I just need to get this transferred into
9  digital form, so I can get you log-ins and get you
10 access so can you start having e-mail and training as
11 soon as Monday morning. I said, Sure, and went on
12 about my business.
13      Q. So, essentially, you told her she could
14 take the handwritten forms that you gave her, convert
15 it to the digital forms we see here in Exhibit 88?
16      A. Correct.
17      Q. And were there any documents that you
18 signed as part of the handwritten package that you
19 submitted to Ms. Dotty?
20      A. Not a single thing.
21      Q. You didn't do a single signature on them?
22      A. No.
23      Q. Why not?
24      A. Because I would have done that in front of
25 her once my questions were answers.

### Page 224

1       Q. Because you still had questions on the
2  documents?
3       A. Yes.
4       Q. Were there any documents that you didn't
5  have questions on?
6       A. I don't recall.
7       Q. What questions did you have on the Notice
8  to Applicant Regarding Consumer Reporting?
9       A. I don't know that I had any questions on
10 that.
11      Q. Then why not sign that document?
12      A. I just don't sign anything in its entirety
13 until I understand what I'm signing.
14      Q. Because you considered it all one package?
15      A. Well, sure.
16      Q. Can you turn to the next page that ends in
17 120?
18      A. Yes.
19      Q. Do you see where it says "Employee Profile"
20 on the top?
21      A. Yes, I do.
22      Q. Was an employee profile part of the package
23 of handwritten information that you submitted to
24 Ms. Doty?
25      A. I'm sure.

### Page 225

1       Q. Is the information, looking at this
2  electronic version, correct with respect to your
3  personal information?
4       A. Yes.
5       Q. And was that likely because you had filled
6  out a handwritten version of this form?
7       A. Yes.
8       Q. And then turn to the next page that starts
9  on 121?
10      A. Yes.
11      Q. Do you see at the top where it says
12 "Salary, Sales Commission and Bonus Provisions,
13 Attachment One"?
14      A. Uh-huh.
15      Q. You have to answer audibly.
16      A. Yes.
17      Q. Was there a Salary, Sales Commission and
18 Bonus Provisions Attachment One that was included in
19 the handwritten package that you submitted to
20 Ms. Doty?
21      A. Say that one more time.
22      Q. Was there a Salary, Sales Commission and
23 Bonus Provisions Attachment One that was included in
24 the handwritten package that you gave back to
25 Ms. Doty?

**Page 226**

1  A. I believe so.
2  Q. Turn to the next page, please. Do you see
3  at the bottom of the page there's a Bates stamp that
4  says 122?
5  A. Yes.
6  Q. On that page it says at the top -- it says
7  Employee Agreement?
8  A. Yes.
9  Q. And what -- was there an Employee Agreement
10 that was part of the handwritten package that you
11 submitted to Ms. Doty when you gave her the
12 handwritten package sometime in July of 2011?
13 A. Yes.
14 Q. Did you read the Employee Agreement before
15 giving it back to Ms. Doty?
16 A. Oh, yes.
17 Q. And did you have questions on the Employee
18 Agreement that you wanted to discuss with Doty?
19 A. Yes.
20 Q. What questions?
21 A. I had questions about the commissions.
22 There was -- if I recall language in the commission
23 section that stated if you were on vacation or out of
24 the office, that your commissions could be waived or
25 something. There was language that made me go, What?

**Page 227**

1  Huh? I've been in sales a long time and I've never
2  seen language like this. And that it was based off
3  of collections.
4      So I wanted to have an understanding of
5  whose responsibility it was to collect the money.
6  And how that commission structure actually worked --
7  what that meant, because there was leading language
8  that there was something missing that needed further
9  understanding on how the commissions and the bonuses
10 worked. And -- as well as the very specific language
11 in the non-compete and the non-solicitation within
12 15 miles of the branch. So, yeah, I had concerns
13 about that, and we discussed those on Monday morning.
14 Q. What was the start date that you had at
15 Select Staffing?
16 A. August 1st, I believe, 2011.
17 Q. Did you and Ms. Doty, or anyone else at
18 Select discuss the questions you had with the
19 Employee Agreement at any time?
20 A. We did on Monday morning.
21 Q. On August 1st?
22 A. Yes, ma'am.
23 Q. So, tell me about those discussions you
24 had?
25 A. I first went into the office, and she was

**Page 228**

1  fairly busy. So she sat me down at a computer and
2  said, Watch these webinars -- these three webinars.
3  I sat down and watched those three webinars. And I
4  believe a couple of hours into the morning she came
5  in and sat down, and said -- I believe we started
6  talking about how I liked the webinars, what I
7  thought, small talk. And I said, Hey, about the --
8  I'm concerned about the commissions. Can you
9  explain? And she said, Oh, yes. She pulled out some
10 kind of book, and showed that there was days of
11 collections. Kind of tried to give me -- in the
12 world of -- it's a very complicated commission
13 program. So she spent probably ten or 15 minutes
14 with me on explaining that, and assured me that I
15 didn't need to worry about the collections, that all
16 of our clients, and any agreements that we do, have
17 ten-day terms. And so your commissions aren't
18 affected until after day 30 of collections, and that
19 they were really good at getting the money in. But
20 it would, ultimately, be my responsibility that if an
21 account did go -- get in credit trouble, that I
22 wouldn't be compensated at 6 percent or 5 percent.
23 It would continually escalate down, until X amount of
24 days, and you get pretty much zilch. That it would
25 be my responsibility to harness those relationships

**Page 229**

1  and get that money collected as needed, but that
2  would be administered through her, to give me
3  forewarning of when I needed to contact those
4  clients.
5  Q. Did those satisfactorily answer your
6  questions about the commission issues?
7  A. The commission issues, yes.
8  Q. What other things did you talk about with
9  Ms. Doty, with respect to the Employee Agreement?
10 A. When I asked her about the
11 non-solicitation, non-compete, she said I had nothing
12 to worry about. They were not enforceable in New
13 Mexico, and told me some kind of story about the
14 company that she came from, and that that was -- that
15 this was a nationwide application package, that is
16 just very broad for the whole entire nation, and
17 there are some states that are not applicable and
18 wouldn't apply. And I didn't need to worry about it,
19 New Mexico was one of them.
20 Q. What did you say in response to that?
21 A. Okay.
22 Q. And did you have a discussion about whether
23 you would sign the Employee Agreement or not?
24 A. I never thought or saw the Employment
25 Agreement again, because, apparently, when I gave her

Larry Shaun Shepard
February 17, 2017

**Page 230**

1  permission to take my paper application and put it on
2  a digital form, I guess at the same time it was
3  assumed, without thinking, that there was digital
4  signatures on that. And it was never a second
5  thought. It was just, Okay, and business as usual.
6  And we moved forward. However, there was some typos,
7  I believe, which now gives me greater even concern.
8     There actually came a point that there was
9  a bit of language that said I wasn't hireable because
10 my Social Security number came back ineligible for
11 hire, and something with the eVerify and the I-9.
12    And they had also -- and also, I think
13 there is a part in here that says, Name you prefer to
14 go by. And on my handwritten application I put
15 Shaun, and I believe on the transfer of the
16 information they put in Larry. And there was a
17 number or two transposed in my Social Security
18 number, and it kicked it back. And I think by
19 Tuesday or Wednesday there was an e-mail saying that
20 there was -- I was ineligible for employment in the
21 United States.
22    Q.  Where is it in the employee agreement where
23 it says what name you prefer to go by?
24    A.  I don't know. I just remember, because
25 that I specifically had to put something down that my

**Page 231**

1  name -- I needed to make sure that I put down the
2  name of choice or something like that. And, in fact,
3  all of my e-mail and, all of my accounts, and all of
4  my log-ins were originally set up under
5  Larry.Shepherd, and they had to -- it took them a
6  couple days to figure it out, but there were numbers
7  transposed between application, I-9, and that they
8  got my e-mail and my whole entire, like, employee
9  name, accounts, everything, under Larry Shaun
10 Shepherd, and it was not supposed to be Larry Shaun
11 Shepherd. We had to go back and redo something,
12 including, I think, an I-9 and eVerify. And then my
13 e-mail account was initially set up as
14 larry.shepherd@selectstaffing.com and it took them
15 about a week or two to figure all of that out. But I
16 never suspected anything.
17    Q.  Are you sure it was on the Employee
18 Agreement, or could it have been on some other form?
19    A.  It could have been. But to the best of my
20 recollection --
21    Q.  Well, look at the Employee Agreement here
22 and tell me where that is?
23    A.  All right.
24    Q.  What are you looking at right now, the
25 application?

**Page 232**

1    A.  Yes.
2    Q.  I'm talking about the Employee Agreement
3  that starts on 122. This is the new hire packet,
4  Exhibit 88, and it has many different documents, an
5  application, Employment Agreement. We looked at a
6  notice, right?
7    A.  Yeah.
8    Q.  So -- are you saying that something in this
9  package asked for which name you preferred?
10   A.  Yes.
11   Q.  So it's not necessarily the Employee
12 Agreement?
13   A.  And instead of putting "Shaun" there, they
14 put "Larry" there, and that's how the Larry.Shepherd
15 thing, and everything got messed up.
16   Q.  Do you remember which particular form that
17 was in?
18   A.  I thought you were just asking me to take a
19 look at it and find it.
20   Q.  No, I thought you were saying it was in the
21 Employee Agreement, and I didn't see it there. If
22 you are telling me it is somewhere in this packet,
23 that's okay. I just wanted to know if you were sure
24 it was the Employee Agreement or not?
25   A.  It was somewhere in this packet.

**Page 233**

1    Q.  So --
2    A.  To the best of my recollection.
3    Q.  But you don't remember which particular
4  document it was in?
5    A.  I do not.
6    Q.  Can you go back to the Employee Agreement
7  that starts on 122, please?
8    A.  Yes.
9    Q.  Irrespective of whether you signed the
10 employment agreement, were there particular
11 provisions of the employee agreement that you agreed
12 to, and particular provisions you did not agree to?
13   A.  Well, the only part I didn't agree to,
14 based off of my lack of signature on the original
15 form, and what Terrie Doty told me based on my hire,
16 was the non-solicitation, non-compete language within
17 this agreement.
18   Q.  So why don't you tell me -- do you see the
19 heading that says Trade Secret Confidentiality
20 Information?
21   A.  Yes.
22   Q.  Can you read subparagraph B under that, and
23 tell me whether you agreed to that provision or not?
24   A.  "Employee agrees that all such trade
25 secrets/confidential information, even the clients

U.S. LEGAL SUPPORT
800-993-4464

59 (Pages 230 to 233)

EXHIBIT 2

### Page 234

and temporary workers developed, obtained or recruited by employee, or with whom which he/she may deal with while he/she is employed by Select Staffing are, and shall remain, the property of Select Staffing and not employee. Both during employment with Select Staffing and for a period of five years after his/her employment with Select Staffing ends, employee will not use, disclose or divulge Select Staffing's trade secrets/confidential information, except as needed to perform his/her duties during employment with Select Staffing."

   Q. Did you agree to that subparagraph B that's part of the Employee Agreement.
   A. I can't say that I did.
   Q. Do you remember one way or another, or are you saying you didn't agree to it?
   A. Anything -- this is the whole language that is leading to the Employee Agreement which is continued to the non-solicitation. So there is not any signature that is on this. So, no, I did not agree to this specific language when it comes to -- because Terrie Doty told me this part of it does apply.
   Q. She told you that you didn't have to keep EmployBridge trade secrets and confidential

### Page 235

information confidential?
   A. Is this language that's leading up to the non-solicitation or non-compete language?
   Q. What do you mean by that?
   A. Right here, during employment -- part C, and for one year after, Select Staffing employee agrees he/she will not solicit any Select Staffing employees.
   Q. Did you agree to that provision?
   A. Is that part one of part two, or part one of two, three, four and ongoing.
   Q. I'm just asking you whether you agreed to paragraph B or not?
   A. I can't say that I did.
   Q. Is it that you didn't agree to it, or you don't remember one way or another?
   A. I did not agree to it.
   Q. And did you agree to subparagraph C?
   A. I can't say that I did.
   Q. Is it that you can't remember one way or another, or you did not agree to it?
   A. I did not agree to this whole section, because all of this language is tied to a non-solicitation or a non-compete provision within this agreement, therefore, if my manager -- my hiring

### Page 236

manager tells me, point blank to my face, that the New Mexico -- this is unenforceable, and does not count in New Mexico. What part -- I can't just. Yes, I agreed to the word "Select." I did not agree to the series of language throughout this entire --
   Q. I'm not asking for word by word. I'm just going paragraph by paragraph and asking if there are particular paragraphs that you agreed to.
       Are you telling me you didn't agree to any of the paragraphs under the Trade Secret Confidentiality Information?
   A. Not by authority of signature or authority of contract, based on what Terrie Doty told me.
   Q. Are there any other ways, other than by authority of contract or the authority of signature, that you agreed to any of the provisions that are under the Trade Secret/Confidentiality heading of the Employee Agreement?
       MR. STANFORD: Quick objection. Form. Foundation.
       Go ahead.
   A. I guess I would have to read it from top to bottom to really clearly understand what I'm saying yes and no to, but if we're specific on this section, no.

### Page 237

   Q. And when you say "this section," which section are you referring to?
   A. The Employee Agreement.
   Q. ==Are you referring to just the Trade Secret/Confidentiality section, or the entire Employee Agreement?==
   A. ==We're carving it out. My question to Terrie Doty was: What is a non-solicitation, non-compete in a city that is not even 15 miles wide? How does that apply? And she specifically told me, None of that applies. It's not enforceable in New Mexico. So if I go back and think how you're strategically asking your question, of course, I agree to hold all of the secrets confidential -- trade secrets et cetera.==
   Q. And where did you make that agreement?
   A. I don't think there's -- I think it's common sense that you would -- that's a natural, common sense agreement.
   Q. Okay. But you didn't make it as a part of the Employee Agreement that we're looking at?
   A. I'm not sure I really understand exactly.
   Q. What part of subsection B, under the Trade Secret/Confidentiality information has to do with a non-solicit or non-compete obligation?