Case 1:16-cv-00833-WJ-KK   Document 104-6   Filed 04/24/17   Page 1 of 1

Page 6 (Pages 77-80)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.
1:16-CV-00833

Fran Scott, Vol. II
March 28, 2017

Page 77

1  **A.   Honestly, I do not recall who went out there**
2  **to meet with him.**
3    Q.   And do you know specifically during the
4  meeting with Mr. Wynn -- and this may have been covered
5  already -- whether Mr. Miller or Mr. Jacquez made any
6  specific solicitation statements to Acme?
7    **A.   The conversation that I had with Keaton Wynn**
8  **was that -- and I'm almost positive that it was Tim that**
9  **was there -- the statement was -- this is not**
10 **verbatim -- "With the number of drivers that you have**
11 **through ProDrivers, we can offer you a much better**
12 **discounted rate."**
13   Q.   Do you have any firsthand knowledge of any
14 trade secret, confidential, or proprietary information
15 that Terry Miller has misappropriated?
16        MR. HART:  Object to the form of the
17 question to the extent it's calling for a legal
18 conclusion.
19        You can answer to the extent you
20 understand.
21   **A.   Trade secrets?  Say the question again.**
22   Q.   Sure.  Do you have any information -- I'm
23 looking from a non-legal person -- do you have any
24 firsthand knowledge or information whether or not Terry
25 Miller has used or disclosed what you consider to be

Page 78

1  confidential or proprietary information of either
2  ProDrivers or EmployBridge?
3    **A.   No.**
4    Q.   Do you have any information that Tim Jacquez
5  has used or disclosed any confidential or proprietary
6  information of either ProDrivers or EmployBridge?
7    **A.   No.**
8    Q.   Did Mr. Miller or Mr. Jacquez ever have direct
9  client contact or relationship with the City of
10 Albuquerque?
11   **A.   No.**
12   Q.   When Mr. Miller was onboarding -- We went over
13 this a little bit before.  I don't want to go into
14 detail on the purported DocuSign materials.  Is there an
15 initial application that a candidate fills out when
16 applying either for ProDrivers and/or EmployBridge?  If
17 you don't know the difference, we can focus on
18 ProDrivers.
19   **A.   There may be an online application, but to be**
20 **perfectly honest with you, I'm not a hundred percent**
21 **sure.**
22   Q.   Do you know whether or not there was a
23 different commission schedule for ProDrivers and for
24 EmployBridge employees?
25   **A.   I do not.**

Page 79

1    Q.   ProDrivers, at least during your time there,
2  have they used a commission structure for purposes of
3  sales and the like?
4    **A.   There is a commission structure for sales, and**
5  **there is an operations bonus for the office staff or the**
6  **operations team.**
7    Q.   And do you know whether -- We'll focus first
8  on the commission structure.  Do you know how long
9  that's been in place?
10   **A.   Ever since I've been employed with ProDrivers.**
11   Q.   And do you know whether it says "ProDrivers"
12 or "EmployBridge" anywhere on that?
13   **A.   I don't know.**
14   Q.   What about the operations bonus materials?
15   **A.   The operations incentive has been in place,**
16 **again, ever since I've been employed.**
17   Q.   Do you know whether that is localized to
18 ProDrivers or is part of the larger EmployBridge family
19 of companies?
20   **A.   I don't know.**
21        MR. STANFORD:  I'll mark 144.
22      (Exhibit 144 marked.)
23   Q.   (By Mr. Stanford)  I'll ask if you recognize
24 this document.
25   **A.   Yes.**

Page 80

1    Q.   What is this document?
2    **A.   It is the spreadsheet that our attorneys put**
3  **together on the projected losses and actual losses.**
4    Q.   Did you have any involvement in the
5  preparation of this document?
6    **A.   I provided the information.**
7    Q.   What information did you provide?
8    **A.   The information for RAC Transport, Acme, and**
9  **Fidelitone.**
10   Q.   So is it fair to say, then, that at least with
11 respect to the information above with regard to COA,
12 which is City of Albuquerque, Ink Impressions, and
13 Superior Ambulance, that's outside of your area of
14 knowledge and understanding?
15   **A.   Yes.**
16   Q.   And are you the one that identified these as
17 losses attributable to Jacquez, Miller, and Riven Rock?
18   **A.   Yes.**
19   Q.   And, again, that's based on your belief that
20 Mr. Jacquez solicited improperly RAC Transport, Acme
21 Iron & Metal, and Fidelitone.
22   **A.   And/or Terry or Tim.**
23   Q.   Do you think that Mr. Jacquez should be stuck
24 with any damages that maybe Mr. Miller caused or vice
25 versa?