Catherine Olinger
February 15, 2017

### Page 18

1  A. Yes.
2  Q. In 2003?
3  A. Yes.
4  Q. Do you remember what month?
5  A. Actually, I do. It was March.
6  Q. How do you remember that month so clearly?
7  A. My birthday is in March, so I remember
8  that.
9  Q. Around the same time period?
10 A. Yes.
11 Q. And what was your title at Westaff?
12 A. So I started off doing payroll, and I was
13 actually just part time. And I was just -- and I
14 just processed payroll.
15 Q. And were you working here in Albuquerque,
16 as well?
17 A. I was, yes.
18 Q. And how long did you do payroll for
19 Westaff?
20 A. Gosh, years -- probably -- I was always
21 doing payroll, so five years.
22 Q. Did you ever have another title?
23 A. I did. Then I became an on-site manager.
24 Q. And what were your responsibilities as
25 on-site manager?

### Page 19

1  A. Basically, I serviced one client, and I did
2  everything for the one client. I did all of the
3  payroll. I filled positions. It was nice. I got to
4  concentrate and service just one client.
5  Q. Which client was that?
6  A. General Mills.
7  Q. And how long did you do that for?
8  A. Oh, gosh, I did that for about three
9  years -- three, four years.
10 Q. From what time period to until about what
11 time period, ballpark?
12 A. Oh, gosh, okay, so -- probably about 2004
13 to about 2007.
14 Q. And then in 2007, approximately, do -- did
15 you have another title and another role?
16 A. Yeah. Then I was just -- I couldn't do it
17 anymore. I mean, it was 24-7, so I became a
18 recruiter in the office. I did -- I found my
19 replacement and everything. So I didn't have to deal
20 with that anymore.
21 Q. Who was your replacement?
22 A. His name was Shaun Dinkle.
23 Q. And as a recruiter, what were -- what were
24 your job responsibilities?
25 A. Basically, just to service all of the

### Page 20

1  clients, interview candidates, also doing payroll,
2  just -- those were the main things.
3  Q. But it was less 24-7?
4  A. Yes. It was more Monday through Friday.
5  Q. And was recruiter -- did you have any other
6  titles or roles at Westaff, after being a recruiter?
7  A. No. Every staffing company has a different
8  personnel manager or staffing assistant, but,
9  basically, you're a recruiter.
10 Q. And then at what point did you stop working
11 for Westaff?
12 A. It was March of 2009. Select Staffing
13 bought Westaff.
14 Q. And then you became an employee of Select
15 Staffing?
16 A. Yes.
17 Q. And how long were you at Select Staffing?
18 A. I was there until February of 2015.
19 Q. And why did you leave in February of 2015?
20 A. There was a lot leading up to why I left.
21 Q. Did you resign?
22 A. I did. I provided notice and I left, same
23 day.
24 Q. Did -- you didn't give two weeks' notice?
25 A. I did not.

### Page 21

1  Q. Why not?
2  A. In the staffing industry -- I've seen
3  dozens of people give notice, and they're walked out
4  the very next minute, so...
5  Q. So you figured you would --
6  A. Save them the trouble.
7  Q. Did anyone ask you to leave that same day,
8  or you just --
9  A. No.
10 Q. -- you just did it?
11 A. I just -- it was time to go.
12 Q. And what -- what were the reasons that you
13 resigned?
14 A. So, in two -- it was late 2014, I became --
15 I was promoted to branch manager.
16 Q. Okay.
17 A. It was very late -- it was, like, right
18 after Christmas. As part of that I was -- I had so
19 many different roles. I was in training, and then I
20 was a recruiter. But I was making, gosh, 85,000 a
21 year as a recruiter. I was doing very well.
22    So, when I became branch manager my
23 commissions went from 2,000 a month to $300 a month.
24 You know, I'm the bread winner in my family, and that
25 was a huge pay cut. So when I first started getting

## Page 162

1    A. We did.
2    Q. When you said "we did," who do you mean?
3    A. I believe Shaun did.
4    Q. Did you personally produce it?
5    A. I did not.
6    Q. You did not. Why not?
7    A. I was copied on it -- or maybe I did. I --
8  I can't recollect. I submitted so much. But I know
9  that was submitted.
10   Q. And it's your understanding that either you
11 or Mr. Shepherd gave it to your attorney?
12   A. Yes.
13        (Exhibit 64 marked.)
14   Q. (By Ms. Libeu) Do you have Exhibit 64 in
15 front of you?
16   A. I do.
17   Q. Have you seen it before?
18   A. I have.
19   Q. What is it?
20   A. It's an e-mail from me to Rebbekka, Shaun,
21 Viola and Amber.
22   Q. And are there earlier e-mails in the chain?
23   A. Yes.
24   Q. Was this the e-mail chain you were talking
25 about that you were copied on?

## Page 163

1    A. I was, yes.
2    Q. And do you see the first e-mail in the
3  chain is from Viola Cunningham to Shaun Shepherd on
4  May 23, 2016?
5    A. I do see that.
6    Q. Is it your recollection that there was an
7  e-mail before this from Mr. Shepherd to
8  Ms. Cunningham?
9    A. I believe there was a phone call, not an
10 e-mail.
11   Q. Do you see in the subject line of the
12 e-mail that we're looking at, it says, subject
13 forward "new staffing company"?
14   A. Yes.
15   Q. Does that suggest to you that this e-mail
16 was a forward of another e-mail?
17   A. Yes.
18   Q. Does that suggest to you that there is
19 another e-mail before this one?
20   A. I believe so, yes.
21   Q. And do you know what that e-mail is?
22   A. I do not.
23   Q. Do you know whether that e-mail was
24 produced in this case?
25   A. I do not.

## Page 164

1    Q. Do you know whether you have a copy of the
2  e-mail, including the original e-mail, in part of
3  this chain?
4    A. I do not. I have this chain, but I --
5  anything other than this, I do not have.
6    Q. So you don't -- you don't have the original
7  e-mail that was -- that was forwarded?
8    A. I don't believe so.
9    Q. And do you see the e-mail from
10 Ms. Cunningham to Mr. Shepherd says, Hi, Shaun I've
11 included Rebbekka, as she's been working on the
12 various staffing accounts -- contracts most recently?
13   A. Yes, yes, I do.
14   Q. Who's Rebbekka?
15   A. Rebbekka Tynan, she is in the purchasing
16 department. I believe she was, like, an assistant to
17 the purchasing department.
18   Q. And Ms. Cunningham goes on to say, "Thanks
19 for getting your contact information back to us." Do
20 you see that?
21   A. I do.
22   Q. Does that suggest that there were prior
23 communications between Ms. Cunningham and
24 Mr. Shepherd?
25   A. It does.

## Page 165

1    Q. And what's your understanding of what those
2  prior communications were?
3    A. My understanding is just calling to say Hi,
4  sorry I didn't get to leave. Hope you're are doing
5  okay.
6    Q. And do you know, in those prior
7  communications, whether Mr. Shepherd mentioned the
8  fact that he was at a new company?
9    A. I do not.
10   Q. Now, do you see the e-mail that goes on to
11 say be sure to sign up in our E procurement system
12 using the City website?
13   A. Yes.
14   Q. Do you know what City's E procurement
15 system is?
16   A. It is called Sicomm.
17   Q. And what -- what is that?
18   A. That's where vendors can get registered for
19 when things come up, requests for -- when RFPs come
20 up, you're notified.
21   Q. Are you -- so if an RFP comes up and you're
22 in the E procurement system, you would get a
23 notification of that?
24   A. You would.
25   Q. And do you see in the next e-mail, it's

Catherine Olinger
February 15, 2017

## Page 166

1  from Mr. Shepherd, back to Ms. Cunningham and
2  Ms. Tynan, copying you and Amber Fluitt?
3      A.  Yes.
4      Q.  And it says, "Hi, Viola and Rebbekka.
5  Thank you so much for the followup.  I hope you both
6  are doing great.  I copied Catherine Olinger so you
7  have her contact information, too.  We will make sure
8  the registration is complete this week.  Please let
9  me know if there is anything we can help with."  Do
10 you see that?
11     A.  I do.
12     Q.  What registration is Mr. Shepherd talking
13 about?
14     A.  So, basically, in order to be notified of
15 RFPs, you to have register on the website.
16     Q.  And that's the registration he's referring
17 to?
18     A.  Yes.
19     Q.  And do you see after that, Mr. Shepherd
20 writes, "Looking forward to working with you"?
21     A.  Yes.
22     Q.  Do you have an understanding of what he
23 meant by that?
24     A.  Just working -- hopefully working together
25 in the future.

## Page 167

1      Q.  Were there any plans at the time of this
2  e-mail, May 24, 2016, to work with the City of
3  Albuquerque?
4      A.  There was not.
5      Q.  Then why would Mr. Shepherd say, "I am
6  looking forward to working with you"?
7          MR. STANFORD:  Objection.  Form.
8          Go ahead.
9      A.  I do not know.  You'll have to ask him.
10     Q.  Do you know who sent, and to whom the
11 earlier e-mail was sent that was the forward, that
12 says "Forward: new staffing company"?
13         MR. STANFORD:  Objection on foundation
14 grounds.
15         Go ahead.
16     A.  I do not.
17     Q.  Does the title suggest to you that someone
18 was sending an e-mail to someone announcing the
19 formation of a new staffing company?
20         MR. STANFORD:  Objection.  Form.
21         Go ahead.
22     A.  Yes.
23     Q.  Did you send an e-mail to anyone announcing
24 the formation of a new staffing company?
25     A.  I did not.

## Page 168

1      Q.  So you weren't the original person that
2  sent the e-mail?
3      A.  I was not.
4      Q.  It was someone else?
5          MR. STANFORD:  Objection.  Form.  It has
6  been asked and answered.
7      A.  I believe so, yes.
8      Q.  And who do you think it was?
9      A.  I do not know.
10     Q.  Do you think it was Mr. Shepherd?
11     A.  It could have been.
12     Q.  Who else could it have been?
13     A.  I do not know.
14     Q.  Can you turn back to your declaration.  I'm
15 going to have you look at paragraph 16.  It says,
16 "While employed by EmployBridge I never worked with
17 Lively Distributing, Insight Lighting, Stock Building
18 Supply, LKQ or Acme Iron & Metal, and did not attempt
19 to influence them to do business with RivenRock."  Is
20 that accurate?
21     A.  That is accurate.
22     Q.  And then the next sentence says, "I have
23 not had any contact with General Mills since leaving
24 EmployBridge, and as far as I know no one at
25 RivenRock has had contact with General Mills."  Is

## Page 169

1  that correct?
2      A.  That is correct.
3      Q.  And the next sentence says, "I received a
4  call from a representative of the City of
5  Albuquerque, but did not initiate the contact, and
6  did not attempt to influence the representative to do
7  business with RivenRock."  Is that accurate?
8      A.  That is accurate.
9      Q.  When did you receive a call from the City
10 of Albuquerque?
11     A.  I don't recall exactly, but my husband
12 actually used to work at the transit department as
13 temp, and Vera Taylor, was the one who reached out to
14 me -- she actually reached out to my husband and
15 he -- he didn't work there anymore.  She wanted to
16 know, Hey, where's Catherine?  She's not at Select
17 anymore.  And he said, Oh, she's with this other
18 company.  He gave her my number.  And she called me
19 and said, Hey, this is Vera.  Where did you go?
20         So I told her, I'm with this new company
21 now.  And then she said she was having some issues
22 with Select.  And I said, I can't help you with that.
23 I'm not there anymore.  And that was it.
24     Q.  When was that phone call approximately?
25     A.  Gosh, spring -- May -- April, May, June,

Page 170

```
 1  somewhere.  I mean, I really don't remember.
 2      Q.  Was it before or after the e-mail that is
 3  in Exhibit 64?
 4      A.  It might have been before.  I -- I really
 5  can't remember exactly.
 6      Q.  And what was the name of the woman that
 7  called you?
 8      A.  Vera Taylor.
 9      Q.  Vera Taylor.  And have you ever spoken to
10  Ms. Taylor since?
11      A.  I have not.
12      Q.  And what number did she call you at?
13      A.  My husband gave her my cell phone number.
14      Q.  And what number did she call your husband
15  at?
16      A.  On his cell phone number.
17      Q.  And how did she have that?
18      A.  Because he used to work directly for her.
19      Q.  Now, back to Exhibit 64.  Looking back at
20  the May 24th e-mail from Mr. Shepherd to
21  Ms. Cunningham where you're included on, one of the
22  things he says is "I copied Catherine Olinger, so you
23  have her contact information, too."
24      A.  Yes.
25      Q.  Do you see that?
```

Page 171

```
 1      A.  I do, yes.
 2      Q.  And why would Ms. Cunningham need your
 3  contact information?
 4      A.  I do not know.
 5      Q.  Did Ms. -- did Mr. Shepherd ever tell you
 6  why he was giving Ms. Cunningham your contact
 7  information?
 8      A.  Just to keep me in the loop.
 9      Q.  In the loop on what?
10      A.  On reaching out to Viola, because I did
11  work a lot with Viola as well, and Rebbekka, so it
12  was good to -- to say hi.
13      Q.  So that you could continue to reach out to
14  them?
15      A.  Possibly.
16      Q.  For what purpose?
17      A.  I don't know.
18      Q.  To provide staffing?
19      A.  If it ever came up.
20      Q.  And then there's some -- a responsive
21  e-mail from Rebbekka that says, "So that's where
22  Catherine went," correct?  Do you see that?
23      A.  I do see that, yes.
24      Q.  And then you respond, "Here I am"?
25      A.  Yeah.
```

Page 172

```
 1      Q.  Did Ms. Cunningham subsequently contact
 2  you?
 3      A.  She did not.
 4      Q.  She did not.  Did you subsequently contact
 5  Ms. Cunningham?
 6      A.  I did not.
 7      Q.  You haven't spoken to her since this e-mail
 8  chain?
 9      A.  No, I have spoken to her recently, yeah.
10      Q.  So when was the next time you spoke to her,
11  after this e-mail chain?
12      A.  Oh, gosh -- okay, so after this e-mail
13  chain, maybe when we were awarded the contract we had
14  to go to a meeting, so maybe October.
15      Q.  In between the time of this May e-mail, and
16  the August request for proposal that was put out --
17      A.  Yes.
18      Q.  -- by the City, did you have any
19  communications with Ms. Cunningham?
20      A.  I did not.
21      Q.  And did you have any communications during
22  that same time period with anyone else at the City of
23  Albuquerque?
24      A.  I did not.
25      Q.  How did you learn that the City had put out
```

Page 173

```
 1  a request for proposal in August of 2016?
 2      A.  So Amber had actually registered with
 3  Sicomm.  And we were notified through e-mail that
 4  they were requesting a bid.
 5      Q.  Other than Ms. Fluitt registering RivenRock
 6  through Sicomm, did anyone -- or are you aware of
 7  anyone at RivenRock having communications with anyone
 8  at the City of Albuquerque between the time period of
 9  that May e-mail we just looked at, and the time that
10  the request for proposal was put out?
11      A.  Not that I'm aware of.
12      Q.  And so Ms. Fluitt was the first one to
13  learn that the City had put out the request for bid?
14      A.  She actually used our branch e-mail, so
15  that the notification would go to everyone.
16      Q.  And what did the notification say?
17      A.  It -- I don't remember exactly.  I think it
18  just said that the City is requesting an RFP
19  solicitation, something to that effect.  I don't
20  remember exactly.
21      Q.  And what communications did you have with
22  the folks in your office about that request for
23  proposal, once you saw it come out?
24      A.  We talked about if we wanted to proceed
25  with going -- doing the bid.
```

Page 174

1  Q. And when did you have the first of those
2  communications?
3  A. Let's see, the RFP came out in August, so
4  it would have been probably right after it came out.
5  Q. Within a day or two?
6  A. Probably, yeah.
7  Q. And where did those conversations take
8  place?
9  A. I remember us having a team meeting in our
10  back office.
11  Q. And who was at the meeting?
12  A. Our whole staff, Terry Miller, Tim Jacquez,
13  Shaun Shepherd, Amber Fluitt, Miranda Eaton, Lupe was
14  still employed with us at the time, Lupe Marquez, and
15  that was it.
16  Q. Yourself?
17  A. Myself, yes.
18  Q. And what were the discussions?
19  A. So we talked about -- they said it's coming
20  up for bid, how much work is involved in this bid,
21  and if it's something that we can even do.
22  Q. And what did you decide on that issue?
23  A. We decided we would give it our best shot.
24  Q. And were you worried that you wouldn't be
25  able to fulfill the services that they need?

Page 175

1  A. Mainly just worried about how we could
2  service it, getting all of the additional insurance
3  they required, yeah, so we really had to figure
4  things like that out.
5  Q. And who made the decision to provide a
6  proposal in response to the request that the City put
7  out?
8  A. Amber did.
9  Q. And why is Amber the one that made that
10  decision?
11  A. Well, she's our -- at that time she was our
12  business development manager. She had done all of
13  the registrations, so she was part of that meeting,
14  and she said, Yeah, let's go ahead and -- she was
15  going to start it.
16  Q. And what did you say at that meeting?
17  A. I said, Sure.
18  Q. What did Mr. Shepherd say at that meeting?
19  A. We all agreed, yeah, let's go ahead. And
20  Amber wanted to proceed with it, so let's see what
21  happens.
22  Q. Was it a consensus decision by the team?
23  A. Yeah. And then we did tell them, you know
24  just how much work is involved. I mean, it's -- it's
25  a lot of work, and how difficult it could be to

Page 176

1  just -- like, an on-boarding process, and, you
2  know -- first of all we had to -- there was a whole
3  list of insurance requirements, fidelity bonds, all
4  sorts of things that we had to have in place if we
5  were going to proceed with it.
6  Q. At this meeting -- or how many meetings did
7  you have about whether you should bid on the request
8  that the City put out?
9  A. It was just that one meeting.
10  Q. Just one meeting?
11  A. Uh-huh.
12  Q. And you made the decision to do it at that
13  one meeting?
14  A. Yes.
15  Q. What did you say, or did you give your
16  opinion on whether RivenRock should submit a response
17  to the bid?
18  A. I said, Sure, let's do it.
19  Q. And why -- why did you say that?
20  A. Because it's an account I was familiar with
21  working with.
22  Q. And you thought it was something that you
23  would be able to service appropriately, given your
24  background?
25  A. I did.

Page 177

1  Q. And what did Mr. Shepherd say about his --
2  what his opinion was on whether RivenRock should put
3  a bid out in response to the request?
4  A. He was a little leery, just if we could
5  meet all of the requirements. But Amber really
6  wanted to push through with it, so we did.
7  Q. And, ultimately, he was on board with the
8  group's decision?
9  A. Yeah, all of us collectively as a group
10  each talked about it, what commitment we would need
11  from everyone, and collectively as a group, yes.
12  Q. Tell me about what commitment was needed
13  from each individual.
14  A. So, well, thinking ahead, you know, we were
15  going to have to work longer hours, weekends for a
16  period of time, if we were awarded it, and if
17  everybody was on board with that, and everybody was.
18  Q. And what was it anticipated that
19  Mr. Miller's role was going to be with the City of
20  Albuquerque contract, if you were awarded it?
21  A. He really wasn't involved in that. He was
22  still going to continue his -- his sales.
23  Q. And that would include sometimes dealing
24  with the City of Albuquerque, or no?
25  A. Yeah, maybe sometimes going out and

## Page 210

1  doing good.
2    Q.  Where in paragraph 17 does it say, I have
3  not contacted the City of Albuquerque except for
4  chitchat?
5        MR. STANFORD:  Objection.  Form.
6        Go ahead.
7    A.  I did not contact the City of Albuquerque,
8  and I'm leaving it at that.
9    Q.  Now, is -- would you consider the e-mail
10 from you to Ms. Rebbekka Tynan and Viola Cunningham
11 on May 24th, contact from you to the City of
12 Albuquerque?
13   A.  A follow-up.
14   Q.  It's a follow-up, okay --
15   A.  Yeah.
16   Q.  -- so you had some follow up with City of
17 Albuquerque, even though you didn't initiate the
18 contact?
19   A.  Exactly.
20   Q.  Do you think you should have made clear in
21 paragraph 17 that you did not initiate some contact,
22 but that you followed up on contact that they had had
23 with you?
24   A.  No.  I like it the way it reads.
25   Q.  Why is that?

## Page 211

1    A.  I just do.
2    Q.  Do you like it because it hides the ball on
3  the type of contact you had had with the City?
4        MR. STANFORD:  Objection.  Form.
5  Counselor, you -- come on, making ridiculous
6  accusations is not appropriate.
7    A.  Not at all.  I have nothing to hide.
8        MR. STANFORD:  Let's take a break.
9        MS. LIBEU:  Okay.
10       (Recess was taken from 2:06 to 2:16 p.m.)
11   Q.  We're back on.  I want to show you another
12 document.
13   A.  Okay.
14       (Exhibit 67 marked.)
15   Q.  (By Ms. Libeu) Do you have Exhibit 67 in
16 front of you?
17   A.  I do.
18   Q.  Have you seen it before?
19   A.  I have.
20   Q.  What is it?
21   A.  It is the request for bid.
22   Q.  From the City of --
23   A.  City of Albuquerque.
24   Q.  -- Albuquerque?
25   A.  Yes.

## Page 212

1    Q.  And it's a request for bid, not a request
2  for proposal, right?
3    A.  It says the City of Albuquerque
4  purchasing -- is requesting bids for the following
5  services.
6    Q.  And the title is Specifications for RFB?
7    A.  Yes.
8    Q.  But as far as you're concerned, it doesn't
9  make a difference whether it's a -- a request for
10 proposal, or request for bid?
11   A.  I don't know.
12   Q.  Who knows the difference, right?
13   A.  I don't know.
14   Q.  And is this the request for bid from the
15 City that RivenRock submitted a response in respect
16 to?
17   A.  Let me look.
18   Q.  Yeah, take your time.
19   A.  It looks that way, yes.
20   Q.  Who prepared the -- RivenRock's response to
21 the City of Albuquerque's request for bid?
22   A.  Amber Fluitt.
23   Q.  And did she prepare 100 percent of it?
24   A.  She did.
25   Q.  What experience does she have preparing

## Page 213

1  responses to requests for bids in the past?
2    A.  As a business development manager, she had
3  been working on bids in all various companies.
4    Q.  What other companies has she -- had she
5  submitted responses to request for bids?
6    A.  I can't recall at the moment.
7    Q.  Had she done any previously for RivenRock?
8    A.  Yeah, she -- it was through RivenRock.
9    Q.  It was through RivenRock.  And how many had
10 she previously done?
11   A.  Let's just take a wild guess, maybe five to
12 ten.
13   Q.  Five to ten?  And were those for contracts
14 much smaller than the City of Albuquerque's contract?
15   A.  Various ones, yes, I believe.
16   Q.  Were any of them larger than the City of
17 Albuquerque contract?
18   A.  Not that I'm aware of, no.
19   Q.  ==So the response to the City's request for
20 bid was the largest one that RivenRock had submitted
21 a response to?==
22   ==A.  Yes.==
23   ==Q.  It was a pretty important response, right?==
24   ==A.  Sure, yeah.==
25   ==Q.  Because, as you testified earlier, you==

## Page 214

1  might have to shut the doors of the company if you
2  didn't win the bid, right?
3      A.  Correct.
4      Q.  Were you confident that Ms. Fluitt had the
5  experience and capability in order to submit this bid
6  100 percent on her own?
7      A.  I did.
8      Q.  Did you speak to her about how to respond
9  to the City of Albuquerque's request?
10     A.  No, she read through the directions, and
11 submitted everything required.
12     Q.  Did she show you any of the documents she
13 submitted before she submitted them?
14     A.  I don't believe so.
15     Q.  Did she ask you any questions about the
16 response that she was putting together?
17     A.  No, I don't believe so.
18     Q.  Do you know if she asked anyone else at
19 RivenRock any questions before she submitted the bid?
20     A.  Not I'm aware of.
21     Q.  Do you know if she showed anyone else any
22 documents before she submitted the -- anyone else at
23 RivenRock any documents before she submitted the
24 response to the bid?
25     A.  Not that I'm aware of.

## Page 215

1      Q.  Now, you were here for Mr. -- Mr. Miller's
2  deposition, right?
3      A.  Yes, I was.
4      Q.  And did you hear Mr. Miller testify that he
5  thought that you and Mr. Shepherd worked on the
6  response to the bid?
7      A.  I did.
8      Q.  What do you think of that?
9      A.  That's incorrect.  He assumed, but that's
10 not what we were working on.
11     Q.  What were you working on when Mr. Miller
12 thought you were working on the response to the bid?
13     A.  We work on lots of things.  Discovery for
14 this lawsuit, class action lawsuits, just our overall
15 branch operations.
16     Q.  How many other clients did you -- or how
17 many clients did you have at the time that you
18 were -- at the time that Ms. Fluitt was working on
19 the response to the City's bid?
20     A.  Let's see, under ten.
21     Q.  And how much -- what percentage of your --
22 your business time would it -- did it take you to
23 service those clients?
24     A.  40 hours a week.
25     Q.  So did you do the discovery and class

## Page 216

1  action lawsuit stuff on top of that 40 hours?
2      A.  We did.
3      Q.  Now, why would Mr. Miller think that you
4  were working on the response to the City's request
5  for bid, if you weren't?
6      A.  I have no idea.
7      Q.  But he's just incorrect?
8      A.  He's incorrect.
9      Q.  Did you hear him testify that he saw you
10 and Mr. Shepherd working late nights at the office at
11 the time that the bid was being prepared?
12     A.  He did.
13     Q.  Were you working late nights?
14     A.  We work late nights all the time.
15     Q.  What were you working late nights on, if
16 not on the request -- response to the request for bid
17 from the City?
18         MR. STANFORD:  Quick objection, form.
19         Go ahead.
20     A.  Oh, gosh, everything.  Discovery, the class
21 action lawsuit, our general overall operations of our
22 business, our vision.  If it -- if we were complying
23 on a day-to-day operation.
24     Q.  Did you --
25     A.  All sorts of stuff.

## Page 217

1      Q.  Did you spend any time working on the
2  response to bid that Ms. Fluitt put together?
3      A.  I did not.
4      Q.  Did Mr. Shepherd, to your knowledge, work
5  on the response to the request for bid?
6      A.  He did not, as far as I know.
7      Q.  Who else, besides Ms. Fluitt, was involved
8  in the bidding process, or the preparing the response
9  to bid?
10     A.  I believe she would reach out to our risk
11 team -- our HR team to help guide her in certain
12 questions, but other than that, no one else.
13     Q.  So those are all folks that don't work in
14 the Albuquerque office?
15     A.  They don't.
16     Q.  Anyone other -- anyone within the
17 Albuquerque office, other than Ms. Fluitt, work on
18 the response to the request for bid?
19     A.  Not that I'm aware of, no.
20     Q.  Other than the one meeting that you
21 testified about that the whole office had about
22 whether to submit a response to the request for bid,
23 did you have any other conversations with anyone else
24 at the office about the response?
25     A.  No.

**Page 218**

1  Q.  What about after Ms. Fluitt submitted the
2  response, did she tell you, Hey, I submitted the
3  response?
4  A.  Yeah, she said, I got it in.
5  Q.  And did you have any discussions with her
6  at that point about the response?
7  A.  Other than she submitted it, no.
8  Q.  Did you provide any information to
9  Ms. Fluitt to be included to the response -- to the
10  response to the City of Albuquerque's bid?
11      MR. STANFORD:  Quick objection.  Form.
12      Go ahead.
13  A.  So did I -- what was the question?  Did
14  I --
15  Q.  Did you provide her with any information to
16  be included with the response to the City's request
17  for bid?
18      MR. STANFORD:  Same objection.
19      Go ahead.
20  A.  Well, she submitted the bid, so she would
21  be in included.
22  Q.  But did you provide her any information?
23  A.  No, I did not.
24  Q.  Okay.  So you didn't provide her any
25  documents to include in the response?

**Page 219**

1  A.  I did not.
2      MR. STANFORD:  Same objection.
3  Q.  And you didn't provide her any information
4  to include in the response?
5  A.  I did not.
6  Q.  Are you aware of anyone else at the office
7  providing Ms. Fluitt with documents or information to
8  be included in the response to the City's bid?
9  A.  I am not aware of anyone else.
10  Q.  Did you ever see the response that
11  RivenRock submitted to the City's bid?
12  A.  I did not.  I believe she submitted
13  everything electronically.
14  Q.  Even after she submitted it, you still
15  haven't seen it, to this day?
16  A.  I've seen it -- yeah, I've seen it
17  recently.
18  Q.  Recently, okay.  But before --
19  A.  Yeah.
20  Q.  Before it was submitted, you never saw it?
21  A.  I did not.
22  Q.  And after it was submitted, when was the
23  first time you saw it?
24  A.  When we were awarded the bid.
25  Q.  And how did it -- how did you come to see

**Page 220**

1  it then?
2  A.  An e-mail went out to the whole branch
3  saying it was awarded, and you could click on the
4  rates and you can see who qualified.  You saw every
5  agency who submitted the bid and where they qualified
6  in each category.
7  Q.  And was the response to the request for bid
8  included in the materials that were sent in that
9  e-mail?
10  A.  I believe so.
11  Q.  And that's when you think you first saw it?
12  A.  Yes.
13  Q.  Have you looked at it since then?
14  A.  I believe so, yes.
15  Q.  How many times?
16  A.  Let's take a stab at three or four.
17  Q.  And what were the purposes of you looking
18  at the response at that -- on those three or four
19  occasions?
20  A.  Just reading through everything, making
21  sure I understood it.
22  Q.  Did you or anyone else at RivenRock have
23  any communications with the City of Albuquerque, or
24  anyone there, between the time the City put out the
25  request for bid and the time RivenRock responded to

**Page 221**

1  the request for bid?
2  A.  No.  I know Amber did contact the
3  purchasing office with questions, but I did not, no.
4  Q.  Did anyone, other than Ms. Fluitt, contact
5  the purchasing department with questions?
6  A.  As far as I know, no.
7  Q.  I'm going to show you another document.
8      (Exhibit 68 marked.)
9  Q.  (By Ms. Libeu) Do you have Exhibit 68 in
10  front of you?
11  A.  I do.
12  Q.  Have you seen it before?
13  A.  I have.
14  Q.  Can you tell me what it is?
15  A.  It is our document checklist.
16  Q.  And what's the document checklist?
17  A.  It is items we submitted for the bid.
18  Q.  So is Exhibit 68 the response to the City
19  of Albuquerque's request for bid?
20  A.  I believe so, yes.
21  Q.  And is this what Ms. Fluitt put together?
22  A.  I believe so, yes.
23  Q.  And I want to turn your attention to the
24  page that ends in 6032.
25  A.  Okay.

**Page 222**

1  Q. Do you see that this is a letter from UPS,
2  To whom it may concern, from a Stephen Lucero?
3  A. Uh-huh.
4  Q. You have to answer audibly.
5  A. Oh, yes.
6  Q. Do you know how Ms. Fluitt obtained this
7  letter to include in the package?
8    MR. STANFORD: Quick objection on grounds
9  of foundation.
10   Go ahead.
11  A. I believe Tim gave it to her.
12  Q. Did Mr. Jacquez give this to her
13  specifically for the bid, or was this a letter that
14  RivenRock had had previously?
15  A. I believe it was a letter we had
16  previously. I really don't know.
17  Q. Do you know when RivenRock received this
18  letter from Mr. Lucero?
19  A. I do not know.
20  Q. Turn to the next page. And this is, for
21  the record, the Bates -- the number that ends in
22  6033.
23  A. Okay.
24  Q. And can you tell me what this is.
25  A. This is a letter of recommendation from

**Page 223**

1  Automated Election Services.
2  Q. And that's also known as Ink Impressions,
3  right?
4  A. Yes.
5  Q. How did RivenRock come to get this letter?
6  A. I believe Tiffany gave it to me.
7  Q. And when did she give it to you?
8  A. I have no idea. Oh, look, it says
9  August 30th.
10  Q. Do you think it was on or about
11  August 30th that she gave you this letter?
12  A. I believe so.
13  Q. And if we look back at the City's request
14  for bid, can you tell, looking at it, when the
15  request for bid was put out?
16  A. On Exhibit 67?
17  Q. Yes.
18  A. I see a closing date of September 5th.
19  Q. So some time before September 5th, right?
20  A. Yes.
21  ==Q. How did -- did you ask Ms. O'Neill for the==
22  ==letter that is in the -- the letter from Automated==
23  ==Election Services that is part of the bid package==
24  ==that Ms. Fluitt put together?==
25  ==A. No. I believe I asked her for this for==

**Page 224**

1  ==other companies we were trying to work with.==
2  Q. And when did you ask her for this letter?
3  A. Oh, gosh, some time in August.
4  Q. Probably shortly before August 30th?
5  A. Most likely.
6  Q. And what other companies did you ask her
7  for this for?
8  A. Amber is always putting bids in -- not
9  bids, but registering, and we had to have certain
10  letters of recommendation on file. So we all
11  compiled letters for her, so, yeah, and she probably
12  gave it to me in August.
13  Q. Now, this is -- she gave it to you at the
14  same time that Ms. Fluitt was preparing the response
15  to the request for bid, correct?
16  A. Yes. And Amber was also working on other
17  requests, as well.
18  Q. Did you, when you asked Ms. O'Neill for
19  this letter, intend for it to be included in the
20  response to City of Albuquerque's request for bid?
21  A. I did not.
22  Q. Did you intend -- do you think it should
23  have been included?
24  A. It's included, so, yeah, I'm glad she
25  included it.

**Page 225**

1  Q. Now, did you tell Ms. Fluitt that you were
2  getting this letter from Automated Election Service
3  for her use in bids?
4  A. For her use in bids yes.
5  Q. And tell me about those conversations.
6  A. She just -- for certain bids she was doing
7  she had to have letters of recommendation about the
8  staff, so I said let me reach out to Tiffany and see
9  if she'll write one.
10  Q. And did you discuss which bid packages
11  Ms. Fluitt should include this in?
12  A. No, I just gave it to her.
13  Q. You knew at the time you got this letter
14  that she was working on the response to the City of
15  Albuquerque's bid?
16  A. One of the bids, yes.
17  Q. And did you tell her not to include this
18  letter?
19  A. I didn't.
20  Q. Why not?
21  A. It just never came up. I didn't say, Don't
22  turn it in here. Use it when you need to.
23  Q. Did you anticipate that she would use this
24  letter for the response to the City of Albuquerque's
25  bid?

**Page 374**

1  otherwise disseminate such information without prior
2  written approval of the president of Select Staffing.
3  Employee acknowledges that he/she is aware of the
4  unauthorized disclosure of confidential information
5  of Select Staffing, its customers or its temporary
6  workers and employees or its clients, may be highly
7  presidential -- highly prejudicial to their interest
8  and invasion of privacy and improper disclosure of
9  trade secrets."  Do you see that?
10     A.  I do.
11     Q.  And are those provisions you agreed to?
12     A.  Sure.  It's a lot.
13     Q.  You don't have any reason to doubt that
14  that's --
15     A.  I don't, no.
16     Q.  -- the provision you agreed to?
17     A.  No, I have to reason to doubt.
18     Q.  Now, I want you to look at subparagraph C.
19     A.  Okay.
20     Q.  It says, "During and for one year after
21  termination of his/her employment with Select
22  Staffing, employee agrees that he/she will not
23  influence, or attempt to influence, either directly
24  or indirectly, any Select Staffing employees,
25  customers, or temporary workers who have dealt or

**Page 375**

1  done business with Select Staffing at any time within
2  six months prior to employee's termination,
3  including, but not limited those who may be recruited
4  or developed by Select Staffing while he/she is
5  employed at Select staffing, to stop or reduce doing
6  business with Select Staffing, and/or to do business
7  with any subsequent employers or employee and/or with
8  any competing firm, business in which employee has an
9  ownership interest."  Do you see that.
10     A.  I do.
11     Q.  Did you agree to that paragraph?
12     A.  I did.
13     Q.  And then the next sentence in subparagraph
14  C says, "Employee will not disclose or use to his or
15  her benefit, or for the benefit or any third party,
16  or to the determent of Select Staffing or its
17  customers in confidential trade secret information."
18  Do you see that?
19     A.  I do.
20     Q.  Did you agree to that provision?
21     A.  I do.
22     Q.  And can you look at subparagraph D, please.
23  It says, "Employee further agrees that during and for
24  period of one year immediately following termination
25  of his or her employment with Select Staffing,

**Page 376**

1  employee shall not interfere with the business of
2  Select Staffing by inducing an employee or temporary
3  worker to leave Select Staffing's employ, or by
4  inducing a customer to sever or reduce its business
5  relationship with Select."  Do you see that?
6     A.  I do.
7     Q.  And is that a provision you agreed to, as
8  well?
9     A.  I did.
10     Q.  So you agreed for one year not to interfere
11  with the business of Select Staffing?
12     A.  Yes, I did.
13     Q.  And you agreed not to interfere with the
14  business of Select Staffing by inducing an employee
15  or a temporary worker to leave Select?
16     A.  That is correct.
17     Q.  And you agreed for a period of one year not
18  to interfere with the business of Select Staffing by
19  inducing a customer to either leave Select or reduce
20  its business?
21     A.  What do they mean by "inducing"?
22     Q.  What do you think -- what do you think the
23  word "inducing" means?
24     A.  Like, am I holding a gun to their head
25  saying, You will come with me, or else?  I mean,

**Page 377**

1  what's -- what do you mean by inducing --
2     Q.  What do you --
3     A.  -- a customer?
4     Q.  Do you have an understanding of what the
5  word "induce" means?
6     A.  To, like -- I think of induced labor, like,
7  let's go ahead and -- that's how I think of induce.
8     Q.  You think of induce, as in the context of
9  labor only?
10     A.  Pretty much.  So by inducing a customer
11  so -- no, I'm just wondering, like, what they mean by
12  that?  Are they meaning that I'm going to go to
13  customer and say, Hey, you better stop doing business
14  with them, because -- come over here.  I mean, what
15  do they mean by that?
16     Q.  What did you understand that that meant
17  when you signed this agreement?
18         MR. STANFORD:  Objection.  Foundation.
19     A.  I have no idea.  It was eight years ago.
20  Who knows -- I mean, I have no idea.  I'm just
21  wondering.
22     Q.  Did you ever ask someone for clarification
23  on what that word meant?
24     A.  I did not.
25     Q.  But you agreed to that --

# Shaun Shepherd

**From:** Catherine Olinger
**Sent:** Tuesday, May 24, 2016 10:16 AM
**To:** Tynan, Rebbekka; Shaun Shepherd; Cunningham, Viola E.; Amber Fluitt
**Subject:** RE: New STAFFING COMPANY

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Here I am!

It's great to hear from you.
I hope all is well in your neck of the woods!

**From:** Tynan, Rebbekka [mailto:rtynan@cabq.gov]
**Sent:** Tuesday, May 24, 2016 9:36 AM
**To:** Shaun Shepherd <shaun.shepherd@rivenrockstaffing.com>; Cunningham, Viola E. <VCunningham@cabq.gov>; Catherine Olinger <Catherine.Olinger@rivenrockstaffing.com>; Amber Fluitt <amber.fluitt@rivenrockstaffing.com>
**Subject:** RE: New STAFFING COMPANY

So THAT'S where Catherine went!
Hope you are all doing well!

Thank you!

Rebbekka K. Tynan, MPA
Senior Buyer
City of Albuquerque
Purchasing Division
PO Box 1293
Albuquerque, NM 87103
Office: 505-768-4945
Fax: 505-768-3355

RIVENROCK005806

EXHIBIT 7

**From:** Shaun Shepherd [mailto:shaun.shepherd@rivenrockstaffing.com]
**Sent:** Tuesday, May 24, 2016 9:35 AM
**To:** Cunningham, Viola E.; Catherine Olinger; Amber Fluitt
**Cc:** Tynan, Rebbekka
**Subject:** RE: New STAFFING COMPANY
**Importance:** High

Hi, Viola and Rebbekka,

Thank you so much for the follow up.  I hope you both are doing great!  I've copied Catherine Olinger so you have her contact information too.  We will make sure the registration is complete this week.  Please let us know if there is anything we can help with.

Looking forward to working with you!!!

Have a super great day!

**Shaun Shepherd**
*Southwest Area Vice President*
214.701.6210 *Cell*
505.336.4222 *Office*
505.738.0340 *Fax*
shaun.shepherd@rivenrockstaffing.com
www.rivenrockstaffing.com



"WHERE ROCKSTARS ARE MADE"

**From:** Cunningham, Viola E. [mailto:VCunningham@cabq.gov]
**Sent:** Monday, May 23, 2016 10:53 AM
**To:** Shaun Shepherd <shaun.shepherd@rivenrockstaffing.com>
**Cc:** Tynan, Rebbekka <rtynan@cabq.gov>
**Subject:** FW: New STAFFING COMPANY

Hi Shaun,

I have included Rebbekka as she has been working on the various staffing contracts most recently.

Thanks for getting your contact information back to us.  Be sure to sign up in our e-procurement system using the City website.

2

RIVENROCK005807

EXHIBIT 7

www.cabq.gov

Viola E. Cunningham
Purchasing Customer Satisfaction Manager
PO Box 1293
Albuquerque, NM  87103

505-768-3340 telephone
505-768-3355 fax

RIVENROCK005808

3

EXHIBIT 7