IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

EMPLOYBRIDGE, LLC, a California
Limited Liability Company, and
EMPLOYMENT SOLUTIONS
MANAGEMENT, INC., a Georgia
Corporation,

        **Plaintiffs,**

      **v.**                       **Case No. 1:16-cv-00833 WJ/KK**

RIVEN ROCK STAFFING, LLC, a Nevada
Limited Liability Company, LARRY SHAUN
SHEPHERD, an individual, CATHERINE
OLINGER, an individual, TERRY MILLER,
an individual, TIMOTHY JAQUEZ, an
individual, and Does 1 through 25, inclusive,

        **Defendants.**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & MEMORANDUM ON COUNTS I, IV-XII ON NON-CITY OF ALBUQUERQUE CLAIMS

Come now Defendants Riven Rock Staffing, LLC, Terry Miller and Timothy Jaquez (hereinafter collectively "Defendants" or individually as "RR," "Miller" and "Jacquez"), with the following Motion for Summary Judgment.[1]  Defendants have filed, concurrently herewith, a separate Motion for Summary Judgment on all counts in the First Amended Complaint that relate to Plaintiffs' failure to obtain an award from the City of Albuquerque ("City") to provide temporary staffing services to the City pursuant to a 2016 Request for Bid ("RFB"). Defendants incorporate by reference the facts, the law and the arguments cited therein. For purposes of the instant Motion, Defendants seek dismissal of the remainder of the claims as follows: (1) all other legal claims asserted against Miller and Jacquez; (2) all other legal claims against RR excepting

---

[1] Pursuant to D.N.M. LR.-Civ.10.5, counsel has conferred and agreed to an exhibit page extension of up to 150 pages for both sides and Plaintiffs understand that 10.5 only requires motion practice in the absence of agreement. Should the Court require so, however, Plaintiffs will prepare and file a joint Motion/Order.

legal claims arising from the alleged solicitation of a company named Superior Ambulance. This includes Counts I, IV-XII.

The gravamen of the FAC is that the individually named Defendants (2 of whom are in arbitration), engaged in unlawful solicitation and/or competition in violation of certain post-employment covenants; used/disclosed confidential/trade secrets information in violation of post-employment covenants and federal and state trade secrets statutes; tortiously interfered with one or more the Defendants' post-employment covenants; tortiously interfered with existing or prospective business relations; and engaged in an overall civil conspiracy to harm Plaintiffs.

Plaintiffs' recent damages disclosures identify only six (6) existing or prospective clients for whom they claim losses. They are (1) the City; (2) Ink Impressions (d/b/a/ Automated Election Services); (3) Superior Ambulance; (4) RAC Transport; (5) Acme Iron & Metal; and (6) Fidelitone.[2] The undisputed facts establish that Defendants did not obtain business from Ink and RAC through unlawful efforts. Defendants have never done any business with Acme Iron & Metal or Fidelitone. Miller and Jacquez had no involvement with Superior Ambulance. All claims involving Miller and Jacquez should be dismissed. All claims against RR, excepting Superior Ambulance, should likewise be dismissed.

## I.   UNDISPUTED MATERIAL FACTS ("UMF")

1.      Defendants incorporate by reference UMF Nos. 1-13 from their concurrently filed Motion for Summary Judgment setting forth the post-employment covenants at issue in this lawsuit, along with other related matters.

## FIDELITONE

2.      Fidelitone is in the supply chain business and has an office in Albuquerque, New Mexico.

---

[2] While Plaintiffs may be permitted to update the individual damages numbers for the six (6) identified entities, discovery has closed and Plaintiffs cannot amend their damages to add new customers or new elements of damages at this stage.

3.      RR has never done any business with Fidelitone. *Exhibit 1, Suppl. Interrogatory Answer No. 7.*

4.      Plaintiffs admit they have not lost any business from Fidelitone. *Exhibit 2, Scott Depo, p.62:24-p.63:17.*

5.      Miller never had contact with anyone at Fidelitone while employed by RR and is not aware of anyone at RR having contact with them. *Exhibit 16, Miller Depo, p.332:21-p.333:9.*

6.      Jacquez never contacted, communicated with, or solicited business from Fidelitone at any time. *Exhibit 20, Jacquez Decl. at ¶¶14-15.*

7.       Fran Scott, Miller's and Jacquez' former supervisor, testified for the first time ever at her March 28, 2017 deposition that Fidelitone personnel (John Priest and Julian Zamora) allegedly informed her that Miller and Jacquez solicited Fidelitone in July 2016 and advised that RR could give a discounted rate of $1.02/hour for driver services.[3] *Scott Depo, Ex. 2, p.65:19-p.66:6;p. 67:24-68:6; p. 83: 8-19; p.93:8-13.*

8.      Scott contends the alleged conduct, and her alleged communication(s) with Fidelitone, occurred in late June/early July 2016 because Plaintiffs purportedly agreed to adjust their billing rates on or about July 1, 2016. *Scott Depo, Ex. 2 p.63:12-17.*

9.      This is not the first time, however, that Scott has provided sworn testimony in this lawsuit. Scott submitted to this very Court a (a) July 20, 2016 Declaration [doc. 2-2, filed 07.20.16]; and (b) an August 15, 2016 Supplemental Declaration [doc. 27-6, filed 08.17.16] in support of Plaintiffs' effort to obtain a preliminary injunction. *See Ex. 3 and 4.*  Both were signed within just weeks of when Scott now contends she was advised of the purported solicitation.  *Id;*

---

[3]  The testimony that Fidelitone purportedly told Scott about the solicitation is inadmissible hearsay to prove solicitation. Fed. R. Evid. 801(c)(1)-(2); Fed. R. Evid. 802.  It is relevant for other reasons.

*UMF 8, supra.* Scott agrees it would have been important to have disclosed it. *Scott Depo, Ex. 2 p.68:2-12.*

10.     In both of her declarations, Scott never once testified that anyone at Fidelitone ever advised her that Miller and/or Jacquez allegedly solicited them, that Miller and/or Jacquez actually solicited Fidelitone or that Plaintiffs purportedly gave Fidelitone any rate discount. *See Ex. 3 and 4.* Scott confirmed at her deposition that she never mentioned Fidelitone in either declaration. *Scott Depo, Ex. 2, p.84:13-p.85:2* ("No.)

11.     In the fall of 2016 RR propounded discovery and specifically asked Plaintiffs to provide, among other things, all material facts in support of the allegations in the FAC of unlawful solicitation, disclosure and/or tortious conduct by RR, the date of the incident(s) and the customer(s) involved. *See e.g. Exhibit 5, Rogs 2-4; 6.*

12.     In their December 22, 2016 Interrogatory Answers, served some six (6) months *after* Scott now claims she was informed of the alleged unlawful solicitation, Plaintiffs never once identified Fidelitone as an existing or prospective customer that RR, Miller and/or Jacquez solicited; never disclosed that Fidelitone personnel ever advised Plaintiffs in the Summer of 2016 Fidelitone had been solicited; and never stated that Plaintiffs gave Fidelitone a $1.02 discount rate. Plaintiffs similarly never identified either Priest or Zamora as material witnesses, despite the specific and additional interrogatory request for disclosure of that information. *Ex. 6.*

13.     Scott herself verified Plaintiffs' Answers. *Ex. 7; Scott Depo, Ex. 2, p.116:11-18.*

14.     Miller and Jacquez similarly propounded discovery and specifically asked Plaintiffs to provide all material facts in support of the allegations that Miller and/or Jacquez, individually or in concert, engaged in unlawful solicitation, disclosure and/or tortious conduct, the date of the incident(s) and the customer(s) involved. *Ex.8 and 9, respectively.*

15.     Plaintiffs' counsel provided the verifications for Plaintiffs' Answers and Objections to Miller's and Jacquez' respective Interrogatories on March 28, 2017, Scott's deposition. The verification dates are March 20, 2017, eight (8) days prior. Incredibly, Scott verified them. *Id.; Scott Depo, Ex. 2, p.116:7-10; p.117:3-9; See Scott Depo, p.126:5-11, 18-25.*

16.     The first time Defendants ever learned that Plaintiffs sought to claim Fidelitone as a basis for damages occurred on March 27, 2017, when Plaintiffs' counsel emailed Plaintiffs' damages disclosures pertaining to Miller, Jacquez and RR. *See Email, Exhibit 10.*

17.     Scott readily admits Miller's Interrogatory Nos. 7 and 13 specifically asked Plaintiffs to identify each customer Miller purportedly solicited. Scott admits the Answers she verified under oath on March 20, 2017, nine (9) months after the alleged incident, nowhere provides that Miller solicited Fidelitone, that Zamora or Priest were material witnesses with information about alleged unlawful solicitation, or that Plaintiffs gave Fidelitone a discounted rate. *See Exhibit 11, Answers 7, 13; Scott Depo, Ex. 2, p.117:3-p.118:22; p.122:4-9.*

18.     Like Miller, Jacquez also specifically asked Plaintiffs to identify all existing or prospective customers whom he purportedly solicited.  As of March 20, 2017, Plaintiffs, and Scott in particular, still verified under oath that Fidelitone was not one of them. Zamora and Priest were similarly never listed as material witnesses even though the Interrogatories specifically requested full disclosure. *See Scott Depo, Ex. 2, p.126:5-11, 18-25; p.128:5-21; Ex. 11, Answer Nos. 7, 13*

19.     Miller and Jacquez also asked Plaintiffs to identify the specific damages caused by their unlawful acts. While Plaintiffs identified several customers for whom they contend Miller and Jacquez caused damages, Fidelitone was never identified anywhere. *Exhibit 12, Answers to Rog No. 14.*

20.    Neither Plaintiffs' September 6, 2016 Fed. R. Civ. P. 26(A) Initial Disclosures nor their November 1, 2016 Supplemental Fed. R. Civ. P. (26)(A) and 26(E) identifies a single witness at Fidelitone, let alone Priest and Zamora in particular, as having discoverable information that Plaintiffs may use to support their claims in this lawsuit. *Ex. 13 & 14.*

21.    Scott contends she gave Fidelitone a $1.02/hour discounted rate, resulting in a purported loss of several thousand dollars. *Scott Depo, Ex. 2, p.93:8-13.* Scott, however, admits she never even negotiated with Fidelitone or told them no. *See Scott Depo, Ex. 2, p.93:8-p.94:12.*

## ACME IRON & METAL

22.    Amber Fluitt serves, among other things, as RR's Business Development Manager. *See Offer Letter, Exhibit 15.*

23.     When Defendant Miller was hired at RR, he was responsible, among things, for providing training, mentoring and guidance for Fluitt. *Miller Depo, Ex. 16, p.102:7-p.103:13.*

24.    In the summer of 2016, and pursuant to his duties, Miller shadowed Fluitt during her efforts to prospect for business on behalf of RR.  Fluitt drove around business areas in Albuquerque, New Mexico and selected the businesses to stop in and visit. *Miller Depo, Ex. 16, p.148:12-149:15.*

25.    During the summer time frame, Fluitt and Miller tried to average 12/15 cold calls per day. *Miller Depo, Ex. 16, p.151:16-25.*

26.    In July 2016, Defendant Miller accompanied Amber Fluitt on a cold call to Acme Iron & Metal, a company for whom Fluitt had previously worked. *Miller Depo, Ex. 16, p.165:21-p.166:6.*

27.    Miller informed Fluitt he had worked with Acme in the past.  *Id. p.166:7-13.*

28.     Once inside, Fluitt spoke to Mr. Keaton Wynn, a company representative. Miller introduced himself and said little. Fluitt reminisced about a former co-worker at Acme and then explained that RR was a staffing service startup that could service certain staffing needs, but it could not service transportation needs at that time. Miller never visited Acme again and neither Miller nor RR has ever gained any business from Acme. *Miller Depo, Ex. 16, p.171:8-12*

29.     Miller admits he brought his business card to the cold calls with Fluitt. *Miller Depo, Ex. 16, p.199:21-23.*

30.     Defendant Jacquez admits he serviced Acme, but he has not had any contact with them since leaving his employment with Plaintiffs. *Jacquez Depo, Exhibit 17, p. 152:4-p.153:18; p.156:13-16.*

31.     RR has never done business with Acme. *Exhibit 1, Supplemental Interrogatory No. 7.*

32.     Scott admits Plaintiffs have not lost any business from Acme. *Scott Depo, Ex. 2, p.62:24-p.63:17.*

33.     Scott now claims Plaintiffs suffered damages because she gave Acme a discount to match an alleged discount rate of $1.02/hour that someone at Acme claims Miller and/or Jacquez quoted to them.[4] Scott contends Acme merely **asked** her to meet the alleged discount rate that Miller or Jacquez purportedly quoted and admits Acme never stated that it would not continue to do business with Plaintiffs if they did not agree to a discount. *Scott Depo, Ex. 2, p.129:5-21.*

34.     Scott admits she never even made an effort to negotiate. *Scott Depo, Ex. 2, p.93:8-p.94:12.*

---

[4] Scott's testimony about what Acme allegedly told her about the alleged solicitation and the rate quote is inadmissible hearsay. The testimony is being offered here to address the issue of the nature of any alleged damages and mitigation.

35.     Miller's Interrogatory Nos. 7 & 13 asked Plaintiffs to identify all customers/clients whom he allegedly solicited.  Plaintiffs never once identified any material fact that Miller solicited Acme. *Scott Depo, Ex. 2, p.119:1-10; p.121:13-20; Ex. 11, Answer Nos. 7, 13.*

## RAC TRANSPORT

36.     Sometime in July 2016, Miller again accompanied Fluitt on another cold sales call to RAC Transport, a company with whom Miller had contact while employed by Plaintiffs. Fluitt is the individual who wanted to stop in. *Miller Depo, Ex. 16, p.194:6-p.195:4.*

37.     Miller advised Fluitt he had previously worked with RAC and that the sales call was entirely her call/her show. *Id. p.195:5-11.*

38.     Fluitt asked to speak to the terminal manager. *Id. p.195:12-18.* Fluitt advised the RAC contact person that RR had transportation services available and inquired whether RAC had any interest.  Miller has no information about whether Fluitt quoted any rates. *Id. p.197:16-p.198:11.*

39.     Miller had no other communications with anyone at RAC besides accompanying Fluitt on her cold call.  *Id. p.198:21-23.*

40.     Jacquez never visited RAC with Fluitt and/or Miller. *Miller Depo, Ex. 16, p.130:3-12.* His only contact occurred when RAC called RR and specifically asked to speak to Fluitt because RAC was looking for a mechanic. That order was never filled. *Jacquez Depo, Exhibit 17, p.189:16-p,190:3.*

41.     In response to Jacquez' Interrogatory No. 7, Plaintiffs, and Scott in particular, never identified RAC as a customer that Jacquez solicited. *Ex.11; Scott Depo, Ex. 2, p.128:5-21.*

42.     RR serviced one driver run for RAC in the summer of 2016 in the amount of $2,163.80. *Exhibit 1, Supplemental Interrogatory No. 7; Jacquez Depo, Ex. 17, p. 191:1-4; p.192:19-193:2.*

Olinger, who never worked with RAC, filled the one (1) position. *Exhibit 18, Olinger Depo p. 281:15-22.*

43.     Scott admits Plaintiffs have not lost any business from RAC. *Scott Depo, Ex. 2, p.62:24-p.63:17.*

44.     Scott contends Plaintiffs suffered losses because she agreed to give RAC a driver discount, allegedly to match a rate quote she claims RAC told her Miller and/or Jacquez made, which is inadmissible hearsay. Regardless, Scott admits she never negotiated with RAC on prices or said no to any price discount.  *Scott Depo, Ex. 2, p.93:8-p.94:12*

## INK IMPRESSIONS

45.     Ink Impression is a former client of Select Staffing whom Olinger serviced during her time with Select.  *Olinger Depo, Ex. 18, p.133:7-15.* Tiffany O'Neill served as Ink's contact person. *Id.*

46.     Ink Impressions became a client of RR as follows: in March of 2016, O'Neill reached out and contacted Olinger, inquired about her well-being and requested a lunch meeting.  Thereafter, Olinger and Shepherd met O'Neill for lunch per her request.  *Olinger Depo, Ex. 18, p.130:7-p.132:3.*

47.     During the meeting, O'Neill indicated her company had an upcoming election project and O'Neill specifically wanted RR to help her. *Olinger Depo, Ex. 18, p.133:4-11.*  O'Neill told Olinger she was unhappy with Plaintiffs and was looking to find someone else to service the company's needs. *Olinger Depo, Ex. 18, p.138:17-p.139:8.* She then advised Olinger that she had the right to work with whom she wanted and she wanted to work with Olinger/RR. *Id. p.139:9-10.*

48.     The parties discussed billing rates as follows: O'Neill actually pulled out a billing rate spreadsheet from Manpower (another staffing company), asked Olinger whether RR could meet their rates and Olinger said they could. *Olinger Depo, Ex. 18, p.139:21-p.140:7.*4.

49.     Olinger provided O'Neill with information about RR, but O'Neill specifically asked if RR would be able to assist with the election project.  Olinger and Shepherd agreed.  *Olinger Depo, Ex. 18,  p.134:7-15.* Thereafter, RR sent her customer service agreements. *Id. at p.135:21-136:3.*

50.     Olinger did nothing to influence, or attempt to influence, Ink to cease business with Plaintiffs. Ink sought out, and wanted, RR to provide services. *Exhibit 19, Olinger 2016.08.10 Decl. at ¶15.*

51.     Shepherd did nothing to solicit Ink Impressions. *Exhibit 21, Shepherd Decl. 2016.08.12 at ¶24.*

52.     To date, RR has performed additional staffing work for Ink, but only at the request of Ink Impressions. *Olinger Depo, Ex. 18, p.137:6-p.138:4.*

53.     During his employment with ProDrivers, Jacquez admits he routinely emailed work information to his personal email, even into June 2016, but he never forwarded any materials either before or after his employment.  *Jacquez Depo, Ex. 17, p.254:18-p.255:20; p.262:17-20.* He also printed out work materials during his employment. *Id. p.256:20-p.258:21.*

54.     During his employment, Jacquez emailed himself for work related reasons and because he wanted to have company information at his disposal because he thought EB was cheating him on commission payments.  *Jacquez Depo, Ex. 17, p.275:2-20; p.278:2-25; p.301:17-20.*   He never forwarded confidential information to himself for use at RR and he would never have stolen Plaintiffs' confidential information. *Jacquez Depo, Ex. 17, p.305:6-14.*

55.     Jacquez did not share any dispatch or other confidential information with any third party, including RR. *Jacquez Depo, Ex. 17, p.292:14-p.293:18; p.298:3-5.*  Nor has Jacquez used any confidential dispatch information. *Id. p.298:19-24.*

56.     Additionally, when Jacquez left no one ever asked him to return all company property. *Jacquez Depo, Ex. 17, p.298:25-p.299:14.*

57.     Jacquez also notes that emailing work materials was common at ProDrivers and that Scott herself would send work related emails to Jacquez' personal Yahoo account. *Id. p.258:1-10.* Scott admits Plaintiffs had no policy or restriction in place on emailing information from one's business email account to one's personal email account. *Scott Depo, Ex. 2, p.29:8-11*

## II.     ARGUMENT

### A.     *The Defend Trade Secrets Act claims (Count I) and New Mexico Uniform Trade Secrets Claims (Count XII) must be dismissed.*

In Counts I and XII of the FAC, Plaintiffs seek to hold all of the Defendants, including RR, liable for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the New Mexico Uniform Trade Secrets Act ("UTSA"), NMSA 1978, § 57-3A-1 *et seq.* (2016).  The legal claims lack merit.

Under the DTSA, "misappropriation" is defined as "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15CV211, 2016 U.S. Dist. LEXIS 130918, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (citing 18 U.S.C. § 1839(5)).

Under the UTSA, "misappropriation" is similarly defined as the following:

(1)  acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2)  disclosure of use of a trade secret of another without express or implied consent by a person who:

>   (a)  used improper means to acquire knowledge of the trade secret; or
>
>   (b)  at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: 1) derived from or through a person who had utilized improper means to acquire it; 2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or 3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>   (c)  before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.                    N.M. Stat. Ann., § 57-3A-2 (2016).

As an initial matter, Plaintiffs' extensive preparation of their forty-one (41) page, twelve (12) count Complaint, apparently did not extend to researching the DTSA's enactment date, May 11, 2016. *See* Defend Trade Secrets Act of 2016, ch. 90, 130 Stat. 376 (2016) (codified as amended at 18 U.S.C. 1831 et seq.). Olinger, Shepherd and Miller had already left their employment in February 2016 and April 2016. No action could possibly lie against Miller and RR (through Olinger, Shepherd et al.) for alleged unlawful conduct pre-dating the enactment of the statute, which requires, as a necessary element, obtaining trade secrets by unlawful means. Plaintiffs have not a single shred of evidence that subsequent to May 11, 2016, Olinger, Miller or Shepherd obtained by improper means, let alone used or disclosed, any trade secrets.

The evidence against Jacquez demonstrates that, while employed, he forwarded some customer list/business information from his email work account to his personal yahoo email account. *UMF 53-55.* As an initial matter, Scott, his supervisor, admits there was no company restriction on emailing information from the business email account to one's personal email account. *UMF 57.* Jacquez even indicated Scott herself would email him work materials at his

personal email account.  *UMF 57.* This is entirely dispositive of the issue of whether he obtained trade secrets through "improper means."

Jacquez also admitted, candidly, that he forwarded work materials to his personal account and even printed out work related materials while employed. But he also testified that he never used or disclosed any trade secret information. UMF *53-55.* And forwarding emails from a business account to a personal email account does not satisfy the requisite elements of "misappropriation" under the DTSA or the UTSA by any legal or factual stretch.

There is absolutely no evidence in the record that RR, a corporation, misappropriated trade secrets through improper means and/or obtained, used or disclosed such information, either as a company or through any individual employees. Those claims should be dismissed as well.

The case against Miller and RR (through Olinger) borders on the frivolous. Plaintiffs have no evidence either person had trade secret information in their possession at any time, let alone acquired it through improper means or disclosed it, let alone shared it with RR who then used/disclosed it. Parties are not permitted to fabricate legal claims based solely "upon information and belief." In sum, there is no evidence that the Defendants acquired trade secrets through improper means or use or disclosed such information with any knowledge or understanding of acquisition by improper means, as specifically required by the DTSA and UTSA. There is, by extension, also no evidence that any alleged acquisition and disclosure *caused* Plaintiffs to suffer any damages, and particularly with regard to RAC, Ink, Acme or Fidelitone.

> **B.      All claims related to Fidelitone must be dismissed.**

The legal claims involving Fidelitone undermine the entire discovery process and should be dismissed. Plaintiffs filed their initial Complaint in July 2016, barely three (3) weeks after

13

Fran Scott testified, on March 28, 2017 that Miller and Jacquez solicited Fidelitone prior to July 1, 2016. While Plaintiffs repeatedly shouldered their allegations on "information and belief," Plaintiffs also identified specific acts they contend Miller, Jacquez and others committed. The Complaint was entirely bereft of a single allegation that Miller and Jacquez solicited Fidelitone. This, in and of itself, is not fatal, but Scott herself submitted to this Court a sworn declaration on July 20, 2016 that never stated Miller or Jacquez solicited Fidelitone. Plaintiffs then filed an Amended Complaint. It likewise never alleged Miller or Jacquez solicited Fidelitone. Again, complaints are primarily pleadings of notice, but Scott again submitted sworn testimony to this Court on August 15, 2017 via a supplemental declaration and, again, never once testified that Miller and Jacquez solicited Fidelitone, despite admitting that would be important. *UMF 8-10*.

In discovery, RR, Miller and Jacquez specifically asked Plaintiffs to identify, under oath, all material facts in support of the allegations that they, individually or collectively, solicited Plaintiffs' customers, the date(s) of the solicitation and the customers involved. Plaintiffs answered no less than six (6) questions on that subject and never once stated that Miller, Jacquez and/or RR solicited Fidelitone. Scott herself verified, under penalty of perjury, every single one of those answers and her counsel also signed the pleadings. *UMF 11-15; 17-19.* Scott verified Plaintiffs' Answers to Miller's and Jacquez' respective interrogatories no less than eight (8) days prior to her deposition and seven (7) days prior to Plaintiffs' counsel providing to Defendants, for the first time ever, that Plaintiffs now seek damages for alleged solicitation of Fidelitone. *UMF 15-16.* But Miller, Jacquez and RR specifically asked Plaintiffs to identify their damages and the sources of the same. Again, Plaintiffs, through Scott, never once identified Fidelitone as a basis for damages. *UMF 16, 19.*

14

Lest that not resolve the matter, Fed. R. Civ. P. 26(A) and 26(E) required Plaintiffs to disclose all known material witnesses. Despite the fact that Scott claims the alleged solicitation took place in July 2016, Plaintiffs served their Initial and Supplemental Disclosures in September 2016 and again in November 2016. They never once identified a single representative from Fidelitone as having any information related to the legal claims in the lawsuit. *UMF 20*. Relatedly, Plaintiffs never identified in any interrogatory answer that any Fidelitone employee constituted a material witness in the lawsuit. *UMF 11-15, 17-18*.

The discovery period in this lawsuit, with limited exceptions, also ended on February 28. 2017. *See December 5, 2016 Order Extending Deadlines [doc. 60]; March 14, 2017 Order Extending Deadlines [doc. 103]*[retaining general February 28, 2017 discovery cutoff].  A party is not permitted to hide the ball during discovery and then show up after hours and create new claims. This is precisely what Plaintiffs have done, despite being given ample opportunity under the Federal Rules of Civil Procedure to provide the relevant information in support of their claims.

To the extent the Court is willing to entertain Scott's testimony of solicitation, it constitutes inadmissible hearsay evidence to prove solicitation, and it is far too late in the litigation for Plaintiffs to try to obtain declarations from Fidelitone. The discovery rules and discovery extensions in this lawsuit already afforded Plaintiffs ample opportunity to develop the evidence, and to share the same, in support of their legal claims. *See* Fed. R. Civ. P. 26, 33, 34; *September 9, 2016 Order Adopting JSR/PDP [doc. 39]*. At this point, it is too little too late.

Miller and Jacquez also deny that they solicited Fidelitone at any time, but to the extent Plaintiffs seek to rebut that testimony it is misplaced. Rebuttal is not the time for a party to produce the evidence in support of its case, rather it is in the case-in-chief. *Stephenson v. Wyeth*

15

*LLC,* No. 04-2312-CM, 2011 U.S. Dist. LEXIS 119013 at *1 (D. Kan. Oct. 14, 2011) (*citing Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008)). Rebuttal evidence is improper when the evidence is germane to plaintiff's case-in-chief and is necessary to establish the burden of proof. *See id.* (noting, "[t]he plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief"). Plaintiffs have, quite simply, done nothing other than hide evidence on their claim, particular when its production was specifically solicited and/or required to be disclosed. *UMF 11-20*

That Scott purportedly agreed to a rate discount is also not a basis for holding Miller, Jacquez and RR liable. Both parties readily admit that RR et al. has not even done any business with Fidelitone. A party is required to mitigate its damages, not create them. *Air Ruidoso, Ltd. v. Executive Aviation Ctr., Inc.*, 1996 NMSC 42, P14, 122 N.M. 71, 920 P.2d 1025 ("It is a well established principle in New Mexico that an injured party has a responsibility to mitigate its damages, or run the risk that any award of damages will be offset by the amount attributable to its own conduct.").

Finally, Scott never made any effort to negotiate or discuss rates with Fidelitone, to the extent any such communications took place, and the record is void of any evidence that Fidelitone demanded Plaintiffs to lower rates or else they would cease doing business. Scott's voluntary decision to purportedly give Fidelitone a rate discount cannot inure to Defendants' detriment.

Zealous advocacy is an ethical and professional obligation. So too is the responsibility to follow the discovery rules and not to generate legal claims *post facto*. This Court should entertain

sanctions on this claim in the form of a charitable contribution in the amount for which Plaintiffs belatedly seek to hold RR et al. liable for Fidelitone.

     C.     *All legal claims involving Acme Iron & Metal must be dismissed.*

Currently, Plaintiffs' entire case involving Acme Iron & Metal is supported by nothing other than the inadmissible, hearsay evidence that Miller and Jacquez solicited it. *Fed. R. Evid. 801; 802*. Jacquez and Miller, for their part, adamantly deny that they solicited business, obtained any business from Acme or provided any discounted rate quotes and in absence of evidence to the contrary, summary judgment is warranted. *UMF 28-30*.

While Plaintiffs claim, again through hearsay, that Acme told them Jacquez solicited Acme, Miller specifically asked Plaintiffs to identify who he allegedly improperly solicited and Plaintiffs, under oath (again Scott), never testified that Miller solicited Acme. *UMF 35.* Plaintiffs cannot now change their testimony and create a material and disputed issue of fact by generating an internal conflict in their own sworn testimony to hold Miller liable.

In addition to the lack of admissible evidence showing breach of contract, misappropriation and/or tortious interference, there is no record evidence demonstrating a meeting of the minds to commit unlawful conduct or unlawful conduct in furtherance of the conspiracy. *Ettenson*, 2001-NMCA-003, P12-13 (discussing elements of civil conspiracy). Plaintiffs have no evidence Miller or Jacquez or anyone else teamed up together to take down the largest national specialty staffing company in the United States. *Id.* That suffices to warrant dismissal of the claims related to Acme.

The evidence further shows that RR et al. never even conducted business with Acme and therefore Plaintiffs never actually suffered losses in the form of lost profit or actual damages. *UMF 31-32.* Plaintiffs had no obligation to provide Acme with any alleged discount, but they

did have an obligation to avoid damages. *UJI 13-1811.* Despite the verified claim in her declaration that Acme "demanded" a rate discount, Scott has now testified that Acme merely "asked" for a rate discount, and the record suffers from any competent evidence that Acme threatened (tactically or otherwise) to sever its business relationship with Plaintiffs but for matching a discounted price rate. *UMF 33-34.* By all accounts Plaintiffs have continued to consummate their business relationship with one another and Acme has remained loyal. But this is not a basis for which suit can lie against Miller, Jacquez and RR. Summary judgment should be granted as to all legal claims involving ACME.

> D.     *All legal claims relating to RAC Transport should be dismissed.*

While Plaintiffs similarly seek to hold RR, Miller and/or Jacquez liable for alleged solicitation, disclosure and/or tortious interference with their existing business relationship with RAC, the evidence warrants dismissal.

Initially, the evidence Scott has provided in support of solicitation of RAC is currently based on nothing other than inadmissible, hearsay evidence. *See Fed. R. Evid. 801, 802.* The current state of the record, in contrast, shows that neither Miller nor Jacquez, and RR by vicarious liability extension, unlawfully solicited, canvassed, accepted or serviced RAC. *UMF 38-40.* Furthermore, when Jacquez asked Plaintiffs to identify, under oath, all clients whom he purportedly solicited, Plaintiffs never claimed he solicited Jacquez in their interrogatory answers or caused them damages. *UMF 41.* Plaintiffs cannot now change their tune because they believe it is convenient to keep more claims in the lawsuit. Again, Defendants were, and are, entitled to rely upon the verified information requested in discovery. *See Fed. R. Civ. P. 26; 33.* Jacquez must be dismissed for that reason, as well as the fact that there is no evidence of any alleged conspiracy between he, Jacquez or and anyone else with regard to RAC. In fact, the visit that

Miller and Fluitt made to RAC *pre-dated* Jacquez' employment and thus there could be no meeting of the minds to conspire to commit unlawful facts, or the existence of acts in furtherance of the actual conspiracy, another necessary element to the cause of action. *UMF 1, 36-40.* The evidence similarly falls short for Miller.

There likewise can be no improper solicitation, tortious interference or civil conspiracy through others.  Olinger serviced and supplied RAC's lone, one week request, to provide staffing services. She never worked for, or with, RAC and was not legally prohibited from supplying their needs. *See Famiglietta v. Ivie-Miller Enters*., 1998-NMCA-155 (contract claim requires material breach); *Ettenson v. Burke*, 2001-NMCA-003, PP12-14 (tortious interference requires substantial and active involvement and proof of improper means). There is no evidence Shepherd did anything with RAC. This too disposes of any civil conspiracy claim which requires, at a minimum, an underlying unlawful act committed by one that is attributable to the alleged co-conspirators. *Ettenson* 2001-NMCA-003, P12 (discussing elements of civil conspiracy).

Finally, and as stated previously, the law in New Mexico requires Plaintiffs to mitigate any losses, not cause them. *N.M. UJI 13-1812.* Scott had a legal obligation to exercise ordinary care to ensure Plaintiffs did not suffer purported damages from RAC. *Id.*  To the extent it even occurred, Scott admits RAC never demanded a price discount or indicated that it would cease to do business with Plaintiffs over any alleged discount quote.  Scott admits she did not even attempt to negotiate with RAC or advise them that Plaintiffs would not agree to a discount. *UMF 43-44.* By all accounts, Scott got played, but that does not create a legal claim for damages. Summary judgment is warranted.

E.      *All legal claims involving Ink Impressions should be dismissed.*

It appears from Plaintiffs' damages disclosures that Plaintiffs do not seek to hold Miller and Jacquez liable for any alleged theory of liability pertaining to Ink Impressions, and Miller and Jacquez hold hope that Plaintiffs will honor that. Miller and Jacquez did not work with Ink Impressions, had no involvement in Ink's solicitation of RR and the business that RR initially secured and continued to service for Ink did not implicate any civil conspiracy, particularly because RR's and Ink's formative dealings pre-dated Miller's and Jacquez' employment with RR. *UMF 1, 45-49.*

Plaintiffs' liability and damages claims against RR for Ink, through the alleged unlawful actions of Olinger and Shepherd, cannot survive summary judgment. The uncontroverted evidence establishes that Shepherd never solicited Ink Impressions to do business with RR. *UMF 46-51; Famiglietta*, 1998-NMCA-155 (contract claim requires material breach). The fact that he attended a lunch meeting, initiated at Ink Impressions' behest, is legally and factually insufficient to demonstrate either active conduct or competition. *Id.* And not that Shepherd's apparent authority and waiver by estoppel defenses need to apply, though Shepherd incorporates them, with regard to Ink there is no evidence Shepherd has performed the same or similar job duties while employed by Plaintiffs or that such duties *caused* Plaintiffs any losses. *Id.* (contract claim requires causation); *Ettenson*, 2001-NMCA-003, P12-14 (civil conspiracy and tortious interference require causation). As discussed further below, Ink Impressions' state of mind shows their business divorce from Plaintiffs was a *fait accompli. UMF 47-48.* While Shepherd never solicited, he certainly never caused Ink's desire to seek business elsewhere.

Plaintiffs' effort to hold RR liable for Ink for Olinger's actions also lacks merit.  While Olinger's non-solicitation covenant restricted her from influencing, or attempting to influence,

Ink Impressions from severing its business relationship with Plaintiffs, Olinger never violated her post-employment covenant.

The evidence demonstrates that Ink reached out to Olinger to meet for lunch, not the other way around. *UMF 46*. Olinger did not induce that invitation and her agreement to meet over sandwiches and drinks did not constitute improper solicitation. *Farm Bureau Mut. Ins. Co. v. Osby*, 2005 Iowa App. LEXIS 1342 **9-10 (Iowa Ct. App. November 9, 2005); *see also Inland American Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 712 S.E.2d 366, 370 (2011) (defining solicit and induce in employment context to require active persuasion, request, or petition). The undisputed facts also demonstrate that O'Neill, on her own accord, specifically stated she wanted to do business with RR and herself brought up price rates and whether RR could match those Ink was paying for services provided by Manpower, another Albuquerque staffing company. *UMF 46-48*. O'Neill's state of mind reflected, *ab initio*, a clear indication of her desire to seek business elsewhere, as well as her unhappiness with Plaintiffs. Olinger never tried to influence, or attempt to influence her decision-making. *Id.; UMF 50*.

While Olinger acknowledged that RR could match Manpower's billing rates for staffing services, that does not demonstrate active influence and certainly does not dispute the evidence that O'Neill stated that she could work with whoever she wanted and she wanted to work with Olinger and RR. *UMF 47*. On this point, to the extent Plaintiffs believe they can overcome solicitation, they cannot overcome causation. *See Ettenson, Famiglietta, supra*. O'Neill's state of mind reflects that she was already done with Plaintiffs and it was her call and decision to make with whom she chose to work. She chose RR. In sum, all claims relating to Ink must be dismissed.

F.     *Defendants Miller and Jacquez are not liable for any claims relating to Superior Ambulance.*

Plaintiffs allege that Olinger solicited Superior Ambulance sometime in the Spring of 2016, but before Miller and Jacquez even joined RR.  They cannot possibly be held liable for conduct that pre-dated their employment. Furthermore, as part of their damages disclosures, Plaintiffs do not even attribute to Miller and Jacquez any damages arising from Superior Ambulance.  Summary judgment for Miller and Jacquez is warranted as to all claims involving Superior Ambulance as well, thereby leaving no legal claims against Miller and Jacquez.

## III.     CONCLUSION

For the reasons stated herein, all claims against Miller and Jacquez should be dismissed in their entirety.   All remaining claims, excepting Superior Ambulance, should likewise be dismissed against RR and the Court should award any additional relief deemed just and proper.

Respectfully submitted,

**MOODY & WARNER, P.C.**

By: */s/ RDS on 2017.04.24*
        Christopher M. Moody
        Repps D. Stanford
4169 Montgomery Blvd. NE
Albuquerque, NM  87109
(505) 944-0033
moody@nmlaborlaw.com
stanford@nmlaborlaw.com
*Attorneys for Defendants*

I HEREBY CERTIFY that the foregoing document was filed through the CM/ECF system which caused all counsel of record to be served by electronic means on this 24th day of April, 2017.

Thomas Stahl
Scott Gordon
Rodey, Dickson, Sloan, Akin & Robb, P.A.

Daniel P. Hart
Michael Cross
Seyfarth Shaw, LLP

*Attorney for Plaintiffs*

MOODY & WARNER, P.C.

By: *_/s/ Repps D. Stanford 2017.04.24_*
        Repps D. Stanford