Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 1 of 11

Page 8 (Pages 29-32)

EMPLOYBRIDGE vs. RIVENROCK STAFFING, et al.
1:16-CV-01268

Fran Scott, Vol. I
February 23, 2017

Page 29

1  cell phone --
2  **A. Is bad.**
3  Q. -- is a very dangerous thing.
4      Were there any restrictions at ProDrivers' office
5  with respect to doing business work outside of hours at
6  one's home?
7  **A. No.**
8  Q. ==Was there any restriction on e-mailing==
9  ==information from a ProDrivers or EmployBridge account to==
10 ==one's personal e-mail account?==
11 **A. ==There's no policy in place.== But if you have**
12 **access to your laptop and your e-mail, there is no**
13 **reason to e-mail to your personal e-mail.**
14 Q. And explain that to me. Why is that the case?
15 **A. Well, you have access to your e-mail on your cell**
16 **phone, you have access to your e-mail on your laptop,**
17 **and if you're taking your laptop home, then you would**
18 **just access your e-mail, your corporate e-mail from your**
19 **laptop.**
20 Q. Okay.
21 **A. There was VPN on your work laptop that allowed**
22 **you to access the server, and then your cell phone had**
23 **your e-mail on there, as well.**
24 Q. Do you know whether or not the VPN would always
25 allow Mr. Jaquez to access his corporate e-mail from his

Page 30

1  cell phone or his personal computer?
2  **A. Well, the cell phone didn't require the VPN. It**
3  **was set up so that as long as you had connectivity, if**
4  **you will, so either your signal from whoever your**
5  **carrier was or a Wifi signal, you were able to access**
6  **your e-mail.**
7      As far as whether or not there was ever issues
8  **with the VPN connecting on a laptop from a home or other**
9  **place -- I can't say that you never encounter problems.**
10 **It's technology.**
11 Q. You indicated that you had access -- that they
12 had access to e-mail via either the phone or e-mail. If
13 you had problems with cell phone service and/or any
14 issues with the VPN, would it be fair to say that it
15 would be difficult to access at least ProDrivers' server
16 through one's phone or their laptop?
17 **A. It would.**
18 Q. And was Mr. Jaquez -- I'm assuming he was issued
19 a company cell phone?
20 **A. No. We are given the opportunity when we're**
21 **brought on to either keep our cell phone and be paid a**
22 **certain dollar amount every month for using that**
23 **personal cell phone or to be issued a second cell phone,**
24 **which would be crazy. So he used his personal cell**
25 **phone.**

Page 31

1  Q. And an IT person came in and did whatever things
2  they do to allow Mr. Jaquez to access his ProDrivers
3  account through his cell phone?
4  **A. Tim probably called the help desk for them to**
5  **walk him through putting the exchange mail on it.**
6  Q. While he was employed at EmployBridge, did you
7  ever observe any conduct on the part of Mr. Jaquez that
8  would cause you to question his honesty?
9  **A. No.**
10 Q. Did Mr. Jaquez or Mr. Miller ever complain to you
11 that they felt that they were not being paid proper
12 bonuses and/or commissions by the company?
13 **A. No.**
14 Q. Were you involved in the hiring of Terry Miller?
15 **A. Yes.**
16 Q. What was your involvement in that?
17 **A. Well, first I placed the ad that he responded to,**
18 **we had an initial interview, and then he interviewed a**
19 **multitude of times with Tom Schnabel and Mike Delusque**
20 **via telephone, and at some point a personal interview.**
21 Q. And do you know who the personal interview was
22 with?
23 **A. I don't. I don't recall.**
24 Q. At some point I'm gonna assume Mr. Miller was
25 offered the job. Hopefully the title in the offer

Page 32

1  letter was better than -- well, it was actually
2  Mr. Jaquez.
3      When do you recall Mr. Miller was officially
4  given an offer of employment by ProDrivers?
5  **A. I don't recall the exact date. I want to say it**
6  **was sometime in April, obviously a short period of time**
7  **before he started, but I don't recall the exact date.**
8  Q. And was Mr. Miller provided any hiring paperwork
9  or packets to come on board with ProDrivers?
10 **A. It's an electronic document that's sent to his**
11 **e-mail with the offer letter and all of the other**
12 **EmployBridge documents.**
13 Q. And is this essentially -- is this a
14 self-contained packet of hiring materials?
15 **A. It's sent from DocuSign, yes, and it has a group**
16 **of paperwork in it or a packet of information.**
17 Q. Do you know whether the packet of information is
18 itemized, or is it like a multi-page document?
19 **A. I don't recall. I don't recall.**
20 Q. And to the best of your understanding, did
21 Mr. Miller complete the hiring packet that was sent to
22 him through DocuSign?
23 **A. Yes.**
24 Q. And then at some point, does that packet get sent
25 back to you?

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 2 of 11

Page 2 (Pages 61-64)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.
1:16-CV-00833

Fran Scott, Vol. II
March 28, 2017

Page 61

```
 1       FRAN SCOTT,
 2  having been previously duly sworn, testified as follows:
 3             EXAMINATION
 4  BY MR. STANFORD:
 5     Q.  Good morning, Ms. Scott.  How are you?
 6     A.  I'm good.  How are you?
 7     Q.  I'm doing okay.  We'll slog through this thing
 8  together, but hopefully we won't keep you here too long.
 9  Hopefully my questioning won't induce any stomach
10  problems.  I've been told that I'm not a good
11  questionnaire, so hopefully we'll avoid that problem.
12         I've read back through your deposition.  I
13  will do everything I can to avoid questions that I
14  already asked before.  There may be one or two just to
15  round out a couple of things.  There is some testimony
16  that I do want to go through.  And I want to see if it's
17  still the case, whether it's true or not.
18         I'm reading from page 15 of your
19  deposition.  I asked the question, "Do you know
20  anything -- firsthand, that is -- about the damages in
21  this lawsuit that EmployBridge is contending was caused
22  by the unlawful acts of the defendants?"
23         And the answer that you gave was "No."
24         Is that still true?
25     A.  No.
```

Page 62

```
 1         MR. HART:  Let me object to the question.
 2  Form.
 3         But you can answer.
 4         MR. STANFORD:  What's your objection?
 5         MR. HART:  I think there's some vagueness
 6  about the terminology being used, EmployBridge versus
 7  ProDrivers.
 8         MR. STANFORD:  I'm just reading the
 9  question from the deposition.
10         MR. HART:  I understand.
11     A.  So when you say "EmployBridge," I
12  automatically think of the commercial side.  I don't
13  think of ProDrivers.  So when you asked "EmployBridge,"
14  all my brain was doing was going to the commercial side.
15     Q.  Okay.  So your answer's changed now.
16     A.  Because it's encompassing ProDrivers.
17     Q.  And I asked the question, "Have you ever
18  performed any kind of damages analysis or assessment of
19  what those numbers might actually be?"
20         You said, "No."
21         Has that now changed?
22     A.  Well, I didn't -- When you asked me that
23  question, I had not.  But since then, I have.
24     Q.  Great.  And the question I also asked at that
25  time, when you were under oath, was "Do you have any
```

Page 63

```
 1  knowledge of what specific business EmployBridge has
 2  lost as a result of the purported unlawful acts of Terry
 3  Miller?"
 4         And your answer was "No."
 5         Do you recall that?
 6         MR. HART:  Let me just assert myself
 7  here.  I objected at the time on vagueness grounds, and
 8  I am reasserting that objection here.
 9         MR. STANFORD:  Perfect.
10     Q.  (By Mr. Stanford)  Your answer was "No."
11  Correct?
12     A.  We haven't lost business.  But have we
13  adjusted bill rates?  Yes.
14     Q.  For whom have you adjusted bill rates?
15     A.  Acme, Fidelitone, and RAC.
16     Q.  When did you do that?
17     A.  On or about July 1.  On or about July 1.
18     Q.  And that would be July 1 of 2016, correct?
19     A.  Yes.
20     Q.  And this was the testimony that you gave on
21  February 23rd of 2017, correct?
22     A.  Yes.
23     Q.  So your testimony postdated the adjustments
24  that you made for Acme, Fidelitone and RAC, correct?
25         MR. HART:  I'm gonna object again on the
```

Page 64

```
 1  grounds of vagueness.  It was an objection I asserted at
 2  the time.  I'm objecting to that again.  The witness has
 3  already testified as to confusion as to understanding
 4  the term "EmployBridge" versus "ProDrivers."
 5     A.  I didn't understand any of the question.
 6     Q.  You didn't understand my question.  Do you
 7  have any knowledge of what specific business
 8  EmployBridge lost as a result of the purported unlawful
 9  acts of Terry Miller?
10     A.  Okay.  I did understand that one.  And I said
11  we haven't lost any business.  We have adjusted our bill
12  rates.
13     Q.  Is that statement still true?
14     A.  Yes.
15     Q.  And then I asked also about business related
16  to EmployBridge or ProDrivers with regard to Timothy
17  Jacquez, and I just want to see if this is still
18  correct.  I asked, "Do you know business EmployBridge
19  has purportedly lost because of any acts undertaken by
20  Tim Jaquez?"
21         And you asked for a clarification.  "So
22  you're speaking specifically EmployBridge or
23  ProDrivers?"
24         "Okay.  Let's break it out.  Welcome to
25  Lawyers 101."
```

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 3 of 11

Page 3 (Pages 65-68)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  
1:16-CV-00833

Fran Scott, Vol. II  
March 28, 2017

Page 65

1  A. Um-hmm.
2  Q. "Sorry."
3     "Let's focus first on ProDrivers."
4     "Okay."
5     "Okay. Specifically business that you
6  believe EmployBridge has lost because of acts undertaken
7  by Tim Jaquez subsequent to his resignation."
8     Do you recall what your answer was?
9  A. I would have said no, because I was still
10 thinking EmployBridge. And, again, we haven't lost
11 business. We've reduced our bill rates because of Tim
12 and Terry.
13 Q. What do you mean that you've reduced it
14 because of Tim and Terry?
15 A. Because they went and undercut my price, and
16 my customers called me and said, "Hey, Terry and Tim
17 were here," or "Terry was here," or "Tim was here," "and
18 this is what they quoted me."
19 Q. So it's your testimony that Acme, Fidelitone,
20 and RAC, all three, have told you that Tim and Terry,
21 Tim Jacquez and Terry Miller, went to their facilities
22 and gave a lower price that ProDrivers, you claim, had
23 to match.
24 A. Yes, sir.
25 Q. When did that take place with regard to Acme?

Page 66

1  A. I don't recall the exact date.
2  Q. Who did you talk to that told you that?
3  A. Keaton Wynn. I have an e-mail from him.
4  Q. We'll look at that e-mail in a little bit.
5  Who from Fidelitone told you that?
6  A. John Priest and Julian Zamora.
7  Q. Do you know whether those two individuals are
8  listed as witnesses in this lawsuit?
9  A. I have no idea.
10 Q. And who from RAC told you that --
11 A. Gareth Floyd.
12 Q. You gotta let me finish. Who at RAC told you
13 that Riven Rock had come to them and had underbid -- By
14 how much was it?
15 A. I believe -- I reduced my rate by 51 cents per
16 hour. I don't know what he said that they quoted him.
17 And it was Gareth Floyd.
18 Q. Did Mr. Floyd tell you that Tim Jacquez had
19 come to visit him and given a different rate quote?
20 A. No.
21 Q. Had he told you that Terry Miller had done so?
22 A. Yes.
23 Q. Did he also tell you that Amber Fluitt was
24 there?
25 A. Absolutely.

Page 67

1  Q. Do you know who brokered that particular at
2  least communication with RAC?
3  A. No, I do not.
4  Q. So if you don't know that, how do you know
5  whether or not it was Mr. Miller or Ms. Fluitt that did
6  it?
7  A. Because I wasn't present when they were there.
8  Q. But you're alleging right now that we owe you
9  money for alleged solicitation acts that --
10 A. I --
11 Q. Excuse me, ma'am. You have to let me finish.
12 -- that ProDrivers lost business. You worked there.
13 And you're attributing that to Terry Miller. Do I have
14 that correct?
15 A. Because Gareth Floyd said that Terry Miller
16 offered him a lower rate.
17 Q. All right. Fidelitone. Who was there that
18 quoted lower rates?
19 A. I don't recall.
20 Q. Was it Terry Miller?
21 A. I don't recall.
22 Q. Was it Tim Jacquez?
23 A. I don't recall.
24 Q. Then how is it that Riven Rock and/or Terry
25 Miller or Tim Jacquez would be liable for any rate

Page 68

1  decrease that you made for your employees?
2  A. Because John Priest and Julian Zamora phoned
3  me and requested a meeting, saying that Tim and Terry
4  had offered them a lower rate.
5  Q. When did that take place?
6  A. Sometime last summer.
7  Q. Is that in the Declaration that you've
8  provided in this lawsuit?
9  A. I don't recall.
10 Q. That would be important to provide that kind
11 of information, correct?
12 A. It would.
13 Q. So it was John -- I'm sorry, what was his --
14 John who?
15 A. Priest.
16 Q. John Priest and Julian Zamora. Do I have that
17 right?
18 A. You do.
19 Q. And Mr. Wynn.
20 A. Keaton Wynn.
21 Q. Correct. He's at Acme.
22 A. Correct.
23 Q. And what did he specifically tell you?
24 A. He told me that Terry Miller and Amber Fluitt
25 went to see him. And maybe it was Tim. I don't

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 4 of 11

Page 7 (Pages 81-84)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  
1:16-CV-00833

Fran Scott, Vol. II  
March 28, 2017

Page 81

1  MR. HART: Object to the form of the
2  question. Calls for a legal conclusion.
3    You can answer.
4  Q. Do you know whether the two were ever acting
5  in any kind of concert or engaging in any kind of
6  conspiracy to take business away from RAC Transport,
7  Acme Iron & Metal, or Fidelitone?
8    MR. HART: Same objection.
9    You can answer.
10  A. They have a non-compete agreement that says
11  that you can't call on our customers for 12 months after
12  you leave our employment. Yes, I think that they did.
13  Q. They acted in concert even though a number of
14  the e-mails that we looked at show that it was either
15  Mr. Miller, Mr. Jacquez, or Ms. Fluitt?
16  A. Either one or the other, yes.
17  Q. So my question is, why would Mr. Miller --
18  Mr. Jacquez, for example, did something wrong. Why
19  would that befall Mr. Miller? Or if Mr. Miller did
20  something wrong, why would that befall Mr. Jacquez?
21    MR. HART: I'm gonna renew my objection.
22    You can answer if you know.
23  A. I don't understand exactly what you're asking.
24  Q. Sure. Let's say we have a non-solicitation,
25  you and I do, and we worked -- and you go out and you do

Page 82

1  something, and you violate your non-solicitation. And I
2  don't.
3  A. Right.
4  Q. I shouldn't get stuck with what you did,
5  correct?
6  A. Correct.
7  Q. Okay. Do your damages calculations that are
8  exemplified in Exhibit 144 account for the fact that
9  maybe Mr. Miller did something that maybe Mr. Jacquez
10  didn't or Mr. Jacquez maybe did something that
11  Mr. Miller didn't?
12    MR. HART: Object to the form of the
13  question and object to foundation.
14    You can answer.
15  A. I'm not even gonna answer the question because
16  I can't answer it intelligently.
17  Q. Can you definitively say, as we sit here
18  today, that Terry Miller caused $3,075 in damages to RAC
19  Transport?
20  A. Tim and Terry solicited those three
21  customers: RAC, Fidelitone, and Acme. Regardless of
22  whether they did it together or separate, they contacted
23  those customers and offered them better rates to try to
24  take the business from ProDrivers, period.
25  Q. Where does it say in your Declaration that

Page 83

1  Mr. Jacquez contacted all three of them?
2  A. At some point in time, my customers verbally
3  contacted me and said either Tim contacted them, Terry
4  contacted them, Amber contacted them, they all contacted
5  'em, at some point.
6  Q. First you're saying Tim -- First you're using
7  the "or," and now you're saying all of them. Did all of
8  them -- Is it your testimony that both Tim and Terry
9  contacted RAC Transport, Acme Iron & Metal, and
10  Fidelitone?
11  A. Yes.
12  Q. And is your testimony that both Terry Miller
13  and Tim Jacquez solicited RAC Transport, Acme Iron &
14  Metal, and Fidelitone?
15  A. Yes.
16  Q. And it's also your testimony that both
17  Mr. Miller and Mr. Jacquez gave price discounts to RAC
18  Transport, Acme Iron & Metal, and Fidelitone.
19  A. Yes.
20  Q. So if I talk to Keaton Wynn and all of those
21  people, they're gonna verify that for me.
22  A. Yes.
23  Q. Just so I'm clear, I want to go back on
24  Exhibit 4. So we've agreed that Terry Miller's name is
25  nowhere included on Mr. Wynn's e-mail. Correct?

Page 84

1  A. Terry Miller's name is not on this e-mail.
2  Q. But it's your testimony that subsequent to
3  that, you had this convenient phone conversation with
4  Keaton Wynn where he did tell you that, lo and behold,
5  Terry Miller came around.
6    MR. HART: Object to the form of the
7  question.
8    You can answer.
9  A. It was actually after this e-mail.
10  Q. So he did that orally and not in writing? Is
11  that what you're telling me?
12  A. That we had a verbal conversation, yes.
13    (Exhibit 145 marked.)
14  Q. I'm going to show you Exhibit Number 145. Can
15  you tell me what this is?
16  A. It's a Supplemental Declaration of Fran Scott.
17  Q. And is that your Declaration?
18  A. Yes.
19  Q. And what's the date on that?
20  A. There are three of them here. Did you mean to
21  hand me all three of them?
22  Q. Oh.
23    MR. HART: Thank you.
24  A. August 15, 2016.
25  Q. Is there anything about Fidelitone in this

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  Fran Scott, Vol. II
1:16-CV-00833  March 28, 2017

Page 85

1  Declaration?  Take your time, please.
2      A.  No.
3      Q.  And let me have you turn to paragraph 6 of
4  Exhibit Number 145.  As I understand, that memorializes
5  the conversation that you had with Mr. Floyd.  Is that
6  accurate?
7      A.  Um-hmm.
8      Q.  You have to verbalize.
9      A.  Yes.
10     Q.  And can you show me where Mr. Jacquez's name
11 is located in paragraph 6 of your Declaration.
12     A.  It is not.
13     Q.  And down at the bottom of paragraph 6, you
14 write, "He also told me they quoted 50 cents less per
15 hour than our current rate."  The "they" there was Terry
16 Miller and Amber Fluitt, correct?
17     A.  Correct.
18     Q.  And on the first page of your Declaration, the
19 supplemental one that we had marked as Exhibit 145, I
20 think I know the answer, but you use the term "the
21 Defendants" in paragraph 3.  Were you referring to all
22 of the Defendants in the lawsuit or some of the
23 Defendants in the lawsuit?  And if so, which ones?
24     A.  I have no idea.  I would have to assume that I
25 was referring to Tim Jacquez and Terry Miller.

Page 86

1      Q.  And part of the reason, my recollection from
2  our last session is that you indicated that you didn't
3  know what Ms. Olinger and/or Mr. Shepherd had been doing
4  or not doing.  Is that fair to say?
5      A.  That is correct.
6      Q.  And that part's true today still?
7      A.  Still today.
8      Q.  With regard to Mr. Gomez in paragraph 4, do
9  you know whether or not Mr. Gomez voluntarily resigned
10 his employment from EmployBridge?
11     A.  He voluntarily resigned from ProDrivers, yes.
12     Q.  Do you know whether or not Catherine Olinger
13 ever worked with Mr. Gomez?
14     A.  I have no clue.
15     Q.  Do you know whether or not there was anything
16 improper or impermissible -- again, I'm not looking for
17 a legal answer -- as to whether there would've been a
18 problem with Ms. Olinger sending over an employer
19 verification for Riven Rock for Mr. Gomez?
20     A.  No.
21     Q.  Did you have any knowledge or information that
22 Mr. Miller or Mr. Jacquez had improperly solicited
23 Mr. Gomez to leave his employment at EmployBridge?
24     A.  No.
25     Q.  What's the difference between the commercial

Page 87

1  side -- The commercial side and what else?  The other
2  side.
3      A.  The transportation side.
4      Q.  And what's the difference between those two?
5      A.  The commercial side is more traditional
6  staffing, ranging anything from general labor to
7  executive placement.  It's broken down into different
8  divisions and groups.
9      Q.  Okay.  What about the transportation side?
10     A.  Transportation is specifically transportation
11 and only transportation.
12     Q.  When you refer to "EmployBridge" in
13 paragraph 4 there, "ProDrivers' temporary employee named
14 Robert Gomez resigned his employment with EmployBridge,"
15 does that refer to the commercial side or the
16 transportation side?
17     A.  In this case, it refers to ProDrivers.
18     Q.  So the transportation side?
19     A.  Yes.
20     Q.  Paragraph 7, a similar claim is made about
21 Creamland Dairy.  Did Creamland Dairy ask you to give
22 them a discount?
23     A.  No, actually, he did not.
24     Q.  And in paragraph 6, can you please identify
25 for me where it indicates that Mr. Floyd told

Page 88

1  EmployBridge or ProDrivers that you needed to match the
2  50 cents per hour.
3      A.  He didn't tell me.  He asked me.
4      Q.  Can you show me where that is in paragraph 6.
5      A.  Well, the last statement says, "He also told
6  me they quoted 50 cents less per hour than our current
7  rate."
8      Q.  Right.  He conveyed to you information that he
9  alleged Mr. Miller and Mr. Fluitt -- or Ms. Fluitt had
10 conveyed to him, correct?
11     A.  That is correct.
12     Q.  It then doesn't say, "Period.  And then, by
13 the way, he also asked EmployBridge and/or ProDrivers to
14 honor that same 50-cents-less-per-hour quote."
15     A.  It does not.  But he did ask.
16     Q.  Does it say it anywhere in this Supplemental
17 Declaration?
18     A.  No, it does not.
19     Q.  Does it say it anywhere in the original
20 Declaration that we looked at?
21     A.  No, it does not.
22     Q.  And just so I'm clear, since we'll focus on --
23 You indicated that he asked you, not that he demanded.
24 Correct?
25     A.  Correct.

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 6 of 11

Page 10 (Pages 93-96)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.
1:16-CV-00833

Fran Scott, Vol. II
March 28, 2017

Page 93

1  "No, I'm not willing to change my rate"?
2     A.  No.
3     Q.  Did you receive any permission from anyone to
4  make that discount?  Is that something that fell within
5  your authority?
6     A.  I did not receive any permission.  It fell
7  within my authority.
8     Q.  All right.  And what were the discounts that
9  you told me that you made for Acme Iron & Metal and
10 Fidelitone?
11    A.  $1.02 per hour.
12    Q.  A dollar -- I'm sorry?
13    A.  Two.  $1.02.
14    Q.  And same questions.  Did you ever tell Acme
15 Iron & Metal, "No, we're not willing to make any
16 discounts to the bill rates"?
17    A.  No.
18    Q.  Did you ever tell Fidelitone --
19    A.  No.
20    Q.  You gotta let me finish.
21    A.  Sorry.
22    Q.  Did you ever tell anyone at Fidelitone,
23 "Sorry, ProDrivers or EmployBridge is not willing to
24 lower the bill rate to $1.02 an hour"?
25    A.  No.

Page 94

1     Q.  Relatedly, did you ever say, "Okay, maybe we
2  can't do $1.02 an hour or 50 or 51 cents an hour, but
3  let's negotiate and see if there's some other bill rate
4  through which the parties can live"?
5     A.  No, I did not.  I negotiated additional
6  temporary employees for the lower discounted rate.
7     Q.  So let me break this down.  So is it fair to
8  say that there were no negotiations with RAC, Acme Iron,
9  and Fidelitone with regard to the lowering or the
10 agreement to lower bill rates by ProDrivers and/or
11 EmployBridge?  Is that accurate?
12    A.  That is accurate.
13    Q.  Now, the second part that you talked about, I
14 have no idea what you're talking about, so educate me as
15 to what it is that you're talking about.
16    A.  I extended the length of the assignment.  So I
17 dedicated these people to the client.
18    Q.  But that's also something that benefits
19 tremendously ProDrivers and/or EmployBridge, right,
20 because the longer that they're over there working, the
21 more profit you get?
22    A.  No, not necessarily.  What it did is allowed
23 me to keep the same person there opposed to just fill in
24 time, which is ultimately more work for me.
25    Q.  Do you know whether or not there was

Page 95

1  additional profit made by EmployBridge or ProDrivers by
2  extending the length of the assignments with respect to
3  any of those entities?  I think we're talking about RAC.
4     A.  No, there was not.
5     Q.  Let's walk through Acme Iron & Metal.  So
6  similar deal.  255,826 is not projected sales, but is it
7  similarly actual sales made for the time period that we
8  talked about?
9     A.  Yes.
10    Q.  And then where did the "Projected Sales" come
11 for the period of time from 3/20/2017 to 6/22/2017?
12    A.  The number of drivers that are placed on
13 assignment multiplied by 40 hours per week, multiplied
14 by the 13-and-a-half weeks from March 20th, 2017, to
15 June 22nd, 2017.
16    Q.  And is there -- I'm sure there is.  It just
17 looks a little unusual.  Why is Fidelitone's -- If its
18 numbers at least over the past eight months to a year
19 were so much considerably lower than Acme Iron & Metal,
20 why are the sales projected the same for Fidelitone and
21 Acme?
22    A.  There are five drivers at Fidelitone now.
23    Q.  Gotcha.  And how long are those assignments?
24    A.  They are indefinite.  They're dedicated
25 assignments.

Page 96

1     Q.  When did those start at Fidelitone?
2     A.  I don't have the exact date.
3     Q.  I won't get all philosophical here.
4  "Indefinite" can mean all kind of things.  Does
5  "indefinite" in your mind also mean they can go on for,
6  at least for theoretically, a really, really long time?
7  Right?
8     A.  They can go on for several months to several
9  years.
10    Q.  Does it also mean that it could also stop next
11 week?
12    A.  It does.
13    Q.  Does EmployBridge or ProDrivers have any
14 provision with RAC, Acme, or Fidelitone that does not
15 allow RAC, Acme, or Fidelitone to use other staffing
16 services to supply drivers to?
17    A.  No, it does not.
18    Q.  So I guess the fancy way of saying that,
19 EmployBridge and ProDrivers does not have any exclusive
20 staffing services contracts with either of those three
21 entities.  Is that fair to say?
22    A.  That is correct.
23    Q.  So if RAC or Acme or Fidelitone all decided
24 tomorrow that they don't want to do business anymore
25 with ProDrivers or EmployBridge, they would be able to

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 7 of 11

Page 13 (Pages 113-116)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.
1:16-CV-00833

Fran Scott, Vol. II
March 28, 2017

Page 113

1  contained by Riven Rock -- or, excuse me, EmployBridge
2  in Interrogatory Number 10 that you have any knowledge,
3  information, belief about?
4           MR. HART:  Object to the form of the
5  question.  Just to clarify, are you asking knowledge in
6  her individual knowledge or knowledge as a corporate
7  representative?
8      Q.  Do you have any -- Other than what we talked
9  about, do you have any knowledge, information, or belief
10 about the Answer, the information in the Answer, besides
11 Good People and the name Debbie Muñoz?
12     A.  That's the information that I have.  That's
13 the only information.
14     Q.  So you have no idea whether it's true or not
15 true.
16     A.  What's true?  The Answer?
17     Q.  Any of the other information contained in
18 here.
19     A.  I have no specific knowledge on what's
20 contained in here other than what I just stated.
21     Q.  And I think we indicated at the last
22 deposition, but I just want to make perfectly clear, do
23 you know who Steve Sorensen is?
24     A.  I've heard the name.
25     Q.  Other than hearing the name, do you know who

Page 114

1  he is?
2      A.  Other than his affiliation with Select -- the
3  Select companies, no, I do not.  I've never met him,
4  never spoken to him.
5      Q.  Do you know who Dave Tonick is?
6      A.  No.
7      Q.  Do you know who Arlita Purser is?
8      A.  No.
9      Q.  Do you know what Pogo is?
10     A.  No.
11     Q.  Do you know where Steve Sorensen banks?
12     A.  No.
13     Q.  Do you know who Marko Gortinski is?
14     A.  No.
15     Q.  Do you know where Mr. Gortinski banks?
16     A.  No.
17     Q.  With respect to Interrogatory Number 11 --
18 sorry for the same boring exercise, but do you know
19 whether or not that information is true and correct?
20     A.  As I stated earlier, I am not familiar with
21 Shaun Shepherd's or Cathy Olinger's non-compete
22 agreement and what it states.  A general typical
23 non-compete agreement with ProDrivers or EmployBridge
24 states exactly what's in this Answer.  But as to the
25 knowledge of what's in Shaun's or Cathy's, no, I do not

Page 115

1  know exactly.
2      Q.  And do you even, in fact, know whether or not
3  Mr. Shepherd or Ms. Olinger have employment agreements
4  with EmployBridge?
5      A.  I do not.
6      Q.  Do you know what the Select Staffing
7  employment agreements might have looked like?
8      A.  No, I do not.
9      Q.  Do you know whether or not, for example,
10 Mr. Shepherd is prohibited under the terms of his
11 employment agreement from soliciting any EmployBridge
12 employees or temporary workers with whom he dealt during
13 the last 12 months of his employment with EmployBridge?
14          MR. HART:  Object to the form of the
15 question.
16          You can answer.
17     A.  I just answered.  I don't know what's in his
18 non-compete agreement, so, therefore, I cannot speak to
19 it.
20          You have scribbles on the back of this.
21 Do you need it?
22     Q.  Oh, I can switch it out.
23          (A discussion was held off the record.)
24     Q.  I'm going to make a quick correction.  Can I
25 have you read back through Exhibit Number 148.  Is that

Page 116

1  the Verification to Mr. Miller's Answers to Plaintiffs'
2  Interrogatories?
3      A.  Yes.
4           MR. HART:  That's not what I have.
5           THE WITNESS:  That's 148.
6           MR. HART:  Mine says Jacquez.
7      Q.  (By Mr. Stanford)  148 that you have in front
8  of you, is that the Verification that you did for
9  Mr. Miller's?
10     A.  Yes.
11     Q.  I'm going to show you Exhibit Number 149 --
12          (Exhibit 149 marked.)
13     Q.  -- and ask if you recognize this document.
14     A.  Okay.
15     Q.  What is Exhibit 149?
16     A.  It's a Verification that I've read the
17 Plaintiffs' Answers to Defendant Riven Rocks Staffing,
18 LLC's, First Set of Interrogatories.
19     Q.  And so I can clean up my mess, are the
20 Interrogatory Answers that you're referring to the ones
21 that we looked at that were marked as Exhibit 147?
22     A.  Yes.
23          (Exhibit 150 marked.)
24     Q.  I'm going to show you what I've marked as
25 Exhibit Number 150 and ask if you recognize those

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 8 of 11

Page 16 (Pages 117-120)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.
1:16-CV-00833

Fran Scott, Vol. II
March 28, 2017

Page 117

1  documents.
2  **A.  Yes.**
3  **Q.  What are those?**
4  **A.  This is the -- Terry Miller's Interrogatories,**
5  **First Set of Interrogatories.**
6  **Q.  And if I could have you look back on -- Is it**
7  **Exhibit 148?**
8  **A.  Yes.  So that's the Verification that I signed**
9  **for Exhibit 150.**
10  Q.  Gotcha.  I knew I could daftly clean up my
11  exhibit mess.
12       **If I could have you turn to Interrogatory**
13  **Number 4.**
14  **A.  Okay.**
15  Q.  This asked, "Please identify all material
16  facts known to Plaintiff at the time of the filing of
17  the original Complaint . . . that Miller personally
18  misappropriated or used trade secrets and/or
19  confidential information."  And what information can you
20  confirm as having firsthand personal knowledge with
21  respect to the Answer?
22  **A.  So on page 6, from the first full paragraph,**
23  **starting with "Subject to," to the end of it, I have**
24  **firsthand knowledge of that.**
25  Q.  Okay.  If I could have you turn to page 7.

Page 118

1  **A.  (Witness complies.)**
2  Q.  The question presented was, "For the customers
3  identified in Interrogatory No. 6," i.e. those covered
4  by Mr. Miller's non-solicitation provision, "please
5  identify each customer of EmployBridge whom you contend
6  Miller solicited, the date on which the solicitation
7  took place, the manner in which the solicitation took
8  place, with whom the solicitation took place, and the
9  identity of all material witnesses with knowledge or
10  information about each solicitation."  Did I read that
11  correctly?
12  **A.  Yes.  You were reading -- Okay.  I'm sorry,**
13  **yes.**
14  Q.  Can you look through the Answer and indicate
15  for me where it indicates that Mr. Miller solicited
16  Fidelitone.
17  **A.  It doesn't in that Answer.**
18  Q.  And this was an Answer that you verified,
19  correct?
20  **A.  Um-hmm.**
21  Q.  You have to verbalize.
22  **A.  I'm sorry.  Yes.**
23  Q.  And can you go back to Exhibit Number 148,
24  please.
25  **A.  Yes.**

Page 119

1  **Q.  What is the date of your Verification of this**
2  **Interrogatory Answer?**
3  **A.  March 20th.**
4  **Q.  So that was just last week?**
5  **A.  Yes.**
6  **Q.  And can you indicate to me in the Answer that**
7  **Riven Rock -- excuse me, EmployBridge supplied that you**
8  **verified on March 20th where Mr. Miller solicited Acme**
9  **Iron & Metal.**
10  **A.  It's not in this Answer.**
11  Q.  And according -- As I understand it, the
12  purported solicitation took place in the summer of 2016.
13  Is that correct?
14  **A.  Correct, uh-hmm.**
15  Q.  That's a yes?
16  **A.  Yes.**
17  Q.  And then at the last part of the Answer on
18  Interrogatory Number 7, does that state, "Floyd," the
19  gentleman from RAC, "stated that Riven Rock quoted 50
20  cents less per hour than EmployBridge's current rate"?
21  Correct?
22  **A.  Correct.**
23  Q.  And you verified that Answer on March 20th of
24  this year, correct?
25  **A.  Yes.**

Page 120

1  Q.  With respect to Interrogatory Number 9, the
2  question was, "Please provide," among other things, "all
3  material facts in support of your contention . . . that
4  Miller has, or is, 'using EmployBridge's confidential
5  information with the knowledge that such information is
6  a trade secret belonging to EmployBridge.'"  Do you know
7  whether or not any of the information contained in the
8  Answer is true and correct?  And let me isolate it.  At
9  least with respect to actions by Defendant Miller.
10  **A.  Okay.  So ask the question again, now that**
11  **I've gotten done reading.**
12  Q.  Sure.  You know what, let me back into this
13  another way and try to make it simpler for you.
14       At the bottom of page 10, it says, "Since
15  Defendant Jacquez emailed himself these trade secrets
16  and/or confidential information --"  And we've talked
17  about your testimony that we certainly have some
18  information that no one's disputing that Mr. Jacquez
19  sent some e-mails to a Yahoo account.  So you agree that
20  you have knowledge and information about that, correct?
21  **A.  Yes.**
22  Q.  And I think at some point you may have perused
23  either the examination report or had talked with
24  Mr. Vaughn, a forensic person who did the actual
25  accounting of e-mails that Mr. Jacquez sent to his Yahoo

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 9 of 11

Page 17 (Pages 121-124)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  
1:16-CV-00833

Fran Scott, Vol. II  
March 28, 2017

Page 121

1  account.  Correct?
2  **A.  Correct.**
3  Q.  Do you have knowledge or information or belief
4  that subsequent to Mr. Jacquez e-mailing himself, that
5  then "Defendant Jacquez and --" importantly, "Defendant"
6  there on the top of page 11 I assume is Defendant
7  Miller "-- have made use of that information in order to
8  solicit Plaintiff's customers away from Plaintiff and to
9  use Riven Rock"?
10  **A.  I have no specific proof that Terry Miller**
11  **used any of the information that Jacquez e-mailed**
12  **himself.**
13  Q.  If I could have you turn to page 13.
14  **A.  (Witness complies.)**
15  Q.  At the bottom paragraph -- and this is with
16  regard to Acme Iron & Metal -- does the Answer that you
17  supplied -- or at least verified, I should say, indicate
18  anywhere in that paragraph that Defendant Terry Miller
19  approached Acme Iron & Metal?
20  **A.  No, it does not.**
21  Q.  And on the next page, with respect to RAC
22  Transport -- Do you see that in late July or early
23  August 2016?
24  **A.  Yes.**
25  Q.  Is there any information indicated in there

Page 122

1  that EmployBridge either matched the price or agreed to
2  a similar discount price for a bill rate?
3  **A.  No.**
4  Q.  And, again, with respect to the Answer to
5  Interrogatory Number 13, would you agree with me that
6  there is no mention anywhere of Fidelitone or the two
7  individuals' names that you indicated were associated
8  with that company?
9  **A.  That is correct.**
10  Q.  And with respect to Interrogatory Number 14, I
11  asked -- or Mr. Miller asked through my typing efforts
12  the damages caused by Mr. Miller.  Would you agree with
13  me, in the Answer that you verified, Fidelitone is not
14  listed anywhere?
15  **A.  That is correct.**
16  Q.  And, again, it's fair to say you cannot verify
17  whether or not additional damages were caused by named
18  Defendants' solicitations of Ink Impressions, Superior
19  Ambulance, Insight Lighting, and the City of
20  Albuquerque?
21  **A.  Correct.**
22       MR. STANFORD:  Let's take a quick break.
23  (Recess was taken from 12:10 p.m. until 12:25 p.m.)
24  Q.  (By Mr. Stanford)  We are going to plow
25  through and get this over with.  In honor of my beard,

Page 123

1  I've been asked whether or not -- Have you ever heard
2  the expression "shave a nickel, add a dime"?
3  **A.  Absolutely.**
4  Q.  Where have you heard that?
5  **A.  I say it all the time.**
6  Q.  What does it mean?
7  **A.  It means shave a nickel off of somebody's**
8  **paycheck and add it -- or pay, hourly pay, and add a**
9  **dime to a bill rate.**
10  Q.  Have you ever heard Mr. Delusque make that
11  statement?
12  **A.  Not to my knowledge.**
13  Q.  Have you had any discussions, other than those
14  that you talked about with Mr. Keaton Wynn, about
15  serving as a witness in this lawsuit?
16  **A.  No.**
17  Q.  What about anyone at Fidelitone?
18  **A.  No.**
19  Q.  A quick segue.  With regard to onboarding, and
20  specifically the onboarding of Mr. Miller and
21  Mr. Jacquez, did I understand correctly that if the
22  process runs as it should, Mr. Jacquez and Mr. Miller
23  would've gone to the DocuSign program, that would've
24  been sent to you, you would've filled out your portions,
25  and then there would've been a signature by a regional

Page 124

1  president or someone above you?
2  **A.  Correct.**
3  Q.  And would those be reflected in all of the
4  documents or some of the documents as part of the hiring
5  packet?  If you know.
6  **A.  I don't know.**
7  Q.  Again, I may have asked this before, but at
8  least some of us are confused.  Do you understand the
9  packet of materials that would've gone to Mr. Miller and
10  Mr. Jacques as part of their onboarding?  Would that
11  have been discreet individual documents, five or ten of
12  them, or would it have been one multipage document?
13  **A.  It would've been one multipage document.**
14  **Now, keep in mind that I haven't onboarded**
15  **in 26-and-a-half years, and we did things paper.  So**
16  **there has been a lot of changes, and Terry and Tim were**
17  **the first employees that I had hired that I was**
18  **specifically responsible for and onboarded since roughly**
19  **2012.**
20  Q.  What does that mean?  Were there issues that
21  came on with their onboarding?
22  **A.  No.  I wasn't familiar with -- I hadn't seen a**
23  **lot of onboarding documents prior to Tim and Terry, so**
24  **from 2012 until Tim and Terry, I was in a different**
25  **role, different capacity, so I don't know how those**

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 10 of 11

Page 18 (Pages 125-128)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  
1:16-CV-00833

Fran Scott, Vol. II  
March 28, 2017

Page 125

1  onboarding documents morphed over the years.
2     Q.  Gotcha.  Okay.  But to the best of your
3  recollection, when Tim and Terry were involved, it was a
4  multipage hiring packet.
5     A.  Correct.
6     Q.  Do you know whether there would be any reason
7  as to why the multipage packet would have a different
8  number of documents for Terry than for Tim?
9     A.  The only thing I could think of was that Terry
10 was a salesperson; Tim was hired as operations.  That
11 could mean something different.  But other than that
12 guess, no.
13    Q.  And then as I believe I understood the
14 process, is once at least they've gone through your --
15 As I understood it, you got an e-mail.  Correct?
16    A.  Correct.
17    Q.  And then you had fields to fill out that --
18 for your signature, Fran Scott, correct?
19    A.  Correct.
20    Q.  And then subsequent to filling those out,
21 where did the packet go?
22    A.  It gets whisked off to -- I believe Chip
23 Grissom is the next person to sign it.
24    Q.  And in the case of Terry and Tim, is it fair
25 to say -- Pre-whisking it off, was that the last time

Page 126

1  that you had access to any of the hiring documents with
2  regard to Terry and Tim?
3     A.  Yes.
4        (Exhibit 151 marked.)
5     Q.  I'm going to show you Exhibit Number 151 --
6  I'll do the courtesy of undoing my mistake on Mr. Hart's
7  copy -- and ask if you recognize that copy.
8     A.  I do.  It's the Verification that I signed for
9  the Interrog- -- I can't say that word -- for Tim.
10    Q.  This is Mr. Jacquez?
11    A.  Yes.
12    Q.  And the date that you verified the Answers
13 that we'll look at here in a minute was March 20, 2017?
14    A.  Yes.
15    Q.  And that's your signature at the bottom?
16    A.  It is.
17       (Exhibit 152 marked.)
18    Q.  Let me show you what I marked as Exhibit 152
19 and ask if you recognize this.
20    A.  I do.
21    Q.  And are these the Answers that you verified on
22 behalf of Employment Solutions Management to Tim
23 Jacquez's First Set of -- and we'll help you not have to
24 pronounce the word -- Interrogatories?
25    A.  Thank you, yes.

Page 127

1     Q.  If I could have you turn to Interrogatory
2  Number 3 which asked, "Please identify all material
3  facts known to Plaintiff at the time of the filing of
4  the original Complaint in support of the allegations
5  that Tim Jacquez personally solicited employees of
6  EmployBridge, and provide the name of each individual
7  with personal knowledge of each material fact
8  identified."  Do you see that?
9     A.  I do.
10    Q.  And then on the second page, the same
11 information that we've seen on several occasions is
12 listed with regard to a Mr. Robert Gomez, correct?
13    A.  Yes.
14    Q.  Do you have any firsthand information that
15 Mr. Jacquez personally solicited Robert Gomez to resign
16 his employment with EmployBridge?
17    A.  No, I do not.
18    Q.  With regard to the Answer to Interrogatory
19 Number 4, is there any information contained in there
20 verified by you that Mr. Jacquez contacted RAC?
21    A.  No.
22    Q.  Is there any information in the verified
23 Answer to Interrogatory Number 4 that Mr. Jacquez
24 contacted Fidelitone?
25    A.  No.

Page 128

1     Q.  Is there any information in there that
2  Fidelitone or RAC made any kind of communications with
3  respect to price discounts?
4     A.  No.
5     Q.  Related follow-up questions.  With respect to
6  Interrogatory Number 7, which specifically asked for
7  customers identified in Interrogatory Number 6, those
8  would be customers covered by the purported non-
9  solicitation agreement, for EmployBridge to "identify
10 each customer of EmployBridge whom you contend Jacquez
11 solicited, the date [in] which the solicitation took
12 place, the manner in which the solicitation took place,
13 and the identify of all material witnesses with
14 knowledge or information about each solicitation,"
15 correct?
16    A.  Yes.
17    Q.  Would you agree with me with respect to the
18 Answer provided by EmployBridge that you verified, that
19 there is no answer provided that Mr. Jacquez solicited
20 RAC Transport?
21    A.  That is correct.
22    Q.  And there's similarly no information or answer
23 provided that you verified last week that Mr. Jacquez
24 solicited Fidelitone.
25    A.  Correct.

Case 1:16-cv-00833-WJ-KK   Document 105-2   Filed 04/24/17   Page 11 of 11

Page 19 (Pages 129-132)

EMPLOYBRIDGE vs. RIVEN ROCK, et al.  
1:16-CV-00833

Fran Scott, Vol. II  
March 28, 2017

Page 129

1   Q.   And there's similarly no related information
2   about any discounts that may or may not have been
3   offered with respect to RAC Transport or Fidelitone.
4   A.   Correct.
5   Q.   The Answer indicates that -- in Interrogatory
6   Number 7, with regard to Acme, that "Acme has recently
7   demanded that EmployBridge match the price that Riven
8   Rock stated it could offer."  And I'm curious about the
9   verb "demanded."  Did the gentleman at Acme flat out
10  demand that EmployBridge honor the discount?
11  A.   No.  He asked.  He said, "I'd like you to meet
12  the rate."
13  Q.   "I would like you to meet the rate."  What
14  else?
15  A.   About it.
16  Q.   Did the gentleman -- I think his name is
17  Mr. Wynn -- at Acme Iron & Metal -- And I hope -- If I
18  covered this already, my apologies.  Did he indicate,
19  "Well, if you don't, we're gonna go look for business
20  elsewhere"?
21  A.   He did not.
22  Q.   I think I've got the answer to a couple of the
23  other ones.  If I could have you turn to page 14.  And
24  this was a question about damages.  It indicates,
25  "Subject to and without waiving the foregoing

Page 130

1   objections, Plaintiff responds that it has been damaged
2   by Defendants' unlawful action --"  I assume that's
3   probably "unlawful actions" "-- in an amount that
4   exceeds $500,000."  Do you know whether or not that's
5   true?
6   A.   I did not at the time that this was answered.
7   Q.   But you don't know today, now, either, do you?
8   A.   Correct.
9   Q.   And is it fair to say, as I understand it,
10  there isn't any damages with respect to Creamland Dairy,
11  Stock Building Supply, LKQ, and R&L Carriers?
12  A.   Correct.
13  Q.   And you would agree with me that Fidelitone is
14  similarly not listed anywhere as part of EmployBridge's
15  damages in this lawsuit.
16  A.   That is correct, it is not mentioned in this
17  Answer.
18  Q.   Either collectively on behalf of all of the
19  Defendants or individually on behalf of Defendant
20  Jacquez.
21  A.   Correct.
22  Q.   And then with respect to the last sentence
23  here, is it your position that Mr. Miller solicited Ink
24  Impressions, Superior Ambulance, Insight Lighting, and
25  the City of Albuquerque?

Page 131

1   A.   I am aware of that.
2   Q.   Do you know whether that is true or not true?
3   A.   I do not.
4       MR. STANFORD:  Let's take a quick break,
5   and I think we will be done.
6       (Recess was taken from 12:41 p.m. until 12:53 p.m.)
7   Q.   (By Mr. Stanford)  Was Narrow Transportation
8   ever a client of ProDrivers?
9   A.   We had a signed service agreement.  We never
10  actually provided drivers to them.
11  Q.   Is that still true today?
12  A.   That is still true today.
13      MR. STANFORD:  I will pass the witness.
14      MR. HART:  Just a few questions.
15              EXAMINATION
16  BY MR. HART:
17  Q.   I'd like to draw your attention to
18  Exhibit 144.  I'd like to draw your attention
19  specifically to the column that says "Projected Sales."
20  Do you see that?
21  A.   Yes.
22  Q.   Now, I think you testified earlier that these
23  are sales that actually occurred.  Do you recall that?
24  A.   Yes.
25  Q.   And this is through March 19th of 2017.  Is

Page 132

1   that correct?
2   A.   Yes.
3   Q.   Now, did ProDrivers actually bill for those
4   sales at the amounts that are listed in this column?
5   A.   No.
6   Q.   Okay.  What does this column reflect?
7   A.   This is the billing prior to hourly pay
8   rate -- or bill rate reduction.
9   Q.   Okay.  So you've testified about various
10  concessions about bill rate.  Am I correct the projected
11  sales in this column is referring to the actual number
12  of hours that you did provide drivers, but if you had
13  billed them at the higher rate before -- that you had
14  billed them at before you dropped the rate?
15  A.   Correct.
16  Q.   Okay.  So the sales happened historically in
17  time, but just at a lower rate than what's reflected
18  here.
19  A.   Correct.
20  Q.   Okay.  And so the losses through 3/19/2017 is
21  reflecting the difference between the higher bill rate
22  and the lower bill rate.
23  A.   Correct.
24      MR. HART:  I'd like to enter one exhibit
25  into evidence as Exhibit 153.