## DECLARATION OF FRAN SCOTT

I, Fran Scott, declare as follows:

1. I am over eighteen years of age and competent to testify to the matters set forth in this declaration.

2. I am employed by EmployBridge, LLC, as the Market Leader for the ProDrivers division's Albuquerque, New Mexico, office.

3. In my capacity as Market Leader for ProDrivers Albuquerque, New Mexico, office, I oversaw and directly managed the employment of Timothy Jacquez and Terry Miller. Both Jacquez and Miller were initially, as well as subsequently, employed by EmployBridge in New Mexico.

4. Timothy Jacquez served as EmployBridge's Utilization Manager for the ProDrivers division in Albuquerque, New Mexico. Jacquez executed an employment agreement on or about April 16, 2015. Attached as Exhibit 1 to this declaration is a true and correct copy of that agreement.

5. Terry Miller served as EmployBridge's Sales Manager for the ProDrivers division in Albuquerque, New Mexico. Miller executed an employment agreement on or about April 17, 2015. Attached as Exhibit 2 to this declaration is a true and correct copy of that agreement.

6. As part of their employment with EmployBridge, Jacquez and Miller received access to ProDrivers' client lists, including clients' telephone numbers, email addresses, and billing rates.

7. Jacquez and Miller also had access to ProDrivers' list of licensed commercial drivers, including their personnel files, contact information, and pay rates, as well as access to company-wide EmployBridge data, which includes employee and client information across the country.

8. Miller resigned his employment with EmployBridge on April 22, 2016.

9. Jacquez resigned his employment with EmployBridge on June 22, 2016. During his exit interview with me, Jacquez informed me that he had been offered a position at Riven Rock Staffing and had accepted the offer. Jacquez stated that he would not be competing with EmployBridge's ProDrivers division because Riven Rock did not offer professional driving services. He also stated that he had met with a number of Riven Rock employees prior to deciding to join Riven Rock. As part of Riven Rock's solicitation, Jacquez spoke with someone who identified himself as an "attorney" for Riven Rock. The "attorney" made representations that EmployBridge was facing a class action lawsuit regarding its

EXHIBIT 3

pay practices and made other disparaging remarks about EmployBridge's general business practices.

10. Since Jacquez has left EmployBridge, I have learned that Riven Rock has started offering professional driving services that compete directly with EmployBridge's ProDrivers division. Riven Rock's driving service is being run by Miller and Jacquez. Since Jacquez has left EmployBridge, I have learned that he has been contacting EmployBridge clients via telephone, email, and personal visits, stating that he and Miller will be opening and heading up a transportation division of Riven Rock.

11. Jacquez and Miller have approached Stock Building Supply, a long-time client of EmployBridge, to offer Stock driving services. Stock has two stores in Albuquerque, New Mexico. On or about June 30, 2016, Jacquez and Miller approached Mike Pacheco, who is the Component Plant Manager at Stock, and represented that if Stock used Riven Rock for its driving needs, it could save five dollars per hour over EmployBridge's rates.

12. Jacquez and Miller have also approached LKQ, a long-time client of EmployBridge, to offer LKQ driving services. LKQ is an automotive parts supplier doing business in Albuquerque, New Mexico, as Keystone Automotive. On or about June 15, 2016, Amber Fluitt, a Riven Rock employee, solicited LKQ to leave EmployBridge and use Riven Rock to supply it drivers for its delivery needs. Fluitt followed up on her visit with emails to LKQ on June 17 and July 7. In her July 7 email, Fluitt stated: "We [Riven Rock] have Tim Jacquez as part of our team now and he is working on getting the transportation side up and running sooner than later." Attached as Exhibit 3 is a copy of Fluitt's emails.

13. Jacquez has also approached Acme Iron and Metal, which is the largest scrap metal recycler in New Mexico and long-time client of EmployBridge. On or about July 1, 2016, Jacquez, along with another Riven Rock employee--Amber Fluitt, contacted Acme's Accounts Manager, Keaton Wynn, and represented that if Acme used Riven Rock for its driving needs, Riven Rock would offer a discounted rate that was below EmployBridge's rate.

14. On July 14, 2016, Keaton Wynn emailed me to summarize his interaction with Jacquez and Fluitt. Attached as Exhibit 4 is a copy of Mr. Keaton's email.

15. As a result of Jacquez and Fluitt's solicitation of Acme Iron and Metal, Acme has recently demanded that EmployBridge match the price that Riven Rock stated it could offer. EmployBridge has given Acme that discount.

16. On or about July 14, 2016, Miller approached Mitch Michaud, the Service Center Manager at R&L Carriers, an EmployBridge client. Miller told Mr. Michauld that Riven Rock could offer an alternative to EmployBridge's driver and staffing solutions. Miller also informed Mr. Michauld that Riven Rock could offer R&L a rate that was lower than

EmployBridge's. Mr. Michauld emailed me to summarize his interaction with Miller. Attached as Exhibit 5 is a copy of Mr. Michauld's email.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of July, 2016.

_____
FRAN SCOTT

# EXHIBIT 1

EXHIBIT 3

DocuSign Envelope ID: A0A875E3-D13E-45FC-8CEE-6C8AF9064B4E

# EMPLOYBRIDGE

## EMPLOYMENT AGREEMENT

You have indicated a willingness to employ me (or to continue to employ me) as a member of the staff of EmployBridge ("Employer"), a direct or indirect subsidiary or division of Employment Solutions Management, Inc. ("EmployBridge") (EmployBridge, together with all of its subsidiaries and divisions, including Employer, is referred to herein as "you" or the "Company"), to assist in the conduct of the staffing services business of the Company in the capacity of a Utilization Manager. In addition to the compensation for services rendered a biweekly base salary of $1,615.39, I acknowledge that my primary consideration in accepting a position and agreeing to be bound by the terms and provisions of this Employment Agreement ("Agreement") is the training provided by you into the highly specialized field of endeavor which I am considering as a possible career. I understand that my earning ability within this field will be greatly enhanced by the training I shall receive or have already received from you.

I understand that in the course of my employment with Company in the aforementioned capacity, I will be given access to certain of your confidential, commercially sensitive, proprietary, and trade secret information, including but not limited to lists of customers, prospects, direct hire candidates and employees, employee applications, resumes, skills inventory sheets and similar summaries of employee and candidate qualifications, customer billing rates and temporary employee pay rate schedules, revenue and expenses, sales reports and analyses, employee reports and analyses, customer job orders, methods of operation, sales techniques, statistical information, the contents of training, operational, procedural and sales manuals, computer programs and the like (collectively, "Confidential Information")(which I agree is your Confidential Information), and I further understand that you have expended substantial sums of money for advertising, public relations work and otherwise to solicit customers for your business, and to recruit and indoctrinate available direct hire personnel and temporary personnel to serve as your employees to render services to such customers and that you will provide me with thorough indoctrination and training in your methods of operation. I understand that your unique and specialized training has been developed to continually train employees so that they work at their maximum potential. In consideration of the valuable benefits I shall receive from you as described above and as a condition of my employment (or continued employment) by you I agree:

1. That at all times while I am an employee of Employer and for a period of twelve (12) months thereafter, I will not, directly or indirectly, induce any customers of the Company for whom I have had responsibility or with whom I have had any contact to patronize any business other than that of the company, or canvass, solicit, accept, or service any business from any customers of the Company for whom I have had responsibility or with whom I have had any contact, or request or advise any customers of the Company for whom I have had responsibility or with whom I have had any contact to withdraw, curtail, or cancel their business with the Company. The geographic area for this restriction is the area where the customer is located.

2. That Company's work force is a valuable and essential asset of Company's business and that its employees were recruited and trained at considerable expense to Company. Thereby, at all times while I am an employee of the Company and for a period of twelve (12) months thereafter, I will not, directly or indirectly, recruit, induce or advise

EXHIBIT 3

any employee, whether engaged as a regular employee or on temporary assignments by the Company, to work for, or to be employed by (as an employee or independent contractor) any person or entity other than the Company.

3. That at all times while I am an employee of Employer, and at any time thereafter, I will not disclose or make available any Confidential, Commercially Sensitive, Proprietary and or Trade Secret Information of the Company to any person or entity.

4. That all Confidential Information, and all physical embodiments thereof, are confidential to and shall be and remain the sole and exclusive property of the Company. Upon request by the Company, and, in any event, upon termination of my employment with the Company for any reason, I shall promptly deliver to the Company all property belonging to the Company in my custody, control or possession, including all Confidential Information.

5. That I am not a party to any contract or agreement containing restrictive covenants limiting, prohibiting, or restricting either my activities in the staffing services industry or my execution of this employment contract and I agree to hold Company harmless from any and all suits and claims arising out of any such restrictive covenants, contracts, or agreements including the cost of all attorney's fees and taxable court costs incurred in the enforcing of this hold harmless clause or in any suits or claims arising from such prior covenants, or agreements.

6. That Company is an equal opportunity employer and staffing service. Neither Company nor any of its customers shall engage in any discrimination relating to race, color, religion, sex, national origin, age, marital status, disability, veteran status, or other protected category, or in any manner discriminate against any employee and /or applicant for any purpose at any time; this includes, without limitation accepting a discriminatory job order or making a discriminatory referral. I agree to abide by Company's nondiscrimination policy and to immediately report any discrimination to the Company branch manager and if an immediate satisfactory resolution of the discriminatory practice does not occur, employee agrees to notify in writing, EmployBridge Inc., 1040 Crown Pointe Parkway, Suite #1040, Atlanta Georgia 30338, Attention: Office of the President, telephone (770) 671-1900 and facsimile (770) 671-1695. If Company determines that any employee violates company policies regarding discrimination, that employee shall be terminated and it must be assumed that such discrimination by the employee was voluntary and without the consent or knowledge of Company.

7. That I may from time to time be provided by the Company with handbooks and manuals regarding Company's policies and procedures. Said handbooks and manuals do not constitute for employment with Company, either express or implied, and Company reserves the right at any time to change, delete, or add any of the provisions therein in its sole discretion. Furthermore, the provisions of said handbooks and manuals are designed by Company to serve as guidelines rather than absolute rules, and exceptions are made from time to time on the basis of particular circumstances.

8. That any new idea, invention, improvement, technique, process, strategy, design, logo, computer program or copyrightable work created by or developed in whole or in part by me during the course of my employment with Company and related to the business of Company, will promptly be disclosed and explained by me to Company, and all rights to such ideas, inventions, improvements, techniques, processes, strategies, designs, logos, computer programs, or copyrightable works will be assigned to Company without additional compensation.

EXHIBIT 3

9. That the restrictions contained in this Agreement are ancillary to an otherwise enforceable agreement, including without limitation, the promise by me not to disclose Confidential Information.

10. That the remedy at law for breach of this Agreement is inadequate and irreparable damage will result in the event of the breach of any covenants herein, and thereby, you shall be entitled to injunctive relief in addition to having an action at law for damages.

11. That the invalidity of any portion of this Agreement shall not affect enforceability of the remainder. If any of these restrictions shall be unenforceable because they are for too long a period or too broad a geographical area, or for any reason whatsoever, I agree that the restrictions shall be effective for such period of time and such area and to such extent as they may be enforceable.

12. This Agreement shall be governed by the laws of the state where I am initially employed by Employer.

13. Either party shall have the privilege of terminating this Agreement and terminating the employment hereunder at any time without cause and without prior notice to the other party. This Agreement shall continue in force and in effect until termination by either party or by mutual consent. In the event of such termination, all liabilities and rights of the parties hereunder shall be terminated except for the rights of Company contained in paragraphs 1-5, 10.

14. That if I breach any of the covenants set forth in this Agreement, jurisdiction and venue are waived and suit may be brought in Fulton County, Georgia and Company may, at Company's option, apply to any Court with proper jurisdiction for the entry of an injunction and restraining order, restraining such breach. Any rights of injunctive relief shall be in addition to and not in derogation or limitation of any other legal rights available to Company.

I, the undersigned, certify with my signature below that I have read, understand and agree to abide by the provisions of this Agreement.

| *Fran Scott* (DocuSigned) | 4/23/2015 | *Timothy Jacquez* (DocuSigned) | 4/16/2015 |
|---|---|---|---|
| (Witness Signature) | (Date) | (Employee Signature) | (Date) |
| Fran Scott | | Timothy Jacquez | |
| (Typed Name of Witness) | | (Typed Name of Employee) | |

**Approved and accepted by:**

Name: Fran Scott
Title: Market Leader

Date: 4/23/2015

EXHIBIT 3

# EXHIBIT 2

EXHIBIT 3

# EMPLOYBRIDGE

## EMPLOYMENT AGREEMENT

You have indicated a willingness to employ me (or to continue to employ me) as a member of the staff of EmployBridge ("Employer"), a direct or indirect subsidiary or division of Employment Solutions Management, Inc. ("EmployBridge") (EmployBridge, together with all of its subsidiaries and divisions, including Employer, is referred to herein as "you" or the "Company"), to assist in the conduct of the staffing services business of the Company in the capacity of a Sales Manager. In addition to the compensation for services rendered a biweekly base salary of $1,846.15, I acknowledge that my primary consideration in accepting a position and agreeing to be bound by the terms and provisions of this Employment Agreement ("Agreement") is the training provided by you into the highly specialized field of endeavor which I am considering as a possible career. I understand that my earning ability within this field will be greatly enhanced by the training I shall receive or have already received from you.

I understand that in the course of my employment with Company in the aforementioned capacity, I will be given access to certain of your confidential, commercially sensitive, proprietary, and trade secret information, including but not limited to lists of customers, prospects, direct hire candidates and employees, employee applications, resumes, skills inventory sheets and similar summaries of employee and candidate qualifications, customer billing rates and temporary employee pay rate schedules, revenue and expenses, sales reports and analyses, employee reports and analyses, customer job orders, methods of operation, sales techniques, statistical information, the contents of training, operational, procedural and sales manuals, computer programs and the like (collectively, "Confidential Information")(which I agree is your Confidential Information), and I further understand that you have expended substantial sums of money for advertising, public relations work and otherwise to solicit customers for your business, and to recruit and indoctrinate available direct hire personnel and temporary personnel to serve as your employees to render services to such customers and that you will provide me with thorough indoctrination and training in your methods of operation. I understand that your unique and specialized training has been developed to continually train employees so that they work at their maximum potential. In consideration of the valuable benefits I shall receive from you as described above and as a condition of my employment (or continued employment) by you I agree:

1. That at all times while I am an employee of Employer and for a period of twelve (12) months thereafter, I will not, directly or indirectly, induce any customers of the Company for whom I have had responsibility or with whom I have had any contact to patronize any business other than that of the company, or canvass, solicit, accept, or service any business from any customers of the Company for whom I have had responsibility or with whom I have had any contact, or request or advise any customers of the Company for whom I have had responsibility or with whom I have had any contact to withdraw, curtail, or cancel their business with the Company. The geographic area for this restriction is the area where the customer is located.

2. That Company's work force is a valuable and essential asset of Company's business and that its employees were recruited and trained at considerable expense to Company. Thereby, at all times while I am an employee of the Company and for a period of twelve (12) months thereafter, I will not, directly or indirectly, recruit, induce or advise

EXHIBIT 3

any employee, whether engaged as a regular employee or on temporary assignments by the Company, to work for, or to be employed by (as an employee or independent contractor) any person or entity other than the Company.

3. That at all times while I am an employee of Employer, and at any time thereafter, I will not disclose or make available any Confidential, Commercially Sensitive, Proprietary and or Trade Secret Information of the Company to any person or entity.

4. That all Confidential Information, and all physical embodiments thereof, are confidential to and shall be and remain the sole and exclusive property of the Company. Upon request by the Company, and, in any event, upon termination of my employment with the Company for any reason, I shall promptly deliver to the Company all property belonging to the Company in my custody, control or possession, including all Confidential Information.

5. That I am not a party to any contract or agreement containing restrictive covenants limiting, prohibiting, or restricting either my activities in the staffing services industry or my execution of this employment contract and I agree to hold Company harmless from any and all suits and claims arising out of any such restrictive covenants, contracts, or agreements including the cost of all attorney's fees and taxable court costs incurred in the enforcing of this hold harmless clause or in any suits or claims arising from such prior covenants, or agreements.

6. That Company is an equal opportunity employer and staffing service. Neither Company nor any of its customers shall engage in any discrimination relating to race, color, religion, sex, national origin, age, marital status, disability, veteran status, or other protected category, or in any manner discriminate against any employee and /or applicant for any purpose at any time; this includes, without limitation accepting a discriminatory job order or making a discriminatory referral. I agree to abide by Company's nondiscrimination policy and to immediately report any discrimination to the Company branch manager and if an immediate satisfactory resolution of the discriminatory practice does not occur, employee agrees to notify in writing, EmployBridge Inc., 1040 Crown Pointe Parkway, Suite #1040, Atlanta Georgia 30338, Attention: Office of the President, telephone (770) 671-1900 and facsimile (770) 671-1695. If Company determines that any employee violates company policies regarding discrimination, that employee shall be terminated and it must be assumed that such discrimination by the employee was voluntary and without the consent or knowledge of Company.

7. That I may from time to time be provided by the Company with handbooks and manuals regarding Company's policies and procedures. Said handbooks and manuals do not constitute for employment with Company, either express or implied, and Company reserves the right at any time to change, delete, or add any of the provisions therein in its sole discretion. Furthermore, the provisions of said handbooks and manuals are designed by Company to serve as guidelines rather than absolute rules, and exceptions are made from time to time on the basis of particular circumstances.

8. That any new idea, invention, improvement, technique, process, strategy, design, logo, computer program or copyrightable work created by or developed in whole or in part by me during the course of my employment with Company and related to the business of Company, will promptly be disclosed and explained by me to Company, and all rights to such ideas, inventions, improvements, techniques, processes, strategies, designs, logos, computer programs, or copyrightable works will be assigned to Company without additional compensation.

EXHIBIT 3

9. That the restrictions contained in this Agreement are ancillary to an otherwise enforceable agreement, including without limitation, the promise by me not to disclose Confidential Information.

10. That the remedy at law for breach of this Agreement is inadequate and irreparable damage will result in the event of the breach of any covenants herein, and thereby, you shall be entitled to injunctive relief in addition to having an action at law for damages.

11. That the invalidity of any portion of this Agreement shall not affect enforceability of the remainder. If any of these restrictions shall be unenforceable because they are for too long a period or too broad a geographical area, or for any reason whatsoever, I agree that the restrictions shall be effective for such period of time and such area and to such extent as they may be enforceable.

12. This Agreement shall be governed by the laws of the state where I am initially employed by Employer.

13. Either party shall have the privilege of terminating this Agreement and terminating the employment hereunder at any time without cause and without prior notice to the other party. This Agreement shall continue in force and in effect until termination by either party or by mutual consent. In the event of such termination, all liabilities and rights of the parties hereunder shall be terminated except for the rights of Company contained in paragraphs 1-5, 10.

14. That if I breach any of the covenants set forth in this Agreement, jurisdiction and venue are waived and suit may be brought in Fulton County, Georgia and Company may, at Company's option, apply to any Court with proper jurisdiction for the entry of an injunction and restraining order, restraining such breach. Any rights of injunctive relief shall be in addition to and not in derogation or limitation of any other legal rights available to Company.

I, the undersigned, certify with my signature below that I have read, understand and agree to abide by the provisions of this Agreement.

DocuSigned by: *Fran Scott*     4/20/2015
(Witness Signature)     (Date)
Fran Scott
(Typed Name of Witness)

DocuSigned by: *Terry Miller*     4/17/2015
(Employee Signature)     (Date)
Terry Miller
(Typed Name of Employee)

**Approved and accepted by:**
Fran Scott
Name:
Title: Market Leader

Date: 4/20/2015

EXHIBIT 3

# EXHIBIT 3

EXHIBIT 3

**From:** Amber Fluitt [mailto:amber.fluitt@rivenrockstaffing.com]
**Sent:** Thursday, July 07, 2016 11:43 AM
**To:** Roger Madrid
**Cc:** Tim Jacquez
**Subject:** Re: CSA/Credit App RivenRock Staffing

Hi Roger,
We don't at this exact moment. We will in roughly 2 weeks with the CDL. Any other positions (non-CDL, clerical, warehouse) we are ready to go. We have Tim Jacquez as part of our team now and he is working on getting the transportation side up and running sooner than later.

Did your grandson already have his surgery?

Get Outlook for iOS


On Thu, Jul 7, 2016 at 11:36 AM -0600, "Roger Madrid" <rmadrid@LKQCORP.com> wrote:

I haven't had a chance to fill this out, but have a question, do you have drivers with CDL class A license? And can they drive throughout the state?

Roger Madrid | General Manager | Keystone Automotive, an LKQ Company
3800 Prince st SE | Albuquerque, NM| 87105
O- 505.341.2300 ext. 2966 |efax- 855.266.4026 | rmadrid@lkqcorp.com

Improvise, Adapt and Overcome

**From:** Amber Fluitt [mailto:amber.fluitt@rivenrockstaffing.com]
**Sent:** Friday, June 17, 2016 12:14 PM
**To:** Roger Madrid
**Cc:** Catherine Olinger
**Subject:** CSA/Credit App RivenRock Staffing

Hey Roger,
It was great talking with you on Wednesday! I have attached our standard credit app as well as the CSA. Please let us know if you have any questions. The terms are flexible and can be customized for LKQ's needs.

Happy Friday and I look forward to doing business with you!



**Amber Fluitt**
*Business Development Manager*
**6106 Jefferson St. N.E., Suite B**
**Albuquerque, NM 87109**
505-702-9229– Cell
505.336.4222 - Office

EXHIBIT 3

amber.fluitt@rivenrockstaffing.com

🌲 **Please consider the environment before printing this email**

EXHIBIT 3

# EXHIBIT 4

EXHIBIT 3



**From:** Keaton Wynn [mailto:keaton@acmeironandmetal.com]
**Sent:** Thursday, July 14, 2016 4:56 PM
**To:** Fran Scott <Fran.Scott@ProDrivers.com>
**Subject:** Timothy and Amber


Dear Fran,

Two weeks ago on July 1st, I was approached by Timothy Jacques and an ex coworker of ours named Amber. I was told by them they had left Pro Drivers and started their own company. I was told by them that the company was similar to pro drivers. They would hire truck drivers to go work temporary jobs for other companies. They informed me that if I got rid of Pro Drivers, with their new company, they would give me better rates than I was currently getting. They also stated that they would employee other job skilled employees besides truck drivers, torch cutters, crane operators, and mechanics to be specific. I do not plan on leaving Pro Drivers and I thought this might be helpful information for you to know. Thank you.



**Keaton Wynn**

**Executive Account Manager**

EXHIBIT 3

**Mobile: (505) 235-8380**

**Fax: (505) 345-3472**

**Website: www.acmeironandmetal.com**



EXHIBIT 3

# EXHIBIT 5

EXHIBIT 3



**From:** TmABQ [mailto:tmabq@rlcarriers.com]
**Sent:** Thursday, July 14, 2016 4:07 PM
**To:** Fran Scott <Fran.Scott@ProDrivers.com>
**Subject:** RivenRock Staffing

*Terry Miller came in today offering us an opportunity to use them as a driver / staff alternative to Pro drivers with a rate of $29.05 per hour for drivers. They said they would be staffed in 2 weeks.*


*Mitch Michaud*
*Service Center Manager*
**R&L Carriers**
*2350 AZTEC RD NE*
*Albuquerque NM.*
*505-881-4019*
*505-881-2147-Fax*

1

EXHIBIT 3