**Page 102**

1  A. Not that I'm aware of.
2  Q. What's your title at RivenRock?
3  A. Business development manager.
4  Q. Have you had that same title the entire
5  time?
6  A. I have.
7  Q. Tell me a little bit about your job
8  responsibilities at RivenRock?
9  A. Okay. So, it's been an evolving kind of --
10 it's taken on a different scope of work over the
11 course of time.
12      So, originally, when I was hired, my job
13 description, my scope of work was going to be, again,
14 training, coaching, mentoring, providing guidance and
15 training.
16      I worked with Amber Fluitt, who was also a
17 business development manager. That was her title.
18 She was the field sales rep. So my initial scope of
19 work -- my responsibilities were going to be work
20 with Amber, train Amber. She has some staffing
21 experience, but no sales experience whatsoever.
22      So it would really be coaching, mentoring,
23 training Amber, working with her out in the field,
24 working with her on the sales process, working with
25 her integrating what our culture is going to be,

**Page 103**

1  about it's not all about the dollar. It's not all
2  about just getting associates out in the field, and
3  see what we can bill the customer. It was about
4  finding good fits, finding the right opportunities
5  for our associates.
6       So that was going to be the training
7  process, with the understanding of, again, building a
8  model office to then be able to go out into other
9  markets and sell consulting services and work with
10 other staffing agencies, as far as like we talked
11 about earlier about using it as a template, having
12 other clients kind of emulate our practices, and our
13 strategies, and our philosophies.
14      So that -- July 1st, roughly, when I'm
15 hired -- the first of July, that was my scope of
16 work. That was my job description. Those were my
17 responsibilities. And then -- that's what I did
18 leading up to the time that now we're served with the
19 lawsuit, and that is now, again, a crippling effect,
20 because now everything is out the window. It is
21 just -- that's done.
22      So it was really a matter of -- I was
23 really in limbo for a period of time, because Shaun
24 is very, very ethical. He is very adamant, and he
25 was, like, it is what it is. We got served with this

**Page 104**

1  lawsuit. We have to deal with it. We'll take the
2  high road. I don't want any cross-contamination. I
3  don't want any -- we're adhering to this. And there
4  was some heated discussions between Shaun and I,
5  because I was like, Shaun, even though I'm not out
6  beating the doors, I'm not trying to get ProDrivers'
7  business and EmployBridge's business. That's not
8  what you brought me on to do. I could do it if I
9  wanted to. I don't have a no compete. There is
10 nothing prohibiting me from doing it.
11      And Shaun was, like, I'm prohibiting you
12 from doing it. We're not going to do that. That was
13 never our intention, anyways, but, yet once we
14 actually get the lawsuit, it was like, we're
15 completely backing off. We don't want there to be an
16 instance where there is any situation where we could
17 blur the line.
18      So that was it. So then I just stayed in
19 the office, and I was helping with phones. Again,
20 I'm cleaning the kitchen. I'm taking out the trash.
21 I'm learning recruiting. I'm doing a lot of
22 different things. But then shortly after that and --
23 again, we lost our direction. There was some pretty
24 scary days, a lot of anxiety about, What are we going
25 to do? EmployBridge is this big $3 billion company,

**Page 105**

1  unlimited resources. There is just the six or seven
2  of us in a little small office, trying to make our
3  way; so what do we do?
4       There were some discussions about, what is
5  our path going forward? Everything's changed. It
6  was very sudden. It was very drastic, and, again, I
7  use this quite often, but I don't take it likely --
8  it had a crippling effect on our company.
9       Shortly thereafter, within a week or so of
10 being served with the lawsuit, an RFP came out for
11 the City of Albuquerque bid. I wasn't privy to the
12 discussions. I wasn't involved in the discussions,
13 but shortly after there was a decision that was made.
14 It was, like, we're going to go after the City of
15 Albuquerque contract. We're basically shutdown on
16 everything else.
17      And so we talked a little bit about that.
18 And it was pretty much that if we got it, it's a lot
19 of work. It's a lot of long hours. It's a lot of
20 work. It's going to be, like, all hands on deck. It
21 is not a real profitable contract, but it's something
22 that at least keeps the ship afloat.
23      And so we talked about that as a group. I
24 was very open, and I was very -- my response was,
25 Shaun, we buy into your vision. If that's the path

**Page 146**

1  since you started?
2  A. I have.
3  Q. Which clients?
4  A. TrustBilt. I'm trying to remember my list.
5  I can't look at your notes. I worked on Simply One
6  Stop Printing, TrustBilt.
7  Q. Is that SOS?
8  A. Yes, Simply One Stop Printing. And also,
9  you have to remember, too, sales isn't necessarily a
10 function of just new accounts -- what new accounts
11 have you brought in? That's all that counts. A lot
12 of it is nurturing existing relationships, trying to
13 grow those relationships.
14     So they are with some existing customers
15 that I got involved in, and started working with
16 them, and tried to educate them on other things we
17 have available, other ways we could be of service.
18 So I was selling, if you want to use that, to
19 existing accounts, as well as trying to bring on new
20 business.
21 Q. You signed your declaration in August.
22 Since then, have you still purposefully avoided
23 having contact with companies you know to be
24 customers of ProDrivers?
25 A. Yes, I have.

**Page 147**

1  Q. Why have you done that if you are now
2  involved in sales, more than you anticipated?
3  A. Well, and that's been a sore spot with me,
4  and that's -- some heated arguments. I won't say
5  arguments -- discussions with Shaun, because Shaun is
6  very adamant, no contact. Nothing. No overlap.
7  We're not going to blur that line. We're going to be
8  very methodical in our approach, that we are not
9  going to approach former clients.
10    Okay. Why not? I don't have a no-compete
11 compete. When I was at ProDrivers, myself, Tim
12 Jacquez and Fran Scott had conversations where
13 let's -- we were all discussing, let's all go out and
14 do this on our own. Let's go do something on our
15 own. Fran was very open. We don't have no-competes.
16 We can do anything we want. Fran was openly looking
17 for another job. She had been approached by a couple
18 of other companies. She was in a state of mind where
19 she was looking at other opportunities. And she was
20 thinking, Hey, we could all do something, maybe on
21 our own, maybe alone, but we had open conversations
22 that we don't have a no compete. We can do anything
23 we want.
24    I relayed that to Shaun. Shaun was
25 adamant, We're not going to blur the lines. We'll

**Page 148**

1  wait to this gets resolved. We want to see how it
2  shakes out. And until then, no contact with
3  ProDrivers' customers. Shaun is my boss, so I
4  adhered to his instructions.
5  Q. Did Mr. Shepherd give you a reason why he
6  was instructing you not to contact ProDrivers'
7  clients?
8  A. Shaun doesn't have to give me reasons.
9  He's my boss.
10 Q. Nevertheless, did he?
11 A. He did not.
12 Q. Tell me about your contact with Stock
13 Building Supply?
14 A. Okay. So, again, this was shortly after I
15 joined with the company, and I'm working with Amber.
16 How I work, as far as sales coach, teaching
17 mentoring, training, all I do is shadow. I want to
18 see how someone interacts with a prospect. I want to
19 see the dialogue. I want to see the conversation. I
20 want to see the body language. I want to see the eye
21 contact. I want to see the interaction.
22    What we were doing is we were, basically,
23 doing a territory. It wasn't targeted like, Let's go
24 to point B. And then let's go to C. It was just a
25 day of prospecting, a day of drop-ins. Let's hit a

**Page 149**

1  certain area, and hit places that looks like it makes
2  sense. If you see a little shack that is a hole in
3  the wall, probably not going to stop in there. If
4  you see a big yard with a lot of employees and a lot
5  of activity, then that's a place we'll want to stop
6  in.
7      And when I say shadow, she drove. She did
8  everything. And then we would have the opportunity
9  to talk about the dynamics of the sales call from
10 call to call to call, but, basically, while we were
11 there on site, in front of the customer, I told her,
12 I'm not going to throw you a life line. It is your
13 call, sink or swim. Do your best. Do some of the
14 things we talked about, and then we can talk about it
15 afterwards.
16    So Stock Building Supply is in a very
17 heavily populated industrial area. We stopped in
18 there as well as other places during the day.
19 Q. When was that, that you visited Stock
20 Building Supply?
21 A. I want to say it was mid July.
22 Q. And who did you meet with at Stock Building
23 Supply?
24 A. So, it was Mike Pacheco.
25 Q. And who decided to stop at Stock Building

Terry E. Miller
February 7, 2017

## Page 150

1  Supply?
2  A.  Amber.
3  Q.  How did she make that decision?
4  A.  Just working the territory.  Heavy
5  industrial area, going down the street, hitting one
6  place, hitting the next.  So it was a stop.
7  Q.  Did you and Ms. Fluitt have any
8  conversations about what territory you would be going
9  to that particular day?
10  A.  It was her day.  Again, I don't give any
11  help in that.  It was your day, you plan it.  So that
12  was an area that she had worked previously, that she
13  wanted to go back into.
14  Q.  But did you know where you were going?  Did
15  she tell you what area you were going to?
16  A.  I knew the geographic, South Valley.  We're
17  going to the South Valley today.
18  Q.  Did you know you would be going to Stock
19  Building Supply that day?
20  A.  I did not.
21  Q.  Before walking into Stock Building Supply,
22  did you or Ms. Fluitt have any conversations about
23  Stock Building Supply?
24  A.  I told her, and I just let her know, your
25  sales call.  I'm just shadowing, but this is a former

## Page 151

1  ProDrivers' customers.  I'm not getting involved.
2  Just so you know -- typically, on other sales calls I
3  wouldn't get involved either, but sometimes if I saw
4  her struggling, I wouldn't want to see her hanging
5  out there, so I would jump in and try to keep the
6  conversation flowing.  But I let her know before
7  going into Stock, I said, this was a ProDrivers'
8  customer.  I'm not going to have any interaction.  I
9  just want you to know, this is hands off.
10  Q.  Did you consider staying behind in the car,
11  or not going in for that call?
12  A.  No, I wanted to go in, because that defeats
13  the purpose.  How can I shadow and make observations
14  of her style and sales call if I'm sitting in the
15  car?
16  Q.  How many potential clients did you visit
17  with Ms. Fluitt on that day?
18  A.  On an average day -- I can't remember
19  specifically that day, but we always tried to hit 12
20  or 15 on a day.
21  Q.  And you have no reason to think that that
22  particular day was any different?
23  A.  No.
24  Q.  So in the 12 to 15 range?
25  A.  Correct.

## Page 152

1  Q.  Wouldn't you have been able to evaluate
2  Ms. Fluitt for that day if you had gone on just one
3  less call to a customer?
4  A.  One less is still 8 to 10 percent, so I'm
5  missing 8 to 10 percent of her calls if I attend one
6  less.
7  Q.  But only for that particular day, right?
8  A.  In that circumstance; that's correct.
9  Q.  How many times did you go with Ms. Fluitt
10  on sales calls?
11  A.  Until the lawsuit was filed, I want to say
12  three to four days out of each week.
13  Q.  For how many weeks?
14  A.  I'm thinking about three weeks.
15  Q.  So if we do some rough math -- do you mind
16  if we put it at ten, to make it easier for the math?
17  A.  Back of the envelope works for me.
18  Q.  So you went to somewhere between 30 and 40
19  calls with Ms. Fluitt for three to four weeks -- 30
20  or 40 calls a week, for three or four weeks?
21  A.  That sounds right.
22  Q.  So a total of somewhere between 90 and 150?
23  A.  I would say 90, probably, might be a little
24  more accurate, on the low side.
25  Q.  So we'll say you went on 90 calls.  So if

## Page 153

1  you omitted Stock Building Supply, you would have
2  missed 1 1/2 percent if you did not accompany her on
3  that one.
4  A.  I look at it day by day, because we do a
5  daily recap.  We talk about the day, following up
6  with customers, the process.  So, again, I don't
7  think I'm doing my job if I'm sitting in the car.
8     And I was just going to say, it just,
9  I'm -- that's my position.  That's my job
10  description, so I'm kind of adamant about, I don't
11  like sitting in the car.
12  Q.  Did you interact with Mike Pacheco when you
13  were at ProDrivers?
14  A.  Well, of course, because I had called on
15  Mike when I was with ProDrivers, and so I even kind
16  of joked, I said, You know -- I believe he was aware
17  of the situation, because he said, Oh, wow, I hear
18  you and Tim aren't with ProDrivers.  I was like,
19  Mike, it was great to see you.  We exchanged some
20  brief pleasantries.  I said, I'm not really in a
21  sales role.  Amber is the salesperson.  I'm just
22  training, working with Amber.  I want Amber to
23  communicate directly with you.  And I said, I'm just
24  kind of here shadowing Amber.  I don't want you to
25  think I'm rude -- like, what's wrong with Terry?  How

## Page 162

1   Q.  And this e-mail is from early July.  Do you
2   see that?
3   A.  I do.
4   Q.  And did you visit Mike Pacheco in the end
5   of June?
6   A.  It must have been end of June, or maybe on
7   that very date of July 1st.  Again, I thought it
8   might have been a little bit later, because, like we
9   had mentioned.  We were going out day after day after
10  day, so I don't know the exact sequence.
11  Q.  Could it have been your visit to
12  Mr. Pacheco with Ms. Fluitt was in the end of June,
13  instead of middle of July?
14  A.  It could be.
15  Q.  In your visit with Ms. Fluitt to visit
16  Stock Building Supply, did you or Ms. Fluitt ever
17  tell Mike Pacheco that RivenRock was starting a
18  driving service?
19  A.  So, I recall that -- obviously, if he saw
20  me there, he asked.  He goes, Oh, wow, are you guys
21  going to be doing drivers.  And I was like, Amber is
22  your contact.  Please direct questions to Amber.  She
23  is the sales rep.  And Amber did mention that it was
24  something we were looking into.
25  Q.  So Ms. Fluitt, then, relayed information

## Page 163

1   about RivenRock to Mr. Pacheco --
2   A.  I believe so.
3   Q.  -- after his question?
4   A.  I believe so.
5   Q.  And she told him that you guys were
6   thinking of starting a transportation service?
7   A.  Correct.
8   Q.  What else did Ms. Fluitt discuss with
9   Mr. Pacheco during that sales call?
10  A.  I believe she asked about some of the
11  things we had observed when we first walked in, about
12  carpenters, general laborers, forklift operators.
13  She made a good explanation of, we're not just
14  transportation.  That's not what we're doing.  It is
15  actually the opposite.  We are fully up and running
16  for general staffing, for forklifts, things of that
17  nature.  Transportation is a side bar, something
18  we're looking at, we're exploring.
19  Q.  But it wasn't up and running?
20  A.  It wasn't anything we could have serviced.
21  What we can service now, today, is any kind of need
22  out on the yard.
23  Q.  So you mentioned Ms. Fluitt also talked
24  about the things she had noticed on the way in, like
25  the carpentry, the forklift, that kind of thing?

## Page 164

1   A.  Uh-huh.
2   Q.  You to have answer audibly.
3   A.  Yes.
4   Q.  Those were things you had highlighted to
5   her before you walked in?
6   A.  I didn't specifically highlight.  I said,
7   Look around.  I made the comment that any time you
8   are on a sales call, you have to use observation.
9   Observe.  Like I mentioned, don't just tunnel to the
10  front door and head right in.  Take a panoramic view.
11  Look around and see what is going on.  That's part of
12  teaching and coaching and mentoring, trying to teach
13  sales.  So I did point out that -- take a look
14  around.  What do you see?  Probably same thing I'm
15  seeing.
16  Q.  Did you or Ms. Fluitt, at that meeting with
17  Mike Pacheco, give him any rates on what you would
18  charge for any services?
19  A.  I don't recall.
20  Q.  You don't recall one way or another?
21  A.  No.
22  Q.  When did RivenRock start offering
23  professional driving services?
24  A.  I want to say it wasn't until much later in
25  July.

## Page 165

1   Q.  Late July time period?
2   A.  Yes.
3   Q.  I'm going to give you another document --
4   actually, it is the same one.  In this e-mail Fran
5   Scott writes that Mr. Pacheco had relayed to her that
6   RivenRock was starting a driving service.  Had
7   RivenRock started preparing to offer a driving
8   service by July 1st?
9   A.  It was under discussion.
10  Q.  What were those discussions?
11  A.  Let's take a look at starting a
12  transportation division.  Let's take a look at a
13  driving service.
14  Q.  Who were those discussions with?
15  A.  Myself, Shaun Shepherd, Tim Jacquez.
16  Q.  Was Ms. Olinger part of those discussions?
17  A.  Not to my knowledge.
18  Q.  Did RivenRock ever obtain any business from
19  Stock Building Supply?
20  A.  No.
21  Q.  The next company you mentioned was Acme
22  Iron & Metal, correct?
23  A.  Correct.
24  Q.  Tell me about that one?
25  A.  That is actually a company that Amber had

### Page 166

1   worked for in the past.  It is, again, kind of in
2   that South Valley area.  It is in a very heavy
3   industrial area.  And, again, in the course of her
4   day, making her sales calls, she wanted to stop in.
5   She had a connection.  She had a -- some commonality,
6   the fact she had worked at them before.
7        I had the same little bit of a speech that
8   I had worked with Acme Metal in the past, although I
9   really didn't have any dealings, so much, out of that
10  location.  I dealt more with the folks over at
11  corporate, but I let her know there is still that
12  relationship.  And kind of the same set of rules as
13  with Stock.
14       Q.   When you say you worked with Acme before,
15  you mean while you were at ProDrivers?
16       A.   Correct.
17       Q.   And who was the contact you had while at
18  ProDrivers?
19       A.   Bill Karr.
20       Q.   C-A-R or K?
21       A.   K-A-R-R, I believe.
22       Q.   Did you know someone named Keaton Wynn when
23  you were working at ProDrivers?
24       A.   I knew the name.
25       Q.   Had you ever met him?

### Page 167

1        A.   I had gone by that location just once.  We
2   had some drivers, and, again, it is important to do
3   some site evaluations, get the lay of the land, see
4   where your drivers are driving -- what the yard looks
5   like.
6        I had never been to that yard, so I was a
7   little curious to see what the lay of the land was.
8   I knew Keaton Wynn by name, but I had never, to my
9   knowledge, had any interaction with him.  It was
10  always with Bill Karr.
11       I walked in one day, and when you walk into
12  the facility, it's like a bank teller window, big,
13  thick glass.  It's not accessible.  You walk into a
14  front reception area, and there is a counter with
15  glass and desks and things behind.  The one time when
16  I was with ProDrivers, when I went by to visit, I
17  identified myself.  I asked if I could introduce
18  myself to Keaton Wynn.  I saw him further in the
19  back.  The receptionist made a motion, like, someone
20  is here.  I'm just the sales guy, he looked up and
21  was, like, he didn't have time.  That was the extent
22  of my interaction.
23       Q.   So you saw him from afar, but you never met
24  him?
25       A.   I was like, Hey.  Of, course, as a

### Page 168

1   salesperson, you always feel so, Nobody wants to see
2   me.  But he was not of the mind to want to visit.
3        Q.   So when you and -- well, when did you and
4   Ms. Fluitt go to Acme Metal?
5        A.   Again, probably sometime in that three-week
6   span when we were out making sales calls together.
7   So any time from very, very late June or 1st of July
8   until when the lawsuit was filed, so until, probably,
9   like, the third week of July.
10       Q.   And what did you and Ms. Fluitt discuss
11  when you drove up to the Acme site --
12       A.   So --
13       Q.   -- before going in?
14       A.   Sure.  Again, she was telling me that she
15  had previously worked for him.  She knew Keaton from
16  when she worked there.  She wanted to stop in.  She
17  wanted to say hello.  Again, I'm, like, it's your
18  day.  It's your sales call.  We go anywhere you want
19  to go, visit whoever you want to visit.  I told her
20  the quick disclosure about with ProDrivers.  But
21  then, again, it's, like, I don't know anybody here
22  anyway.  It's your sales call.  All I'm doing is just
23  shadowing and observing.
24       Q.   Anything else that you discussed before
25  going in?

### Page 169

1        A.   Not that I recall.
2        Q.   What did you discuss, or who did you see
3   when you went into Acme?
4        A.   Amber asked for Keaton -- to see Keaton.
5   Whether he recognized her, or whatever, he came out,
6   and he spoke to us.  He spoke to Amber.
7        Q.   And did you speak to him at all?
8        A.   I didn't know him.  I might have made
9   mention, or made light of -- I might have joked
10  about, Hey, remember that day I dropped by, and you
11  wouldn't come and see me.  And now that I'm with a
12  pretty girl, you come rushing right out.  We kind of
13  had a chuckle about that.
14       Q.   Did you introduce yourself?
15       A.   I did.
16       Q.   And did he introduce himself?
17       A.   He did.
18       Q.   Was there anyone else, other than you,
19  Ms. Fluitt and Mr. Wynn that had a conversation that
20  day at Acme?
21       A.   Not that I'm aware.
22       Q.   And what did the three of you discuss?
23       A.   So, Amber talked about having worked there.
24  She asked about someone in particular, I believe his
25  name was -- they called him Manuelito.  She went on,

### Page 170

1  telling the story about he is a small gentleman, and
2  Amber -- if you saw her, she is very tall, and that
3  he proposed to her every day.  And she would tell
4  him, Not until you grow.  If you grow a foot, I'll
5  marry you.  And one day he came out and he stood on a
6  bucket or something, and he was about her height.
7  And he said, You said if I was your height, you'd
8  marry me, so now you have to marry me.
9       It was an interaction of former colleagues
10 that worked together.  That was kind of like the
11 icebreaker.  That is more what they talked about.
12 And then Amber did turn it into a business call about
13 what is going out in the yard?  What could we do to
14 help -- "we" being her and the company.  It turned
15 more towards a business nature.
16     Q.  And what did she tell Mr. Wynn about
17 RivenRock?
18     A.  So, again, RivenRock, staffing component is
19 fully up and running, and that RivenRock could
20 service any kind of needs out in the yard, general
21 labor, things of that nature.
22       Of course, you know, people see me and they
23 identify the fact that I was with ProDrivers, and
24 they ask about driver services.  And Amber had
25 mentioned it's being looked at, something being

### Page 171

1  considered, but we are not able to service
2  transportation clients at this point in time.
3     Q.  Do you think that Mr. Wynn would have asked
4  about driving services had you not been there?
5       MR. STANFORD:  Objection.  Foundation.
6     A.  Again, I can't speak to what he would ask
7  or what he wouldn't ask.
8     Q.  ==Did you visit Acme Metal, either with or==
9  ==without Ms. Fluitt at any point thereafter?==
10    ==A.  No.==
11    Q.  ==Did RivenRock get any business from Acme?==
12    ==A.  No.==
13    Q.  Has Mr. Jacquez, to your knowledge, ever
14 visited Stock Building Supply on behalf of RivenRock?
15    A.  To my knowledge, no.
16    Q.  Do you know a company called R&L Carriers?
17    A.  I do.
18    Q.  What is that?
19    A.  R&L Carriers is -- in the industry it's
20 referred to as LTL, "less than truck load" carrier.
21 They are a transportation company.
22    Q.  Did you have any contact with them while
23 you were at ProDrivers?
24    A.  Yes.
25    Q.  Are they a ProDrivers' client?

### Page 172

1     A.  They are, and they were.
2     Q.  Who was your contact at R&L Carriers when
3  you were at ProDrivers?
4     A.  So, a couple of different gentlemen.  A
5  gentleman by the name of Orlando, and the terminal
6  manager, Mitch.
7     Q.  Do you remember either of their last
8  names -- Orlando what?
9     A.  I don't recall Orlando's last name.  And
10 I'm not even sure of Mitch's last name.
11    Q.  Could it have been Mitch Michaud?
12    A.  Something like that.
13    Q.  Have you ever had any contact with anyone
14 at R&L Carriers, since you joined RivenRock?
15    A.  I have.
16    Q.  Tell me about that?
17    A.  Again, in the course of Amber's day,
18 driving with Amber, R&L is in a very heavily
19 populated industrial and business centric center, big
20 warehouse operation, so, obviously, caught her
21 attention.  She wanted to go in.  And I gave her the
22 same conversation about any ProDrivers' client, that,
23 again, ProDrivers' client -- I'm just, so you know,
24 because they're going to want to interact with me,
25 and it's your sales call.  I'm not there to interact

### Page 173

1  with them, but just so she knows that it was a
2  former -- someone that I called on at ProDrivers.
3     Q.  When did you and Ms. Fluitt call on R&L
4  Carriers on behalf of RivenRock?
5     A.  Again, probably sometime between that
6  three-week span of very late June, very early July,
7  first of July, until the third week or so into July.
8     Q.  Who did you speak to, or who did Ms. Fluitt
9  speak to?
10    A.  I believe it was with Mitch.
11    Q.  And what did Ms. Fluitt tell Mitch?
12    A.  So, again, the conversation was related to
13 warehouse, forklift, any kind of admin, clerical
14 position, office position, because they have office
15 folks, as well.  It was just, basically, general
16 staffing-related conversation.
17    Q.  Was there any discussion about RivenRock
18 providing drivers to R&L Carriers?
19    A.  There was a discussion because, again,
20 Mitch asked, Oh, wow, are you guys going to do
21 driving?
22       Amber's response was like others, something
23 we're looking at, something we're exploring, but we
24 can't service drivers at this particular time.  But
25 we are fully up and running for warehouse, office,

**Page 194**

1  is one of those success stories that we talked about
2  earlier. We make it very easy for an associate to
3  find a good home, and that's a good success story.
4      Q. What is that associate's name?
5      A. Ian Carnie.
6      Q. Are you familiar with a company called RAC
7  Transport?
8      A. Yes.
9      Q. Was that a ProDrivers' client when you were
10 at ProDrivers?
11     A. Yes.
12     Q. Was it someone who you had contact with
13 when you were at ProDrivers?
14     A. Yes.
15     Q. Who was the contact you had there?
16     A. Gareth Floyd, I want to say was his last
17 name.
18     Q. Have you had contact with anyone at RAC
19 Transport, since joining RivenRock?
20     A. Once.
21     Q. Tell me about that?
22     A. Sales call. Amber, during that three-week
23 period of late June, very early July, to the third
24 week of July. Again, RAC, very -- it's in an area
25 very heavily concentrated with industrial. It's a

**Page 195**

1  business park. Amber was driving, going down the
2  street. Stopping in here, here, here. RAC,
3  obviously, big transportation terminal, big
4  warehouse, big operations, so she wanted to stop in.
5  I informed her as to that pre-existing relationship,
6  like I had done with the other folks that we had
7  discussed.
8      Q. What, specifically, did you tell her?
9      A. It is a ProDrivers' customer that I had
10 previous contact with, and that it's, again, her
11 sales call and it's her show.
12     Q. And what happened during the meeting at RAC
13 Transport?
14     A. So, we went in and Amber asked to speak to
15 the terminal manager, which is Gareth, and --
16     Q. Did she ask for him by name, or just the
17 manager?
18     A. She asked for the manager, I believe.
19     Q. She didn't know his name?
20     A. I wasn't going to make it easy. I let her
21 know, this is a former ProDrivers' customer, and
22 that's it. She knew to ask for the manager, or the
23 terminal manager. And Gareth's office is -- the
24 second you walk in the door, his office is right
25 there. And he has a big window, and so he can

**Page 196**

1  observe people coming in and out. So I believe he
2  would have seen me walk in with Amber, and I'm sure
3  he recognized me right away.
4      Q. What did he say to you?
5      A. We said Hello, exchanged pleasantries.
6  Again, I let him know that I'm just shadowing Amber.
7  I'm out on sales calls with Amber for the day, and
8  that if he had a couple of minutes, Amber would like
9  the opportunity to speak with them. And, pretty
10 much, just pretend I'm not here.
11     Q. Did you tell Mr. Floyd that you were with
12 RivenRock?
13     A. I did.
14     Q. And what happened after that? What -- did
15 Ms. Fluitt start her sales pitch?
16     A. She started interacting.
17     Q. And tell me about what she said?
18     A. She was asking about needs in the
19 warehouse, about forklift, about admin, clerical,
20 about general staffing-related needs, and that was
21 the tone of the discussion.
22     Q. Were there any rates quoted to Mr. Floyd
23 during that meeting?
24     A. Not to my knowledge.
25     Q. Were there any promises made or requests

**Page 197**

1  about needing a bilingual staff?
2      A. Not that I'm aware of.
3      Q. Was there any conversation about driving
4  services?
5      A. So, again, when they see me, and right away
6  they're thinking, Wow, are you guys going to do
7  driving? Everyone gets excited about that. Amber,
8  again, mentioned something we're taking a look at,
9  something that's being explored. We can't service
10 that need at the present time, but we're fully up and
11 running, fully functional on office, admin, clerical,
12 on general staffing.
13     Q. Has RivenRock obtained any business from
14 RAC Transport?
15     A. I believe we did.
16     Q. Tell me about that. What business have you
17 gotten?
18     A. I believe we -- I remember Amber had talked
19 to them about -- I believe it was a forklift
20 operator. I don't know that we ever actually
21 dispatched a forklift operator, but -- on the general
22 staffing side, I don't recall. I don't recall if we
23 ever did or didn't. I know there was discussion with
24 Amber and Gareth about a forklift operator need.
25         Once we got deeper into it, and we decided

Perry E. Miller
February 7, 2017

## Page 198

1  that we were going to do the transportation, and we
2  had that up and running, Amber discussed
3  transportation with him. I'm thinking she told him
4  if there was a need in transportation that she could
5  service his account, and I believe that there was --
6  I want to say a couple of driving assignments, but,
7  again, nothing that I was personally involved in.
8      Q. What rate did Ms. Fluitt quote Mr. Floyd
9  for driving services?
10     A. I don't have any knowledge of that. I
11  don't know what her negotiations were.
12     Q. Other than the one meeting that you had
13  with Ms. Fluitt and Mr. Floyd, have you had any
14  communications personally --
15     A. I have not.
16     Q. Just a second -- with anyone at RAC
17  Transport since joining RivenRock?
18     A. I apologize. I have not.
19     Q. Just the one?
20     A. Just the one time.
21     Q. And since then, Ms. Fluitt has handled the
22  communications, to your knowledge?
23     A. She has.
24     Q. Has RivenRock provided dock workers to RAC
25  Transport?

## Page 199

1      A. Again, I know there was a discussion
2  between Amber and Gareth. I don't know if that ever
3  came to fruition.
4      Q. What about warehouse workers?
5      A. Same. I don't know.
6      Q. What about office staff?
7      A. Again, I remember there was a need. There
8  was a discussion, but I don't recall. I don't know
9  if that ever got filled.
10     Q. What is your -- you said you recalled that
11  there may have been some driving assignments. Why do
12  you remember that in particular?
13     A. Again, we work in a very small office, and
14  just hearing that they needed a driver, that there
15  was a dispatch, that we dispatched a driver once the
16  transportation department was more of a reality than
17  just a concept and just a discussion.
18         MS. LIBEU: Is now a good time for a break?
19         MR. STANFORD: Sure.
20         (Recess was taken from 2:32 to 2:44 p.m.)
21     Q. (By Ms. Libeu) So on the sales calls you
22  went to, did you bring business cards?
23     A. I believe so.
24     Q. Did Ms. Fluitt bring business cards?
25     A. I believe so.

## Page 200

1      Q. Did you leave business cards with LKQ when
2  you stopped in?
3      A. When I was with ProDrivers, I never went by
4  LKQ. When I started my employment with RivenRock.
5      Q. How about Stock Building Supply, when you
6  went by there with Ms. Fluitt, did you leave your
7  business card?
8      A. I don't recall.
9      Q. What about Acme Metal, when you went by
10  there with Ms. Fluitt, did you leave your business
11  card?
12     A. I don't recall.
13     Q. Did she?
14     A. I would believe so.
15     Q. And what about Stock Building Supply, did
16  she leave her business card?
17     A. I believe so.
18     Q. And Creamland Dairy, when you both went
19  there, did you leave your business card?
20     A. Not that I recall.
21     Q. Did Ms. Fluitt?
22     A. I believe so.
23     Q. And R&L Transport, when you went there, did
24  Ms. Fluitt leave her business card?
25     A. I believe so.

## Page 201

1      Q. Did you leave your business card?
2      A. Not that I recall.
3      Q. When you went to Narrow Road, did you leave
4  a business card there?
5      A. I did.
6      Q. Do you have any other sort of office swag?
7  I know at ProDrivers you had notepads, right?
8      A. Uh-huh.
9      Q. You have to answer out loud.
10     A. I'm sorry. Yes.
11     Q. What other sort of swag do you have at
12  RivenRock?
13     A. Sticky, like, Post-it pads.
14     Q. Anything else?
15     A. Not that I recall.
16     Q. Do they say "RivenRock" on the top?
17     A. Exactly.
18     Q. Did you leave any notepads at any of the
19  places you visited with Ms. Fluitt?
20     A. I did not.
21     Q. Did Ms. Fluitt leave those things?
22     A. I believe so.
23     Q. Other than business cards or notepads, did
24  Ms. Fluitt leave any other RivenRock paraphernalia
25  when you went and visited places with her?

### Page 330

1  A. First serve would be a new customer for the
2  week, or a react. A customer that was dormant for a
3  period of time, and that you were able to reactivate
4  and bring them back. They considered that a first
5  serve, because they figure, if they are not doing
6  business, they are not a customer.
7  Q. Turn to the next page in the document.
8  A. Uh-huh.
9  Q. Do you see that there is something that
10 says face-to-face meetings and a list of companies?
11 A. Correct.
12 Q. Do you see that?
13 A. I do.
14 Q. Are these all companies that you had
15 face-to-face meetings with that week --
16 A. They are.
17 Q. -- while you were at EmployBridge?
18 A. Excuse me for interrupting. Yes.
19 Q. Can you look down the list of these
20 companies and tell me which, if any, you have had any
21 contact or communications with while at RivenRock?
22 A. So, I see Stock Building.
23 Q. And we talked about that one already,
24 right?
25 A. Correct.

### Page 331

1  Q. Any others?
2  A. I believe that's it.
3  Q. Do you see above it, it says "note" and in
4  parentheses, "SBM"?
5  A. I do.
6  Q. Do you know what that means?
7  A. I do not.
8     (Exhibit 57 marked.)
9  Q. (By Ms. Libeu) Do you have Exhibit 57 in
10 front of you?
11 A. I do.
12 Q. Have you seen Exhibit 57 before?
13 A. I believe so.
14 Q. What is Exhibit 57?
15 A. So it would have been my weekly activity
16 report that was sent 4/1.
17 Q. 4/1 of 2016?
18 A. Yes. Excuse me.
19 Q. So this is an e-mail you sent to Fran Scott
20 on April 1st of 2016?
21 A. Yes.
22 Q. And attached is your Weekly Sales Activity
23 Report for that period?
24 A. Yes.
25 Q. I want you to look at the face-to-face

### Page 332

1  meetings column again. And can you look down that
2  list there and tell me if these are all companies
3  that you had face-to-face meetings with when you were
4  at ProDrivers?
5  A. If I listed it as a face-to-face, then it
6  would have been a face-to-face meeting.
7  Q. You wouldn't have listed it if you did not
8  have a face-to-face meeting?
9  A. Correct.
10 Q. And can you tell me, in looking down the
11 list of face-to-face meetings, if any of those
12 companies you've had contact or communications with
13 while at RivenRock?
14 A. The only one I see is Fidelitone.
15 Q. You've had some communications with
16 Fidelitone?
17 A. Oh, not communications. I thought you said
18 contact. And that is when I was with Amber that day
19 on her sales call.
20 Q. I don't think we talked about Fidelitone.
21 A. I'm sorry, it's late and I was thinking of
22 TransCore for some reason. So Fidelitone is a no. I
23 don't know why --
24 Q. You haven't had any contact with
25 Fidelitone --

### Page 333

1  A. No.
2  Q. -- while you were at RivenRock.
3  A. No.
4  Q. Who is the contact person at Fidelitone?
5  A. Garrett something.
6  Q. Are you aware of anyone at RivenRock having
7  any communications or contact with anyone at
8  Fidelitone?
9  A. I'm not.
10 Q. Do you see down below where it says "first
11 serves"?
12 A. Yes.
13 Q. What is the company listed there?
14 A. Albuquerque Winnelson.
15 Q. And do you remember why you listed them as
16 a first serve in this particular report?
17 A. So, it was either a new customer, or it was
18 a reactivated customer that was dormant that we
19 dispatched a driver to during that week period.
20 Q. Have you had any contact with Albuquerque
21 Winnelson since you've been at RivenRock?
22 A. I have not.
23    (Exhibit 58 marked.)
24 Q. (By Ms. Libeu) Do you have Exhibit 58 in
25 front of you?