```
                          Page 130
 1   Technologies, but that was with Volt.  That was just
 2   coincidence that she was there.
 3        Q.  Other than LKQ and RAC Transport, you don't
 4   remember any other EmployBridge or clients that
 5   Amber stopped by?
 6        A.  I didn't know who were EmployBridge's
 7   clients.  I knew who were ProDrivers'.  When I heard
 8   she had gone to those places, those were places I
 9   knew of.
10        Q.  Did you accompany Ms. Fluitt at a visit to
11   LKQ or RAC Transport?
12        A.  She went there before I started.
13        Q.  And did you accompany Ms. Fluitt on any
14   visits to any clients or potential clients?
15        A.  We drove around a little bit, yeah --
16   trained.
17        Q.  What companies did you visit with
18   Ms. Fluitt?
19        A.  Went to Array Technologies, which was
20   someone I worked with at Volt.
21        Q.  What was the name of the company?
22        A.  Array Technologies.  We went shopping --
23   just, literally, door knocking, holes in the walls,
24   and places I never heard of.  When you are training
25   someone how to cold call, it's someone -- you don't
```

```
                          Page 131
 1   do any research.  I know nothing about, you know
 2   nothing about.  Let's just walk in and ask questions.
 3   Just introduce yourself, and -- that's how you learn
 4   how to cell.
 5        Q.  Any other companies that you remember
 6   visiting with Ms. Fluitt, other than Array
 7   Technologies?
 8        A.  There is Pepperidge Farms.  There is a lot
 9   of companies that we tried to walk into.
10        Q.  Any other names you remember?
11        A.  There is a huge list.  Pella Windows and
12   Doors.  Just, literally, random places.  Anyplace, we
13   would drive and stop and park and walk.
14        Q.  What are those names that you can remember?
15        A.  I can't think of those names.  Just
16   everywhere.
17        Q.  If you think of any others, besides the
18   three you mentioned, just let me know, throughout the
19   day?
20        A.  Okay.
21        Q.  Approximately how many clients does
22   RivenRock currently service?
23        A.  I don't know.  Outside the City -- the City
24   of Albuquerque would be one client.
25        Q.  Okay, got it.
```

```
                          Page 132
 1        A.  If you had to say -- if I just considered
 2   the City of Albuquerque one client, what others?
 3   Less than 15, maybe.
 4        Q.  So it's about 15 clients, plus the City of
 5   Albuquerque?
 6        A.  You could say 15 to 20, maybe.  That we
 7   have, but actually service regularly would be less
 8   than ten.
 9        Q.  So, the 15 to 20 you service from time to
10   time, but you have ten regulars?
11        A.  Pretty regulars.
12        Q.  Plus the City of Albuquerque?
13        A.  Yeah.  The City of Albuquerque, and less
14   than ten, somewhere in there.
15        Q.  Is the City of Albuquerque your biggest
16   client?
17        A.  Yes.
18        Q.  Does RivenRock currently have any plans to
19   seek clients outside of Albuquerque?
20        A.  It is too hard to recruit outside of New
21   Mexico with our office.
22        Q.  Is that a no?
23        A.  No.
24        Q.  What industries does RivenRock service?
25        A.  Light industrial, administrative,
```

```
                          Page 133
 1   transportation.
 2        Q.  Are those all industries that EmployBridge
 3   serviced, as well?
 4        A.  EmployBridge, as a whole?
 5        Q.  Yes.
 6        A.  Yes.  That's what I've heard.  They do
 7   everything, so yeah.
 8        Q.  Does RivenRock have any plans to target any
 9   other industries other than light industrial,
10   administrative and transportation?
11        A.  No.  That covers everything.
12        Q.  What do you mean "that covers everything"?
13        A.  Light industrial is warehouse.
14   Administrative is everything from a receptionist to
15   IT.  Industrial is everything from a welder to an
16   electrician to a general laborer, so we can do
17   everything.
18        Q.  That covers the panoply?
19        A.  It covers the panel, yeah.
20            MS. LIBEU:  Is this a good time for a
21   break?
22            MR. STANFORD:  Sure.
23            (Recess was taken from 11:36 to 11:53 a.m.)
24        Q.  (By Ms. Libeu) I want to show you something
25   on my phone, if that's okay.  I pulled up
```

**Page 150**

1   MR. STANFORD: Same objection. Foundation.
2   Form.
3   A. He wouldn't say anything. We haven't been
4   there since we left.
5   Q. Why would Fran send an e-mail to Mike
6   DeLusque saying that you had visited Mike Pacheco, if
7   you hadn't?
8   MR. STANFORD: Same objection. Form and
9   foundation.
10  A. Again, Fran will stop at nothing to
11  sabotage someone. She sabotaged her own client,
12  calling DOT on her clients and her drivers. What
13  would stop her from -- that's my opinion. What would
14  stop her from doing that to me. If she has done it
15  before, so this doesn't surprise me at all. Of
16  course, she would lie.
17  Q. So, there is absolutely no truth to her
18  e-mail that you visited Mike Pacheco?
19  A. No truth, since I left ProDrivers, did I
20  meet Mike Pacheco at any location of Stock Building
21  Supply.
22  Q. It looks like from Fran's e-mail, that it
23  says that you were -- RivenRock was starting a
24  driving service as early as July 1st, 2016. That's
25  what her e-mail suggests, right?

**Page 151**

1   A. That's what the e-mail says.
2   Q. Were you starting a driving service as
3   early as July 1st 2016?
4   A. No.
5   Q. How much after this e-mail did the driving
6   service at RivenRock begin?
7   A. Begin, more than 30 days.
8   Q. And you started preparing in mid July?
9   A. Mid July, 20th, going forward -- mid to
10  late July.
11  Q. Did you ever tell Mr. Pacheco that if Stock
12  used RivenRock for its driving means, it could save
13  $5 per hour over EmployBridge's rate?
14  MR. STANFORD: Objection. Form.
15  Go ahead.
16  A. I never talked to Mike Pacheco, since I
17  left ProDrivers.
18  Q. So you never said that to him?
19  MR. STANFORD: Objection. Form. Counsel,
20  you're asking the same questions three and four
21  times. Let's move on.
22  A. I never talked to Mike Pacheco when I left
23  ProDrivers.
24  Q. So you never told him that he could save $5
25  an hour over EmployBridge rates?

**Page 152**

1   MR. STANFORD: Objection. Form.
2   A. I never talked to Mike Pacheco when I left
3   ProDrivers.
4   Q. Do you know a company called Acme Iron and
5   Metal?
6   A. I do.
7   Q. Is that a -- was that a ProDrivers'
8   customer when you were at ProDrivers?
9   A. It was.
10  Q. And was that a customer that you serviced
11  while at ProDrivers?
12  A. Yes.
13  Q. And how long had Acme Iron and Metal been a
14  client of ProDrivers at the time you had been there?
15  A. Only the last six to eight months that I
16  was with ProDrivers.
17  Q. How about Stock Building Supply, how long
18  had they been a client of ProDrivers, while you were
19  there?
20  A. They were a client before I got there.
21  Q. Do you know how long they had been a client
22  before you arrived at ProDrivers?
23  A. I don't know the number.
24  Q. Have you had any contact with anyone at --
25  let me ask this: Who was your contact at Acme Iron

**Page 153**

1   and Metal when you were at ProDrivers?
2   A. I can't remember the names. It's been too
3   long.
4   Q. Was one of your contacts a gentleman named
5   Keaton Wynn?
6   A. That sounds familiar. What was the name?
7   Q. Keaton Wynn.
8   A. It could be, yeah. Again, it's been
9   awhile.
10  Q. But the name sounds familiar?
11  A. Sounds familiar.
12  Q. Have you ever had any contact with Keaton
13  Wynn since leaving ProDrivers?
14  A. If that was one of my contacts there, no.
15  Q. Have you had any contact with anyone at
16  Acme Iron and Metal, since you joined RivenRock?
17  A. I have not made any contact with anybody
18  from Acme Iron and Metal since leaving ProDrivers.
19  (Exhibit 8 marked.)
20  Q. (By Ms. Libeu) Do you have Exhibit 8 in
21  front of you?
22  A. I do.
23  Q. I'll represent to you, again, this is
24  another document produced by EmployBridge. And it
25  has got Bates number in the lower right-hand corner,

### Page 154

1   EB88.  Do you see that?
2       A.  Yes.
3       Q.  And do you see that it's an e-mail from
4   Keaton Wynn to Fran Scott, on July 14, 2016?
5       A.  I do see that.
6       Q.  And do you see that the e-mail address from
7   Mr. Wynn is Keaton@acmeironandmetal.com?
8       A.  Yes.
9       Q.  Does that refresh your memory that Keaton
10  Wynn was at Acme Iron and Metal?
11      A.  It does now.
12      Q.  Do you see that the subject line of the
13  e-mail is "Timothy and Amber"?
14      A.  Yes.
15      Q.  And Mr. Wynn writes to Fran Scott, Dear
16  Fran, two weeks ago, on July 1st, I was approached
17  by Timothy Jacquez and an ex-coworker of ours named
18  Amber.  I was told by them they had left ProDrivers
19  and started their own company.  I was told by them
20  that the company was similar to ProDrivers, they
21  would hire truck drivers to go work temporary jobs
22  for other companies.  They informed me that if I got
23  rid of ProDrivers, with their new company they would
24  give me better rates than I was currently getting.
25  They also stated that they would employee other job

### Page 155

1   skilled employees besides truck drivers, torch
2   cutters, crane operators and mechanics, to be
3   specific.  I do not plan on leaving ProDrivers, and I
4   thought this might be helpful information for you to
5   know.  Thank you."  Do you see that?
6       A.  I do see it.
7       Q.  Did you approach Mr. Wynn around
8   July 1st, about working with RivenRock?
9       A.  I never approached Acme Iron and Metal,
10  since I left ProDrivers.
11      Q.  So Mr. Wynn is lying in this e-mail?
12      A.  Yes.
13          MR. STANFORD:  Objection.  Foundation and
14  form.
15      Q.  (By Ms. Libeu) Why would Mr. Wynn lie?
16          MR. STANFORD:  Same objection.  Form and
17  foundation.
18      A.  I don't know why he would lie.  I'm not
19  him.
20      Q.  So when Mr. Wynn says that he was
21  approached by you on or about July 1st, that's not
22  true?
23          MR. STANFORD:  Objection.  Form and
24  foundation.
25      A.  Well, his e-mail is also invalid, because

### Page 156

1   it says, I was told by them that "they" had left
2   ProDrivers.  "They" doesn't make sense.  Amber was
3   never part of ProDrivers.  So that automatically
4   tells me that he doesn't know what he is talking
5   about.
6       Q.  So the "they" in that e-mail means he is
7   telling lies all throughout the e-mail?
8           MR. STANFORD:  Objection.  Form and
9   foundation.
10      A.  Again, I don't know.  I'm not him.  I don't
11  know why he would lie.  But that there tells me it
12  doesn't make sense.
13      Q.  Did you ever visit Acme Iron and Metal with
14  Amber Fluitt?
15      A.  I have never visited Acme Iron and Metal,
16  since I left ProDrivers.
17      Q.  So Mr. Wynn's statement that you and Amber
18  Fluitt went and met him at Acme Iron and Metal is
19  incorrect?
20          MR. STANFORD:  Counsel, I'm going to one
21  more form.  We need to stop this pattern of saying
22  the same questions three and four times.
23          MS. LIBEU:  I'm going through each line of
24  the e-mail.  I'm allowed to ask that.
25          MR. STANFORD:  You have asked the question

### Page 157

1   three and four times.
2           MS. LIBEU:  I'm entitled to an answer.
3           MR. STANFORD:  He's given you each one.  I
4   don't want to call in.  We're getting to the point
5   where it is becoming harassment.  When you keep
6   asking the same questions three and four times, it
7   becomes harassment.  I don't want to have to instruct
8   him to stopping answering, but I will if you continue
9   to berate the same questions.
10          MS. LIBEU:  You can make your objections,
11  and we'll continue.
12          MR. STANFORD:  We're not going to continue
13  at a certain point; if you continue to ask the same
14  question over and over.  You've asked the general
15  question.  Now, all you are doing --
16          MS. LIBEU:  I'm allowed to ask specifics?
17  I'm allowed to ask the general, and then specifics.
18          MR. STANFORD:  You've done the same thing.
19          MS. LIBEU:  Your objection is noted for the
20  record.
21          MR. STANFORD:  We'll have one more time.
22  And if you ask the same questions, I'll instruct him
23  not to answer.  We're at that stage.  And I've only
24  ever had this happen twice.
25      Q.  (By Ms. Libeu) When Mr. Wynn says that you

## Page 186

1   A. Yes.
2   Q. But it wasn't this Eric, to the best of
3   your memory?
4   A. I can't remember who that was.
5   Q. What were those conversations about?
6   A. Following up on business, why we don't have
7   business with them anymore.
8   Q. Why don't you have business with them
9   anymore?
10  A. Workers' comp is way too high. It is a
11  dangerous environment.
12  Q. Why did they call you, and not Amber?
13  A. They called the main office phone.
14  Q. And you answered?
15  A. (Witness nods head.)
16  Q. You have to answer audibly?
17  A. Yes.
18  Q. How long of a time period did RivenRock
19  service Sagebrush Sales?
20  A. I do not know.
21  Q. Do you know what time -- I realize you
22  don't know what time it began. Do you know what time
23  it ended?
24  A. I do not know, actually.
25  Q. Do you know how many people, or how many

## Page 187

1   field associates RivenRock placed at Sagebrush Sales?
2   A. I do not know.
3   Q. And Rio Grande Drywall, is that a company
4   you reached out to while you were at ProDrivers?
5   A. Yes.
6   Q. Did they become a ProDrivers' client?
7   A. No.
8   Q. Have you talked to anyone at Rio Grande
9   Drywall since joining RivenRock?
10  A. I have not.
11  Q. And Bruckner Leasing, is that another
12  company you reached out to while at ProDrivers?
13  A. Yes.
14  Q. And did they become a ProDrivers' client?
15  A. No.
16  Q. Have you talked to anyone at Bruckner
17  Leasing since joining RivenRock?
18  A. No.
19  Q. And other than Champion and Sagebrush
20  Sales, which we've discussed, are you aware of
21  anyone -- not just you personally, talking to anyone
22  at any of the companies listed on Exhibit 10?
23  A. No.
24  Q. Do we want to take a lunch break? Is the
25  witness getting hungry.

## Page 188

1   A. I'm starving.
2   MS. LIBEU: Let's take a lunch break.
3   (Recess was taken from 12:47 to 1:46 p.m.)
4   Q. (By Ms. Libeu) I'm going to give you
5   another document.
6   (Exhibit 11 marked.)
7   Q. (By Ms. Libeu) Do you have Exhibit 11 in
8   front of you?
9   A. I do.
10  Q. Have you seen this document before?
11  A. No, not that I can recall.
12  Q. Can I have you look at the top of the page,
13  where it says "From"?
14  A. Okay.
15  Q. Does it appear to be an e-mail you sent to
16  Fran Scott on June 2nd of 2016?
17  A. It look like it.
18  Q. But you don't remember this e-mail?
19  A. No.
20  MR. STANFORD: Is that the 8th or 2nd?
21  MS. LIBEU: 8th. Did I say 2nd?
22  MR. STANFORD: You did.
23  Q. (By Ms. Libeu) I'm sorry. It appears to
24  be an e-mail from you to Fran Scott on June 8, 2016,
25  correct?

## Page 189

1   A. Uh-huh.
2   Q. You have to answer audibly.
3   A. Yes.
4   Q. Any reason to doubt that you sent this
5   e-mail?
6   A. No.
7   Q. Do you see that you write, "Fran, I have
8   either had an appointment to meet with the
9   decision-maker, and did, or I did a drop-in and met
10  with the decision-maker." And then there is a list
11  of companies. Do you see that?
12  A. Uh-huh. Yes. Sorry.
13  Q. Is this list of companies in Exhibit 11,
14  companies that you contacted while at ProDrivers?
15  A. Yes.
16  ==Q. Can you look through the list and tell me==
17  ==whether any of these -- whether you have contacted==
18  ==any of these clients while at RivenRock?==
19  ==A. The only one I've had contact with is RAC==
20  ==Transport.==
21  ==Q. And tell me about that contact?==
22  ==A. So he called in, wanted to speak to Amber.==
23  ==I remember -- actually remember when I talked to him.==
24  ==He wanted to have a conversation with Amber. She==
25  ==wasn't in. They were looking for, like, a mechanic,==

**Page 190**

```
 1   anyone in the area, general realm.  So we talked
 2   about it.  We never filled anything with it, as a
 3   mechanic.
 4        Q.  And when you say he called in, who is the
 5   "he" you are referring to?
 6        A.  I cannot remember his name.  The operations
 7   guy.  It has been so long, I can't think of his name.
 8        Q.  But someone at RAC Transport?
 9        A.  Yes.
10        Q.  And called asking for Amber?
11        A.  Yes.
12        Q.  Had Amber made contact with him previously?
13        A.  She had.
14        Q.  Tell me what you know about that?
15        A.  Just again, knocked on doors.  That was a
16   client she had just walked into.  They have a big
17   warehouse.
18        Q.  How did she learn about RAC Transport?  Did
19   someone give her that name, or did she just see it on
20   the side of the road?
21        A.  Just driving.  She is territory management,
22   again, and ran into one of them.
23        Q.  And you said RivenRock didn't end up
24   filling that mechanic position?
25        A.  No.
```

**Page 191**

```
 1        Q.  Has RivenRock provided any services to RAC
 2   Transport?
 3        A.  I think we had someone do a run for them
 4   one time.
 5        Q.  When was that?
 6        A.  I can't recall the date, August sometime.
 7        Q.  And do you remember who the person was who
 8   did the run?
 9        A.  Jason Smith.
10        Q.  And is he the field associate of
11   RivenRock's?
12        A.  Yes.
13        Q.  How did he become a field associate at
14   RivenRock?
15        A.  Called in looking for work.
16        Q.  He called your office?
17        A.  Yes.
18        Q.  Who spoke to him?
19        A.  All of us.  He did his orientation,
20   paperwork, everything.
21        Q.  Do you know whether Jason Smith has ever
22   been a field associate for ProDrivers?
23        A.  Never has.
24        Q.  How about for any of the EmployBridge
25   companies?
```

**Page 192**

```
 1        A.  For the companies -- he was a former
 2   employee of YRC Transport.
 3        Q.  Of YRC?
 4        A.  Yes.
 5        Q.  Is that an EmployBridge company?
 6        A.  That is a ProDrivers' company they worked
 7   with.
 8        Q.  I want to make sure I'm understanding.  He
 9   worked for YRC Transport, but not through ProDrivers?
10        A.  He worked for that company, and
11   ProDrivers -- we serviced that account.  He worked
12   specifically for that company.
13        Q.  Was he considered an associate of
14   ProDrivers or EmployBridge at that time?
15        A.  No, he's never been an employee -- field
16   employee, or anything of ProDrivers.
17        Q.  He was just directly employed by YRC?
18        A.  Yes.
19        Q.  Other than the one run that Mr. Smith did
20   for YRC Transport, has RivenRock provided any other
21   services to RAC Transport?
22        A.  Not since then.  We haven't done anything
23   with them.
24        Q.  Before then were there any services that
25   RivenRock provided to RYC Transport?
```

**Page 193**

```
 1        A.  No.  They called for a couple of admin
 2   positions, but we never filled them.
 3        Q.  Other than RAC Transport, are there any
 4   other companies on Exhibit 11 that you have
 5   communicated with while at RivenRock?
 6        A.  Me, no.
 7        Q.  Are there any companies on Exhibit 11 that
 8   someone, other than you, has communicated with on
 9   behalf of RivenRock?
10        A.  Other than me, yes.
11        Q.  And which companies is that?
12        A.  HD Supply White Cap.
13        Q.  That is on the first page, HD Supply White
14   Cap?
15        A.  Yes.
16        Q.  What others?
17        A.  It looks like that is the only one.
18        Q.  And what has RivenRock's relationship been
19   with HD Supply White Cap?
20        A.  We purchased safety equipment from them
21   before, for some of our field associates -- hard
22   hats, safety gloves.
23        Q.  So RivenRock has purchased things from HD
24   Supply White Cap?
25        A.  Correct.  We never actually put anyone with
```

**Page 254**

1  A. No. We have one of those shred things --
2  like just a shredder.
3  Q. You have that at your house?
4  A. I do it with all of my paperwork, like when
5  you get credit card stuff. I've been a victim of
6  credit card fraud, like, four times, so I shred
7  everything.
8  Q. And so you shredded the ProDrivers'
9  documents you had at your house after you left
10 ProDrivers?
11 A. Everything I had with that.
12 Q. And when did you do that shredding?
13 A. Shortly after I left, within days.
14 Q. Was there any hard copy documents from
15 ProDrivers you had that you didn't shred?
16 A. Not to my knowledge. I shredded
17 everything.
18 Q. What about stuff that you e-mailed
19 yourself? Was that something you did routinely while
20 you were at ProDrivers?
21 A. All of the time.
22 Q. And what types of things did you e-mail
23 yourself?
24 A. Dispatch sheets that had driver's names,
25 numbers, contacts, client lists, client's numbers,

**Page 255**

1  contacts, rates. I had all that stuff.
2  Q. And what e-mail address did you use to send
3  it to yourself?
4  A. My personal e-mail, because, like I said, I
5  can't go to my -- sometimes I can't get to my work
6  e-mail, my work e-mail.
7  Q. What is your personal e-mail?
8  A. Timothy_Jacquez@Yahoo.
9  Q. Did you ever forward ProDrivers' material
10 to anything other than, either -- when you were
11 forwarding it to yourself, did you always use that
12 Yahoo account?
13 A. Yes.
14 Q. Did you forward ProDrivers' documents to
15 anyone other than yourself, while you worked there?
16 A. No, just me.
17 Q. How about after you left there, did you
18 forward any of the ProDrivers' documents that you had
19 in your possession to anyone else?
20 A. No.
21 Q. And what did you do with the e-mails you
22 had sent to yourself, after you left ProDrivers?
23 A. I have really bad OCD, so I cleaned out --
24 anything that doesn't have to pertain to anything on
25 my Yahoo, is empty.

**Page 256**

1  Q. And --
2  A. I don't even save text messages. Every day
3  I clean out my -- my OCD doesn't let me do that. I
4  delete text messages, phone calls. I delete my
5  lists, my e-mail -- I delete all that.
6  Q. When did you delete all of the ProDrivers'
7  information that you had forwarded to yourself?
8  A. A day or two after I left.
9  Q. Did you delete the deleted items folder, as
10 well?
11 A. Yeah.
12 Q. Before deleting it, did you print out any
13 of it?
14 A. Before I left?
15 Q. After you left?
16 A. No.
17 Q. And before deleting it, did you forward it
18 to anyone else?
19 A. No.
20 Q. Did you start e-mailing yourself more
21 things in June of 2016, or was it fairly typical of
22 your practice prior to that?
23 A. It is fairly typical with e-mailing, but a
24 lot more printing out. Like I said, I go to Northern
25 New Mexico, so I print out mostly everything so I

**Page 257**

1  could have copies of it.
2  Again, I don't have access to internet, so
3  if I send it to myself, it wouldn't make sense. So
4  when I was planning vacations -- I'm planning all of
5  these things coming up in late June, July. So I need
6  to have -- even though I was planning on still giving
7  two weeks, if they came back and countered -- give me
8  more money, whatever the case was, or everything fell
9  through, I'm still going to continue to do my job.
10 So, I needed to have -- I was prepared to
11 work weekends, even on my vacation. I did it on mini
12 vacation, anyway. So it was common practice, getting
13 ready for things I needed.
14 Q. So you printed out more materials in June
15 of 2016 than was typical of your prior team period?
16 A. No, it's the same. Every week I would
17 print out and take home dispatch. Fran and I would
18 do it. If she is playing in her garden, or doing
19 whatever, we can look at a sheet. It's easier than
20 opening a laptop, starting it, finding a power cord.
21 You can look real quick -- yeah, it's there.
22 Q. So it would be fair to say your practice
23 for printing materials in June of 2016, was similar
24 to your practice of printing materials while you were
25 at ProDrivers in earlier periods?

**Page 258**

1   A.   Yeah, we did it all of the time.  And
2   sending things to your personal e-mail was real
3   common, too.  When I started at ProDrivers, before I
4   even had a ProDrivers' e-mail, Fran was sending me
5   dispatch sheets to my personal e-mail so I could be
6   in the loop, before I started.  I remember calling
7   her saying, I don't even know what this is.  She just
8   said, I'm trying to keep you in the loop.  I was,
9   like, this means nothing to me right now.  It was
10  common to send things any which way.
11      Q.   What about volume of printing?  Was it
12  approximately the same volume of materials you
13  printed in June of 2016, than in earlier periods at
14  ProDrivers?
15      A.   It is about the same.  As -- when I started
16  we didn't have very many drivers.  When I left we had
17  more, so it was probably more pages.  As we went on,
18  we would have more pages.
19      Q.   So you didn't print more materials in June
20  than you did in earlier periods?
21      A.   It is pretty much the same.
22      Q.   What about e-mailing things to yourself?
23  Did you do more e-mailing in June of 2016 of
24  materials to yourself, than you did in earlier time
25  periods at ProDrivers?

**Page 259**

1   A.   Sometimes, yes.  If I wasn't going out of
2   town -- I was dating someone at the time, so I
3   usually never did go up to Northern New Mexico.  I
4   stayed down here most of the time, so I could e-mail
5   stuff instead of printing it out.
6       Q.   But in terms of how many e-mails you sent
7   to yourself, was it more frequent?  Did you do it
8   more often in June of 2016, than earlier periods, or
9   was it approximately the same?
10      A.   Kind of the same.
11      Q.   So it was something you did routinely
12  throughout your employment at ProDrivers?
13      A.   Printing out, e-mailing stuff, it just
14  depended on how busy we were, but like I said, I was
15  dating someone, so you try not to go out of town and
16  do it real quick.  I don't want a laptop at dinner.
17  I could have something handy and look at it real
18  quick, make a phone call.
19      Q.   So if someone were to go back in time and
20  look and, you know, pre-June 2016 how much you
21  e-mailed things to yourself, and June 2016, June 2016
22  shouldn't be materially different than the other time
23  periods?
24      A.   No.  Like I said, there was probably more
25  kind of went through.  I don't know, just however I

**Page 260**

1   felt like I was going to print stuff out.  Like I
2   said, I wasn't seeing someone during that time
3   period, so I'm going to print stuff out and go by
4   myself to Northern New Mexico to family.  So I would
5   sent stuff to me.
6       Q.   Did you send more things to yourself in
7   June of 26th than other time periods?
8       A.   Probably.
9       Q.   And that was because why again?
10      A.   Dating someone, and I'm not going out of
11  town, so I could be local and look at a phone or my
12  e-mail or my laptop.
13      Q.   Prior to June 2016?
14      A.   Yeah.
15      Q.   When did you start dating your current
16  girlfriend?
17      A.   Not current anymore.  I'm single.
18      Q.   My assumption was incorrect.
19          MR. STANFORD:  You're zero for two.
20  Getting this guy in trouble.
21      A.   I'm very lonely.  Thank you.
22      Q.   I'm so sorry.  When did you start dating
23  your girlfriend that you were dating in June of 2016?
24      A.   May.
25      Q.   So you started dating her in May?

**Page 261**

1   A.   Yes.
2       Q.   Beginning of May?  End of May?
3       A.   Middle, towards the end.
4       Q.   Did you e-mail yourself things in May, so
5   that you could visit her, as well?
6       A.   Yes.  I would print stuff out, e-mail,
7   whatever is convenient that day.
8       Q.   So you -- did you go visit her, and I
9   apologize not being familiar with New Mexico
10  geography.  You went north to visit her?
11      A.   No, she lived here.  If I was going to go,
12  north, before I started dating her, I would print
13  something out.  She is here local in Albuquerque, so
14  I could -- I'm here, I'm -- I have internet access.
15  If I have my laptop, or if my phone worked, I would
16  send it to myself.
17      Q.   Okay.  So did you send -- you went to
18  Northern New Mexico more before you started dating
19  your then girlfriend in May of 2016, right?
20      A.   Correct.
21      Q.   So was -- is it correct, before you started
22  dating her, you printed out more things than after
23  you started dating her?
24      A.   Correct.
25      Q.   And would that be the same with e-mail as

**Page 262**

1  well, you e-mailed more things before you started
2  dating her, than after?
3      A.  I e-mailed more things when I was dating
4  her.
5      Q.  And that's because you had internet access
6  here?
7      A.  Yes, because I'm not going out of town
8  much.
9      Q.  And you e-mailed yourself things in May
10 because you were dating her, and you were staying
11 local?
12     A.  Yes.
13     Q.  And you e-mail them from the ProDrivers'
14 account?
15     A.  ProDrivers, yeah, because it is easier to
16 go to my thing and send it.
17     Q.  And you continued e-mailing things to
18 yourself in June of 2016 from your ProDrivers'
19 account, right?
20     A.  Yes.
21     Q.  Did you e-mail yourself more things in June
22 of 2016, or May of 2016?
23     A.  I don't know.  I e-mailed things as I
24 needed them, printed out things as I needed them.
25     Q.  Was it -- when did you start at ProDrivers

**Page 263**

1  again?
2      A.  April 2015.
3      Q.  So did you e-mail your stuff -- e-mail your
4  stuff from your ProDrivers' account in April 2015?
5      A.  When I was learning, some e-mail, some
6  printed out.  You're still learning.  It took me a
7  good solid eight, nine months to fully understand
8  what I was doing.  So we worked off paper dispatch
9  all of the time.  It's easier to reconcile when it's
10 right in front of you.
11     Q.  What about nonpaper e-mails?  Did you
12 e-mail yourself, at your Yahoo account, from your
13 ProDrivers' account in April 2015?
14     A.  Did I e-mail -- say that again.
15     Q.  Did you e-mail anything from your
16 ProDrivers' account to your Yahoo account in April of
17 2015?
18     A.  I can't recall.
19     Q.  What about May?  Did you e-mail anything in
20 May of 2015 from your ProDrivers' account to your
21 Yahoo account?
22     A.  I can't remember.
23     Q.  When is the first time you remember
24 e-mailing yourself from your ProDrivers' account to
25 your Yahoo account?

**Page 264**

1      A.  Pretty shortly, within a few months.
2      Q.  Of April of 2015?
3      A.  Yeah, probably.
4      Q.  And then it was something that you did as
5  needed, probably weekly?
6      A.  Weekly.  Printed more stuff than anything,
7  yeah.
8      Q.  How many times a month, let's say, in 2015,
9  on average, would you send yourself things from your
10 ProDrivers account to your Yahoo account?
11     A.  In 2015?
12     Q.  Yes.
13     A.  Couple times a month, each.
14     Q.  And then what about in early 2016, let's
15 say before May when you started dating your then
16 girlfriend -- January, February, March, April, how
17 many times a month would you e-mail yourself from
18 your ProDrivers' account to your Yahoo account?
19     A.  In February I sent me some stuff that I
20 had.  January, I think I did.  Probably March and
21 April.  I know we had a really big account that I was
22 working around the clock -- weekends, nights.  I was
23 getting calls nonstop about it.  So I had paper
24 forms.  I had e-mail forms.  I looked at both.  I
25 literally had paper forms sitting on the desk right

**Page 265**

1  next to my bed, when they would call me at 2:00 in
2  the morning and I would have to dispatch, and say,
3  Call this person, and it's easier to look at real
4  quick.
5      Q.  So in January, February, March, April, you
6  probably sent a couple of times a month, something to
7  yourself at your Yahoo account?
8      A.  I'm not sure.  Maybe once or something.
9      Q.  Is that your best estimate, maybe once a
10 month?
11     A.  Yeah.  I printed more things.  It's easier.
12 I'm visual.  I don't want to lug around a big, old
13 laptop with a cord, when I have paper like that.
14     Q.  I thought paperless was supposed to make
15 everything easier?
16     A.  Not when you have a heavy laptop and cords
17 and a bag.
18     Q.  Your most recent time period when you were
19 at ProDrivers, what was the -- I know you went
20 through several laptops, what was the laptop -- when
21 did you get the most recent laptop you used?
22     A.  Like, May, April -- end of April, beginning
23 of May.
24     Q.  Of 2016?
25     A.  Yes.  I fought to get a new one.

## Page 274

1  dispatch on June 16, 2016?
2      A.  It looks very possible, yes.
3      Q.  Do you have any reason to believe you
4  didn't e-mail yourself that dispatch?
5      A.  No.
6      Q.  And that was, again, the day after
7  Mr. Miller texted you and said this was going to
8  happen, right?
9      A.  Right.
10     Q.  And if you look down to the next document
11 there, it says 6/16, and it looks like the e-mail
12 subject you e-mailed yourself, "driver card template
13 with logo."  Do you see that?
14     A.  Yes.
15     Q.  Do you have any reason to believe you
16 e-mailed yourself -- any reason to believe you did
17 not e-mail yourself that on June 16, 2016?
18     A.  No.
19     Q.  Why would you e-mail yourself a driver card
20 template?
21     A.  Like I said, I was told from Fran, told
22 from Mike, the reason I'm very unhappy -- and Fran
23 and I had these conversations after Terry left.  We
24 were both unhappy.  She is unhappy with commission.
25 I'm unhappy.  Can't figure out numbers.  I have to

## Page 275

1  get myself in line for what I'm going to do.
2      My ultimate plan was to get everything I
3  possibly needed to show, I'm supposed to be getting
4  commission off someone that I hire and bring in the
5  office.  So who am I going to show this to?  I can't
6  go to Fran.  She doesn't know how to pull numbers.
7  Mike is telling me he can't do anything.  Do some
8  research yourself.  The only other resource I have
9  would be in the Atlanta, Georgia, office.  So if I
10 can bring everything I need to someone for what I do,
11 and how I'm supposed to get paid.  And these are the
12 documents I need to get someone from start to finish,
13 I have to have all of my ducks in a row.  Apparently,
14 I can't do it in the Albuquerque office.  I can't do
15 all this by myself, so I have to do what I need to
16 do.  I need to have dispatch sheets so I can
17 reconcile everything that I could possible need.
18 Plus I'm still dispatching and doing my job, so I
19 need to have my dispatch and client lists so I can
20 get in touch with everything.
21     Q.  Why would you need a driver card template?
22     A.  This is all of the information that you
23 need when you are putting a driver on list.  You need
24 to have driver card templates.  What else is this
25 other stuff?  What information I need for medical

## Page 276

1  cards, postcards.  All of this stuff goes into
2  ProTread.  I needed all of this information to go --
3  it is funny how corporate -- actually, they have no
4  idea what we are doing in each office.  When you ask
5  them, when we went to corporate meetings, they would
6  ask you what you guys do.  What am I in charge of?
7  From start to finish, and they didn't really know.
8      Q.  If this is a template, I'm wondering why
9  would you need a template?
10     A.  So I could have all of my documentation, so
11 when I do my own forensic investigation, I have
12 everything I possibly need.
13     Q.  And why would a template help you with
14 that, is what I'm wondering?
15     A.  It's just the paperwork.  It is what it's
16 called.  It's just a form.
17     Q.  So you were going to use a driver card
18 template to do your own forensic investigation on
19 what commissions you were owed?
20     A.  Everything I would possibly need to get
21 someone hired, from start to finish, I want all that
22 paperwork I have.
23     Q.  Why?
24     A.  So I can go to the corporate office and
25 say, This it what I'm going to be getting paid on.

## Page 277

1  This is all the paperwork I'm signing.  You can go
2  check all of our documents, and there you go.
3      Q.  I understand why the filled out forms might
4  help you with that.  Why would a template help you
5  with that?
6          MR. STANFORD:  Objection.  Form.  Asked and
7  answered.
8          Answer it again.
9      A.  It's what it's called.  It's just what it's
10 called.
11     Q.  Do you see something on there that says
12 "2013 ProTread log-in instructions"?
13     A.  Yes.
14     Q.  What's that?
15     A.  ProTread is what drivers are using.  Any
16 driver that goes on the road has to do a ProTread
17 module.  I have to go in and check it, make sure they
18 actually did it.  Again, it is part of the hiring
19 criteria before they turn a wheel.
20     Q.  Is ProTread ProDrivers specific?
21     A.  No.  Anyone can log in.
22     Q.  Anyone in the industry?
23     A.  Yes, it is -- a lot of freight companies
24 use it.  I wanted everything, from start to finish,
25 on what it takes to hire someone on.  Not all offices

**Page 278**

1  use ProTread but they're supposed to.
2  Q.  And so why did you e-mail yourself all of
3  these materials in June of 2016?
4  A.  Because that's at the time --
5  MR. STANFORD:  Objection.  Form.
6  Go ahead for the fourth time.
7  A.  Again, I'm getting to the point now where
8  I'm super frustrated in not getting paid correctly.
9  No one is helping me.  I need to have everything I
10 could possibly need so I can go to my corporate
11 office.  I'm getting no support from Fran Scott, Mike
12 DeLusque, any of my other senior managers were
13 actually not -- they actually took a demotion to a
14 different role -- no longer a market leader.  They
15 are sales managers now.
16 I have to have everything I could possibly
17 need so I can take it to the Atlanta, Georgia,
18 office, or contact them.  People I don't know -- I
19 want to make sure I have everything I could possibly
20 need, so when I go to them, they can go, okay.  This
21 is what I do.  This is what I have.  This is what I'm
22 supposed to get paid on.  To get drivers through the
23 process, this is all of the paperwork I have.  This
24 is what I'm doing.  This is my job, and I need all of
25 my documentation behind me.

**Page 279**

1  Q.  Did you contact EmployBridge or ProDrivers'
2  corporate office?
3  A.  I did.
4  Q.  When?
5  A.  Shortly after I left, and during the time
6  when I was there.
7  Q.  Tell me about the time when you were there?
8  A.  Called them.  Tried to get some
9  clarification.  I had only been to the Atlanta office
10 one time.  I didn't really know who to ask for, if I
11 could get some clarification.  I don't remember the
12 person's name -- who it was -- who I can talk to
13 about certain commissions, and EBITDAs and all of
14 this stuff.  I don't understand the logistics.  They
15 said they would get back to me, never happened.
16 I ended up getting a job with RivenRock.
17 Left.  Tried contacting them again to get some
18 clarification, if I did have any kind of non-competes
19 or any kind of paperwork.  I wanted my whole new hire
20 paperwork that I supposedly signed.
21 When I called the corporate office, they
22 would put me on hold numerous times when I called.
23 And they said, well, you need to go into the local
24 office to get it.  I was instructed to go into the
25 local office, and they had no information for me.

**Page 280**

1  I'm not going to go back into a hostile work
2  environment, when I'm getting text messages from Mike
3  DeLusque saying, We'll go after you to the full
4  extent.  We don't care about money.  So, of course,
5  I'm not going to go back into that hostile work
6  environment.
7  Q.  When was the first time that you contacted
8  EmployBridge or ProDrivers' corporate?
9  A.  Beginning of June.
10 Q.  Before you left?
11 A.  Yes.
12 Q.  Who did you speak to?
13 A.  I can't remember.  That's what I'm saying.
14 I can't remember the name.  Whoever answered the
15 phone.  They said, We'll put you on hold.  What
16 office are you calling from?  What state?  New
17 Mexico.  Hold on.  There is only one office in New
18 Mexico.
19 Q.  What number did you call from?
20 A.  It's like -- I would have to.  I don't
21 know.  I had it on my directory.
22 Q.  Did it have, like -- did it say
23 EmployBridge corporate, did it tell you a specific
24 department?
25 A.  It is ProDrivers' corporate office.

**Page 281**

1  Q.  So it said ProDrivers' corporate office, or
2  something similar?
3  A.  Yes.
4  Q.  And was that in Atlanta?
5  A.  Yes.
6  Q.  And then you called them a second time
7  after you left?
8  A.  After I left, yes, in July.
9  Q.  About July what?
10 A.  Beginning of July sometime.
11 Q.  And what number did you call then?
12 A.  The same number.  I just Googled Atlanta
13 ProDrivers' office.
14 Q.  And you called the same number.
15 A.  Yes.
16 Q.  And you said the second time you wanted to
17 call and you asked if you had a non-compete?
18 A.  I said any new hire paperwork that I have.
19 What kind of paperwork do I have?
20 They said, Well, we don't know.  Every
21 office is a little different.  I said, Is there any
22 paperwork, such as non-compete, anything that I have?
23 They said, Hold on.  What office are you from?
24 Albuquerque.  Okay, hold on.  And it was just quiet.
25 And they said, No, any new hire paperwork

Page 290

1  wanted to touch freight, don't touch freight. It is
2  something basic so if you have a client, you can look
3  and see what they can and can't do.
4      Q. Does it have a schedule on where they
5  worked? When they're scheduled to work, that kind of
6  thing?
7      A. For the week, yeah.
8      Q. It has a weekly schedule?
9      A. That's how you dispatch. So if I have it
10 printed out in front of me, an after-hours saying who
11 are your available drivers, they have the same list
12 I'm looking at. I can tell them, this is is Ryder
13 certified. Send this person. Don't send this
14 person. This person worked on Tuesday, but they also
15 worked all week, and they don't have their ten hours
16 down, so I can track everything.
17     Q. And how was the dispatch list created?
18     A. Myself and Fran. Fran kind of did it --
19 had a generic one, and we modified it as it made more
20 sense to us.
21     Q. So there was an existing one when you
22 started with the company?
23     A. Yes.
24     Q. And then you and Fran modified it over
25 time?

Page 291

1      A. Yes. What makes it easier for you. At a
2  glance, so you can look at it, makes it easier to
3  just look at.
4      Q. Was it a collection -- was it data
5  collected over time at ProDrivers?
6      A. Data?
7      Q. Like the information data, was it collected
8  over time?
9      A. Yeah.
10     Q. And who had access to the dispatch list at
11 ProDrivers?
12     A. Everyone.
13     Q. What do you mean "everyone"?
14     A. Myself, Fran, Mike DeLusque, Tom Snable,
15 after hours, Tennessee, everyone.
16     Q. Did anyone outside of the company have
17 access to the dispatch list?
18     A. No.
19     Q. So just ProDrivers' folks?
20     A. Just ProDrivers.
21     Q. Did ProDrivers treat the dispatch list as
22 confidential?
23     A. No.
24     Q. What do you mean by "No"?
25     A. I could take it home with me. We printed

Page 292

1  things out. We shared it with clients all of the
2  time. They would say, Who's here? I would say, Let
3  me look at my dispatch. No, he worked this place
4  yesterday, so actually he can't run because he
5  doesn't have enough hours. They would say, Who else
6  did that? Oh, they worked with this company
7  yesterday. So clients knew who we worked with, and
8  we printed things out. It was not confidential at
9  all.
10     Q. But did you share it with -- the dispatch
11 list itself with clients?
12     A. With clients, no. They didn't get a
13 physical copy itself.
14     Q. When you printed out the dispatch list to
15 work at home, did you share it with anyone outside of
16 ProDrivers?
17     A. No, nobody would be interested in my job.
18     Q. When you say it's not -- you're saying it
19 is not confidential, because you were allowed to
20 print it?
21     A. Yes.
22     Q. But were you allowed to share it with
23 people outside of ProDrivers?
24     A. I wouldn't share it with anyone outside of
25 ProDrivers, anyway. If they wanted to look at it,

Page 293

1  Fran or Mike never said no, just your eyes only. It
2  was okay. There was nothing like that that was ever
3  expressed. There was nothing in any handbok.
4  Nothing like that when I hired, because I never got a
5  handbook, so there was nothing like that that said,
6  these are the rules and regulations. It is just,
7  again, I didn't get proper training. I got baptism
8  by fire. No handbook, no nothing.
9      Q. Did you ever share it with a competitor of
10 ProDrivers?
11     A. No.
12     Q. Why not?
13     A. Why would I share that with a competitor of
14 ProDrivers?
15     Q. If it is not confidential, why wouldn't you
16 share?
17     A. Because I'm not trying to screw some other
18 company. That is no one else's business.
19     Q. Do you think your supervisors would have
20 been angry had you shared the dispatch list with a
21 competitor of the company?
22     A. Probably.
23     Q. Why would they have probably been mad?
24        MR. STANFORD: Objection. Form and
25 foundation.

Page 298

1  working at RivenRock?
2     A.  Yeah, I guess so.
3     Q.  Did you give this dispatch -- a copy of
4  this dispatch to anyone at RivenRock?
5     A.  No.
6     Q.  What did you do with this e-mail after you
7  left ProDrivers?
8     A.  Everything was deleted.
9     Q.  Do you recall approximately when you
10 deleted this e-mail?
11    A.  I don't.
12    Q.  Would it have been in June of 2016?
13    A.  June, July.
14    Q.  And why would you have deleted it?
15    A.  I don't need it.  Like I said, I have OCD
16 about weird things.  All of my stuff -- I don't save
17 text messages.  End of every day, all my stuff is
18 wiped out.  I delete it and start fresh.
19    Q.  Have you used this dispatch list for your
20 work at RivenRock?
21    A.  The list of these drivers?  No.
22    Q.  Have you used any ProDrivers' dispatch list
23 for your work at RivenRock?
24    A.  No.
25    Q.  Did anyone ask you, before you left

Page 299

1  ProDrivers, to take ProDrivers' information with you
2  when you left?
3     A.  No.  It was never told to be deleted,
4  either.
5     Q.  What do you mean, it was never told to be
6  deleted?
7     A.  No one ever said, Wipe out all your
8  e-mails.  Give me your phone.  Let me take your
9  e-mail off your phone.  I mean, I didn't have a work
10 phone, so no one said, Let me see your phone.  Let me
11 take your company e-mail off.  Let me check all of
12 your stuff.  It was Sayonara.  Take it easy.  That
13 would be proper protocol, I would think, if they were
14 so worried about it.
15    Q.  Was there an employee handbook at
16 EmployBridge while you were there?
17    A.  Never saw one.
18    Q.  Did you ever hear of one existing?
19    A.  Never.
20    Q.  Was there ever any policy at ProDrivers
21 when you were there, about what you could and could
22 not do with the company's information and data?
23    A.  No.
24    Q.  You're not aware of one?
25    A.  I'm not aware of anything.  Like I said,

Page 300

1  Fran took -- I followed Fran's footsteps on some
2  thing, minus the forgery and fraud, I wouldn't do.
3  But as far as sending me dispatch sheets, printing
4  dispatch sheets, anything like that, yeah, we both
5  did it.
6     Q.  Do you know if there was a policy that you
7  were prohibited from taking dispatch lists after your
8  employment with ProDrivers ended?
9     A.  If there was one, it would have been in the
10 handbook, which I never got, so, no, I never knew
11 that.
12    Q.  Did you think it would be -- strike that.
13 I'll give you another document.
14       (Exhibit 16 marked.)
15    Q.  (By Ms. Libeu) Do you have Exhibit 16 in
16 front of you?
17    A.  I do.
18    Q.  What is it?
19    A.  It's another e-mail sent from ProDrivers to
20 myself June 12, 2016, of a dispatch sheet.
21    Q.  The e-mail is sent on June 16th, right?
22    A.  Yes.
23    Q.  And you sent it from your ProDrivers'
24 account to yourself?
25    A.  I did.

Page 301

1     Q.  And attached to the e-mail is a dispatch
2  report for the week ending June 12th; is that right?
3     A.  Yes.
4     Q.  Why did you e-mail this document to
5  yourself?
6     A.  Again, still dispatching.  We're busy, as
7  you can tell.  Every single driver is busy on every
8  single day.  That is probably 200-some dispatches.
9  There are hardly any drivers.  I remember Anna could
10 only work two days.  Every single driver is busy.
11 This shows you we are in our peak.  So, of course, I
12 need -- there are people dropping out.  There are
13 other companies -- a couple of drivers here and there
14 that I could push around, and put them somewhere,
15 because they didn't work.  This clearly shows we're
16 at our peak, so I need to have access to this.
17    Q.  And when you sent things to yourself, you
18 said it was so you could work from home or other
19 places outside of the office?
20    A.  Unfortunately, yes.
21    Q.  Did you usually send yourself things on
22 what day of the week?
23    A.  All days of the week.
24    Q.  Did you ever have any discussion with
25 anyone about sensitivity surrounding ProDrivers'

**Page 302**

```
 1  information?
 2      A.  No.
 3      Q.  So no one, as part of your on-boarding
 4  package, or otherwise, gave you information about
 5  keeping materials a secret at ProDrivers?
 6      A.  I never got an on-boarding packet, and if I
 7  did, I'm sure they would have said something.  But,
 8  again, I followed in Fran's footsteps.  So Fran's
 9  footsteps is, print it out, send it to yourself,
10  whatever you have to do if you are on call, because
11  we can't trust the after-hours team.  It was
12  pointless to even have the team in Tennessee.  They
13  called nonstop.  I even looked over all of the times
14  they called.  They literally called me all days of
15  the week, text, phone, so, yeah.
16      Q.  What did you do with this e-mail, after you
17  left ProDrivers?
18      A.  If it was in my e-mail, I deleted.
19  Anything in my e-mail, I deleted.
20      Q.  I'll show you another document.
21          (Exhibit 17 marked.)
22      Q.  (By Ms. Libeu)  Do you have Exhibit 17 in
23  front of you?
24      A.  I do.
25      Q.  What is it?
```

**Page 303**

```
 1      A.  It's another dispatch sheet.
 2      Q.  Are you sure?
 3      A.  Maybe not.  I'm sorry I'm going off
 4  repetition.  Didn't we talk about this earlier?
 5      Q.  We sort of did.  I think we talked about
 6  the e-mail that's first in the chain.
 7      A.  This looks like a client list -- who is a
 8  prospect, who's not.
 9      Q.  So the first e-mail is from you to Fran
10  Scott on June 8, 2016D.  Do you see that?
11      A.  Yes.
12      Q.  And this was something you e-mailed Fran,
13  with a list of clients that you had visited?
14      A.  Okay.
15      Q.  Is it?  That's my question.
16      A.  Yes.
17      Q.  And then the top of the chain you've --
18  shows you forwarded it to yourself at your Yahoo
19  account, right?
20      A.  Yes.
21      Q.  And that was on June 14, 2016?
22      A.  Right.
23      Q.  Why did you forward this to yourself?
24      A.  This is some new customers.  Like I said, I
25  always have information with me.  Some of these
```

**Page 304**

```
 1  customers are prospects, as you can see.  So if one
 2  of these customers is calling me, I need to have my
 3  paperwork in line.  Some of these are kind of weird,
 4  like, PG Enterprises, but I need to have this
 5  paperwork.  If I need to revert back and fill out an
 6  employee form, or whatever the case, I have names,
 7  and everything I need.  Again, common practice, Fran
 8  has the same stuff on all of our clients.  So if we
 9  need to go somewhere, I can Google something.
10      Q.  What information is contained about clients
11  in this e-mail that is in Exhibit 17?
12      A.  The name -- I can pretty much remember, if
13  you tell me some of these clients, I can tell you,
14  probably, who the manager is there.  My brain is not
15  sharp right now, because it has been awhile.  You
16  could tell me back in the day, Who is at HD Supply,
17  and I could tell you the name.  I could just
18  remember.
19      Q.  But the name of the manager isn't on this
20  e-mail, right?
21      A.  Right.
22      Q.  It's just the name of the company?
23      A.  Right.
24      Q.  So why would you need the name of the
25  companies over the weekend, or whenever you were
```

**Page 305**

```
 1  using it for outside of the office?
 2      A.  If I had to Google someone -- I could
 3  Google Pueblo Fruits, if I needed a number for any
 4  reason.  I can Google it.  I can find out the
 5  address, if I couldn't remember the name.
 6      Q.  Did you ever forward yourself any
 7  information at ProDrivers that you wanted to save for
 8  use at RivenRock, or at another competitor?
 9      A.  No.
10      Q.  Why not?
11      A.  I'm not trying to steal anyone else's
12  business.  I'm trying to live.  I'm trying to provide
13  for myself.  I have bills and stuff, like everyone
14  else.  If ProDrivers isn't going to take care of me,
15  which they hadn't, I'm going to find somewhere else
16  that -- I can revert back to traditional staffing
17  like I've done.  I can go anywhere.  If I want to do
18  transportation again, I could, because, again, I did
19  not sign anything.  Fran made it clear I didn't have
20  any of this stuff.  So anywhere I want to go, I have
21  the knowledge to do it.
22      Q.  The information, or at least some of it at
23  RivenRock wasn't confidential.  Why didn't you take
24  it to use at a competing business?
25          MR. STANFORD:  Objection.  Form.
```