Page 130

1  A. I have not.
2  Q. So you mentioned that you had, before the
3  lawsuit was filed, clients that were Automated
4  Election, Superior Ambulance and DeVore Aviation,
5  correct?
6  A. Yes.
7  Q. Tell me about how Automated Election became
8  a client.
9  A. They actually reached out to me in March.
10  Q. Who's -- who was that?
11  A. Tiffany O'Neill.
12  Q. And what did Ms. O'Neill say to you when
13  she reached out?
14  A. She wanted to know. She was a client of
15  Select in the past, and we -- I knew Tiffany really
16  well. She called and said, Why aren't you there?
17  And then wanted to know what I was doing? And then
18  wanted to set up a lunch and meet and talk about her
19  company.
20  Q. And that was in March?
21  A. March -- yeah, it was in March.
22  Q. How did she know that you had left Select?
23  A. She had called the office to ask for me,
24  and they said I was no longer there.
25  Q. And then she called your cell phone?

Page 131

1  A. She texted me.
2  Q. She texted you?
3  A. Uh-huh.
4  Q. And what did she say in that text?
5  A. She said, What the heck happened? Where
6  are you? And then I texted back, I'm no longer
7  there. And she wanted to know what I was doing. And
8  I told her that we were working on starting this new
9  company. And she said, Let's go to lunch.
10  Q. Have you produced that text message in this
11  case?
12  A. I have.
13  Q. Who did you give it to for production?
14  A. I believe Repps.
15  Q. You gave it directly to him?
16  A. Or e-mailed it to him, or -- yeah, I mean,
17  there's so many documents I submitted.
18  Q. What I'm asking is, you didn't give it to
19  an intermediary, you gave it directly --
20  A. Yeah, yeah --
21  Q. -- to the lawyer?
22  A. Anything asked, I gave to Repps.
23  Q. Okay. And did you end up having lunch with
24  Ms. O'Neill?
25  A. Yes. Shaun Shepherd and myself and

Page 132

1  Tiffany.
2  Q. And where did you have lunch?
3  A. It was at the Flying Star in Corrales.
4  Q. And what did you discuss at that lunch?
5  A. Talked -- first of all, we talked about our
6  families, things like that. And then she talked
7  about an upcoming project that she wanted us to help
8  her with.
9  Q. And what was the project?
10  A. It was an election coming up, and she
11  needed people to assist with that election.
12  Q. Is Automated Election also called Ink
13  Impressions?
14  A. Yes, they are.
15  Q. Same company?
16  A. Sort of. It's -- yeah, it's Automated
17  Elections, and then Ink Impressions.
18  Q. How are they related?
19  A. The Automated Elections portion handles all
20  of the elections. Ink Impressions, they do a lot of
21  paper printing.
22  Q. Are they -- do they have the same parent
23  company, or are they the same company, but just
24  different divisions?
25  A. They're, like, two separate buildings,

Page 133

1  so...
2  Q. Two separate buildings?
3  A. Yeah.
4  Q. You don't know the corporate structure
5  between the two?
6  A. I don't.
7  Q. Was Ink Impressions a client of Select
8  Staffing when --
9  A. They were.
10  Q. -- you were there? And was that a client
11  that you serviced directly?
12  A. Yes, I was one of them who serviced it.
13  Q. And who was your contact at Ink
14  Impressions?
15  A. Tiffany O'Neill.
16  Q. And what about Automated Election Services,
17  was that a Select Staffing client?
18  A. It's kind of the same.
19  Q. Kind of the same?
20  A. Yeah.
21  Q. You thought of them as the same --
22  A. Pretty --
23  Q. -- when you were at Select?
24  A. Pretty much, yeah.
25  Q. Do you think of them the same now when are

**Page 134**

1  you at RivenRock?
2     A.  Yeah.  They are pretty much the same, I
3  mean, there's the election -- yeah, pretty much the
4  same.
5     Q.  Is Ms. O'Neill the contact for both?
6     A.  She is.
7     Q.  When did that lunch meeting take place with
8  Ms. O'Neill?
9     A.  It was some time in March.  I don't recall
10 the exact date, though.
11    Q.  And what did you tell her about the
12 business you were starting?
13    A.  Told her that we were starting RivenRock
14 Staffing, and she asked if we'd be able to assist her
15 with the elections, and we said, yes.
16    Q.  And what elections were those?
17    A.  I don't -- it was some kind of water
18 rights.  I don't remember the exact election.  I know
19 it was something with land rights and water rights.
20    Q.  And when did that election take place?
21    A.  I believe it was June 7th or 4th or
22 3rd.
23    Q.  Some time in June?
24    A.  Very beginning of June, yes.
25    Q.  And were -- did -- was RivenRock able to

**Page 135**

1  help her with that project?
2     A.  We were, yes.
3     Q.  And what type of work did you do for them
4  for that election?
5     A.  So, we had people who would actually go out
6  to the separate election sites and set up the
7  computers.  And that's pretty much it -- the
8  printers, everything, they'd have people -- kind of
9  techie kind of guys who would go and set up
10 computers, printers at these election sites.
11    Q.  Is that similar to the type of staffing
12 services that you provided to Ms. O'Neill when you
13 were at Select?
14    A.  Yes.
15    Q.  And who else was at that lunch meeting,
16 besides you Mr. Shepherd and Ms. O'Neill?
17    A.  There was no one else there.
18    Q.  And at that meeting did you make the
19 arrangements to help her with the June elections?
20    A.  Yeah, we started to make arrangements.
21    Q.  And did you ever finalize a contract or
22 other documents with her?
23    A.  Not at that meeting, but then we did send
24 her, you know, customer service agreements, and --
25 and she did make it known, she was a little concerned

**Page 136**

1  with us being a startup, if we could even fill the
2  whole order.  So she also said, you know, she works
3  closely with Manpower.
4     Q.  Uh-huh.
5     A.  So we wouldn't be the only ones involved.
6     Q.  Who is Manpower?
7     A.  They're another staffing company here in
8  town.
9     Q.  So Manpower and RivenRock --
10    A.  Yes.
11    Q.  -- helped with that election?
12    A.  Uh-huh.
13    Q.  You to have answer audibly.
14    A.  Yes.  I'm sorry.  Yes.
15    Q.  You're fine.  What was the next
16 communication you had with Ms. O'Neill, after that
17 lunch meeting?
18    A.  Just getting the contract signed, getting
19 updates.  She would say, This is how many people I
20 expect for you to provide.  Just updates on the
21 staffing.
22    Q.  And what was the revenue that you took in
23 at RivenRock with Automated Election for that June
24 election cycle that you worked on?
25    A.  The whole revenue for the whole cycle?

**Page 137**

1     Q.  Yes.
2     A.  It wasn't much.  I can't recall the exact
3  number.  I look at so many numbers.
4     Q.  Just a ballpark estimate?
5     A.  Maybe 2,000.
6     Q.  And have you done any other work with
7  Automated Election or Ink Impressions since then?
8     A.  We have.  Then there was the big election
9  in November that we also assisted with the same type
10 of people.
11    Q.  And that was having people come to set up
12 the computers for election sites?
13    A.  Yeah, they'd go out to the election sites
14 and set up the computer equipment.
15    Q.  And what revenue did RivenRock take in for
16 that project?
17    A.  That one, I'd say roughly approximately
18 maybe 3,000 or 4,000.
19    Q.  And that was for the total project?
20    A.  Yes.
21    Q.  Any other projects that you've had with
22 Automated Election?
23    A.  There -- no.  There was that one, and --
24 oh, there was, actually -- recently, there was
25 another small election that I don't even know if that

**Page 138**

1  was what I think it was. It was something on
2  education. And we had about seven people that she
3  asked to return from previous projects to help assist
4  for just about a week.
5     Q. And how much revenue did RivenRock take in
6  for that one?
7     A. I haven't seen the numbers yet, so
8  probably -- it was only for a week. Maybe 500.
9     Q. And when did that election take place?
10    A. It was last week.
11    Q. So very recent project?
12    A. Yeah, it was very recent.
13    Q. Other than those three elections, have you
14 had any other projects for Automated Election or Ink
15 Impressions?
16    A. No.
17    Q. When you met with Ms. O'Neill, either when
18 she called you on the phone or when you met for
19 lunch, did you discuss with her where she was
20 currently getting her staffing needs?
21    A. She said she was with Manpower and Select,
22 but she was not happy with the service she was
23 getting from Select, and was looking to branch out to
24 find someone else.
25    Q. Why was she unhappy with Select.

**Page 139**

1     A. The billing. So, basically, she kept
2  getting anonymous calls from people she never even
3  heard of. So, Tiffany is very anal about her
4  invoicing, and she kept getting calls from random
5  people saying, Your invoices aren't paid, when they
6  were paid.
7        She was just very frustrated with the level
8  of service. She said she wouldn't get calls back.
9  And she said I now have the right to work with whom I
10 want, and I want to work with you.
11    Q. Did you -- she tell you who she was getting
12 the calls -- I know she said "anonymous," but do you
13 know who was calling?
14    A. No.
15    Q. Do you have any idea who was calling?
16    A. I don't.
17    Q. Do you know if Automated Election or Ink
18 Impressions has done business with Select since --
19 since you had that lunch meeting with her?
20    A. I do not.
21    Q. Did you discuss rates with Ms. O'Neill?
22    A. We did.
23    Q. And when -- when was that?
24    A. It was at that lunch meeting.
25    Q. And what did you discuss with her about

**Page 140**

1  rates?
2     A. She actually pulled out a rate sheet and
3  said, This is what I'm charging Manpower. And she's,
4  like, Can you guys meet that rate? And we said We
5  could, and that was that.
6     Q. And it was Manpower's rate sheet?
7     A. Yes.
8     Q. Did you have any discussions with her about
9  what rates she was paying Select?
10    A. She did. They -- she -- they were actually
11 charging her a lot more.
12    Q. A lot more than what?
13    A. Than Manpower was.
14    Q. And that's why she wanted to know if you
15 could beat Manpower's rate?
16    A. If we could match them.
17    Q. If you could match them. Did you?
18    A. Yes, we did.
19    Q. Have you had communications with -- I know
20 you said she initially reached out to you by text,
21 but have you had communications with Ms. O'Neill or
22 anyone else at Automated Election, either by e-mail
23 or text?
24    A. I have.
25    Q. And did you turn over all of those

**Page 141**

1  communications to your lawyer?
2     A. I did.
3     Q. Tell me about Superior Ambulance. How did
4  they come to be a client of RivenRock.
5     A. I -- actually, Amber and I were out on a
6  cold call, and I saw them, and I said, Let's go over
7  to Superior.
8     Q. And who was there besides you and
9  Ms. Fluitt?
10    A. There was Loretta Archuleta, she's the
11 owner. And there's Paul Vigil, he's, I believe,
12 operations manager.
13    Q. Do you know how to spell Vigil?
14    A. V-I-G-I-L.
15    Q. And it was your suggestion that you stop
16 by?
17    A. It was.
18    Q. And where were you and Ms. Fluitt out and
19 about that you were in the area?
20    A. They're out on the west side, so there's a
21 lot -- a lot of businesses out there.
22    Q. Were you visiting a particular business
23 that day?
24    A. We were cold calling, so we were just all
25 over the place.

Catherine Olinger
February 15, 2017

Page 142

1  Q. And you saw the sign for Superior
2  Ambulance?
3  A. Yeah, and I said, I used to work with them
4  at Select. Let's go in there.
5  Q. And what else did you tell Ms. Fluitt about
6  your prior knowledge of Superior Ambulance, before
7  you went in?
8  A. Just that we used to service them, and it's
9  actually a little bit of a story. Nicole Romero had
10 a friend who worked at Superior. And had shared with
11 me -- it's awful -- one of the -- there was a Select
12 person working there who had been recently on the
13 news because she left her baby on top of her car in
14 the car seat, and was driving on the freeway and the
15 baby flew off. So it was all over the news.
16 Q. Was the baby okay?
17 A. I think so. I don't remember. It was
18 horrible. I think the baby was okay. So she told me
19 this story, and how Loretta, like, flew off the roof
20 because the media was at Superior. It was the
21 journalists, the police, and so it was my
22 knowledge -- I didn't believe they were still working
23 with Select.
24 Q. And when did that incident happen with the
25 baby flying off the roof?

Page 143

1  A. The baby -- oh, gosh, maybe March, April, I
2  can't remember exactly.
3  Q. Of 2016?
4  A. Yes.
5  Q. That was after you left?
6  A. It was after I left.
7  Q. Superior Ambulance was a client you
8  serviced when you were --
9  A. It was.
10 Q. -- at Select? And who --
11 A. Yes.
12 Q. Who was the contact you had there when you
13 were at Select?
14 A. Who was -- it was Paul Vigil.
15 Q. And did you know Loretta Archuleta when you
16 were at Select?
17 A. I did. I used to help her with her
18 invoicing.
19 Q. How would you help her with her invoicing?
20 A. She would call and say, This rate isn't
21 right, or This week ending date is off just little,
22 things like that.
23 Q. And how did you -- after the baby incident,
24 how did you come to the understanding that Select was
25 no longer working with Superior Ambulance?

Page 144

1  A. Just from Loretta. I know she was -- did
2  not take to being broadcasted as the employer,
3  lightly. So I saw Superior and I said, Hey, I -- I
4  know they used -- you know, I serviced them. Let's
5  go in there.
6  And so then when I met with Loretta, that
7  was the first thing she said. Well, first of all,
8  she asked why I left Select Staffing. She told me
9  she still currently uses them, but wanted to be
10 perfectly clear on background screening. And then
11 she shared with me her story how the police, the news
12 was at their door saying that Superior was this
13 person's employer, when they were Select's employee.
14 She was just furious about that.
15 And then she said -- I said, well, we offer
16 temporary services, as well. And she said, Well,
17 what's your background screening process? Do you
18 make it perfectly clear that they are you're
19 employee, not mine, because I never want to be in a
20 situation like this again.
21 Q. Did you know about the baby incident before
22 you went to --
23 A. I did.
24 Q. -- visit her? And how did you learn about
25 it?

Page 145

1  A. Nicole, actually, had a friend who worked
2  there, and Nicole shared that story with me, and then
3  I saw it on the news.
4  Q. And when you said that you learned from
5  your -- your understanding from Loretta was that she
6  was no longer using Select, where did you get that
7  understanding?
8  A. No. She still was using Select --
9  Q. She was?
10 A. -- but, you know, she informed me, if I
11 could offer her services, would I make it perfectly
12 clear that the associates are our associates? You
13 know, they work for RivenRock, not Superior, but they
14 are on assignment. And that's where a lot of
15 confusion kept happening. And then our background
16 check, because apparently the girl who was working
17 there had a felony, and she wanted to know what type
18 of screening process we did? What kinds of
19 background vendor we did, and if we could -- if we --
20 if she did decide to use us, if we could make --
21 stress that immensely, that they are our employee,
22 not hers, until if they get hired on.
23 Q. Now, when you decided to go into Superior
24 Ambulance that day with Ms. Fluitt, did you think
25 that Select Staffing was still servicing?

Page 146

1   A. I didn't.
2   Q. And why did you think that?
3   A. Because of the whole felony, baby thing
4   that Nicole made me aware of.
5   Q. You just assumed --
6   A. I assumed.
7   Q. -- that they had terminated the
8   relationship?
9   A. I assumed.
10  Q. And that wasn't correct?
11  A. That was not correct.
12  Q. And it was March or April where -- when you
13  went in?
14  A. I believe so, yes.
15  Q. And can you tell me about the conversation
16  that you had that day. After -- I mean, you told me
17  a little bit about she told you about the baby
18  incident.
19  A. Yes.
20  Q. What else did you discuss?
21  A. She asked about the new company.
22  Q. Uh-huh.
23  A. And if we could help provide services to
24  her? And I told her we could. And then, again, she
25  just stressed, you know, what type of background

Page 147

1   screening, interviews, things like that. And then I
2   kind of handed her over to Amber, because she's
3   the -- the business development manager. And I know
4   she sent out e-mails. I was copied on all of those
5   e-mails about getting the service contract set up,
6   getting -- and then she started sending us orders.
7   Q. Now, did you tell Ms. Archuleta and
8   Mr. Vigil that you were at a new company?
9   A. Yes, I did.
10  Q. And what did you tell them about how the
11  new company was -- came to be?
12  A. I did. I just said -- they asked why I was
13  no longer with Select. And I stated, it just wasn't
14  a company I wanted to work for anymore, and I'm with
15  a new company. I mean, that really was it.
16  Q. And then they started asking about what
17  your background checks were?
18  A. Yeah. Yeah, she just, you know, kept
19  expressing that horror story, and if -- you know,
20  what type of screening we do.
21  Q. Did you discuss rates with them at that
22  meeting?
23  A. I did.
24  Q. And what did you discuss about rates?
25  A. I told her I could give her, I believe, a

Page 148

1   38 percent mark up.
2   Q. And why did you pick that rate?
3   A. That's a good clerical rate.
4   Q. Did you know what rate she had been paying
5   Select Staffing?
6   A. Not offhand.
7   Q. Did you know whether the 30 percent
8   markup -- 38 percent markup was above or below
9   EmployBridge's rate?
10  A. I did not recall.
11  Q. Did you -- what was the -- how did you
12  leave the meeting? Was it you were going to send
13  them a contract?
14  A. Yeah. And she said, Send me the service
15  agreements and -- and that was it. And then after,
16  Amber kind of got all that going. We started
17  servicing them as a client.
18  Q. And how much revenue have you made from
19  Superior Ambulance since RivenRock started servicing
20  them?
21  A. About -- about 6,000.
22  Q. And that's from the first time you serviced
23  them through the present?
24  A. Through present, yes.
25      (Exhibit 63 marked.)

Page 149

1   Q. (By Ms. Libeu) I'll show you a document.
2   Do you have Exhibit 63 in front of you?
3   A. Yes, I do.
4   Q. Have you seen it before?
5   A. I have.
6   Q. What is it?
7   A. It is my declaration.
8   Q. And did you sign this declaration
9   personally?
10  A. I did.
11  Q. And when was that?
12  A. August.
13  Q. Of 2016?
14  A. Yes.
15  Q. And did you sign the declaration under
16  penalty of perjury?
17  A. Yes, I did.
18  Q. And is all of the information in your
19  declaration accurate, to the best of your abilities?
20  A. To the best of my knowledge, yes.
21  Q. So I want you to look at paragraph 15. Do
22  you see there it says, "Two customers of Select
23  Staffing/EmployBridge have decided to do business
24  with RivenRock. Those are Ink Impressions and
25  Superior Ambulance. Ink Impressions contacted me

## Page 278

1  A. Yes.
2  Q. And you were cc'd on it?
3  A. I was.
4  Q. Is this the e-mail you were recalling that
5  Ms. Fluitt cc'd you on -- correspondence with RAC?
6  A. You know what, she -- she copied me on
7  pretty much everything at that point, so it probably
8  is. There might be more. I don't know.
9  Q. Okay. So this is in July of 2016 --
10  A. Okay.
11  Q. -- right? Do you see that?
12  A. I do --
13  Q. Okay.
14  A. -- yeah.
15  Q. And there may or may not have been
16  subsequent communications?
17  A. I don't know. Whatever we had we turned
18  in, I don't know.
19  Q. And you recall having communications with
20  RAC directly, yourself, as well?
21  A. I did, yes. I remember e-mailing Gareth
22  about these positions. He was looking for a
23  bilingual customer service representative.
24  Q. And was Ms. Fluitt on those e-mails?
25  A. Yes. We were -- we --

## Page 279

1  Q. You cc'd each other?
2  A. Yeah.
3  Q. So those e-mails that you had, were they
4  before or after this July 15th e-mail?
5  A. Probably after. Because I was thinking
6  more like August, but July, August.
7  Q. Summer, anyway?
8  A. Something like that.
9  Q. And do you see Ms. Fluitt writes, "Hi,
10  Gareth. It was so great to meet you yesterday.
11  Thank you for meeting with us." Do you see that?
12  A. I do.
13  Q. And does this suggest that Ms. Fluitt met
14  with -- with Mr. Floyd on July 14th?
15  A. Yeah, that's what it looks like.
16  Q. Do you know who -- when she says, "Thank
17  you for meeting with us," do you know who the "us" is
18  that she's referring to?
19  A. I -- I know it wasn't me, because I never
20  went to that location. So it could have been either
21  Tim or Terry.
22  Q. It was probably one of those two?
23  A. Yeah.
24  Q. Do you know how the meeting was set up?
25  A. I don't know.

## Page 280

1  Q. I'll show you another document.
2  (Exhibit 73 marked.)
3  Q. (By Ms. Libeu) Do you have Exhibit 73 in
4  front of you?
5  A. Yeah, yeah, these -- this is the e-mail I
6  think I was talking about. It was in July.
7  Q. And this is the e-mail that you were
8  thinking of that you sent to Mr. Floyd?
9  A. Yeah. He said, Can we set up interviews?
10  I sent him resumes. And then he wrote back, Can we
11  set up interviews on Thursday morning? And then I
12  put, You got it.
13  Q. And is this the e-mail chain that you were
14  thinking of that you thought was in August?
15  A. I believe so, yeah.
16  Q. So it looks like it was July?
17  A. July.
18  Q. And this e-mail, if you compare it to
19  Exhibit 72, was -- appears to have been sent four
20  days after Ms. Fluitt met with Mr. Floyd?
21  A. Yes.
22  Q. And do you see, if you look at the original
23  e-mail that you sent in Exhibit 73 on July 18,
24  2016 --
25  A. Yes.

## Page 281

1  Q. -- do you see Ms. Fluitt and Mr. Miller are
2  copied?
3  A. I do.
4  Q. Why did you cc Ms. Fluitt?
5  A. Because it was her client, and I wanted to
6  keep her updated on filling the order she brought.
7  Q. And why did you cc Mr. Miller?
8  A. Because he was training Amber at the time,
9  so they kind of had to -- had to know what was going
10  on.
11  Q. Was it because Mr. Miller was, at the
12  meeting with Ms. Floyd, that you might have cc'd him?
13  A. He could have been. I -- I honestly don't
14  remember.
15  ==Q. Has RivenRock obtained any business from==
16  ==R-A-C Transport or RAC Transport?==
17  ==A. No. I think we did one warehouse guy, or a==
18  ==driver for like a week, but that was it.==
19  ==Q. That was it. And do you know when those==
20  ==older -- those orders were filled?==
21  ==A. August, July. I -- I know this was kind of==
22  ==frustrating because he never would get back to us.==
23  Q. Did you ever fill the receptionist
24  position?
25  A. We didn't.