## THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**EMPLOYBRIDGE, LLC**, a California Limited
Liability Company, and **EMPLOYMENT
SOLUTIONS MANAGEMENT, INC.**, a Georgia
Corporation,

               Plaintiffs,

     v.

**RIVEN ROCK STAFFING, LLC**, a Nevada
Limited Liability Company, **LARRY SHAUN
SHEPHERD**, an individual, **CATHERINE
OLINGER**, an individual, **TERRY MILLER**, and
individual, **TIMOTHY JACQUEZ**, an individual,
and Does 1 through 25, inclusive,

               Defendants.

Case No. 16-833-WJ/KK

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: NON-CITY OF ALBUQUERQUE CLAIMS

Defendants' Motion for Summary Judgment & Memorandum on Counts I, IV-XII on

Non-City of Albuquerque Claims (Dkt. 105) ("second motion for summary judgment" or "2d

MSJ") is not well-taken.  Because Defendants mostly organize their second motion by customer,

rather than by claims, many of Defendants' arguments are unclear.  However, Defendants

apparently contend that the Court should dismiss all claims against Riven Rock ("RR"), Jacquez,

and Miller other than claims against RR based on Olinger's solicitation of a customer call

Superior Ambulance (for which Defendants lodge no defense).

As set forth below and in EmployBridge's response to Defendants' Motion for Summary

Judgment on City of Albuquerque Contract & Supporting Memorandum (Dkt. 104) ("1st MSJ"),

Defendants' arguments are not sound.  The record contains more than sufficient evidence by

which a factfinder can determine that Defendants violated their restrictive covenants,

misappropriated EmployBridge's trade secrets, tortiously interfered with EmployBridge's

contractual and business relations, and engaged in a civil conspiracy to unlawfully and unfairly

compete against EmployBridge in the Albuquerque staffing market.  Accordingly, this Court should deny Defendants' motion.

I.  **DISPUTED MATERIAL FACTS**

1.    EmployBridge disputes Defendants' UMF No. 5.  It is not undisputed that Miller never had contact with anyone at Fidelitone when he was employed by RR.  Amber Fluitt testified that Miller accompanied her on a call to Fidelitone in June or July 2016.  (Ex. C, Fluitt Dep. 80:1-13.)[1]

2.    EmployBridge disputes Defendants' UMF No. 6.  It is not undisputed that Jacquez never contacted, communicated with, or solicited business from Fidelitone at any time.  Jacquez states that he did extensive work for Fidelitone when he was at ProDrivers.  (Ex. M, Jacquez Dep. 248:23-249:9.)

3.    EmployBridge disputes Defendants' UMF No. 46.  Defendants' assertion is based on inadmissible hearsay evidence.  FED. R. EVID. 802.

4.    EmployBridge disputes Defendants' UMF No. 47.  Defendants' assertion is based on inadmissible hearsay evidence.  FED. R. EVID. 802.

5.    EmployBridge disputes Defendants' UMF No. 48.  Defendants' assertion is based on inadmissible hearsay evidence.  FED. R. EVID. 802.

6.    EmployBridge disputes Defendants' UMF No. 49.  Defendants' assertion is based on inadmissible hearsay evidence.  FED. R. EVID. 802.

7.    EmployBridge disputes Defendants' UMF No. 50.  It is not undisputed that Olinger did nothing to influence Ink Impressions to cease doing business with EmployBridge.  Olinger met with Ink Impressions on a number of occasions, including taking Shaun Shepherd to a lunch meeting with Ink Impressions' owner, Tiffany O'Neill, and made clear that RR was a viable alternative for staffing services.  (Ex. F, Olinger Dep. 130:7-134:15.)

---

[1] Pursuant to D.N.M. LR.-Civ. 10.5, counsel for Plaintiffs has conferred with counsel for Defendants, who has agreed to an exhibit page extension beyond the page limits set forth in D.N.M. LR.-Civ. 10.5.

8.    EmployBridge disputes Defendants' UMF No. 54.  It is not undisputed that Jacquez would never have stolen Plaintiffs' confidential information.  In fact, Jacquez emailed himself numerous files for no apparent business purpose, including highly confidential documents, and was unable to provide any explanation for his actions.  (Ex. M, Jacquez Dep. 273:5-275:20.)

9.    EmployBridge disputes Defendants' UMF No. 56.  Jacquez's employment contract specifically states that his is obligated to return all EmployBridge property following his termination.  (Ex. N (Dep. Ex. 29, p. 2, ¶ 4).)  No one at EmployBridge needed to ask Jacquez to return the company's property for that obligation to be in place.

10.    EmployBridge disputes Defendants' UMF No. 57.  It is misleading to state that EmployBridge did not have a specific restriction on emailing business information to personal accounts.  First, Jacquez's employment agreement states that EmployBridge's information should not be shared.  (Ex. N (Dep. Ex. 29, p. 2, ¶ 3).)  Second, Scott testified that there was no legitimate business reason for EmployBridge employees to email information to their personal accounts.  (Ex. O, Scott Dep. 29:8-13.)

## II.    **ADDITIONAL MATERIAL FACTS**[2]

E.    Shepherd's Employment Agreement states he "will not solicit any customers of Select Staffing for the purpose of offering services that compete with those offered by Select Staffing" and he "shall not compete with Select Staffing by performing the same or substantially the same job duties for a competitor as he/she performed for Select Staffing" within 15 miles of the Select Staffing branch office.  (Ex. B (Dep. Ex. 88), Shepherd Empl. Agrmt. at 7, ¶¶ (c), (d).)

V.    Olinger's Employment agreement states that she "will not influence, or attempt to influence, either directly or indirectly, any Select Staffing … customers … to do business with any subsequent employers of Employee and/or with any competing firm/business in which

---

[2] To relieve the Court from having to refer back to EmployBridge's opposition to Defendants first MSJ, the relevant "Additional Material Facts" from that opposition—namely AMF E, V, W, and X—are reproduced here.  In the hope of avoiding confusion, EmployBridge has retained the lettering used in its first opposition.  The "Additional Material Facts" that EmployBridge believes apply specifically to this opposition begin at letter "AA," below.

employee has any ownership interest."  (Ex. K (Dep. Ex. 74), Olinger Empl. Agrmnt. at p. 10 ¶ (c).)

W.      Shepherd was the person who gave the "green light" to Riven Rock's decision to bid on the City contract.  (Ex. C, Fluitt Dep. 129:20-130:15.)

X.      Riven Rock's bid for the City of Albuquerque account was Shepherd's "vision."  (Ex. E, Miller Dep. 105:25; *see also id.* 107:13-20.)

AA.     Miller accompanied RR employee Amber Fluitt on her sales call to EmpoyBridge's customer Acme Iron & Metal when she was canvassing businesses shortly after Miller joined RR.  (Ex. E, Miller Dep. 165:21-171:2.)

BB.     During their stop at Acme, Miller had an extended interaction with the owner and joked with him about the time Miller had made a sales call when he was with EmployBridge.  (Ex. E, Miller Dep. 169:2-13.)

CC.     Miller testified regarding his presence at the Acme sales meeting with Fluitt and its influence on customers, "[Y]ou know, people see me and they identify the fact that I was with ProDrivers [an EmployBridge brand], and they ask about driver services."  (Ex. E, Miller Dep. 169:16-24.)

DD.     Miller has stated that when he canvassed RAC Transport with Fluitt, the manager "would have seen me walk in with Amber, and I'm sure he recognized me right away."  (Ex. E, Miller Dep. 195:12-196:3.)

EE.     Miller introduced Fluitt to the RAC manager.  (Ex. E, Miller Dep. 196:4-10.)

FF.     Miller testified regarding his presence at the RAC sales meeting with Fluitt and its influence on customers, "So, again, when they see me, and right away they're thinking, Wow, are you guys going to do driving?  Everyone gets excited about that."  (Ex. E, Miller Dep. 197:5-12.)

GG.     The day after Miller and Fluitt visited RAC, Fluitt emailed the RAC manager and thanked him for meeting with "us."  (Ex. C, Fluitt Dep. 61:10-63:25, Ex. L (Dep. Ex. 120).)

HH.    Following Miller and Fluitt's sales call to RAC, Riven Rock obtained an order for driver services from RAC.  (Ex. E, Miller Dep. 198:2-7.)

II.    Miller personally accompanied Fluitt on sales calls to EmployBridge customer Fidelitone.  (Ex. C, Fluitt Dep. 79:23-82:12; Ex. E, Miller Dep. 332:10-19.)

JJ.    Miller personally accompanied Fluitt on sales calls to EmployBridge customer Stock Building Supply.  (Ex. C, Fluitt Dep. 91:15-94:19; Ex. E, Miller Dep. 148:12-151:15.)

KK.    Miller personally accompanied Fluitt on sales calls to EmployBridge customer R&L Carriers.  (Ex. C, Fluitt Dep. 105:13-107:21; Ex. E, Miller Dep. 171:16-174:1.)

LL.    Fluitt reached out to EmployBridge customer LKQ and Roger Madrid that RR soon would be providing transportation services, the exact services that Miller and Jacquez provided to LKQ on behalf of EmployBridge.  (Ex. C, Fluitt Dep. 67:10-77:20, Ex. 121; Ex. E, Miller Dep. 186:4-12; Ex. M, Jacquez Dep. 160:4-162:8.)

MM.    Fluitt emailed Roger Madrid and stated: "we [RR] have Tim Jacquez as part of our team now and he is working on getting the transportation side up and running sooner than later." (Ex. P (Dep. Ex. 121).)

NN.    Jacquez emailed confidential information to his personal email address in June 2016, including lists of EmployBridge's customers, lists of EmployBridge's employee truck drivers, lists of available trucking companies throughout New Mexico, and information related to EmployBridge's benefits.  (Ex. M, Jacquez Dep. 272:15-278:25; Ex. Q (Dep. Ex. 10); Ex. R (Dep. Ex. 11); Ex. S (Dep. Ex. 12); Ex. T (Dep. Ex. 13); Ex. U (Dep. Ex. 14); Ex. V (Dep. Ex. 15); Ex. W (Dep. Ex. 16), Ex. X (Dep. Ex. 33).)

OO.    Under his employment agreement, Miller may not, directly or indirectly, "induce" EmployBridge's customers to patronize any business other than that of EmployBridge, or "canvass, solicit, accept, or service any business" from EmployBridge customers, or "request or advise" customers to withdraw, curtail, or cancel their business with EmployBridge.  (Ex. Y (Dep. Ex. 49), p. 1 ¶ 1.)

PP.      Under his employment agreement, Jacquez may not, directly or indirectly, "induce" EmployBridge's customers to patronize any business other than that of EmployBridge, or "canvass, solicit, accept, or service any business" from EmployBridge customers, or "request or advise" customers to withdraw, curtail, or cancel their business with EmployBridge.  (Ex. N (Dep. Ex. 29), p. 1 ¶ 1.)

QQ.      During RR's 30(b)(6) deposition, RR's corporate representative—Shepherd—could name only eight accounts that RR serviced during its history.  (Ex. I, Shepherd 30(b)(6) Dep. at 114:5-25).

RR.      Of the eight accounts that RR's corporate representative could identify as ones that RR has serviced, five—the City of Albuquerque, Ink Impressions, Lively Distributing, Superior Ambulance, and RAC Transport—are current or now-former EmployBridge clients.  (Dkt. 2-1 (Maydew Dec.) ¶¶ 21-24; Dkt. 27-6 (Suppl. Scott Dec., p. 2 ¶ 6.)

## III.    LEGAL ARGUMENT

### A.      Defendants' Second Motion for Summary Judgment Circumvents the Court's Local Rules and Should Be Denied on that Basis.

Defendants filed two separate motions for summary judgment: the first, Defendants' Motion for Summary Judgment on City of Albuquerque Contract & Supporting Memorandum (Dkt. 104) ("1st MSJ"), seeks summary judgment on the "City of Albuquerque Contract," while the second seeks summary judgment "On Counts I, IV-XII on Non-City of Albuquerque Claims."  This is improper.  "A party should ordinarily submit only one motion for summary judgment which contains all arguments and evidence in support of a judgment in favor of the moving party, so as to avoid a piece-meal approach to a multiple claim suit." *Cole v. Convergys Customer Mgt. Group, Inc.*, 2013 WL 1446556, at *1 (D. Kan. Apr. 9, 2013); *see also Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1021 (S.D. Ohio 2007) ("Parties are generally expected to set forth all their arguments in support of summary judgment in a single dispositive motion; piecemeal litigation at the summary-judgment stage is disfavored.").

Even if multiple motions were proper, Defendants' 48 pages of combined briefing far exceed the 27-page limitation set forth in Local Rule 7.5.  *See* D.N.M.LR-Civ. 7.5 ("The length of a motion ... and supporting brief[ ] must not exceed twenty-seven double-spaced pages."). Courts regularly deny multiple motions for summary judgment on their face.  *See, e.g.*, *New Cingular Wireless PCS, LLC v. Cty. of Bernalillo, N.M.*, 2014 WL 10298031, at *4 (D.N.M. Dec. 2, 2014) (Parker, J.) (summarily denying party's two motions for summary judgment and ordering party to "re-file a single motion, not to exceed 27 pages, on all its claims" within two weeks).

Because Defendants have neither asked for nor received leave to submit multiple summary judgment motions or to exceed the page limits set by this Court's Local Rules, Defendants' 2d MSJ should be denied.

**B.**      **The Breach of Contract Claims Survive Summary Judgment**

This Court should deny Defendants' request for summary judgment on the claims against the individual Defendants for breach of the restrictive covenants in their employment agreements with EmployBridge.

As an initial matter, Defendants' motion pays scant attention to the actual language of the covenants at issue.  For example, Defendants premise much of their motion on an argument that none of them "solicited" EmployBridge clients under an artificially narrow definition of the term "solicit."  (*See, e.g.*, UMF 6 (Jaquez never "solicited business from Fidelitone"), UMF 51 ("Shepherd did nothing to solicit Ink Impressions"), 2d MSJ at 15 ("Miller and Jacquez also deny that they solicited Fidelitone at any time"), *id.* at 17 (Jacquez and Miller "adamantly deny that they solicited business" from Acme Iron & Metal), *id.* at 20 ("The uncontroverted evidence establishes that Shepherd never solicited Ink Impressions to do business with RR."), *id.* at 21 (Olinger's agreement to meet with Ink Impressions to discuss business "did not constitute improper solicitation").)

As discussed below and in EmployBridge's opposition to Defendants' 1st MSJ, Defendants' own admissions provide more than sufficient evidence by which a factfinder can

determine that Defendants unlawfully "solicited" EmployBridge's clients under any definition of the term.  Importantly, however, Defendants' post-employment obligations are not limited to "solicitation."  Shepherd not only may not solicit EmployBridge customers but also may not compete with EmployBridge within a 15-mile radius by performing the same or substantially the same job duties for a competitor as he performed for EmployBridge.  (AMF E.)  Olinger may not directly or indirectly *"influence, or attempt to influence"* EmployBridge customers "to do business with any subsequent employers of [Olinger]."  (AMF V (emphasis added).)  And Miller and Jacquez may not, directly or indirectly, *"induce"* EmployBridge's customers to patronize any business other than that of EmployBridge, or *"canvass, solicit, accept, or service any business"* from EmployBridge customers, or *"request or advise"* customers to withdraw, curtail, or cancel their business with EmployBridge.  (AMF OO & PP (emphasis added).)  Defendants' own admissions establish their violations of these covenants.

    For example, Miller admits that he accompanied RR employee Amber Fluitt (who reported to Jacquez) on her sales call to EmployBridge's customer Acme when she was canvassing businesses shortly after he joined RR.  (AMF AA.)[3]  During their stop at Acme, Miller had an extended interaction with the owner and joked with him about the time Miller had made a sales call when he was with EmployBridge.  (AMF BB.)  Moreover, Miller recognized that his presence at that sales meeting with Fluitt served to influence the customer: "[Y]ou know, people see me and they identify the fact that I was with ProDrivers [an EmployBridge brand], and they ask about driver services."  (AMF CC.)  Courts have found that similar customer

---

[3] Contrary to Defendants' arguments (2d MSJ at 15-19), EmployBridge's claims are not based on hearsay.  As discussed above, Defendants' admissions provide more than sufficient bases to conclude that Defendants violated their restrictive covenants.  The evidence about which Defendants complain in their motion—emails and phone calls that EmployBridge received from its customers following Defendants' offers to undercut EmployBridge's rates—are not being introduced to prove the truth of what is asserted in them.  Rather, they will be introduced to support EmployBridge's claim that it has lost revenue as a result of Defendants' actions.  (Dkt. 2-2, 7/20/16 (Scott Decl.) ¶ 15.)  What is more, the conversations recounted in those communications constitute a party admission, and are admissible because they are not hearsay under Federal Rule of Evidence 801(d)(2).  Following the representations by Fidelitone, Acme, and RAC, EmployBridge was forced to reduce its rates to meet those that were quoted.

contact constitutes solicitation.  *See, e.g.*, *PartyLite Gifts, Inc. v. MacMillan*, 895 F Supp 2d 1213, 1230 (M.D. Fla. 2012) (recognizing that initiating a call or meeting to former customers constitutes solicitation).  Regardless, if such actions are not "canvassing," it's hard to imagine what is.

Similarly, Miller acknowledges that, during the time that he canvassed RAC Transport with Fluitt, the manager "would have seen me walk in with Amber, and I'm sure he recognized me right away."  (AMF DD.)  In fact, Miller provided Fluitt with the introduction that she needed to the RAC manager, and Miller requested a few minutes of his time.  (AMF EE.)  And, again, Miller acknowledges that his presence at RAC had an impact on the customer: "So, again, when they see me, and right away they're thinking, Wow, are you guys going to do driving? Everyone gets excited about that."  (AMF FF.)  Not surprisingly, in Fluitt's email to RAC transport the day after that visit, she thanked the manager for meeting with "us."  (AMF GG.) And, indeed, after this sales call Riven Rock obtained an order for driver services from RAC. (AMF HH.)

Moreover, Miller personally accompanied Fluitt on similar sales calls to EmployBridge customers Fidelitone,[4] Stock Building Supply, and R&L Carriers, all of whom Miller serviced while employed by EmployBridge, and provided her with advice before and after the sales calls. (AMF II, JJ, KK.)  As with the other sales calls, there can be no dispute that Miller's participation in such sales calls was intended to, and did, pique customers' interest in RR's driver

---

[4] Defendants' claim that damages related to Fidelitone were disclosed too late in the litigation to be compensable is without merit.  Fact discovery closed in this case on March 31, 2017. (*See* Dkt. 103). EmployBridge disclosed its damages calculations before the close of discovery, and Defendants' counsel likewise deposed Fran Scott about the calculations and her allegations regarding Fidelitone before the close of discovery.  Moreover, because both Fluitt and Miller testified about their canvassing of Fidelitone at their own depositions, Defendants can hardly argue that they were somehow surprised that Fidelitone is at issue in this case.  If Defendants believe they have grounds to limit Plaintiffs' damages resulting from Defendants' solicitation of Fidelitone, they are certainly free to make that argument at trial or in a pre-trial motion in limine.  Regardless, Defendants' argument about the timing of EmployBridge's damages disclosures is not a proper ground for dismissing EmployBridge's claims on summary judgment-particularly since EmployBridge seeks both equitable relief and damages in this lawsuit.  (*See* Dkt. 23 at 38-40.)

staffing services.  As Miller testified, during his sales call to Stock Building Supply, "He [the owner] goes, 'Oh Wow, are you guys going to be doing drivers?'  And I was like, 'Amber is your contact.  Please direct questions to Amber.  She is the sales rep.  And Amber did mention that it was something we were looking into."  (Ex., E Miller Dep. 162:15-24.)[5]

As explained in EmployBridge's response to Defendants' 1st MSJ, Defendants cannot evade their restrictive covenants by employing a "straw person" (Fluitt) to engage in activities that they cannot do themselves.  *See, e.g., Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *20 (S.D.N.Y. 2008) (employees "cannot escape liability simply because" another employee tended to business on the bound employees' behalf); *Trane U.S., Inc. v. Plazek*, 2011 WL 3880412, at *6 (N.D. Ind. 2011) (finding that defendant violated a TRO when he "identified a business opportunity," then, instead of directly soliciting a customer, "he used another employee of BTS to accomplish the same thing").  Yet the evidence discussed above suggests that Defendants did precisely that.

Although EmployBridge's claims against Olinger and Shepherd are not before this Court, the evidence likewise shows that Olinger and Shepherd violated their covenants with respect to Ink Impressions.  Overlooking the specific terms of the covenants, Defendants argue that Ink Impressions had decided on its own that it wanted to do business with RR, and that O'Neil, Ink Impressions' owner, "herself brought up price rates and whether [RR] could match those …."  (2d MSJ at 21.)  Even if true (which EmployBridge disputes) it is immaterial.  Olinger is

---

[5] Similarly, Fluitt admits that she reached out to EmployBridge customer LKQ (whom Jacquez and Miller both serviced while employed by EmployBridge) and told Jacquez's and Miller's contact there, Roger Madrid, that RR soon would be providing transportation services, the exact services that Miller and Jacquez provided to LKQ on behalf of EmployBridge.  (AMF LL.)  Although Jacquez supervised Fluitt at the time, he denies any responsibility for her solicitation of LKQ but admits that, during her sales call to LKQ, she specifically mentioned Jacquez's role with RR because he was "someone, at the time, that she would report to, so she is going to say who's involved with the company, who's a manager."  (Ex. M, Jacquez Dep. 161:24-162:8.)  Not surprisingly, in a follow-up email to Madrid, on which she copied Jacquez, Fluitt reiterated to Madrid that "we [RR] have Tim Jacquez as part of our team now and he is working on getting the transportation side up and running sooner than later."  (AMF MM.)  As with Miller, a fact finder can (and should) conclude that Jacquez intentionally used Fluitt as a "strawperson" to evade his covenants.

prohibited from "influenc[ing], or attempt[ing] to influence," EmployBridge's customers, "either directly or indirectly."  (AMF V.)  And Shepherd is precluded from "competing" with EmployBridge within a 15-mile radius of the Select Branch Office where he was employed by EmployBridge.  (AMF E.)  By offering RR as a viable competitor and accepting Ink Impressions' business, Shepherd and Olinger breached the terms of their Employment Agreements.[6]  *See Scarbrough v. Liberty Nat. Life Ins. Co.*, 872 So.2d 283, 285 (Fla. 1st DCA 2004) (even though former employee did not initiate the contact, a solicitation of the former employer's customer still occurred where former employee was actively involved by making a comparison for the customer between the benefits and premiums of his former employer and his current employer); *FCE Benefit Adm'rs Inc. v. George Washington Univ.*, 209 F.Supp.2d 232, 239 (D.D.C. 2002) (holding that an insurance agent breached an agreement not to "call upon, solicit, or take away" her former employer's customers, because "[e]ven though she was initially contacted by [the former customer], … she assumed an active role in the [former customer's] decision-making process.")  Accordingly, Defendants' motion for summary judgment on the breach of contract claims should be denied.

###    C.    The Trade Secrets Claims Survive Summary Judgment

This Court should also deny Defendants' request for summary judgment on the trade secret misappropriation claims.

Defendants argue that EmployBridge's Defend Trade Secrets Act ("DTSA") claim must be dismissed because the Act took effect on May 11, 2016, after Shepherd, Olinger, and Miller had already left EmployBridge's employ.  (2d MSJ at 11-12.)  Their argument is based on either

---

[6] In their second motion, Defendants argue that the claims relating to Ink Impressions should be dismissed against Miller and Jacquez because they did not directly participate in the restricted activity.  (2d MSJ at 22.)  To be clear, EmployBridge does not contend that Miller and Jacquez breached their non-solicitation covenants with respect to Ink Impressions (which they did not service while employed by EmployBridge), and EmployBridge does not contend that the damages it incurred from loss of the Ink Impressions business are attributable to Jacquez or Miller individually.  Nevertheless, EmployBridge does seek to hold Miller and Jacquez liable for their participation in the Defendants' overall conspiracy to unfairly compete against EmployBridge.  (*See* Section III.E, *infra*.)

a misrepresentation or a misunderstanding of the Act.  The term "misappropriation," as defined

by the DTSA, includes not only the act of ***acquiring*** trade secrets, but also the ***disclosure and***

***use*** of those trade secrets.  *See* 18 U.S.C. § 1839.  While Shepherd's acquisition of

EmployBridge's trade secrets may have occurred before May 11, 2016, his retention, disclosure,

and use of EmployBridge's trade secrets took place well after the DTSA's enactment, and

appears to have continued even after this lawsuit was filed.  In fact, Shepherd did not return

emails containing EmployBridge's trade secrets (including confidential information about the

City of Albuquerque account) until after this Court entered the Stipulated Preliminary Injunction

on August 24, 2016, more than three months after the effective date of the DTSA.  Accordingly,

Defendants' ongoing violations of the DTSA after its enactment give rise to a claim under that

Act.

 Nearly every court that has addressed this issue agrees with this plain-language

interpretation.  "Congress clearly expressed its intent to apply the DTSA to continuing

misappropriations that began prior to—but continued after—the DTSA's enactment."  *Brand*

*Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. CV 16-2499, 2017 WL

1105648, at *8 (E.D. Pa. Mar. 24, 2017); *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 2016

WL 5391394, at *5-*6 (M.D. Fla. Sept. 27, 2016) (parties may recover for acts of

misappropriation that occur after the DTSA's effective date, even if the initial act of

misappropriation took place before); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.,*

*Inc.*, 2016 WL 5338550, at *6-*7 (S.D.N.Y. Sept. 23, 2016) (same).  Defendants do not get a

free pass simply because their actions violated the DTSA before it was enacted.  Their post-

enactment actions also violated the Act and are therefore actionable.

 Not only did Defendants possess EmployBridge confidential and trade secret

information, the record evidence creates a strong inference that they used it to identify, solicit,

and steal away EmployBridge clients.  During RR's 30(b)(6) deposition, RR's corporate

representative—Shepherd—could name only eight accounts that RR serviced during its history.

(AMF QQ.)  Of those eight accounts, five—the City of Albuquerque, Ink Impressions, Lively

Distributing, Superior Ambulance, and RAC Transport—are current or now-former EmployBridge clients.  (AMF RR.)  In light of the direct competition between Defendants and EmployBridge—which includes providing the same exact services that they provided at EmployBridge to the same exact customers during the same time that they indisputably were in possession of thousands of emails containing confidential information about those very customers—a factfinder can infer that Defendants used EmployBridge's trade secrets to steal clients away and gain an unfair advantage in the marketplace.  Regardless, the failure to return EmployBridge's trade secret information, even after this lawsuit was filed and well after the effective date of the DTSA, is itself an actionable violation of the DTSA.  *See Scientific Games Int'l, Inc. v. Cash*, 2017 WL 542034, at *1-6 (N.D. Ga. Jan. 25, 2017) (enjoining employee from working for competitor where employee had downloaded employer's electronic files prior to resignation, reasoning that employee's failure to return the files violated the DTSA even though there was no evidence that the employee had opened, accessed, read, used, transferred, reviewed, or disclosed any of the files after his resignation).

Jacquez, in particular, has no defense to EmployBridge's DTSA claim because it is undisputed that he emailed confidential documents to his personal email address in June 2016 (i.e., *after* the effective date of the Act) just days before he left EmployBridge and after Miller confirmed that they were likely to be hired by RR.  (AMF NN; Ex. Z (Dep. Ex. 3.)  Incredibly, Defendants argue that Jacquez's actions did not violate the DTSA because there was no company policy prohibiting employees from forwarding company emails to their personal accounts.  (2d MSJ at 12-13.)  This argument, too, misses the mark.

First, the facts belie Jacquez's explanation for his actions.  In the weeks leading up to his resignation, Jacquez emailed himself four types of confidential EmployBridge documents: (1) lists of EmployBridge's customers, (2) lists of EmployBridge's employee truck drivers, (3) lists of available trucking companies throughout New Mexico, and (4) information related to EmployBridge's benefits.  (AMF NN.)  When asked to explain his actions, Jacquez claimed that he was sending these documents to himself so that he could calculate his sales commissions,

which he claims were not being properly paid by EmployBridge. (Ex. M, Jacquez Dep. 272:15-275:20.) But none of those documents, all of which were sent mere weeks or days before Jacquez quit to join RR, have anything to do with commissions or with Jacquez's job duties for EmployBridge. The customer lists Jacquez sent himself include no commission data, but do include some of the customers that Riven Rock has subsequently solicited away from EmployBridge. (*See, e.g*., Ex. R (Dep. Ex. 11); Ex. T (Dep. Ex. 13.) The login information, too, served no discernable purpose related to Jacquez's job in June 2016. (Ex. M, Jacquez Dep. 277:11-278:25; Ex. X (Dep. Ex. 33).) And neither EmployBridge's driver information nor the list of trucking companies contain any information related to commissions.

Second, even if Jacquez had a legitimate reason for emailing the documents to himself (and he didn't), he had no justifiable reason for retaining the documents after quitting EmployBridge. In his Employment Agreement with EmployBridge, Jacquez agreed that "[u]pon request by the Company, and, in any event, upon termination of my employment with the Company for any reason, I shall promptly deliver to the Company all property belonging to the Company in my custody, control or possession, including all Confidential Information." (Ex. N (Dep. Ex. 29, p. 2, ¶ 4.) He did not do so. Indeed, had EmployBridge not filed this suit and obtained a preliminary injunction requiring the return of its property, he would likely still have the documents in his possession and free for use at his new job with RR.

In short, the facts of this case evidence that Jacquez (1) emailed himself EmployBridge documents that contained trade secret information and had no connection to his job duties; (2) he did so just days before he left EmployBridge to work at a competitor, after he had applied to work at RR, and after Miller confirmed that they were likely to be hired by RR; and (3) despite the return of property provision in his Employment Agreement, he did not return the documents upon termination but retained them for months until ordered by this Court to return them. Such evidence precludes summary judgment on the trade secret misappropriation claims.[7]

---

[7] In addition, lack of an explicit policy against emailing oneself confidential information does not give rise to a broad permission to do so. Defendants' argument to the contrary is based on one sentence taken out of context from

**D.     The Tortious Interference Claims Survive Summary Judgment**

Although Defendants do not specifically address the tortious interference claims in their 2d MSJ, they ask this Court to dismiss "all legal claims," including the tortious interference claims (Counts VI-X).  (2d MSJ at 1-2.)  Because Plaintiffs present no argument in support of their request that the tortious interference claim be dismissed, this Court should deny the request on that basis.  Regardless, Defendants' request is without merit for the same reasons that Defendants' request is without merit in their 1st MSJ.  (*See* Response to 1st MSJ, § III.B. (discussing tortious interference claims).)

**E.     The Civil Conspiracy Claim Survives Summary Judgment**

This Court should also deny Defendants' request for summary judgment on the civil conspiracy claim.

Defendants' repeated claim that there is no conspiracy because EmployBridge has yet to adduce direct evidence is a misstatement of EmployBridge's burden.  By their nature, "conspiracies must generally be inferred from indirect evidence."  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C.2002); *accord Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases."); *see also Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (although plaintiff had no direct proof of an agreement between the alleged conspirators, "the sequence of events created a substantial enough possibility of a conspiracy to allow her to proceed to trial, especially given the fact that the noncircumstantial evidence of the conspiracy could only come from adverse witnesses").

The record evidence provides sufficient factual support for the conspiracy EmployBridge alleges.  For example, when discussing the series of events related to RAC Transport,

---

Fran Scott.  (*See* SUF 57.)  When asked whether EmployBridge had formal restrictions on emailing information to a private account, Scott stated: "There's no policy in place."  Defendants are happy to quote that first sentence in isolation.  But Scott went on: "But if you have access to your laptop and your e-mail, there is no reason to e-mail to your personal e-mail."  (Ex. O, Scott Depo. at 29:8-13 (emphasis added).)  When asked to elaborate, Scott stated: "Well, you have access to your e-mail on your cell phone, you have access to your e-mail on your laptop, and if you're taking your laptop home, then you would just access your e-mail, your corporate e-mail from your laptop." *Id*. at 29:15-19. In other words, EmployBridge did not have a formal policy against sending information to private accounts because the practice was completely unnecessary for conducting legitimate business.

Defendants contend that Miller and Fluitt called on the business in July 2016.  (UMF 36.)  RAC was one of Miller's customers when he was employed by EmployBridge.  (*Id.*)  Rather than avoid that conflict, Miller went into RAC with Fluitt but allegedly said it was "her show."  (UMF 37.)  However, in Fluitt's email to RAC transport the day after that visit, she thanked the manager for meeting with "us."  (AMF GG.)  But Miller's attempt to get Fluitt to commit acts he is prohibited from performing points to a conspiracy.  In addition, once Riven Rock received the RAC contract, the account was serviced by Olinger.  (UMF 42.)  These admissions by Defendants and their colleagues point to a conspiracy to interfere with EmployBridge's customers in violation of valid employment agreements and common law.

Similar evidence of the conspiracy is outlined in Defendants' 1st MSJ.  Defendants state that following the City of Albuquerque's request for bid submissions, "Shepherd, Rose and Abtahi, individually and collectively, engaged in several discussions to ascertain whether to accept the City's invitation to submit a bid."  (1st MSJ, UMF 38.)  Then, "[Riven Rock] staff, including Olinger and Shepherd, discussed whether to submit a bid and the team agreed to give it their best shot."  (*Id.*, UMF 39.)  Next, in clear violation of the Preliminary Injunction Order and his post-employment obligations, "Shepherd placed Amber Fluitt in charge of the City bid, and advised her to work with Rose and Will Hall, another employee of RR.  Shepherd generally advised if RR could not take the hard costs, add 4% for corporate allocation, 3% for health care and still obtain one dollar per hour in gross margin, RR could not survive servicing the contract."  (*Id.*, UMF 41.)  In addition, Fluitt testified that Shepherd was the person who gave the green light to Riven Rock's decision to bid on the City contract.  (AMF W.)  And Miller describes the bid as Shepherd's "vision."  (AMF X.)  Miller further describes the decision to bid on the City contract as one that the entire staff of Riven Rock discussed in detail.  (Ex. E, Miller Dep. 105:9-107:20 ("Q. Who was involved in the discussions?  A. The office staff.  So it would be Shaun Shepherd, Catherine Olinger, Amber Fluitt, Tim Jacquez, myself ….").)  These facts, too, constitute an admission of a conspiracy among Defendants to steal EmployBridge's customers in violation of valid employment agreements.

**F.      Defendants' Damages Mitigation Argument Is Without Merit.**

Finally, Defendants assert that even though they improperly contacted EmployBridge's clients and offered to undercut EmployBridge's rates, EmployBridge still cannot seek compensation because it did not mitigate its damages.  (MSJ at 16-19.)  This is absurd.  If EmployBridge had refused to match RR's rates and, instead, had simply allowed RR to take its customers, such inaction would have been a failure to mitigate.  But that's not what happened. EmployBridge mitigated its damages by offering to meet the rate with which RR tried to undercut it.  (Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction, Ex. 2 (Dkt. 2-2), 7/20/16 (Scott Decl.) ¶ 15.)  RR cannot now claim that the rate it offered EmployBridge's customers is facially unreasonable.  Such an argument amounts to an admission that RR was unwilling to perform the work at that rate itself, and merely trying to harm EmployBridge by forcing it to reduce its rates.

Moreover, as EmployBridge explains in its opposition to Defendants' 1st MSJ, questions about the amount of damages to which EmployBridge is entitled have no bearing on whether Defendants are liable to EmployBridge for their solicitations of EmployBridge's customers.  As shown in EmployBridge's Prayer for Relief (Plaintiffs' Amended Complaint for Damages and Injunctive Relief (Dkt. 23) 8/17/2016), Defendants' narrow framing of the case does not accurately reflect EmployBridge's claims or the relief that it seeks, which includes both monetary damages and equitable remedies.  Defendants are not entitled to obtain dismissal of all EmployBridge's claims against them simply by challenging EmployBridge's entitlement to one aspect of the varied relief that EmployBridge's seeks.

## IV.    CONCLUSION

For the reasons set forth above, there are genuine issues of material fact that cannot be resolved through summary judgment.  Accordingly, Defendants' motion should be denied.

DATED: May 30, 2017                                Respectfully submitted,

                                                                       */s/ Daniel P. Hart            /*

                                                   RODEY, DICKASON, SLOAN,
                                                   AKIN & ROBB, P.A.
                                                   tstahl@rodey.com
                                                   201 Third Street NW, Suite 2200
                                                   Albuquerque, New Mexico 87102
                                                   Telephone: (505) 768-7240
                                                   Facsimile:  (505) 768-7395

                                                   SEYFARTH SHAW LLP
                                                   Daniel P. Hart
                                                   1075 Peachtree Street, NE, Suite 2500
                                                   Atlanta, Georgia 30309
                                                   Telephone: (404) 881-5433
                                                   Facsimile: (404)

                                                   SEYFARTH SHAW LLP
                                                   Michael Cross
                                                   400 Capitol Mall
                                                   Suite 2350
                                                   Sacramento, CA 95814-4428
                                                   Telephone: (916) 498-7017
                                                   Facsimile: (916) 288-6330

                                                   *Attorneys for Plaintiffs*
                                                   *EMPLOYBRIDGE, LLC and*
                                                   *EMPLOYMENT SOLUTIONS*
                                                   *MANAGEMENT, INC.*

### CERTIFICATE OF SERVICE

I certify that on May 30, 2017, I filed the foregoing *PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: NON-CITY OF ALBUQUERQUE CLAIMS* and that it was served on Defendants via the Court's CM/ECF electronic filing system to the following counsel of record, as reflected on the Notice of Electronic Filing (NEF):

Christopher M. Moody
Repps D Stanford
Moody & Warner PC
4169 Montgomery Blvd. NE
Albuquerque, NM 87109

moody@nmlaborlaw.com
stanford@nmlaborlaw.com

*/s/ Daniel P. Hart                    /*
***Attorney for Plaintiffs***

39265941v.2